

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

SONTERRA CAPITAL MASTER FUND, LTD., on
behalf of itself and all others similarly situated,

                    Plaintiff,

          - against -

BARCLAYS BANK PLC, COÖPERATIEVE CENTRALE
RAIFFEISEN-BOERENLEENBANK B.A., DEUTSCHE
BANK AG, LLOYDS BANKING GROUP PLC, THE
ROYAL BANK OF SCOTLAND PLC, UBS AG, AND
JOHN DOE NOS. 1-50,

                    Defendants.

Docket No.

# 15 CV 3538

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

JUDGE BRODERICK

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

JURISDICTION AND VENUE .......................................................................... 7

SUBSTANTIVE ALLEGATIONS .................................................................... 14

I.     Background ........................................................................................ 14

II.    Defendants Restrained Trade In, and Intentionally Manipulated the Prices of, Sterling LIBOR-Based Derivatives ...................................................................... 16

    A.    Defendants Made, and Coordinated the Submission of, False Sterling LIBOR Submissions to the BBA ...................................................................... 17

    B.    Defendants Colluded With Inter-Dealer Brokers to Carry Out Their Rigging of Sterling LIBOR and the Prices of Sterling LIBOR-Based Derivatives ............... 21

    C.    Defendants' Persistent Manipulation of Sterling LIBOR Caused Sterling LIBOR and the Prices of Sterling LIBOR-Based Derivatives to Be Artificial Throughout the Entire Class Period........................................................................ 23

    D.    Defendants Made False Bids and Offers in the Sterling Money Market............. 26

    E.    Defendants Engaged in Sham Transactions at Times of Decreased Liquidity to Maximize the Impact of Their Manipulative Conduct ........................................ 29

    F.    Defendants Intentionally Re-Organized Their Sterling LIBOR-Based Derivatives Desks to Facilitate and Encourage Manipulative Conduct.................................... 30

III.    Plaintiff Transacted in Sterling LIBOR-Based Derivatives at Artificial Prices Proximately Caused by Defendants' Manipulative Conduct .......................................... 34

TRADE AND COMMERCE................................................................................ 36

CLASS ACTION ALLEGATIONS .................................................................... 37

EQUITABLE TOLLING AND FRADULENT CONCEALMENT ........................................... 39

CLAIMS FOR RELIEF ...................................................................................... 40

FIRST CLAIM FOR RELIEF ............................................................................ 40

SECOND CLAIM FOR RELIEF ........................................................................ 42

THIRD CLAIM FOR RELIEF ............................................................................ 44

FOURTH CLAIM FOR RELIEF ........................................................................ 45

FIFTH CLAIM FOR RELIEF ............................................................................ 46

SIXTH CLAIM FOR RELIEF ............................................................................ 46

SEVENTH CLAIM FOR RELIEF ...................................................................... 51

EIGHTH CLAIM FOR RELIEF ........................................................................ 52

PRAYER FOR RELIEF ...................................................................................... 53

DEMAND FOR JURY TRIAL ............................................................................ 54

i

Plaintiff Sonterra Capital Master Fund, Ltd., complains upon knowledge as to itself and its acts and upon information and belief as to all other matters, against Defendants (defined in ¶¶ 29-46) as follows:

## INTRODUCTION

1.      This action arises from Defendants' unlawful combination, agreement, and conspiracy to fix and restrain trade in, and the intentional manipulation of, the Sterling London Interbank Offered Rate ("Sterling LIBOR"), and the prices of Sterling LIBOR-based derivatives during the period of at least January 1, 2005 through at least December 31, 2010 ("Class Period"), in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq*. ("CEA"), the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq*., the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 – 1968 ("RICO"), and common law.

2.      LIBOR is the most widely used benchmark interest rate in the world.

3.      Issued on behalf of the British Bankers' Association ("BBA"), LIBOR is intended to represent the cost of borrowing funds in the inter-bank money market, as reflected by the rate of interest offered on deposits, just prior to 11:00 A.M. London time.  During the Class Period, LIBOR was published each day for 10 currencies, including Sterling, across 15 "tenors," *i.e.*, deposit durations, ranging from overnight to twelve months.

4.      LIBOR for each tenor of each currency is based on the submissions of a select group of contributor banks (the "panel").  Each Defendant was a contributing member of the BBA's Sterling LIBOR panel during the Class Period.  Accordingly, each trading day, Sterling LIBOR was calculated based on the Defendants' submissions to the BBA, which were supposed to represent the rate at which each Defendant could borrow Sterling in the inter-bank money market just prior to 11:00 A.M. London time.

5.    Throughout the Class Period Defendants implemented a comprehensive scheme to rig Sterling LIBOR and manipulate the prices of Sterling LIBOR-based derivatives.  Their strategy simultaneously employed multiple anticompetitive means, including *inter alia*:

(a) coordinating the submission of false Sterling LIBOR submissions to the BBA for the purpose of driving the published Sterling LIBOR fix in an artificial direction and/or amount that was not reflective of defendants' true inter-bank borrowing costs;

(b) sharing proprietary information regarding their Sterling LIBOR-based derivatives positions;

(c) making false and "spoof" bids and offers in the Sterling money market for the purpose of manipulating Sterling interest rates to artificial levels;

(d) engaging in sham transactions with co-conspirators for financial derivatives that were priced, benchmarked and/or settled based on Sterling LIBOR; and

(e) timing illegitimate trades in Sterling money market instruments during periods of reduced liquidity so as to maximize the manipulative impact of such trades on Sterling interest rates.

6.    Defendants' common goal in implementing this scheme was simple – to generate hundreds of millions (if not billions) of dollars in illicit profits for themselves and their co-conspirators on their Sterling LIBOR-based derivatives positions.

7.    Defendants' manipulation of Sterling LIBOR and the prices of Sterling LIBOR-based derivatives during the Class Period was intentional, persistent, and knowingly unlawful. Defendants Barclays Bank plc ("Barclays"), Coöperatieve Centrale Raiffeisen-Boerenleebank B.A. ("Rabobank"), Deutsche Bank AG ("Deutsche Bank"), Lloyds Banking Group plc ("Lloyds"), The Royal Bank of Scotland plc ("RBS"), and UBS AG ("UBS") have thus far agreed to historic settlements with government regulators, including the United States Commodity Futures Trading Commission ("CFTC"), United States Department of Justice ("DOJ"), and United Kingdom Financial Conduct Authority ("FCA")[1], collectively paying in

---

[1] The FCA succeeded the Financial Services Authority in 2013.

excess of $7 billion in fines and penalties to resolve charges relating to the restraint of trade and

manipulation of LIBOR, including Sterling LIBOR and the prices of Sterling LIBOR-based

derivatives.

8.      As part of these settlements, Defendants admitted their manipulation of Sterling

LIBOR and the prices of Sterling LIBOR-based derivatives including, *inter alia*:

9.      **Deutsche Bank**.  As part of its deferred prosecution agreement with the DOJ,

Deutsche Bank admitted to manipulating Sterling LIBOR and the prices of Sterling LIBOR-

based derivatives.  Deutsche Bank was a member of the BBA Sterling LIBOR panel during the

Class Period.  Beginning in approximately 2005 and continuing until at least 2010, Deutsche

Bank's Sterling LIBOR submitters frequently made false Sterling LIBOR submissions that

benefited Deutsche Bank's trading positions in derivative products priced based on Sterling

LIBOR.[2]

10.      Deutsche Bank's manipulative conduct originated from within its Global Finance

and Foreign Exchange ("GFFX") business unit, which consisted of two subdivisions (a) "Global

Finance and FX Forwards" ("GFF") and Foreign Exchange ("FX").[3]  However, it was not

confined to a small group of individual traders.  The FCA concluded that Deutsche Bank's

manipulation of Sterling LIBOR "extended to a number of areas within GFFX London including

the MMD [money market derivatives] desk, Pool Trading desk, and FX Forwards desk.  It also

extended to GFFX desks abroad including . . . [in] New York."[4]  In total, the FCA identified at

least 29 individuals involved in the manipulative conduct at Deutsche Bank, including managers,

---

[2] *See* DOJ Deferred Prosecution Agreement and Attachment A Statement of Facts with Deutsche Bank AG at 65-66, ¶¶ 96-97, *USA v. Deutsche Bank AG,* No. 15cr61, Dkt. No. 6 (D. Conn. Apr. 23, 2015) (hereinafter "Deutsche Bank DOJ Statement of Facts").

[3] *See* Deutsche Bank DOJ Statement of Facts at 8.

[4] *See* FCA Final Notice to Deutsche Bank, Reference No. 150018, at 2 (hereinafter "Deutsche Bank FCA Notice");

derivative traders, and submitters in London, Frankfurt, Tokyo and New York.[5]

11.     During this same time period, the CFTC also found that Deutsche Bank "engaged in systemic and pervasive misconduct directed at manipulating critical, international financial benchmark rates," including Sterling LIBOR and "routinely made false reports regarding Sterling LIBOR in attempts to manipulate Sterling LIBOR in order to benefit Deutsche Bank's trading positions."[6]

12.     **UBS**. As part of its non-prosecution agreement with the DOJ, UBS admitted to manipulating Sterling LIBOR and the prices of Sterling LIBOR-based derivatives.  UBS was a member of the BBA Sterling LIBOR panel during the Class Period.  From at least as early as November 2007 through approximately July 2009, UBS's Sterling LIBOR submitters frequently received and accommodated requests from UBS's Sterling derivatives traders to alter UBS's Sterling LIBOR submissions to financially benefit their Sterling LIBOR-based derivatives positions.[7]

13.     The CFTC uncovered at least ninety requests from UBS's Derivatives Traders to "adjust UBS's Sterling LIBOR submissions in a manner that would benefit their derivatives trading positions" between 2007 and 2009.[8]  "The focus of requests, as with other currencies, was greatest when the Derivatives Traders had significant fixings on their swaps positions" as

---

[5] *Id* at 12.

[6] *See* CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions against Deutsche Bank AG, at 32 CFTC Docket No. 15-20 (Apr. 23, 2015) (hereinafter "Deutsche Bank CFTC Order").

[7] *See* DOJ Non-Prosecution Agreement and Appendix A Statement of Facts with UBS AG at 31-33, ¶¶ 77-82 (Dec. 18, 2012) (hereinafter "UBS DOJ Statement of Facts").

[8] *See* CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions against UBS AG and UBS Securities Japan Co., Ltd., at 38 CFTC Docket No. 13-09 (Dec. 19, 2012) (hereinafter "UBS CFTC Order").

UBS's traders manipulated Sterling LIBOR to fix the prices of those Sterling LIBOR-based derivatives for their financial benefit.[9]

14. Understanding the impact that their manipulative conduct would have upon the prices of Sterling LIBOR-based derivatives, "UBS's Sterling Trader-Submitters regularly acknowledged and followed these requests" for false submissions.[10] The FCA also found that "UBS's Trader-Submitters routinely took the positions of its interest rate derivatives traders . . . into account" when making Sterling LIBOR submissions, demonstrating the persistent nature of this manipulative scheme.[11]

15. **Rabobank**. As part of its deferred prosecution agreement with the DOJ, Rabobank admitted to manipulating Sterling LIBOR and the prices of Sterling LIBOR-based derivatives. Rabobank was a member of the BBA Sterling LIBOR panel during the Class Period. From around November 2007 through February 2009, Rabobank's Sterling LIBOR submitters received and accommodated requests from Rabobank's Sterling swaps traders to make false Sterling LIBOR submissions that would manipulate and fix the prices of Sterling LIBOR-based derivatives for their financial benefit.[12]

16. **Barclays**. As part of its non-prosecution agreement with the DOJ, Barclays admitted to manipulating Sterling LIBOR and the prices of Sterling LIBOR-based derivatives. Barclays was a member of the BBA Sterling LIBOR panel during the Class Period. From at least 2005 through at least 2009, Barclays' Sterling LIBOR submitters made false Sterling LIBOR submissions to

---

[9] *Id.*

[10] *Id.*

[11] *See* FCA Final Notice to UBS AG at 2, ¶ 6 (Dec. 19, 2012) (hereinafter "UBS FCA Notice").

[12] *See* DOJ Deferred Prosecution Agreement and Attachment A Statement of Facts with Rabobank at 31-32, ¶¶ 67-68, *USA v. Cooperatieve Centrale Raffeisen-Boerenleenbank BA*, No. 3:13cr200, Dkt. No. 14 (D. Conn. Oct. 29, 2013) (hereinafter "Rabobank DOJ Statement of Facts").

financially benefit Barclays' Sterling LIBOR-based derivatives positions.[13]  The CFTC found that during this time period, Barclays' interest rate swap traders located in New York and London regularly requested that Barclays' LIBOR submitters make false LIBOR submissions to manipulate the daily LIBOR fixing in multiple currencies, including Sterling LIBOR, to financially benefit their LIBOR-based derivatives positons.[14]  Barclays also coordinated Sterling LIBOR submissions with former Barclays' traders, now working for unknown co-conspirator banks, to manipulate Sterling LIBOR for their collective financial benefit.[15]

17.    **Lloyds**.  As part of its deferred prosecution agreement with the DOJ, Lloyds admitted to manipulating Sterling LIBOR and the prices of Sterling LIBOR-based derivatives. Lloyds was a member of the BBA Sterling LIBOR panel during the Class Period.  Between at least as early as 2006 and at least as late as July 2009, Lloyds' Sterling LIBOR submitters made false Sterling LIBOR submissions "intended to benefit trading positions, rather than rates that complied with the definition of LIBOR."  Lloyds further admitted that "[t]he submitters contributed these improper rates in order to benefit their own trading positions or the trading positions of others," including those of unidentified co-conspirators.[16]

18.    Lloyds admitted to conspiring with inter-dealer brokers, intermediaries in the financial markets who arrange transactions between market participants, to coordinate its Sterling LIBOR submissions with unidentified co-conspirators for their collective financial benefit.[17]  The

---

[13] See DOJ Non-Prosecution Agreement and Attachment A Statement of Facts with Barclays Bank PLC at 5 (June 26, 2012) (hereinafter "Barclays DOJ Statement of Facts").

[14] See CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions against Barclays PLC, Barclays Bank PLC and Barclays Capital Inc., at 3 CFTC Docket No. 12-25 (June 27, 2012) (hereinafter "Barclays CFTC Order").

[15] Id.

[16] See DOJ Deferred Prosecution Agreement and Attachment A Statement of Facts with Lloyds (Jul. 28, 2014) at A-6, ¶ 14 (hereinafter "Lloyds DOJ Statement of Facts").

[17] See Lloyds DOJ Statement of Facts at A-10 (discussing request for false Sterling LIBOR submissions with unidentified Broker-1).

FCA also identified instances where Lloyds acted improperly in making Sterling LIBOR submissions based on other traders' requests, in addition to their own trading positions.[18]

19.     **RBS**. As part of its deferred prosecution agreement with the DOJ, RBS admitted to manipulating LIBOR for multiple currencies.[19]  During the Class Period, RBS was a member of the BBA Sterling LIBOR panel.[20]  RBS's Sterling LIBOR-based derivative traders were integral in the bank's strategy to manipulate LIBOR for multiple currencies during the Class Period.  For example, the CFTC found that RBS's Sterling cash traders, served as intermediaries between RBS and UBS to coordinate requests for manipulative LIBOR submissions.[21]

20.     Given the persistent and secretive nature of the Defendants' wrongdoing, Plaintiff believes that further evidentiary support for the claims alleged herein will be unearthed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a), and pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and § 22 of the Commodity Exchange Act, 7 U.S.C. § 25, in addition to § 1964 of RICO, 18 U.S.C. § 1964.

22.     Venue is proper in this District pursuant to, among other statutes, §§ 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 22 and 26, § 1965 of RICO, 18 U.S.C. § 1965, and 28 U.S.C. § 1391(b), (c), and (d).  One or more of the Defendants resided, transacted business, were

---

[18] *See* FCA Final Notice to Lloyds Bank plc and Bank of Scotland plc (Jul. 28, 2014) at 11, ¶ 4.30 (hereinafter "Lloyds FCA Notice").

[19] *See* United States Department of Justice, Criminal Division, Fraud Section and Antitrust Division Deferred Prosecution Agreement and Attachment A statement of Facts with The Royal Bank of Scotland plc, at 8 *USA v. Royal Bank of Scotland*, No. 3:13cr74, Dkt No. 5 (D. Conn. Feb. 6, 2013) (admitting to manipulation of Yen-LIBOR and Swiss franc LIBOR).

[20] *See* Commodity Futures Trading Commission Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions against The Royal Bank of Scotland plc and RBS Securities Japan Limited, CFTC Docket No. 13-14 (February 6, 2013) at 5 (hereinafter "RBS CFTC Order").

[21] *Id.* at 21.

found, or had agents, and a substantial portion of the affected interstate trade and commerce described in this Complaint was carried out in this District.

23.     Each Defendant is subject to personal jurisdiction because it transacted business throughout the United States, including in this District, including by transacting in Sterling LIBOR-based derivatives that are priced, benchmarked, and/or settled based on Sterling LIBOR from within the United States.

24.     Defendants, directly and indirectly, unilaterally and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, specifically through use of electronic messaging and other electronic means of communication transmitted by wire across interstate and international borders in connection with the unlawful acts and practices alleged in this Complaint.

25.     The U.S. courts have jurisdiction over the claims asserted in this Complaint pursuant to § 22 of the CEA, 7 U.S.C. § 25, §1 of the Sherman Antitrust Act, 15 U.S.C. § 1, §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a), § 1964 of RICO, 18 U.S.C. § 1964, and 28 U.S.C. §§ 1331 and 1337, respectively.  Additionally, Sterling LIBOR and Sterling LIBOR-based derivatives contracts are each a commodity that trades in U.S. interstate commerce. Sterling LIBOR is a "commodity" and is the "commodity underlying" Sterling LIBOR-based derivatives contracts, as those terms are defined and used in Section 1a(9) and 22 of the CEA, 7 U.S.C. §§ 1a(9) and 25(a)(1)(D), respectively.  More specifically, Sterling LIBOR is an "excluded commodity" as that term is defined in Section 1a(19), 7 U.S.C. §§ 1a(19) (formerly 7 U.S.C. §1a(13)).  In the CEA, the term "'excluded commodity' means (i) an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure . . . ."

Excluded commodities are subject to all CFTC anti-manipulation rules, including Section 9(a)(2), which criminalizes the dissemination of false market information.

26.     Defendants' restraints of trade, intentional false reporting, manipulation and agreements to fix the price of Sterling LIBOR and manipulation of the prices of Sterling LIBOR-based derivatives had direct, substantial and foreseeable effects in the United States, and on the Sterling LIBOR-based derivatives Plaintiff and members of the Class transacted in during the Class Period.  Defendants, as Sterling LIBOR contributor banks and sophisticated market participants, knew that Sterling LIBOR rates published and compiled by and on behalf of the BBA are disseminated in the U.S., and are used to price, benchmark, and/or settle Sterling LIBOR-based derivatives traded in the United States.  For these reasons, Defendants knew that making false Sterling LIBOR submissions to the BBA as well as other manipulative and collusive conduct in the Sterling LIBOR-based derivatives market, would, and did, have direct, substantial and reasonably foreseeable effects in the United States, including on the prices of Sterling LIBOR-based derivatives contracts transacted in the United States.

27.     Defendants' manipulative conduct, as alleged herein, had a direct, substantial, and reasonably foreseeable effect on United States domestic commerce, and such effects give rise to Plaintiff's claims, within the meaning of the Foreign Trade Antitrust Improvements Act.

## PARTIES

28.     Plaintiff Sonterra Capital Master Fund, Ltd., ("Plaintiff" or "Sonterra") is an investment fund headquartered in New York.  Sonterra engaged in U.S.-based transactions for Sterling LIBOR-based derivatives, including Sterling foreign exchange forwards, during the Class Period at artificial prices proximately caused by Defendants' unlawful manipulation and restraint of trade as alleged herein.  As a consequence of Defendants' manipulative conduct,

9

Sonterra was damaged and suffered legal injury on Sterling foreign exchange forwards transacted during the Class Period.

29.    Defendant Barclays Bank plc is a United Kingdom public limited company headquartered in London.  During the Class Period, Barclays was a member of the BBA Sterling LIBOR panel.  Barclays is a registered swap dealer with the CFTC.

30.    Barclays operates a New York branch ("Barclays Bank plc, New York Branch"), located in this District at 745 Seventh Avenue, New York, New York.  Barclays Bank plc, New York Branch is licensed, supervised, and regulated by the New York State Department of Financial Services ("NYDFS") to do business in this state.

31.    Barclays manipulated Sterling LIBOR and the prices of Sterling LIBOR-based derivatives from within this District during the Class Period.  The CFTC found that Barclays' New York Swaps Desk, which traded interest rate swaps priced, benchmarked, and/or settled based on Sterling LIBOR, manipulated Sterling LIBOR during the Class Period.[22]  For example, a Barclays trader in Singapore sent at least one request for a false Sterling LIBOR to Barclays' traders located in this District, crossing U.S. wires.[23]

32.    Defendant Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a financial services provider with offices worldwide and its main headquarters in the Netherlands.  During the Class Period, Rabobank was a member of the BBA Sterling LIBOR panel.  Rabobank operates a New York branch located in this District at 245 Park Avenue, 37th Floor, New York, NY 10167.

33.    Rabobank manipulated Sterling LIBOR and the prices of Sterling LIBOR based derivatives from within this District during the Class Period.  The CFTC found that during the

---

[22] *See* Barclays CFTC Order at 8.

[23] *Id.* at 8 n. 9.

Class Period, Rabobank's profit-driven, LIBOR manipulation scheme involved traders, managers, and at least one senior manager located in, *inter alia*, Rabobank's New York branch.[24]

34.      Defendant Deutsche Bank AG is a German financial services company headquartered in Frankfurt, Germany.  During the Class Period, Deutsche Bank was a member of the BBA Sterling LIBOR panel.

35.      Deutsche Bank operates a New York branch ("Deutsche Bank AG, New York Branch") located in this District at 60 Wall Street, New York, NY 10005.  Deutsche Bank AG, New York Branch is licensed, supervised, and regulated by the NYDFS to do business in this state.  Deutsche Bank is a registered swap dealer with the CFTC.

36.      Deutsche Bank manipulated Sterling LIBOR and the prices of Sterling LIBOR-based derivatives from within this District during the Class Period.  On April 23, 2015, Deutsche Bank and Deutsche Bank AG, New York Branch paid a $600 million fine to the New York State Department of Financial Services, admitting that between 2005 and 2010, Deutsche Bank AG, New York Branch manipulated LIBOR for several currencies, including Sterling LIBOR.[25]

37.      Defendant Lloyds Banking Group plc is a United Kingdom public limited company headquartered in London.  During the Class Period, Lloyds was a member of the BBA Sterling LIBOR panel.  Lloyds is a registered swap dealer with the CFTC.

38.      Lloyds operates a New York branch ("Lloyds Bank plc, New York Branch") located in this District at 1095 Avenue of the Americas, New York, NY 10036.  Lloyds Bank plc, New York Branch is licensed, supervised, and regulated by the NYDFS to do business in this state.

---

[24] *See* Rabobank CFTC Order at 3.

[25] *See In re Deutsche Bank AG, Deutsche Bank AG, New York Branch,* Consent Order Under New York Banking Law §§ 44 and 44-a (Apr. 23, 2015) (hereinafter "Deutsche Bank NYDFS Consent Order").

39.     Lloyds engaged in Sterling LIBOR-based derivative transactions with counterparties located within the United States during the Class Period, including asset management corporations, mortgage and loan corporations, banks, and other financial institutions.[26]

40.     Defendant The Royal Bank of Scotland plc is a British banking and financial services company headquartered in the United Kingdom.  RBS operates in approximately forty countries and territories around the world, including the United States.  RBS maintains Foreign Representative Office, registered with the New York State Department of Financial Services, in this District at 340 Madison Avenue, New York, New York.  RBS is a registered swap dealer with the CFTC.

41.     RBS operates a Connecticut branch ("The Royal Bank of Scotland plc, Connecticut Branch"), located at 600 Washington Boulevard, Stamford, CT 06901.  The Royal Bank of Scotland plc, Connecticut Branch is licensed, supervised, and regulated by the Connecticut Department of Banking to do business in that state.

42.     During the Class Period, RBS transacted in LIBOR-based derivatives with counterparties located within the United States, including asset management corporations, business corporations, insurance companies, universities, and non-profit organizations.[27]

43.     Defendant UBS AG is a Swiss banking and financial services company headquartered in Zurich and Basel, Switzerland.  UBS provides investment banking, asset management and wealth management services for private, corporate and institutional clients worldwide.  It has operations in over 50 countries, including the United States.

---

[26] *See* Lloyds DOJ Statement of Facts at A18.

[27] *See* RBS DOJ Statement of Facts at 38.

44.     UBS maintains branches in several U.S. states, including Connecticut, Illinois, Florida, and New York, with its U.S. headquarters in New York and Stamford, Connecticut. UBS is registered with the Office of the Comptroller of the Currency, the Connecticut Department of Banking, and the CFTC as a swap dealer. UBS is licensed and supervised by the Board of Governors of the Federal Reserve System.

45.     During the Class Period, UBS's Rates Division and Short Term Interest Rate ("STIR") desk transacted in interest rate derivatives, such as interest rate swaps, whose value depended on LIBOR, including the Sterling LIBOR, through traders located in Connecticut.[28]

46.     John Doe Defendants Nos. 1-50 are other entities or persons, including banks, interdealer brokers, cash brokers, and other co-conspirators whose identities are currently unknown to Plaintiff. The John Doe Defendants participated in, furthered, and/or combined, conspired or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing, and manipulation of Sterling LIBOR and the prices of Sterling LIBOR-based derivatives.

47.     **U.S.-Based Market Activity.** According to the Federal Reserve Bank of New York, Barclays, UBS, RBS, and Deutsche Bank each engaged in over-the-counter interest rate derivatives transactions from within the United States throughout the Class Period. Every three years, the Federal Reserve Bank of New York conducts a survey of the over-the-counter interest rate derivatives and foreign exchange market.[29] This survey measures the "turnover," or volume of transactions, in over-the-counter interest rate and foreign exchange derivatives within the United States. The Federal Reserve Bank of New York survey only includes data from dealers

---

[28] *See* UBS CFTC Order at 8-9.

[29] For the latest survey, *see The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, April 2013*, FEDERAL RESERVE BANK OF NEW YORK (Sept. 5, 2013), http://www.newyorkfed.org/markets/pdf/2013triennialreport.pdf.

located within the United States and transactions that are located within the United States. Dealers located outside of the United States report their figures to the central bank where they are located. Defendants Barclays, UBS, RBS and Deutsche Bank, each participated in the Federal Reserve Bank of New York's survey of foreign exchange and interest rate derivatives dealers throughout the Class Period, indicating that they entered into foreign exchange and interest rate derivatives transactions, including those based on Sterling LIBOR, from within the United States.

48.     During the Class Period, the Sterling foreign exchange and interest rate derivatives market was the fourth largest interest rate derivatives market within the United States, with more than $1.3 trillion in Sterling LIBOR-based derivatives traded during April 2007 alone.[30] In total, almost $100 trillion in Sterling LIBOR-based derivatives traded over-the-counter within the United States during the Class Period.

## SUBSTANTIVE ALLEGATIONS

I.    **Background**

49.     Sterling LIBOR is a benchmark interest rate that is intended to reflect the rate of interest at which banks offer to lend unsecured funds denominated in Pounds Sterling, the official currency of the United Kingdom, to other banks in the inter-bank money market.

50.     Sterling LIBOR is based on interest rate quotes submitted by a select group of 16 contributor panel banks. Each trading day, the contributors are asked to submit the rate of interest at which they could borrow funds, if they were to do so, by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11:00 A.M. London time. Panel banks

---

[30] *See The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, April 2007*, FEDERAL RESERVE BANK OF NEW YORK, Annex II (available at https://web.archive.org/web/20080515211300/http://www.newyorkfed.org/markets/triennial/fx_survey.pdf)

submit quotes for 15 tenors, ranging from overnight to twelve months, which reflect the duration of the loan.

51.     To calculate Sterling LIBOR, Thomson Reuters, as administrator of the LIBOR fixing, ranks the contributor bank quotes for each tenor in order and averages the middle 50%. This average rate becomes the official Sterling LIBOR for that particular tenor and is distributed electronically to the market, including within the United States, through Thomson Reuters and Bloomberg among other financial services platforms.

52.     Throughout the Class Period, Defendants were members of the BBA Sterling LIBOR panel and contributed interest rate quotes that were used to calculate Sterling LIBOR.

53.     According to BBA guidelines in place during the Class Period, Sterling LIBOR and thus the Defendants' Sterling LIBOR submissions, were supposed to be "based on offered inter-bank deposit rates,"[31] representing the cost of borrowing unsecured funds in the Sterling market.[32] Contributor banks were not permitted to consider factors unrelated to their cost of borrowing, *e.g.*, the value of their Sterling LIBOR-based derivatives positions.

54.     Despite this prohibition, Defendants systematically made false Sterling LIBOR submissions to the BBA for the purpose of manipulating and fixing the prices of "Sterling LIBOR-based derivatives," financial instruments that are priced, benchmarked, and/or settled based on Sterling LIBOR, for their financial benefit.

---

[31] *See e.g.*, *The BBA LIBOR Fixing and Definition*, BBA (last visited Sept. 30, 2008) https://web.archive.org/web/20080930203457/http://www.bba.org.uk/bba/jsp/polopoly.jsp?d=225&a=1413&artpage =all.

[32] Deposit rates represent the cost of borrowing funds in the inter-bank market because one way banks borrow money is by issuing certificates of deposit ("CDs"). A CD functions as a short term loan to the bank. Money is deposited for a certain period of time and is returned to the depositor with interest at maturity. *See* Timothy Q. Cook and Robert K. Laroche, *Instruments of the Money Market*, FEDERAL RESERVE BANK OF RICHMOND, 2 (available at https://www.richmondfed.org/publications/research/special_reports/instruments_of_the_money_market/).

55.     There are many different types of Sterling LIBOR-based derivatives, including, *inter alia*, over-the-counter instruments, such as interest rate swaps, forward rate agreements, foreign exchange forwards, cross-currency swaps, overnight index swaps, and tenor basis swaps,[33] as well as exchange-traded futures and options, such as the Sterling currency futures contract traded on the Chicago Mercantile Exchange ("CME")[34] and three-month Sterling futures contracts traded on the LIFFE.[35]

56.     Each Sterling LIBOR-based derivative is priced, benchmarked and/or settled using a pricing formula that incorporates Sterling LIBOR.[36]  Thus, as Sterling LIBOR changes, so does the value of all Sterling LIBOR-based derivatives.

57.     Defendants, as sophisticated Sterling LIBOR-based derivative market participants, understood this direct pricing relationship, and exploited it for their financial benefit throughout the Class Period, manipulating Sterling LIBOR in order to fix the prices of Sterling LIBOR based derivatives at artificial levels.

58.     Defendants' manipulative conduct, as further alleged below, directly impacted the trillions of dollars in Sterling LIBOR-based derivatives contracts that traded within the United States during the Class Period.

## II.     Defendants Restrained Trade In, and Intentionally Manipulated the Prices of, Sterling LIBOR-Based Derivatives

59.     To date, Defendants have entered into settlement agreements with multiple global

---

[33] *See* Rabobank CFTC Order at 6 (explaining that these derivatives, including foreign exchange forwards, are "priced off of" Sterling LIBOR and were traded by Rabobank during the Class Period to generate profit).

[34] *See British Pound Futures Contract Specs*, CME GROUP, http://www.cmegroup.com/trading/fx/g10/british-pound_contract_specifications.html.

[35] *See Three Month Sterling (Short Sterling) Future*, ICE, https://www.theice.com/products/37650330/THREE-MONTH-STERLING-SHORT-STERLING-FUTURE.

[36] For example, the price of the LIFFE three-month Sterling futures contracts is equal to 100 minus three-month Sterling LIBOR.  *See Id.* (displaying pricing formula).

regulatory agencies, including the DOJ, CFTC, and FCA, regarding their intentional manipulation of Sterling LIBOR and the prices of Sterling LIBOR-based derivatives.  While these settlement agreements provide only a snapshot of select instances of Defendants' manipulative conduct, they demonstrate how Defendants coordinated their Sterling LIBOR submissions and manipulative trading practices to fix the prices of Sterling LIBOR-based derivatives for their financial benefit.

### A. Defendants Made, and Coordinated the Submission of, False Sterling LIBOR Submissions to the BBA

60.      During the Class Period, Defendants' derivatives traders frequently used electronic communications, including instant messages and chat rooms, to share information regarding their Sterling LIBOR-based derivatives positions and to request Sterling LIBOR submissions that would manipulate and fix the prices of those derivatives at artificial levels for their financial benefit.

61.      These electronic chats occurred both internally (among Sterling LIBOR-based derivatives traders and Sterling LIBOR submitters within the same bank) as well as externally (among Sterling LIBOR-based derivatives traders and submitters located at different, supposedly competing, Sterling LIBOR contributor banks) including through electronic messages relayed between Defendants by various unidentified inter-dealer brokers.[37]

62.      For example, the CFTC found that "[f]rom at least November 2007 through at least September 2009, UBS's Sterling Derivatives Traders responsible for Sterling LIBOR

---

[37] As demonstrated in Part IIB *infra*, Lloyds admitted to conspiring with at least two different inter-dealer brokers to manipulate Sterling LIBOR and the prices of Sterling LIBOR-based derivatives during the Class Period. *See* Lloyds DOJ Statement of Facts at A9-A10 (identifying two separate instances of collusion with "Broker 1" and "another" unidentified inter-dealer broker).

submissions received at least ninety requests from Derivatives Traders to adjust UBS's Sterling

LIBOR submissions in a manner that would benefit their derivatives trading positions."[38]

63.     The conversation below is one example where a UBS Sterling LIBOR-based

derivatives trader requests a false higher Sterling LIBOR submission to financially benefit his

Sterling LIBOR-based derivatives positons:

**May 27, 2009**:

UBS Sterling LIBOR-Based Derivatives Trader: need these libors to move higher

UBS Sterling LIBOR Submitter: market is calling 6m fix today at 1.485 . . . . I will fix it

at 1.505.[39]

64.     On May 27, 2009, consistent with the UBS Sterling LIBOR-Based Derivative

Traders' request, UBS's six-month Sterling LIBOR submission was 1.505%, artificially higher

than the 1.485% reflected in the inter-bank money market.[40]  UBS's false May 27, 2009 Sterling

LIBOR submission caused Sterling LIBOR to be artificial and fixed the prices of Sterling

LIBOR-based derivatives at artificial levels.

65.     This kind of manipulative conduct occurred frequently during the Class Period.

In fact, the same UBS trader and submitter identified in ¶63 manipulated Sterling LIBOR the

very next day.  This time, UBS's Sterling LIBOR Submitter initiated the conversation, reaching

out to UBS's Sterling LIBOR-Based Derivatives Trader:

**May 28, 2009**:

UBS Sterling LIBOR Submitter: any special libor fixings today?

UBS Sterling LIBOR-Based Derivatives Trader: I would like to see fixings drift higher
again . . . yesterday's came in good."

---

[38] *See* UBS CFTC Order at 38.

[39] UBS DOJ Statement of Facts at 31-32, ¶ 78.

[40] *Id.*

UBS Sterling LIBOR Submitter: ok fix 6m at 1.51[41]

66.    As promised, UBS's six-month Sterling LIBOR submission on May 28, 2008 was

1.51%,[42] artificially higher than reflected in the inter-bank money market.  UBS's false May 28,

2009 Sterling LIBOR submission also caused Sterling LIBOR to be artificial and fixed the prices

of Sterling LIBOR-based derivatives at artificial levels.

67.    UBS's false Sterling LIBOR submissions, and in fact those of all Defendants,

were intended to financially benefit their Sterling LIBOR-based derivative positions and were

unrelated to any legitimate money market transactions.  Below is another example of an

electronic chat, which the DOJ describes as "typical" during the Class Period, where UBS's

Sterling LIBOR submitter disregards the actual offered rate of deposit in the market, instead

making a false Sterling LIBOR submission for UBS's financial benefit:

**June 17, 2009:**

UBS Sterling LIBOR Submitter: Hi libor fixings today?

UBS Sterling LIBOR-Based Derivatives Trader: hmm . . I'm hoping to see a high 3m fix

UBS Sterling LIBOR Submitter: ok will fix at 26.5 but market expects 25[43]

68.    UBS's Sterling LIBOR submitter did, in fact, follow through in accommodating

the trader's request and UBS's June 17, 2009 Sterling LIBOR submission was 1.265%.[44]  UBS's

false June 17, 2009 Sterling LIBOR submission caused Sterling LIBOR to be artificial and fixed

the prices of Sterling LIBOR-based derivatives at artificial levels.

---

[41] UBS DOJ Statement of Facts at 32, ¶ 79.

[42] *Id.*

[43] UBS DOJ Statement of Facts at 32-33, ¶ 82.

[44] *Id.*

69.     This conduct was not limited to UBS.  Other Defendants routinely manipulated Sterling LIBOR by making false submissions that would (and did) financially benefit their Sterling LIBOR-based derivative positions.  Below is a conversation between a Deutsche Bank Sterling LIBOR submitter and Deutsche Bank Sterling Desk Manager planning to manipulate Sterling LIBOR to benefit two "fixings," when Sterling LIBOR-based derivatives are priced, benchmarked and/or settled:

**August 1, 2008:**

Deutsche Bank Sterling LIBOR Submitter: Um, **we've got the two fixings up today, we need a high LIBOR in the ones. Got a yard**[45]...

Deutsche Bank Sterling Desk Manager: Yeah

Deutsche Bank Sterling LIBOR Submitter: . . . **going out so we need high uh high LIBOR in the ones and we'd need a low screen on the threes.**  I've got it at forty base points the LIBOR's coming in at like seventy-eight and I've I've moved our screen to like thirty-eight so I've got to modify that ticket at eleven yeah?[46]

70.     The following short email exchange between a Rabobank Senior Sterling trader and Rabobank's Sterling Desk Manager demonstrates the ease and matter-of-fact way in which the Defendants manipulated Sterling LIBOR during the Class Period:

**November 30, 2007:**

Rabobank Senior Sterling Trader Submitter: (email to desk manager)

Subject: Libors

Need high 3s wnd low 1s

Rabobank Sterling Desk Manager: (email responding to senior trader submitter)

Subject: RE: Libors

Okokthe strate

---

[45] The term "yard" is commonly used among traders to refer to a notional value of $1 billion, *i.e.*, a trader who has 5 yards hold a position with a notional value of $5 billion.

[46] Deutsche Bank CFTC Order at 31 (emphasis in original).

Rabobank Senior Sterling Trader Submitter: (email responding to desk manager)

Subject: RE: Libors

See [Sterling Trader Submitter 3] has to put up with my nagging usually…He is worth his weight in gold[47]

71.     These communications demonstrate how Defendants consistently made false Sterling LIBOR submissions during the Class Period.  Defendants' submissions were not based on any legitimate money market transactions and were made solely to benefit the Defendants' trading positions.   This manipulative conduct rendered Sterling LIBOR and the prices of Sterling LIBOR-based derivatives artificial during the Class Period, causing legal injury to Plaintiff and the Class, who were forced to transact at artificial prices proximately caused by Defendants' manipulative conduct.

**B.  Defendants Colluded With Inter-Dealer Brokers to Carry Out Their Rigging of Sterling LIBOR and the Prices of Sterling LIBOR-Based Derivatives**

72.     Defendants coordinated their Sterling LIBOR submissions with other currently unknown Sterling LIBOR panel banks by using "inter-dealer brokers," *i.e.*, intermediaries that facilitate transactions between dealer banks in markets where there are no centralized exchanges, such as the over-the-counter market for Sterling LIBOR-based derivatives.

73.     Inter-dealer brokers communicate with multiple market participants, including the Defendants, every day.  Given their natural positions as intermediaries, Defendants used inter-dealer brokers to send requests for false Sterling LIBOR submissions to other currently unknown Sterling LIBOR contributor panel banks, coordinating their activity and maximizing the impact of Defendants' manipulative scheme.

---

[47] Rabobank CFTC Order at 36.

74.     For example, below is a conversation between Lloyds' Sterling LIBOR submitter and unidentified Broker 1 during which, Broker 1 counsels Lloyds' Sterling LIBOR submitter on how to maximize the impact of his false Sterling LIBOR submission:

**August 17, 2007**:

Broker 1: I was just thinking, if um, if you went 75 for 3s LIBOR you might get take out of the um, the 8 [submissions used to calculate the fix]. Whereas if you go 70 you'll still be include in the 8 [submissions used to calculate the fix] and you'll get the higher fixing. It seems odd, but that's what I reckon.

Lloyds Submitter-3: I've not no fixings today.  So I can do my LIBORs wherever I fucking want to put them, mate."[48]

75.     In addition to Broker 1, Lloyds admitted that its Sterling LIBOR submitters coordinated their manipulative conduct with at least two different inter-dealer brokers, sending the following message to a different unidentified "Broker 2" explaining the reason behind an artificially higher Sterling LIBOR submission:

**October 5, 2007**:

Lloyds Submitter-3: (message to Broker 2) I put mine higher because I have a little bit of fixing here and there[49]

76.     While the above referenced communications from Lloyds demonstrate that Defendants used inter-dealer brokers to coordinate their manipulation of Sterling LIBOR, they are likely just the tip of the iceberg.  Defendants used inter-dealer brokers to coordinate their manipulation of LIBOR and the prices of LIBOR-based derivatives across multiple currencies during the Class Period.  For example, the communications below are taken from UBS's non-prosecution agreement with the DOJ:

---

[48] Lloyds CFTC Order at 7; Lloyds DOJ Statement of Facts at A9-A10.
[49] Lloyds DOJ Statement of Facts at A10.

**February 25, 2009**:

**In an electronic chat with Trader 1...**

Trader 1: low 1m and 3m . . . we must keep 3m down . . . try for low on all of em

Broker B: ok ill do my best for those today

**Later that day on a recorded phone call with Bank F...**

Broker B: Can I ask you're a small favor?

Submitter F: Yeah

Broker B: Where are you going to set your Libor threes today?

Submitter F: Uh, same, .65.

Broker B: Is there any way you might be able to take it down [one basis point] cause I'm getting a big trade out of it? . . . I'm getting someone to do me a big trade if they said I can help 'em sort of get Libors down a bit today

Submitter F: Yeah, okay.[50]

77.     The UBS example above is instructive as to how the same Defendants in this case used inter-dealer brokers to coordinate their manipulative conduct.  Given that Defendants used inter-deal brokers as a common tactic to manipulate LIBOR for multiple currencies during the Class Period, Plaintiff believes that additional evidence of broker collusion regarding the manipulation of Sterling LIBOR, including the identities of Broker 1 and Broker 2 above, will be revealed given a reasonable opportunity for discovery.

**C. Defendants' Persistent Manipulation of Sterling LIBOR Caused Sterling LIBOR and the Prices of Sterling LIBOR-Based Derivatives to Be Artificial Throughout the Entire Class Period**

78.     Even in the limited sub-set of Defendants' communications released to date, the persistent nature of their manipulative scheme is clear.

---

[50] UBS DOJ Statement of Facts at 21-22.

79.     For example, on September 27, 2007, a UBS manager inquired via email with UBS's Asset and Liability Management group ("ALM"), which was responsible for making LIBOR submissions, why UBS's Sterling LIBOR submissions were particularly high that day. ALM responded that it had just issued a "big forward," *i.e.*, a Sterling LIBOR-based derivative that settles based on where LIBOR fixes on a particular day, and that they were "**trying to keep the fixing high** to increase the first interest payment on that fixing."[51] This conversation indicates a planned manipulation for more than two-months in advance of the next IMM fixing.[52]

80.     In the conversation below, a Lloyds' Sterling LIBOR submitter describes his price-fixing ritual whereby he *always* makes false Sterling LIBOR submissions in preparation for end of the month fixings:

**March 31, 2009**:

Former HBOS Sterling Submitter: [...] I was just going to say, I am receiving on 3s LIBOR today on a couple on – on a bid reset on about 2 and a half yards and I am receiving tomorrow on 5 yards, so on the LIBOR front obviously I don't know if you have got anything contrary to that, but if you haven't the firmer the better please.

Lloyds TSB[53] Sterling Submitter: The higher the better.

Former HBOS Sterling Submitter: Yes please.

Lloyds TSB Sterling Submitter: Oh mate, **I have always got loads of loans going out at the end of the month so I always try and fix it higher**[54]

81.     Throughout the Class Period, traders bragged about their ability to make money by consistently keeping Sterling LIBOR at artificial levels.  For example, in the message below,

---

[51] UBS DOJ Statement of Facts at 32 (emphasis added).

[52] These quarterly International Monetary Market, or "IMM" Dates, occur on the third Wednesday of March, June, September and December of every year.  The September 2007 IMM Date occurred on September 17, 2007, before the message in ¶ 79 was sent, meaning the next fixing was in December.

[53] Defendant Lloyds was formerly known as Lloyds TSB.  After acquiring U.K. banking and insurance company HBOS plc, Lloyds TSB changed its name to Lloyds Banking Group plc in 2009.

[54] Lloyds CFTC Order at 8-9.

a Lloyds' Sterling LIBOR Submitter brags to unidentified "Broker 1" about how his consistently higher Sterling LIBOR submissions were responsible for Lloyds' financial success:

**June 28, 2007**:

Lloyds TSB Sterling Submitter: If I didn't have my LIBOR **slightly higher than I usually did**, we wouldn't even make—if I have my LIBORs where LIBORs are, in 1s, I wouldn't make anything[55]

82.    Sterling LIBOR-based derivative traders and Sterling LIBOR submitters also coordinated their false submissions weeks in advance, gradually manipulating Sterling LIBOR in a particular direction for their financial benefit.  For example, Deutsche Bank's Sterling LIBOR submitter and a Sterling desk manager discuss their plan to manipulate Sterling LIBOR higher over the next few weeks in advance of the September 2010 IMM date:

**August 31, 2010**:

Sterling LIBOR Submitter: [Senior MMD Sterling Trader's] come over, he wants 3s [unintelligible] libor down a tick [unintelligible]

Sterling Desk Manager: No, no, no, no, no.

Sterling LIBOR Submitter: No, he's got a fixing, he said. I said we've got stuff about the 15th of September. We need higher libors, don't we.

Sterling Desk Manager: Yeah

Sterling LIBOR Submitter: But you need it, we need 3s to go to 76 and 77

Sterling Desk Manager: Yeah, I want it higher libor.[56]

83.    At other Defendant banks, management issued a standing order to manipulate Sterling LIBOR.  The CFTC found that UBS's management issued a company policy for its

---

[55] *Id* at 7.

[56] Deutsche Bank CFTC Order at 32.

Sterling LIBOR submitters to solicit requests for submissions from UBS's Sterling LIBOR-based derivatives traders on a *daily* basis:

> Commencing in or around the summer of 2008 and continuing until September 2009, a member of UBS's STIR management also sought to ensure that derivatives trading positions were consistently being taken into account. Senior STIR Manager A instructed the Trader-Submitters who were based in Zurich to consult each morning with the UBS Sterling Derivatives Traders in London to determine their net risk with respect to the derivatives trading positions and to adjust UBS's Sterling LIBOR submissions accordingly to benefit those positions. The Trader-Submitters complied with the instruction and at that point **adjusted their Sterling LIBOR submissions each day** based on information obtained daily from the London-based traders about their net positions tied to Sterling.[57]

84.    Deutsche Bank had a similar company policy in place. The FCA found that while Deutsche Bank's traders did make requests for false submissions on days when they had large fixings, they also "made requests on days they did not have fixings in the hope that Deutsche Bank's submissions would influence other Panel Banks *future* submissions."[58]

85.    These long-term manipulative efforts demonstrate how Defendants consistently made false Sterling LIBOR submissions for their financial benefit throughout the Class Period. This manipulative conduct rendered the prices of Sterling LIBOR-based derivatives artificial throughout the entire Class Period, causing legal injury to Plaintiff and Class members who were forced to transact at artificial prices proximately caused by Defendants' manipulative conduct.

**D. Defendants Made False Bids and Offers in the Sterling Money Market**

86.    Defendants also engaged in a manipulative trading strategy referred to as "forcing LIBOR" at Defendant Lloyds[59] and "pushing cash" at Defendant Deutsche[60] that involved

---

[57] UBS CFTC Order at 39 (emphasis added).

[58] Deutsche Bank FCA Notice at 14 (emphasis added).

[59] Lloyds FCA Notice at 13.

making false "bids" and "offers," prices at which the bank was willing to borrow or lend funds, within the inter-bank money market. Distinct from making false Sterling LIBOR submissions, this conduct involved publishing false pricing information directly to the money market in order to create artificial prices for Sterling LIBOR-based derivatives.

87.     This manipulative trading strategy worked by creating artificial supply and demand for short term Sterling denominated deposits, altering the rates at which banks offered to lend Sterling to each other in the inter-bank money market.

88.     Because Sterling LIBOR is supposed to represent the inter-bank offered rate on Sterling deposits, by manipulating Sterling money market rates through, *inter alia*, placing false bids and offers for Sterling deposits, Defendant manipulated the prices of Sterling LIBOR-based derivatives to artificial levels during the Class Period for their financial benefit.

89.     Lloyds FCA Final Notice demonstrates how Defendants planned and executed one of these coordinated efforts to "force" Sterling LIBOR higher.[61] This coordinated manipulation of Sterling LIBOR involved at least one unidentified inter-dealer broker, "Broker B," and traders from at least one other co-conspirator bank who served as a counterparty to manipulative Sterling LIBOR-based derivatives trades.[62]

90.     The scheme began on August 31, 2006, when Lloyds and Broker B began discussing a plan to enter into a series of forward rate agreements ("FRAs")[63] that were priced

---

[60] Deutsche Bank CFTC Order at 15.

[61] Lloyds FCA Notice at 13.

[62] *Id.*

[63] In a forward rate agreement, the parties agree to pay or receive interest based on some underlying notional amount, *e.g.* $1,000,000, on a certain future date. Typically, one party agrees to pay a fixed rate of interest on the underlying notional amount, *e.g.*, 3%, and receive floating interest rate payments equal to LIBOR, while the other party makes floating interest rate payments based on LIBOR and receives fixed interest rate payments. On the settlement date, the party receiving the greater interest rate payment is paid the difference between the fixed and floating interest rate. For example, if at settlement LIBOR is 3.5%, *i.e.*, 0.5% higher than the agreed upon fixed rate of interest, the party receiving floating rate payments will be paid 0.5% interest on the underlying notional amount.

based on one-month Sterling LIBOR during September 2006.[64]  These were sham transactions,

arranged by Broker B to conceal the nature of Defendants' manipulative scheme.  For example,

in a recorded phone call to Trader F, Broker B explains the need for a complicit counterparty:

> **August 31, 2006**: (phone call to Lloyds Trader F)
>
> Broker B: I'll have [bank] there as well...because that's what you want. You don't want
> the market knowing what you're fucking doing[65]

91.     In accordance with their plan, on September 21, 2006, Lloyds Trader F enters into

a series of forward rate agreements with the counterparty arranged by Broker B.[66]  These FRAs

have a notional value of £10 billion had and a fixed rate of interest equal to 4.925%; they were

due to settle in just four days, on September 25, 2006.[67]

92.     To generate illicit profits from these Sterling LIBOR-based derivatives, Lloyds

Trader F needs to force one-month Sterling LIBOR higher than the fixed 4.925% interest rate

due under the agreements.  To this end, Lloyds Trader F and Broker B immediately implement

the "forcing LIBOR" strategy, coordinating the over-bidding for Sterling deposits in the money

market "to force the LIBOR up over a tick and a half," financially benefiting the FRAs.[68]  As

Lloyds' Trader F explains to Broker B, by over-bidding for Sterling LIBOR deposits, *i.e.*,

artificially increasing demand, Trader F, Broker B, and their unidentified co-conspirators

(referred to as "them" in the conversation below) will artificially raise rates in the inter-bank

money market, forcing Sterling LIBOR higher, an increasing the value of the FRAs:

---

[64] Lloyds FCA Notice at 13.

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] *Id.*

**September 25, 2006**:

Trader F: (to Broker B) I have told them my plan…I want to bid everything, so all LIBOR force up the one month[69]

93.     The plan was successful.  Lloyds bid one-month Sterling higher until 11:11 A.M. on September 25, 2006, when one-month Sterling LIBOR was fixed at 4.9575%.[70]  As a result of this concerted manipulative conduct and artificially higher Sterling LIBOR fix, Lloyds made £266,063 in illicit profits on the £10 billion in FRAs.[71]  This strategy was successfully repeated throughout the Class Period including at least two more times before the end of 2006.[72]

## E. Defendants Engaged in Sham Transactions at Times of Decreased Liquidity to Maximize the Impact of Their Manipulative Conduct

94.     To increase the impact of manipulative trading strategies like "forcing LIBORs" or "pushing cash," Defendants coordinated their bids and offers, focusing on times of the day where the Sterling money market was illiquid, *i.e.*, trading volume was reduced, so their manipulative and anticompetitive conduct would have a greater effect on the market.

95.     Traders at Defendant Lloyds planned their sham Sterling money market transactions at times where the market was illiquid.  This both maximized the impact of their manipulative conduct and reduced the chances that Lloyds would actually have to stand by the bids they were placing in the market and overpay for Sterling deposits.  As one Lloyds Sterling LIBOR-based derivatives trader explains, when it comes to forcing LIBOR, **"you've got to do it when people can't lend"** and therefore the likelihood of Lloyds' bids actually being fulfilled was reduced.[73]

---

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] Lloyds FCA Notice at 13 (emphasis added).

96.     Deutsche Bank employed a similar strategy.  For example, in the conversation below, Deutsche Bank traders discuss the need to coordinate their sham bids and offers in the Euro money market at "times when the cash market is even thinner than normal" to maximize the impact of their manipulative trading strategy:

> **September 7, 2006**: (chat message to Trader-3)
>
> Naturally we can not give cash in size due to bs limits but we can take in cash without restriction. Since DB has a good name in the market, we suhd be able to rise some size. This impact becomes even bigger when we do this in times when the cash market is even thinner than normal (ie. Year end)[74]

97.     Deutsche Bank senior management knew and approved of this manipulative trading strategy.  Following the conversation above, Deutsche Bank Submitter 4 shared the details of this planed manipulative conduct with Deutsche Bank Senior Manager 6 and Deutsche Bank Manager 5, estimating the "total profit possible EUR 2mn."[75]  Despite being informed of the trader/submitter's intent to start "pushing cash," senior management did not discipline, reprimand, or discourage the use of this manipulative trading strategy.

**F.  Defendants Intentionally Re-Organized Their Sterling LIBOR-Based Derivatives Desks to Facilitate and Encourage Manipulative Conduct**

98.     Defendants' manipulation of Sterling LIBOR was not an accident, but the result of a conscious effort by senior management to increase profits by encouraging its LIBOR submitters and LIBOR-based derivatives traders to engage in unlawful conduct.

99.     For example, in 2006 Deutsche Bank merged its Pool Trading and Money Markets Derivatives ("MMD") desks to increase the bank's trading profits by aligning the desks' trading positions across all LIBOR currencies.[76]

---

[74] Deutsche Bank DOJ Statement of Facts at 28.

[75] *Id.*

[76] Deutsche Bank CFTC Order. at 8.

100.    As a result of the merger, Deutsche Bank's MMD derivatives traders sat next to Deutsche Bank's cash traders who were also LIBOR submitters.[77] Deutsche Bank's Global Senior Manager instructed all traders to have open communications across offices, including those in New York, and instilled an expectation that LIBOR-based derivatives traders and LIBOR submitters would communicate routinely about market conditions and trading positons.[78]

101.    In fact, management encouraged Deutsche Banks' employees to manipulate LIBOR for all currencies.  Deutsche Bank Senior Manager-1, who was the head of Deutsche Bank's Global Finance and FX Forwards desk, knew of Deutsche Bank's involvement in the LIBOR manipulation scheme.  Instead of taking corrective action, discouraging activity that he knew was wrong, Senior Manager-1 encouraged at least one trader in his annual performance review to increase his relationship with money market traders "to control the short date [LIBOR] setting with cash and derivatives."[79]

102.    Deutsche Bank used this new organizational structure to promote a corporate culture that focused on manipulating LIBOR for all currencies to generate illicit trading profits. Deutsche Bank's Global Senior Manager and other senior traders, including the London manager of its MMD desks ("London MMD Manager"), had weekly meetings to discuss a manipulative trading strategy based on increasing the "spread," or difference, between the different tenors of LIBOR, by, *inter alia*, making false LIBOR submissions.[80]  The intention of these meetings was to ensure that this trading strategy was well known and utilized across currency desks by Deutsche MMD and Pool Traders.[81]

---

[77] *Id.*

[78] *Id.*

[79] Deutsche Bank DOJ Statement of Facts at 66-67.

[80] *See* Deutsche Bank CFTC Order at 9.

[81] *Id.*

103.    As a result of being indoctrinated with Global Senior Manager's manipulative trading strategy, Deutsche Bank's LIBOR submitters not only accommodated requests for false submissions from LIBOR-based derivatives traders, but also "built this bias" for an increasing spread between tenors, into Deutsche Bank's LIBOR submissions throughout the Class Period.[82] Even in the absence of specific oral or written requests for false submissions from Deutsche Bank traders, Deutsche Bank submitters still consistently made false LIBOR submissions for Deutsche Bank's financial benefit.[83]

104.    The strategy was extremely successful.  Following implementation, Deutsche Bank's MMD desk's revenue increased by almost 400% from €399 million in 2007, to €1.92 billion in 2008, accounting for 14.27% of Deutsche Bank's *total* revenue during that year.[84]  As a result of this astronomical increase in revenue, Deutsche Bank's London MMD Manager personally received a bonus of £90 million in 2008 or around $140 million.[85]

105.    UBS also made similar seating arrangements.  From at least January 2005 through September 2009, derivatives traders on UBS's Short Term Interest Rates or "STIR" desk traded short-term interest rate derivatives and made submissions for all LIBOR currencies, except U.S. Dollar LIBOR and Euro LIBOR.[86]

106.    The STIR desk managed both UBS's interest rate risk and short term cash position, engaging in transactions for interest rate derivatives and cash trading in the money markets for each currency, including Sterling.[87]

---

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *See* Deutsche Bank DOJ Statement of Facts at 22-23.

[86] UBS CFTC Order at 8.

[87] *Id.*

107.    Under UBS's scheme, Sterling LIBOR-based derivatives traders were not just seated next to Sterling LIBOR submitters, they actually made the submissions themselves. By placing Sterling LIBOR derivatives traders (whose compensation was directly based on the performance of their trading books) in charge of determining UBS's Sterling LIBOR submissions, UBS created a direct conflict of interest between the traders' profit motive and their responsibility to submit Sterling LIBOR quotes that reflected UBS's true cost of borrowing.

108.    Rabobank employed a near identical structure. In 2004, Rabobank combined its money markets desks, which were responsible for cash trading and funding the bank, with its short-term interest rate derivatives desk, which traded derivatives that were priced, benchmarked, and/or settled based on Sterling LIBOR.[88] Rabobank then assigned responsibility for making the bank's Sterling LIBOR submissions to the very traders whose positions, including those in foreign exchange forwards, were valued based on Sterling LIBOR.[89] As a result, those traders made false Sterling LIBOR submissions to financially benefit those trading positions.[90]

109.    Like at Deutsche Bank, Rabobank's Senior Manager, who was the bank's representative to the BBA, expected LIBOR-based derivative traders and submitters across all currencies, including Sterling LIBOR, to communicate about market conditions and individual trading conditions.[91] Rabobank's Senior Manager openly discussed trading positions with LIBOR-based derivative traders and submitters using Bloomberg Instant Messages and email, encouraging Rabobank employees in different offices to share information about preferred LIBOR rates that would financially benefit their positons.[92]

---

[88] *See* Rabobank CFTC Order at 6.

[89] *Id.* at 2.

[90] *Id.* at 6.

[91] *Id.*

[92] *Id.*

110.    In October 2006, RBS's senior management also reorganized its trading desks so that derivatives traders and money market traders, some of whom were also LIBOR submitters, would share the same physical location within the firm.[93]   The co-location plan, known as the Short-Term Markets Desk ("STM"), was expressly intended to encourage derivatives and money market traders to share market information that could impact trading and funding decisions.[94]

111.    This new seating arrangement amplified the preexisting conflict of interest between the profit motive of LIBOR-based derivatives traders, whose compensation was directly based on the performance of their trading book, and the responsibility of LIBOR submitters who, according to BBA guidelines, were required to submit RBS's true cost of borrowing in the inter-bank market without any reference to the bank's LIBOR-based derivatives positions.[95]

112.    RBS's LIBOR-based derivatives traders quickly took advantage of this new arrangement, not only sharing their view of market conditions, but also telling RBS's primary LIBOR submitter what their derivatives positions were and encouraging him to make LIBOR submissions that would make those positions more profitable.[96]

## III.    Plaintiff Transacted in Sterling LIBOR-Based Derivatives at Artificial Prices Proximately Caused by Defendants' Manipulative Conduct

113.    During the Class Period, Plaintiff Sonterra engaged in U.S.-based transactions of Sterling LIBOR-based derivatives, including Sterling foreign exchange forwards, at artificial prices proximately caused by Defendants' manipulative conduct.

114.    Sterling foreign exchange forwards are priced based on Sterling LIBOR.  A foreign exchange forward is an agreement to buy or sell a certain amount of one currency, *e.g.*,

---

[93] RBS CFTC Order at 6.

[94] *Id.*

[95] *Id.*

[96] *Id.*

Sterling, in terms of another, *e.g.*, U.S. Dollars, on some future date.  The cost of buying or selling Sterling under a foreign exchange forward is determined using a formula that incorporates Sterling LIBOR.  The calculation involves taking the "spot price" of Sterling for immediate delivery, and adjusting it to account for the "cost of carry," *i.e.*, the amount of interest paid or received on Sterling deposits, for the duration of the agreement.  Sterling LIBOR, the benchmark rate for Sterling deposits, is used in this formula to calculate the cost of carrying Sterling over the duration of the foreign exchange forward.  As a result, a manipulation of Sterling LIBOR, renders the cost of buying or selling Sterling under a foreign exchange forward artificial.

115.    The relationship between Sterling LIBOR and the price at which Sterling is bought and sold under a Sterling foreign exchange forward is a fact acknowledged by the CFTC, which included the manipulation of Sterling foreign exchange forwards in Defendant Rabobank's $475 million LIBOR manipulation settlement.[97]  It is also supported by Defendants' conduct.  For example, Defendant Deutsche Bank specifically involved its "FX" or foreign exchange forwards desk, which traded, *inter alia*, Sterling foreign exchange forwards, in the Sterling LIBOR manipulation, demonstrating the direct link between Sterling LIBOR and the prices of Sterling foreign exchange forwards.[98]

116.    Throughout the Class Period, Defendants engaged in a long-term, persistent manipulation of Sterling LIBOR for their financial benefit.  The CFTC, DOJ, and FCA all found that this manipulative conduct involved making false Sterling LIBOR submissions on a near-daily basis.  Defendants also engaged in a coordinated price fixing scheme in the Sterling money

---

[97] *See* Rabobank CFTC Order at 6 (listing Sterling foreign exchange forwards as being priced off of Sterling LIBOR).

[98] *See* Deutsche Bank FCA Notice at 2.

market, "pushing cash" or "forcing LIBOR" by, *inter alia*, submitting false bids and offers for Sterling money market interests, to manipulate inter-bank deposit rates and Sterling LIBOR.  By continuously making false Sterling LIBOR submissions and engaging in manipulative trading conduct, Defendants caused the prices of Sterling LIBOR-based derivatives, including Sterling foreign exchange forwards to be artificial throughout the Class Period.

117.    As a result, Sonterra engaged in transactions for Sterling foreign exchange forwards at artificial prices that were directly and proximately caused by Defendants' manipulative conduct, causing Sonterra to suffer legal injury on its Class Period transactions.

## TRADE AND COMMERCE

118.    Beginning in at least January 1, 2005, and continuing until at least December 31, 2010, Defendants engaged in a continuing contract, combination or conspiracies in restraint of trade in violation of the Sherman Act.

119.    During the Class Period, Defendants sold substantial quantities of Sterling LIBOR-based derivatives in a continuous and uninterrupted flow in interstate commerce to customers located in states other than the states in which Defendants produced Sterling LIBOR-based derivatives.

120.    The Defendants' business activities that are subject to this Complaint were within the flow of and substantially affected interstate trade and commerce.

121.    During the Class Period, the Defendants' conduct and their co-conspirators conduct occurred in, affected, and foreseeably restrained interstate commerce of the United States.

## CLASS ACTION ALLEGATIONS

122. Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on its own behalf and as representative of the following Class:[99]

> All persons or entities that engaged in U.S.-based transactions in financial instruments that were priced, benchmarked, and/or settled based on Sterling LIBOR at any time from at least January 1, 2005, through at least December 31, 2010 (the "Class").
>
> Excluded from the Class are Defendants and their employees, agents, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this complaint, and the United States Government.

123. The Class is so numerous that individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of geographically dispersed Class members transacted in Sterling LIBOR-based derivatives worth trillions of dollars during the Class Period.

124. Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

125. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is an adequate representative of the Class and has no interest which is adverse to the interests of absent Class members. Plaintiff has retained counsel competent and experienced in class action litigation, including commodities manipulation and antitrust litigation.

[99] Plaintiff has defined the Class based on currently available information and hereby reserves the right to amend the definition of the Class, including, without limitation, membership criteria and the Class Period.

126.    Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class. These common questions of law and fact include, without limitation:

    a.   Whether Defendants and their co-conspirators engaged in a combination or conspiracies to manipulate Sterling LIBOR and the prices of Sterling LIBOR-based derivatives in violation of the Sherman Act;

    b.   the identity of the participants in the conspiracies.

    c.   the duration of the conspiracies;

    d.   the character and nature of the acts performed by the Defendants in furtherance of their conspiracies;

    e.   whether Defendants unlawful conduct caused injury to the business and property of Plaintiff and the Class;

    f.   whether Defendants were unjustly enriched at the expense of Plaintiff and the Class;

    g.   whether Defendants unlawful acts violate RICO;

    h.   whether Defendants' unlawful conduct caused cognizable legal injury under the Commodity Exchange Act;

    i.   the appropriate measure of damages sustained by Plaintiff and Class members.

127.    A class action is superior to other methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Treatment as a class will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many Class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual

members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for the Defendants.

128. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

129. The applicable statute of limitations relating to the claims for relief alleged in ¶¶ 133 - 190 herein were tolled because of fraudulent concealment involving both active acts of concealment by Defendants and inherently self-concealing conduct.

130. Defendants' affirmative acts of concealment used to hide their violations of law from Plaintiff and the Class include, *inter alia*: (a) knowingly submitting (or causing to be submitted) Sterling LIBOR quotes that were false, misleading, or inaccurate because they were based in whole or in part on impermissible and illegitimate factors, such as which rate would financially benefit Defendants' Sterling LIBOR-based derivatives positions and/or the Sterling LIBOR-based derivatives positions of their co-conspirators, and representing that these submissions were a reliable and truthful assessment of borrowing costs in the inter-bank money market; (b) "spoofing" the Sterling money market by posting false bid and offers for Sterling deposits that were intended to manipulate the prices of Sterling LIBOR-based derivatives to artificial levels; (c) "forcing LIBOR" or "pushing cash" by overbuying and/or overselling money market instruments to create artificial supply and demand.

131. Many, if not all, of these affirmative acts of concealment were also inherently self-concealing. Defendants engaged in multiple forms of price fixing, which are inherently self-

concealing and could not be detected by Plaintiff or other members of the Class.[100]  The secret

nature of Defendants' conspiracy - which relied on non-public methods of communication,

including private instant messages, to conceal their agreements to manipulate Sterling LIBOR

and the prices of Sterling LIBOR-based derivatives -prevented Plaintiff from uncovering their

unlawful conduct.[101]

132.    As a result, Plaintiff and the Class had no knowledge of Defendants' unlawful and

self-concealing manipulative acts and could not have discovered same by exercise of due

diligence prior to the time when there were public disclosures reporting the manipulation of

Sterling LIBOR and the prices of Sterling LIBOR-based derivatives.  Plaintiff thus asserts the

tolling of the applicable statutes of limitations affecting the rights of the claims for relief asserted

by Plaintiff.  Defendants are also equitably estopped from asserting that any otherwise applicable

limitations period has run.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Conspiracy to Restrain Trade in Violation of § 1 of the Sherman Act)

### (Coordinated Submission of False Sterling LIBOR Submissions to the BBA)

### (Against all Defendants)

133.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though

fully set forth herein.

---

[100] *See In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*, 00 CIV 7804 (LMM), 2004 U.S. Dist. LEXIS 3892, at *15 (S.D.N.Y. Mar. 12, 2004) (recognizing that bid-rigging and price-fixing conspiracies are inherently self-concealing) (citing *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1084 (2d Cir. 1988).

[101] *See e.g., In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 514 (S.D.N.Y. 2003) ("[a]mong the principal allegations against Defendants are assertions that they reported false trade data to entities that collect that information for public dissemination. . . Such activities are inherently self-concealing").

134.   Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

135.   During the Class Period, Defendants entered into a series of agreements designed to create profit or limit liabilities amongst themselves by coordinating the manipulation of Sterling LIBOR and the prices of Sterling LIBOR-based derivatives, by conspiring to, *inter alia*, make false submissions to the BBA designed to artificially suppress, inflate, maintain, or otherwise alter Sterling LIBOR.

136.   This conspiracy to manipulate and fix the prices of Sterling LIBOR caused injury to both Plaintiff and members of the Class because they were deprived of the benefit of a legitimate and accurate Sterling LIBOR that reflected actual market conditions.  Plaintiff and members of the Class also were deprived of the ability to accurately price Sterling LIBOR-based derivatives entered into during the Class Period and to accurately determine the settlement value of Sterling foreign exchange forwards and other Sterling LIBOR-based derivatives by reference to an accurate Sterling LIBOR.  Plaintiff and members of the Class thus received, during the term of their transactions and upon settlement, less in value than they would have received absent Defendants' conspiracy and overt acts taken in furtherance thereof.

137.   The conspiracy is a *per se* violation of § 1 of the Sherman Act.  Alternatively, the conspiracy resulted in substantial anticompetitive effects in the over-the-counter and exchange traded Sterling LIBOR-based derivatives market.  There is no legitimate business justification for, or pro-competitive benefits caused by, Defendants' conspiracy and overt acts taken in furtherance thereof.  Any ostensible pro-competitive benefits are pretextual or could have been achieved by less restrictive means.

138.     As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

139.     Plaintiff and members of the Class seek treble damages for Defendants' violations of §1 of the Sherman Act under §4 of the Clayton Act.

140.     Plaintiff and members of the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## SECOND CLAIM FOR RELIEF

### (For Price Fixing In Violation of § 1 of the Sherman Act)

### (Non-Rate-Setting Collusion)

### (Making False Bids and Offers, Engaging in Sham Transactions, and Coordinating Manipulative Trading of Sterling LIBOR-Based Derivatives)

### (Against All Defendants)

141.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

142.     Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

143.     During the Class Period, Defendants entered into a series of agreements designed to create profit or limit liabilities amongst themselves by coordinating the manipulation of Sterling LIBOR and the prices of Sterling LIBOR-based derivatives, by conspiring to, *inter alia*: (a) make false bids and offers for Sterling money market instruments; (b) arrange for sham transactions between co-conspirators; and (c) employ manipulative trading strategies, including intentionally trading when the Sterling money market was illiquid, designed to artificially

suppress, inflate, maintain, or otherwise alter Sterling LIBOR and the prices of Sterling LIBOR-based derivatives.

144.    This conspiracy to manipulate and fix the prices of Sterling LIBOR-based derivatives caused injury to both Plaintiff and members of the Class because it destroyed the legitimizing price discovery function of the Sterling money market and deprived them of the benefit of a legitimate and accurate Sterling LIBOR that reflected actual money market conditions.  As a result, Plaintiff and members of the Class were deprived of the ability to accurately price Sterling LIBOR-based derivatives entered into during the Class Period and to accurately determine the settlement value of Sterling foreign exchange forwards and other Sterling LIBOR-based derivatives.  Plaintiff and members of the Class thus received, during the term of their transactions and upon settlement, less in value than they would have received absent Defendants' conspiracy and overt acts taken in furtherance thereof.

145.    The conspiracy is a *per se* violation of § 1 of the Sherman Act.  Alternatively, the conspiracy resulted in substantial anticompetitive effects in the over-the-counter and exchange traded Sterling LIBOR-based derivatives market.  There is no legitimate business justification for, or pro-competitive benefits caused by, Defendants' conspiracy and overt acts taken in furtherance thereof.  Any ostensible pro-competitive benefits are pretextual or could have been achieved by less restrictive means.

146.    As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act, throughout the Class Period.

147.    Plaintiff and members of the Class seek treble damages for Defendants' violations of §1 of the Sherman Act under §4 of the Clayton Act.

148.    Plaintiff and members of the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## THIRD CLAIM FOR RELIEF

### (Manipulation in Violation of the Commodity Exchange Act)

### (7 U.S.C. §§ 1, *et seq.*)

### (Against All Defendants)

149.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

150.    Each Defendant is liable under §§ 6(c), 9, and 22, of the CEA, codified at 7 U.S.C. §§ 9, 13, and 25 respectively, for the manipulation of Sterling LIBOR and the prices of Sterling LIBOR-based derivatives that were priced, benchmarked, and/or settled based on Sterling LIBOR.

151.    Defendants had the ability to manipulate Sterling LIBOR and the price of Sterling LIBOR-based derivatives.  Defendants, through interstate commerce, knowingly submitted or caused to be submitted false rate quotes to the BBA.  These submissions were used to determine the official published Sterling LIBOR.  By virtue of the Sterling LIBOR methodology, the Defendants had the ability to influence and did affect the rates that would become the official Sterling LIBOR.  Further, because of their market power as major dealers of Sterling LIBOR-based derivatives, the Defendants had the ability to influence and did affect the prices of Sterling LIBOR-based derivatives.

152.    As evidenced by communications revealed to the DOJ, CFTC, and FCA, the Defendants fully, intentionally, and systematically manipulated Sterling LIBOR and Sterling LIBOR-based derivatives prices to artificial levels for the express purpose of obtaining hundreds of millions (if not billions) of dollars in illegitimate profits on Sterling LIBOR-based derivatives,

held by themselves or other co-conspirators, the prices of which (and thus profits or losses) were priced, benchmarked and/or settled based on Sterling LIBOR.  As an intended and direct consequence of Defendants' knowingly unlawful conduct, the prices of Plaintiff's Sterling LIBOR-based derivatives, and those traded by Class members, were manipulated to artificial levels by Defendants.

153.    During the Class Period, Sterling LIBOR and the prices of derivatives that were priced, benchmarked, and/or settled based on Sterling LIBOR were artificial and did not result from legitimate market information, competition, or supply and demand factors.  Defendants directly caused artificial Sterling LIBOR and artificial prices of Sterling LIBOR-based derivatives by, *inter alia*, making false Sterling LIBOR submissions to the BBA and conducting manipulative trading activity in the Sterling money market that created artificial supply and demand.

154.    As a direct result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered actual damages and injury in fact due to artificial Sterling LIBOR and prices of derivatives that were priced, benchmarked, and/or settled based on Sterling LIBOR.

## FOURTH CLAIM FOR RELIEF

### (Principal-Agent Liability in Violation of § 2 of the Commodity Exchange Act)

### (Against All Defendants)

155.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

156.    Each Defendant is liable under § 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

157.   Plaintiff and members of the Class seek the actual damages they sustained in Sterling LIBOR-based derivatives for the violations of the CEA alleged herein.

## FIFTH CLAIM FOR RELIEF

### (Aiding and Abetting Liability in Violation of § 22 of the Commodity Exchange Act)

### (Against All Defendants)

158.   Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

159.   Defendants knowingly aided, abetted, counseled, induced, and/or procured the violations of the CEA alleged herein.  Defendants did so knowing of each other's manipulation of Sterling LIBOR and willfully intended to assist these manipulations, which resulted in artificial Sterling LIBOR-based derivatives prices during the Class Period in violation of § 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

160.   Plaintiff and members of the Class seek the actual damages they sustained in Sterling LIBOR-based derivatives for the violations of the CEA alleged herein.

## SIXTH CLAIM FOR RELIEF

### (Violation of the Racketeer Influenced and Corrupt Organizations Act)

### (18 U.S.C. §§ 1961 *et seq.*)

### (Against All Defendants)

161.   Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

162.   18. U.S.C. § 1962(c) makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

46

163.    18 U.S.C. § 1962(d), in turn, makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

164.    Under 18 U.S.C. § 1961(1), an as applicable to § 1962, "racketeering activity" means (among other things) acts indictable under certain sections of Title 18, including 18 U.S.C. § 1343 (relating to wire fraud).

165.    18 U.S.C. § 1961(5) provides that, to constitute a "pattern of racketeering activity," conduct "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and at least the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

166.    18 U.S.C. § 1961(3) defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property," and 18 U.S.C. § 1961(4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

167.    18 U.S.C. § 1343, the wire fraud statute listed in 18 U.S.C. § 1961(1) as a RICO predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representation, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such a scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

168.    At all relevant times, Defendants, including the employees who conducted Defendants' affairs through illegal acts (including by transmitting false Sterling LIBOR

submissions and/or directing other employees to do the same and by placing false bids and offers for Sterling money market instruments in order to "spoof" the market, among other predicate acts of wire fraud) were "person[s]" within the meaning of 18 U.S.C. § 1961(4), with a definable corporate structure and hierarchy of corporate direction and control.

169.    At all relevant times, Plaintiff was a "person" within the meaning of 18 U.S.C. § 1961(3).

170.    Defendants' collective association, including through their participation together as members of the BBA Sterling LIBOR panel, constitutes the RICO enterprise in this case. Every member of the enterprise participated in the process of transmitting or causing to be transmitted false Sterling LIBOR submissions, and Sterling LIBOR-based derivative price quotes, during the Class Period.  As alleged herein, each Defendant engaged in the acts of wire fraud in furtherance of the conspiracy and participated as a member of the association in fact enterprise.

171.    Defendants completed all elements of wire fraud within the United States or while crossing United States borders.  Defendants did so by: (a) transmitting or causing to be transmitted false Sterling LIBOR submissions, and Sterling LIBOR-based derivative price quotes in the U.S. or while crossing U.S. borders through electronic servers located in the United States; (b) transmitting or causing to be transmitted false Sterling LIBOR submissions that Thomson Reuters and the BBA relied on in collecting, calculating, publishing, and/or disseminating the daily Sterling LIBOR submissions of each Defendant and the daily Sterling LIBOR fix that was transmitted, published, and disseminated in the United States or while crossing U.S. borders through electronic servers located in the United States; (c) coordinating their daily Sterling LIBOR submissions and Sterling LIBOR-based derivatives positions in

electronic chats routed through electronic servers located in the United States; (d) sending trade confirmations based on manipulated Sterling LIBOR rates to counterparties in the United States; and (e) transmitting, publishing, and/or disseminating false and manipulative bid and ask price quotes for Sterling LIBOR-based derivatives within the United States or while crossing U.S. borders through electronic servers located in the United States.

172.    The common purpose of the enterprise was simple: profiteering.  By engaging in the predicate acts alleged including, but not limited to, transmitting or causing false Sterling LIBOR submissions to be transmitted to Thomson Reuters as agent for the BBA, transmitting false bids and offers for Sterling deposits, and by exchanging Sterling LIBOR-based derivatives positions and prices, Defendants affected the prices of Sterling LIBOR-based derivatives, rendering them artificial.  This directly resulted in Defendants reaping hundreds of millions (if not billions) of dollars in illicit trading profits on their Sterling LIBOR-based derivatives positions.

173.    Defendants each committed far more than two predicate acts of wire fraud.  As alleged in detail herein, Defendants engaged in at least the following predicate acts of wire fraud:

      a.  The transmission of false Sterling LIBOR quotes to Thomson Reuters in the U.S. or while crossing U.S. borders through electronic servers located in the United States, for further dissemination;

      b.  Causing Thomson Reuters as agent for the BBA, to transmit false Sterling LIBOR,  while crossing U.S. borders through electronic servers located in the United States;

      c.  Causing the transmission and dissemination in the United States of false Sterling LIBOR individual bank quotes by Thomson Reuters;

      d.  The transmission and dissemination of false bid and ask price quotes for Sterling LIBOR-based derivatives and other financial instruments, including Sterling deposits, within the United States;

e. Electronic communications and instant messages containing manipulative requests that emanated from within the United States or were routed through electronic servers located within the United States;

f. Sending trade confirmations based on manipulated and false Sterling LIBOR rates to counterparties within the United States.

174.   Defendants' racketeering scheme affected interstate commerce. Trillions of dollars in Sterling LIBOR-based derivatives were traded within the United States during the Class Period including but not limited to, Sterling foreign exchange forwards, Sterling currency futures contracts traded on the CME, interest rate swap, and forward rate agreements.

175.   As alleged herein, Plaintiff and members of the Class are direct victims of Defendants' wrongful and unlawful conduct. Plaintiff's and the Class' injures were direct, proximate, foreseeable, and natural consequences of Defendants' conspiracy; indeed depriving Plaintiff and the Class of their money relative to their Sterling LIBOR-based derivatives contracts was the very purpose of the Defendants' scheme.

176.   Plaintiff and members of the Class seek treble damages for the injuries they have sustained, as well as restitution, cost of suit and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

177.   As a direct and proximate result of the subject racketeering activities, Plaintiff and members of the Class seek an order, in accordance with 18 U.S.C. § 1964(a) enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

## SEVENTH CLAIM FOR RELIEF

### (Violation of the Racketeer Influenced and Corrupt Organizations Act)

### 18 U.S.C. §§ 1961 *et seq*.

### (Against all Defendants)

178.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

179.    Apart from construction and carrying out the racketeering scheme detailed above, Defendants conspired to violate RICO, constituting a separate violation of RICO under 18 U.S.C. § 1962(d).

180.    The fraudulent scheme, as set forth above, alleges a violation of RICO in and of itself.

181.    Defendants organized and implemented the scheme, and insured it continued uninterrupted, by concealing their manipulation of Sterling LIBOR and the prices of Sterling LIBOR-based derivatives from Plaintiff and members of the Class.

182.    Defendants knew their manipulative scheme would defraud participants in the Sterling LIBOR-based derivatives market yet each Defendant agreed to participate despite their understanding the fraudulent nature of the enterprise.

183.    As alleged herein, Plaintiff and members of the Class are direct victims of Defendants' wrongful and unlawful conduct.  Plaintiff and the Class' injuries were direct, proximate, foreseeable, and natural consequences of Defendants' conspiracy, indeed, those effects were precisely why the scheme was concocted.

184.    Plaintiff and members of the Class are entitled to recover treble damages of the injuries they have sustained, according to proof, as well as restitution and costs of suit and reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c).

185.    As a direct and proximate result of the subject racketeering activity, Plaintiff and members of the Class are entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

## EIGHTH CLAIM FOR RELIEF

### (Unjust Enrichment in Violation of Common Law)

### (Against all Defendants)

186.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

187.    Defendants and members of the Class, including Plaintiff, entered into Sterling LIBOR-based derivatives transactions.  These transactions were priced, benchmarked, and/or settled based on Sterling LIBOR, which was supposed to reflect actual market conditions. Rather than compete honestly and aggressively with each other, Defendants colluded to manipulate Sterling LIBOR and the prices of Sterling LIBOR-based derivatives to ensure they had an unfair advantage in the marketplace.

188.    Defendants financially benefited from their unlawful acts described herein, including but not limited to, coordinating the manipulation of Sterling LIBOR by taking advantage of the BBA submission process, placing false bids and offers for Sterling money market instruments, or other activities designed to artificially suppress, inflate, maintain, or otherwise alter Sterling LIBOR and the prices of Sterling LIBOR-based derivatives.  These unlawful and inequitable acts caused Plaintiff and Class members to suffer injury, lose money, and otherwise be deprived of the benefit of accurate Sterling LIBOR reflecting actual market conditions, as well as the ability to accurately price, benchmark, and/or settled Sterling LIBOR-based derivatives transactions.  As a result, Plaintiff and Class members received, upon execution or settlement of their trades, less in value than they would have received absent

Defendants' wrongful conduct. Plaintiff and the Class' losses correspond to Defendants' unlawful gains.

189.    Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiff and members of the Class.

190.    Plaintiff and members of the Class seek restoration of the monies of which they were unfairly and improperly deprived as described herein.

## PRAYER FOR RELIEF

Plaintiff demands relief as follows:

A.      That the Court certify this lawsuit as a class action under Rules 23(a), (b)(2), and (b)(3), of the Federal Rules of Civil Procedure, that Plaintiff be designated as class representative, and that Plaintiff's counsel be appointed as Class counsel for the Class;

B.      That the unlawful conduct alleged herein be adjudged and decreed to violate § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

C.      That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint under §16 of the Clayton Antitrust Act, 15 U.S.C. §26;

D.      That the Court award Plaintiff and the Class damages against Defendants for their violation of federal antitrust laws, in an amount to be trebled under § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, plus interest;

E.      That the unlawful conduct alleged here in be adjudged and decreed to be an unlawful enterprise in violation of RICO;

F.      For a judgment awarding Plaintiff and the Class damages against Defendants for their violation of RICO, in an amount to be trebled in accordance with such laws;

G.      That the Court award Plaintiff and the Class damages against Defendants for their violations of the Commodity Exchange Act;

H.      That the Court order Defendants to disgorge their ill-gotten gains from which a constructive trust be established for restitution to Plaintiffs and members of the Class;

I.      That the Court award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

J.      That the Court award Plaintiff and the Class prejudgment interest at the maximum rate allowable by law; and

K.      That the Court direct such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated:  May 6, 2015                                        Respectfully submitted,

Geoffrey M. Horn
Vincent Briganti
Peter St. Philip
Raymond Girnys
Christian P. Levis
LOWEY DANNENBERG COHEN & HART, P.C.
One North Broadway
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
Email: ghorn@lowey.com
        vbriganti@lowey.com
        pstphilip@lowey.com
        rgirnys@lowey.com
        clevis@lowey.com