# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

SONTERRA CAPITAL MASTER FUND, LTD., on behalf of itself and all others similarly situated,

                Plaintiff,

           - against -

BARCLAYS BANK PLC, BARCLAYS CAPITAL INC., COÖPERATIEVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., DEUTSCHE BANK AG, LLOYDS BANKING GROUP PLC, THE ROYAL BANK OF SCOTLAND PLC, UBS AG, AND JOHN DOE NOS. 1-50,

                Defendants.

Docket No. 15-cv-3538 (VSB)

<br>

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND FAILURE TO STATE A CLAIM

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 3

   I.    LIBOR and Sterling LIBOR ................................................................................... 3

   II.   Defendants' Violation of the BBA Rules and Manipulation of Sterling LIBOR .......... 4

        A.   Direct Evidence From Criminal and Regulatory Settlements ................................ 6

        B.   Overwhelming Circumstantial Evidence of Price Fixing .................................... 6

   III.  Plaintiff and the Class Were Injured ..................................................................... 7

ARGUMENT ..................................................................................................................... 7

   I.    Plaintiff and the Class Have Article III Standing ..................................................... 7

        A.   Plaintiff's Injury is Fairly Traceable to Defendants' Misconduct ......................... 8

        B.   Plaintiff Has Standing to Bring Claims on Behalf of the Class ............................ 9

   II.   Plaintiff Pleads Cognizable Antitrust Claims ....................................................... 11

        A.   Plaintiff Has Antitrust Standing ..................................................................... 11

            1.   The Complaint Alleges a *Per Se* Violation of the Sherman Act ..................... 12

            2.   Defendants' Argument Is Predicated on *LIBOR I's* Legal Errors ................. 13

            3.   Defendants' Rigging of Sterling LIBOR Requires *Per Se* Condemnation ...... 15

            4.   Sterling LIBOR-Based Derivatives Were Directly Affected by Defendants' Collusion and Damages Are Sufficiently Quantifiable ................................ 16

        B.   The FTAIA Does Not Bar Plaintiff's Sherman Act Claims ................................ 19

            1.   Defendants Engaged in Substantial Domestic Anticompetitive Conduct ..... 20

            2.   Defendants Rigged the U.S. Market for Sterling LIBOR-Based Derivatives, Causing a Substantial and Foreseeable Effect on Domestic Commerce .. 21

            3.   Plaintiff's Claims Arise Out of the Domestic Effect of Defendants' Conduct ......................................................................................... 22

C.  The Complaint Plausibly Alleges Horizontal Price-Fixing ....................................22

1.  This Complaint Meets the Standard for Pleading a Contract, Combination, or Conspiracy ...............................................................................................22

2.  The Complaint Plausibly Alleges the Existence of an Illegal Sterling LIBOR Rate-Setting Agreement............................................................................23

3.  Defendants Engaged in Further Concerted Manipulative Action .................37

III.  Plaintiff Plausibly Pleads Rico Claims .......................................................................38

A.  Defendants' Recycled Standing Arguments Again Fail..........................................39

B.  The RICO Claims Are Not Impermissibly Extraterritorial ...................................39

C.  Plaintiffs Allege a RICO Claim Under Section 1962(c) ........................................41

1.  Plaintiff Adequately Alleges an Enterprise ...............................................42

2.  Plaintiff Adequately Alleges Defendants Engaged In A Scheme To Defraud ...............................................................................................................43

3.  Plaintiff Adequately Alleges A Pattern Of Racketeering Activity .................43

D.  Plaintiff Has Stated A RICO Conspiracy Claim....................................................44

IV.  Plaintiff's Sherman Act and RICO Claims Are Timely ...................................................44

V.  Plaintiff Has Sufficiently Alleged Unjust Enrichment .....................................................47

VI.  Leave To Amend .........................................................................................................48

CONCLUSION ........................................................................................................................49

TABLE OF AUTHORITIES

**Cases**

*Am. Soc. Of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982) ........................................14

*Am. Tobacco Co. v. U.S.*, 328 U.S. 781 (1946) ................................................................. 23, 36

*Ambook Enterprises v. Time, Inc.*, 612 F.2d 604 (2d Cir. 1979) ...................................35

*Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162 (2d Cir. 2012) ..........................23

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) ...............................................18

*Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ....................18

*Associated Press v. United States*, 326 U.S. 1 (1945) .................................................38

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) ......................................15

*Baskin v. Hawley*, 807 F.2d 1120 (2d Cir. 1986) .....................................................45

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) .............................. 23, 29, 30, 35

*Boritzer v. Calloway*, No. 10 Civ. 6264, 2013 WL 311013 (S.D.N.Y. Jan. 24, 2013) ...................41

*Boyle v. United States*, 556 U.S. 938 (2009) .........................................................42

*BPP Ill., LLC v. Royal Bank of Scotland Grp. PLC*, 603 F. App'x 57 (2d Cir. 2015) ..............2, 44, 45, 47

*Brown v. Pro Football*, 518 U.S. 231 (1996) ................................................... 30, 34

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ............................ 12, 15

*Calabrese v. CSC Holdings, Inc.*, 283 F.Supp.2d 797 (E.D.N.Y. 2003) .............................42

*Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980) ...................................... 12, 14

*Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229 (S.D.N.Y. 2012) .................................43

*City of New York v. Bello*, 579 F. App'x 15 (2d Cir. 2014) .........................................44

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) ..............................14

*Costco Wholesale Corp v. AU Optronics Corp.*, Case No. C 11-0058 SI, 2011 WL 3809767 (N.D. Cal. Aug. 29, 2011) ................................................................................28

*Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290 (2d Cir. 1983) ...................18

*Daniel v. Am. Bd. Of Emergency Med.*, 428 F. 3d 408 (2d Cir. 2005) ...............................17

*DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001)..............................................................41

*DNAML Pty., Ltd. v. Apple Inc.*, No. 13 Civ. 6516 (DLC), 2014 WL 2545113 (S.D.N.Y. June 5, 2014) .................................................................................................................................17

*Elsevier Inc. v. W.H.P.R., Inc.*, 692 F.Supp.2d 297 (S.D.N.Y. 2010) ................................41

*Eskofot A/S v. E.I. Du Pont de Nemours & Co.*, 872 F.Supp. 81 (S.D.N.Y. 1995) .................38

*European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014) .......................40

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) ...................... 21, 22

*First Nationwide Bank v. Gelt Funding Corp.*, 820 F.Supp.89 (S.D.N.Y. 1993), aff'd, 27 F.3d 763 (2d Cir. 1994) ................................................................................................................43

*Foman v. Davis*, 371 U.S. 178 (1962)................................................................................49

*Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004), *cert. denied*, 544 U.S. 1017 (2005), *rehearing denied*, 545 U.S. 1150 (2005) ..............................................................................38

*Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, 282 F. App'x 94 (2d Cir. 2008)................................42

*Gatt Communs., Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68 (2d Cir. 2013) ........................... 11, 12

*Gelboim, et al. v. Bank of America Corp., et al.*, 13-cv-3565 (L), ECF No. 464 (2d Cir. July 17, 2015) .....16

*Gordon v. Palumbo*, No. 07 Civ. 6624, 2009 WL 690647 (S.D.N.Y. Mar. 9, 2009)................................39

*Gratz v. Bollinger*, 539 U.S. 244 (2003) ................................................................... 9, 10

*Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990) ...............................44

*Helicopter Support Systems, Inc. v. Hughes Helicopter, Inc.*, 818 F.2d 1530 (11th Cir. 1987) .........................38

*Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010) .............................................18

*Hinds County, Miss. v. Wachovia Bank, N.A.*, 700 F. Supp. 2d. 378 (S.D.N.Y. 2010) ..............................45

*Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258 (1992)..................................................18

*Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F .Supp. 2d 262 (D. Conn. 2003) .........................15

*In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06 MD 1775 (JG) (VVP), slip. op. at 31, 2010 U.S. Dist. LEXIS 146377, (E.D.N.Y. Sept. 22, 2010) ................................................................45

*In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775, 2009 WL 3443405 (E.D.N.Y. Aug. 21, 2009)................................................................................................................ 24, 28

*In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419 (S.D.N.Y. 2015)..........................8, 15, 17

*In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999) ....................................................................24

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432 (9th Cir. 1990).......25

*In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41 (S.D.N.Y. 2012) ...........................................44

*In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677 (2d Cir. 2009) ......................................11, 13

*In re Dreyfus Aggressive Growth Mutual Fund Litig.*, 2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000) ..........10

*In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671 (S.D.N.Y. 2012) ......................................................23

*In re Flat Glass Antitrust Litig.*, 385 F.3d 350 (3d Cir. 2004).....................................................................35

*In re Foreign Exchange Antitrust Litigation*, 74 F. Supp. 3d 581 (S.D.N.Y. 2015) .........................12, 13, 29

*In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651 (7th Cir. 2002) ........................24, 28, 31

*In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*, 00 CIV 7804 (LMM), 2004 WL 487222
    (S.D.N.Y. Mar. 12, 2004)............................................................................................................. 45, 46

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666 (S.D.N.Y. 2013) .........13, 29, 40

*In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498 (S.D.N.Y. 2003) ................................................45

*In re Nine West Shoes Antitrust Litigation*, 80 F. Supp. 2d 181 (S.D.N.Y. 2000).........................................44

*In re Optical Disc Drive Antitrust Litig.*, Case No. M 10-2143 RS, 2012 WL 1366718 (N.D. Cal. Apr. 19,
    2012)................................................................................................................................................28

*In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d. 987, 1011 (E.D. Mich. 2010) .....................................31

*In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603 (N.D. Ga. 1997)..............................................31

*In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51 (2d Cir. 2012) ............................................................ 12, 15

*In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896 (N.D. Cal. 2008)........31

*In re Sumitomo Copper Litig.*, 995 F. Supp. 451 (S.D.N.Y. 1998) ...............................................................41

*In re Text Messaging Antitrust Litig.*, 630 F.3d 622 (7th Cir. Ill. 2010).................................................35, 37

*In re Vitamins Antitrust Litig.*, No. 99-197 (TFH), 2000 WL 1475705, (D. D.C. May 9, 2000) .............32

*Indian Head, Inc. v. Allied Tube & Conduit Corp.*, 817 F.2d 938 (2d Cir. 1987) .........................................14

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981) ......................................................19

*Jerome M. Sobel & Co. v. Fleck*, No. 03 Civ. 1041, 2003 WL 22839799 (S.D.N.Y. Dec. 1, 2003) ..........41

*Johnson v. City of Shelby*, 135 S. Ct. 346 (2014) ...................................................................49

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997)....................................................................44

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000) ...........................15

*Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014)............29

*Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014) .............17

*Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002) ...................................19

*Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395 (2d Cir. 2014)..................... 19, 21

*Mandarin Trading Ltd. v. Wildenstein*, 884 N.Y.S.2d 47 (1st Dep't 2009), aff'd, 919 N.Y.S.2d 465 (N.Y. 2011) ..............................................................................................................................................48

*McLafferty v. Deutsche Lufthansa AG*, No. 08-cv-1706, 2009 WL 3365881 (E.D. Pa. Oct. 16, 2009) ....21

*Minn-Chem v. Agrium Inc.*, 683 F.3d 845 (7th Cir. 2012).....................................................21

*Momentum Luggage & Leisure Bags v. Jansport, Inc.*, No. 00 Civ. 7909, 2001 U.S. Dist. LEXIS 415, 2001 WL 58000 (S.D.N.Y. Jan. 23, 2001) ........................................................................................................48

*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984) ...........................................22

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1624 (2013)...........................................................................................................10, 11

*New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065 (2d Cir. 1988)................................... 44, 45

*Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145 (9th Cir. 2003) ................38

*Pavlov v. Bank of New York Co., Inc.*, 25 Fed.App'x 70 (2d Cir. 2002) .............................43

*Petroleos Mexicanos v. SK Eng'g & Constr. Co.*, 572 F. App'x 60 (2d Cir. 2014).............40

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117 (2d Cir. 2007) ........12

*Precision Associates, Inc. v. Panalpina World Transport (Holding) Ltd.*, 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011)...............................................................................................................................................45

*Precision Assocs. v. Palapina World Transp. (Holding) Ltd.*, No. 08-CV-42 (JG) (VVP), 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012).....................................................................................................23, 30, 31

*Precision Assocs., Inc. v. Panalpina World Transp., (Holding), Ltd.*, No. 08-cv-42, 2013 WL 6481195 (E.D.N.Y. Sep. 20, 2013)...........................................................................................................................21

Precision Assocs., Inc. v. Panalpina World Transp., (Holding), Ltd., No. 08-cv-42, 2014 WL 298594 (E.D.N.Y. Jan. 28, 2014) ........................................................................21

*Purchase Real Estate Group Inc. v. Jones*, 05 Civ. 10859, 2010 WL 3377504 (S.D.N.Y. Aug. 24, 2010) ...43

*Ross v. Am. Exp. Co.*, Nos. 04 Civ. 5723, 05 Civ. 7116, 2014 WL 1396492 (S.D.N.Y. Apr. 10, 2014)22

*Ross v. Bank of Am., N.A.*, 524 F.3d 217 (2d Cir. 2008)........................................................8

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ..................................................................9

*Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010) .........................29, 31, 35, 36, 37

*State of N.Y. v. Cedar Park Concrete Corp.*, 684 F. Supp. 1229 (S.D.N.Y. 1988)........................46

*United States v. Andreas*, 216 F.3d 645 (7th Cir. 2000)........................................................31

*United States v. Consol. Packaging Corp.*, 575 F.2d 117 (7th Cir. 1978)................................34

*United States v. Corey*, 566 F.2d 429 (2d Cir. 1977) ............................................................39

*United States v. Delta Dental of Rhode Island*, 943 F. Supp. 172 (D.R.I. 1996) ......................38

*United States v. Friedman*, 854 F.2d 535, 562 (2d Cir. 1988)...............................................42

*United States v. Guadagna*, 183 F.3d 122 (2d Cir. 1999) .....................................................43

*United States v. Hayes*, 12 MJ 3229, 2015 WL 4620254, at *1, 7 (S.D.N.Y. Aug. 3, 2015) .....................40

*United States v. Hayes*, 99 F. Supp. 3d 409 (S.D.N.Y. 2015) ................................................40

*United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989).....................................................42

United States v. Kim*, 246 F.3d 186 (2d Cir. 2001)* ...............................................................41

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) ....................................12, 14, 15

*United States v. Trapilo*, 130 F.3d 547 (2d Cir. 1997)...........................................................43

*WC Capital Mgmt., LLC v. UBS Secs., LLC*, 711 F.3d 322 (2d Cir. 2013) .................................8

*White v. R.M. Packer Co.*, 635 F.3d 571 (1st Cir. 2011) ......................................................36

**Statutes**

15 U.S.C. §1 .........................................................................................................25

18 U.S.C. § 1961 ..................................................................................................50

18 U.S.C. § 1962(c) .............................................................................................44

18 U.S.C. § 1962(d) .................................................................................................................. 50

**Other Authorities**

Herbert Hovenkamp & Christopher R. Leslie, The Firm as Cartel Manager, 64 Vand. L. Rev. 813

(2011) ................................................................................................................................ 15

**Rules**

FED. R. CIV. P. 15(c)(1)(B) ...................................................................................................... 56

FED. R. CIV. P. 21 .................................................................................................................... 56

**Treatises**

12 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 2022a (3d ed. 2010) ............. 13

6 Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1404 (3d ed. 2010) .................. 28

## PRELIMINARY STATEMENT

Six of the world's largest banks secretly agreed to fix the London Interbank Offered Rate ("LIBOR") for British Pound Sterling ("Sterling LIBOR"), an interest-rate benchmark and key price component in many financial instruments in which Defendants[1] compete. Plaintiff—and the Class it seeks to represent—hold Sterling LIBOR-based derivatives and are the direct victims of Defendants' collusive manipulation.

In government settlements, Deutsche Bank, Barclays, UBS and Lloyds (the "Admitted Conspirators") have each admitted that they coordinated their Sterling LIBOR submissions with other panel banks in a conspiracy to manipulate Sterling LIBOR for their financial gain and paid billions in penalties, fines and settlements. Admissions of collusive conduct establish the existence of a conspiracy. The Complaint's allegations of Rabobank's admitted manipulation of Sterling LIBOR and RBS' admitted collusive manipulation of other currencies, which resulted in significant government settlements, along with numerous other plausible connective allegations link both Rabobank and RBS to the admitted price-fixing conspiracy.

Defendants are left to challenge Plaintiff's Article III and antitrust standing and the timeliness of Plaintiff's claims. That Plaintiff suffered injury-in-fact could not be more obvious: Defendants' collusive manipulation of Sterling LIBOR and Sterling LIBOR-based derivatives fixed the prices of Plaintiff's Sterling LIBOR-based derivatives. The Complaint thus alleges the most straightforward possible injury-in-fact: Plaintiff and the Class paid or received the cartel price because of Defendants' price fixing. Having pled that its own transactions resulted in injury-in-fact, Plaintiff raises a "set of concerns" identical to all class members' claims and may bring claims on behalf of Class members injured by Defendants' manipulation of Sterling LIBOR.

---

[1] "Defendants" refers to Barclays Bank plc, Barclays Capital Inc. (collectively, "Barclays"), Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank"), Deutsche Bank AG ("Deutsche Bank"), Lloyds Banking Group plc ("Lloyds"), The Royal Bank of Scotland plc ("RBS"), and UBS AG ("UBS").

Defendants' argument that antitrust injury is lacking because rates were set collaboratively conflicts with the rulings of the Supreme Court and the Second Circuit. The law is clear that agreements among horizontal competitors to fix a component of a price are so inherently anticompetitive that they constitute *per se* violations of the Sherman Act; and there is no principle in antitrust law that would *a priori* exempt manipulation of a collaborative process from causing antitrust injury. The injuries to Plaintiff and the Class flowed directly from the single most fundamental violation in antitrust law: Defendants' price-fixing cartel. Nor are there concerns about remote injuries or speculative damages: Defendants' conduct injured Plaintiff and the Class and damages can be measured with *mathematical certainty*.

Plaintiff's Sherman Act and RICO claims are timely because the limitations period was tolled due to Defendants' concealment of their conspiracy. Moreover, the Second Circuit in *BPP Ill., LLC v. Royal Bank of Scotland Grp. PLC* ("*BPP II*"), 603 F. App'x 57 (2d Cir. May 13, 2015), has recently held, in an action for fraud concerning RBS's alleged manipulation of LIBOR, that the very same news articles which Defendants here contend put Plaintiff on inquiry notice as a matter of law, were in fact not sufficient to support a dismissal on statute of limitations grounds.

Defendants' remaining arguments fail because each depends on the same contested and contradicted assertion that their conduct did not impact the Sterling LIBOR-based derivatives traded by Plaintiff and the Class. Not only have Defendants engaged in domestic conduct, they did so to financially benefit their U.S.-based transactions in Sterling LIBOR-based derivatives.

The Complaint's allegations are based on the factual findings of numerous government regulators, guilty pleas to criminal acts of wire fraud, and Defendants' own admissions. As demonstrated below, Plaintiff plausibly alleges that Defendants' conduct also gives rise to the other claims of the Complaint. Thus, Defendants' motion to dismiss should be denied.

## FACTUAL BACKGROUND

### I.  LIBOR and Sterling LIBOR

LIBOR is a benchmark interest rate used in financial markets around the world. ¶¶ 9, 82-83.[2] Futures, options, swaps, and other derivative financial instruments traded in the over-the-counter market and on exchanges worldwide are priced, benchmarked, and/or settled based on LIBOR. ¶112. LIBOR is published under the auspices of the British Bankers' Association ("BBA"), the leading trade association for the U.K. financial services sector. ¶¶ 82-83.

LIBOR is calculated for ten currencies based upon submissions from a panel of banks, and is intended to reflect competitive conditions in the interbank lending market in London. ¶¶ 7, 106-07. Defendants were panel bank members whose submissions controlled Sterling LIBOR—the benchmark intended to reflect the rate of interest at which banks could obtain unsecured loans in Pound Sterling from other banks in the inter-bank money market. ¶ 106.

To set Sterling LIBOR, each panel bank answers the following question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size, just prior to 11:00 a.m.?" ¶ 92. Each panel bank electronically submits its rates every London business day to Thomson Reuters, as an agent for the BBA, by 11:10 a.m. London Time. ¶94. Once each panel bank has submitted its rate, the contributed rates are ranked. ¶108. The highest and lowest quartiles are excluded from the calculation, and the middle two quartiles (*i.e.*, 50% of the submissions) are averaged to formulate the resulting Sterling LIBOR "fix" or "setting." ¶ 108.

Thomson Reuters calculates and publishes the rates each business day by approximately 11:30 a.m. London Time. ¶ 94. Fifteen maturities (or "tenors") are quoted, ranging from overnight to twelve months. ¶ 107. The published Sterling LIBOR rates are made available in the United States and worldwide by Thomson Reuters and other data vendors through electronic means and a variety of

---

[2] "Complaint" or "¶" refers to the Amended Class Action Complaint. ECF No. 18.

information sources. ¶ 108. In addition to publishing the resulting Sterling LIBOR fix, Thomson Reuters also publishes each panel bank's submitted rates along with the names of the banks. ¶ 94.

Antitrust law has long recognized the dangers lurking in this kind of sharing and publication of price information, especially when done, as here, through an unregulated trade group consisting of horizontal competitors. *See* ¶ 93. Precisely because Sterling LIBOR was reset daily and perceived as reliable, the integrity of the Sterling LIBOR benchmark was of fundamental importance to the foreign exchange and interest rate derivatives market within the United States. ¶ 86. During the Class Period, the Sterling LIBOR-based derivatives market, including Sterling foreign exchange and interest rate derivatives, was the fourth largest such market within the United States. *Id.* More than $1.3 trillion in Sterling LIBOR-based derivatives were traded during April 2007 alone. *Id.* In total, almost $100 trillion in Sterling LIBOR-based derivatives were traded over-the-counter within the United States during the Class Period. *Id.*

Defendants maintained extremely large and profitable operations in the United States during the Class Period from which they transacted in a full range of financial instruments tied to Sterling LIBOR. ¶ 87. Indeed, in addition to being Sterling LIBOR panel members, Defendants competed with one another (and others) in the United States in the sales of interest rate swaps, forward rate agreements, foreign exchange forwards, and other financial products in which the price or payment terms were based upon Sterling LIBOR. ¶ 89. Defendants also competed with one another (and others) in transacting in the futures markets. *Id.* This includes the three-month Sterling futures contracts traded on the LIFFE, and the Sterling currency futures contract traded on the Chicago Mercantile Exchange ("CME"). ¶ 89.

## II.  Defendants' Violation of the BBA Rules and Manipulation of Sterling LIBOR

Sterling LIBOR's status as a trusted benchmark derived from three key instructions promulgated by the BBA, which were designed to ensure the integrity of the Sterling LIBOR-setting process. ¶¶ 94-100.  *First*, the BBA required each contributor bank to truthfully report its projected borrowing costs

based solely on its own assessment of the interbank lending market. ¶¶ 94-95. As Defendants have acknowledged in recent non-prosecution and deferred prosecution agreements with the U.S. Department of Justice, panel member banks were forbidden from misstating these costs.[3]

*Second*, the BBA mandated that each panel bank refrain from referring to or coordinating with other panel banks, and that submissions remain independent and confidential until after the calculation and publication of the daily Sterling LIBOR benchmarks. ¶ 96. As Defendants have admitted, under the BBA rules, each contributor panel bank must submit its rates without reference to rates contributed by other contributor panel banks. *Id.* This rule served an obvious and critical anti-collusion measure to ensure that panel banks could not coordinate their rate submissions with each other or other institutions. ¶ 96.

*Finally*, the prohibition on information sharing was reinforced by the requirement that the confidential submissions be simultaneously published after the benchmark-setting process was completed each day. *Id.* Accordingly, a single outlier bank that tried to unilaterally skew its Sterling LIBOR submissions would risk financial market and regulatory scrutiny, which created a powerful incentive against unilateral efforts to manipulate the benchmark.[4]

Defendants agreed to take advantage of the perception of reliability engendered by these rules and created the perfect vehicle for collusive manipulation. Accordingly, the Complaint alleges that, no

---

[3] *See, e.g.*, DOJ Deferred Prosecution Agreement and Attachment A, Statement of Facts with Deutsche Bank AG 71, ¶¶ 111-12, *USA v. Deutsche Bank AG,* No. 15cr61, Dkt. No. 6 (D. Conn. Apr. 23, 2015) (hereinafter "Deutsche Bank DOJ Statement of Facts").

[4] For this reason, in coordinating LIBOR rate submissions, managers at five of the six Defendant banks repeatedly instructed—using the exact same expression—that panel submissions remain "within the middle of the pack." *See* CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions against Barclays PLC, Barclays Bank PLC and Barclays Capital Inc., at 20-21, CFTC Docket No. 12-25 (June 27, 2012) (hereinafter "Barclays CFTC Order"); CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions against UBS AG and UBS Securities Japan Co., Ltd., at 4 CFTC Docket No. 13-09 (Dec. 19, 2012) (hereinafter "UBS CFTC Order"); FCA Final Notice to RBS AG at 15, ¶¶ 4.50-4.59 (Jun. 27, 2012) (hereinafter "RBS FCA Notice"); CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions against Lloyds Banking Group plc and Lloyds Bank plc, at CFTC Docket No. 14-18 (July 28, 2014) ("Lloyds CFTC Order") at 14.

later than January 1, 2005, Defendants (and others) began violating the BBA rules and making coordinated, artificial submissions in a successful effort to collusively manipulate Sterling LIBOR for their collective financial gain.

### A. Direct Evidence From Criminal and Regulatory Settlements

The United States Department of Justice ("DOJ"), the Commodity Futures Trading Commission ("CFTC") and other governmental bodies and regulators have brought multiple charges against Defendants for collusive manipulation of LIBOR. ¶¶ 5, 11-12. In the resulting non-prosecution agreements, deferred prosecution agreements and other settlements, UBS, Barclays, Lloyds, and Deutsche Bank have each expressly admitted that they coordinated their Sterling LIBOR submissions with other panel banks to collusively manipulate Sterling LIBOR for their financial gain. *See* ¶¶ 12-18, 21-22. Rabobank has also expressly admitted that it manipulated Sterling LIBOR (*see* ¶ 19); and the non-prosecution agreement for RBS, the remaining Defendant, shows that it too collusively manipulated Sterling LIBOR (*see* ¶¶ 23-24).

The Complaint recounts the results of these government investigations, which include findings that LIBOR is a key price component in Sterling LIBOR-based derivatives traded by Defendants. *See, e.g.,* ¶ 112 (Rabobank CFTC Order explaining that Sterling-LIBOR based derivatives are "priced off" Sterling LIBOR and were traded by Rabobank during Class Period to generate profit). Other key revelations are chat messages and emails among panel bank employees and third party interdealer brokers demonstrating their knowledge that the submitted rates were dishonest, and a shared imperative to keep the conspiracy quiet. As one interdealer broker vividly stated to Deutsche Bank in arranging Sterling forward rate agreement transactions that were part of a "forcing LIBOR" scheme with another panel bank: "*You don't want the market knowing what you're fucking doing.*" ¶ 149.

### B. Overwhelming Circumstantial Evidence of Price Fixing

Beyond the direct evidence of Defendants' conspiracy based on explicit admissions, regulators

found that Defendants often mirrored each other's collective manipulative conduct—often in uncanny ways. For example, Barclays, UBS, Lloyds, RBS, and Rabobank each admitted artificially suppressing LIBOR submissions in the relevant period because they each believed they would suffer a competitive disadvantage it they did not join the conspiracy. *See supra* at 5 n.4. Managers at each of these banks directed submitters to "stay in the middle of the pack" in making their LIBOR submissions, using *the exact same collusive expression. Id.* Many Defendants also took nearly identical internal measures closely coinciding in time to facilitate the manipulative conduct, including rearranging their Sterling LIBOR-based derivatives desks to facilitate manipulative conduct. ¶¶ 156-162 (Deutsche Bank); ¶¶ 163-165 (UBS); ¶¶ 166-167 (Rabobank); ¶¶ 168-170 (RBS). These facts, taken together with Defendants' admissions, conclusively demonstrate that Defendants were secretly engaged in widespread and simultaneous flouting of the BBA's reporting rules.

## III. Plaintiff and the Class Were Injured

Plaintiff and the Class hold financial instruments that incorporate Sterling LIBOR into their price terms. *See* ¶¶ 3-4, 30, 32. Defendants' collusive manipulation of Sterling LIBOR thus fixed the prices of Plaintiff and the Class' Sterling LIBOR-based derivatives, causing them to receive less and pay more. ¶ 98. On behalf of the Class, Plaintiff alleges it paid or received the cartel price, rather than the competitive price, because of Defendants' price fixing. Injuries to Plaintiff and the Class stem directly from the substitution of prices based on collusion for prices based on competition.

## <u>ARGUMENT</u>

## I. Plaintiff and the Class Have Article III Standing

Plaintiff and the Class have Article III standing as their injuries flowed directly from Defendants' secret agreement to manipulate Sterling LIBOR and Sterling LIBOR-based derivatives throughout the Class Period. Intended to weed out purely "abstract or hypothetical questions [of] law," Article III's "injury in fact" requirement "is a low threshold." *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 222 (2d Cir.

2008). A plaintiff satisfies this requirement by merely alleging a "concrete and particularized," "actual or imminent" injury that is "fairly traceable to the challenged action." *WC Capital Mgmt., LLC v. UBS Secs., LLC*, 711 F.3d 322, 329 (2d Cir. 2013). Article III standing is evaluated assuming all factual allegations in the complaint are true. *Id.*

### A.  Plaintiff's Injury is Fairly Traceable to Defendants' Misconduct

Plaintiff and the Class hold financial instruments priced, benchmarked, and/or settled based on Sterling LIBOR. ¶¶ 180, 215, 268. Defendants' collusive manipulation of Sterling LIBOR and Sterling LIBOR-based derivatives fixed the prices of Plaintiff's Sterling LIBOR-based derivatives. *Id.* The Complaint thus alleges the most straightforward possible injury-in-fact: Plaintiff paid or received the cartel price because of Defendants' price fixing. *See In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 444 (S.D.N.Y. 2015).

Defendants contend that Plaintiff cannot allege an injury-in-fact for its transactions in Sterling foreign exchange forwards because these instruments are not alleged to be "priced or settled by reference to Sterling LIBOR." *Def. Br.* at 12.[5] The Complaint, however, specifically alleges that "***Sterling foreign exchange forwards are priced based on Sterling LIBOR***," (¶ 172) (emphasis added). Sterling foreign exchange forwards are agreements to buy or sell Sterling in the future that are priced using an industry standard formula that incorporates Sterling LIBOR. *Id.* The calculation involves taking the "spot price" of Sterling for immediate delivery, and adjusting it to account for the "cost of carry," *i.e.*, the amount of interest paid or received on Sterling deposits, for the duration of the agreement. *Id.* Sterling LIBOR, the benchmark rate for Sterling deposits, is used in this formula to calculate the cost of carrying Sterling over the duration of the foreign exchange forward. *Id.*

The relationship between Sterling LIBOR and the price at which Sterling is bought or sold under

---

[5] "*Def. Br.*" refers to the Mem. of Law in Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint for Lack of Subject Matter Jurisdiction and Failure to State a Claim (ECF No. 66).

a foreign exchange forward is a fact that is specifically acknowledged by the CFTC.[6] And this relationship is corroborated by Defendants' own conduct; for example, Deutsche Bank specifically involved its foreign exchange forwards desk, which traded Sterling foreign exchange forwards, in the Sterling LIBOR manipulation. *See* ¶ 173. The Complaint thus "traces" the impact of Defendants' manipulation of Sterling foreign exchange forwards through Sterling LIBOR.[7]

The Complaint also specifically alleges: (i) the Class engaged in transactions involving currency futures, LIFFE and CME futures, swaps (including interest rate, currency, cross currency and basis rate swaps), and forward rate agreements (*see, e.g.*, ¶¶ 180, 215, 268); (ii) how each financial instrument is priced, benchmarked, and/or settled based on Sterling LIBOR (¶¶ 112-113); (iii) that Defendants' secret price-fixing conspiracy operated "on a near-daily basis" (¶ 174); and (iv) Plaintiff and the Class lost money as a result of Defendants' collusion (*see, e.g.*, ¶ 269). Defendants concede that certain instruments traded by the Class "expressly incorporate Sterling Libor." *Def. Br.* at 11.

**B.  Plaintiff Has Standing to Bring Claims on Behalf of the Class**

Having pled that its own transactions resulted in injury-in-fact, Plaintiff may bring claims on behalf of Class members injured by Defendants' manipulation of Sterling LIBOR. Under Second Circuit law, a plaintiff may bring claims on behalf of a class of individuals who have suffered a related, but distinct injury that the named plaintiff himself did not suffer. Defendants do not address the Second Circuit's class standing standard, or the raft of on-point decisions. *See, e.g., Gratz v. Bollinger*, 539 U.S. 244, 262-66 (2003); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.* ("*NECA-IBEW*"), 693 F.3d

---

[6] The CFTC included the manipulation of Sterling foreign exchange forwards in Defendant Rabobank's $475 million LIBOR manipulation settlement. This finding is consistent with the CFTC's findings in the Yen-LIBOR and Swiss franc LIBOR manipulation cases that foreign exchange forwards are priced based on "IBOR" rates for the relevant currency. *See* ¶¶ 112, 173.

[7] Article III requires injury that is "fairly traceable" to the "challenged action"; it does not specify how or when that injury must be traced and, certainly, it contains no "settled by reference to" requirement. "[A]t the pleading stage the fairly traceable standard is not equivalent to a requirement of tort causation" and is satisfied by "something *less than the concept of proximate cause.*" *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013) (emphasis in original).

145 (2d Cir. 2012), *cert. denied*,133 S. Ct. 1624 (2013); *In re Dreyfus Aggressive Growth Mutual Fund Litig.*, 2000 WL 1357509, at *3, 5 (S.D.N.Y. Sept. 20, 2000).

In *Gratz v. Bollinger*, the Supreme Court considered whether representation of absent class members was a question of Article III standing or a question of adequacy of representation under Rule 23. *Gratz*, 539 U.S. at 244. Although the Court declined to decide the issue, it concluded that no matter which analysis was proper, both Article III standing and Rule 23 adequacy were satisfied as the named plaintiff need only share "the same set of concerns" as class members to satisfy either one. *Id.* at 267.

The Second Circuit applied *Gratz's* "same set of concerns" standard in residential mortgage-backed securities ("RMBS") litigation. *See NECA-IBEW*, 693 F.3d 145. In *NECA-IBEW*, the complaint asserted claims based upon seventeen different offerings made pursuant to a single shelf registration statement and seventeen separate prospectus supplements, each of which was alleged to contain untrue or misleading statements. *Id.* Because the named plaintiff had purchased certificates in only two of the seventeen offerings, the district court dismissed the complaint as to the other fifteen offerings for lack of standing. The Second Circuit reversed and held that a plaintiff has "class standing if he plausibly alleges (1) that he personally has suffered some actual . . . injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *NECA-IBEW*, 693 F.3d at 162 (internal cite and quotation marks omitted).[8]

Thus, under the Second Circuit's analysis in *NECA-IBEW*, the inquiry is whether a defendant's putatively illegal conduct (that caused injury to a named plaintiff) implicates the "same set of concerns" as the conduct alleged to have caused injury to other members of the putative class by the same defendant. *Id.* at 162. As the Court in *NECA-IBEW* stated, "in the context of claims alleging injury

---

[8] The Court also found that the fact that the named plaintiff and members of the class purchased securities in different tranches, and therefore, might have suffered different damages did not "raise such a 'fundamentally different set of concerns' as to defeat class standing." 693 F.3d at 164.

based on misrepresentations, the misconduct alleged will almost always be the same: the making of a false or misleading statement." *Id.*

Here, Plaintiff was injured by Defendants' false rate submissions and other manipulative acts concerning Sterling LIBOR, and Defendants' injurious conduct implicates the same set of concerns for putative class members who purchased other Sterling LIBOR-based derivatives. As in *NECA-IBEW*, the common conduct of Defendants, the common injurious impact of that conduct on the class members, and the related common proofs thereof, are at the core of class standing analysis. Because Plaintiff alleges injury as a result of the same anticompetitive conduct, and such conduct is alleged to affect all Sterling LIBOR-based derivatives, Plaintiff raises a "set of concerns" identical to all class members' claims and has standing to bring claims for the Sterling LIBOR-based derivatives in which other members of the Class traded. *Id.*

## II.  Plaintiff Pleads Cognizable Antitrust Claims

The Complaint alleges a conspiracy that implemented at least five types of anticompetitive conduct (¶¶ 9, 144-155), executed by horizontal competitors (¶¶ 88-89), conspiring together and with interdealer brokers (¶¶ 117-134) to fix prices in one of the world's largest derivatives markets (¶ 143). The injuries to Plaintiff and the Class flowed directly from the most fundamental antitrust violation: Defendants' price-fixing cartel in Sterling LIBOR and Sterling LIBOR-based derivatives.

### A.  Plaintiff Has Antitrust Standing

A plaintiff has antitrust standing when it alleges "antitrust injury" and is an "efficient enforcer" of the antitrust laws. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) (citations omitted). When assessing antitrust injury, and to avoid confusing the injury analysis with the merits, courts are required to "assume that the practice at issue is a violation of the antitrust laws," and "posit[] a rationale" for its prohibition. *Gatt Communs., Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 n.9 (2d Cir. 2013). The Second Circuit has crafted a three-step process for evaluating on this basis whether a

11

plaintiff has alleged antitrust injury. The plaintiff identifies (i) "the practice complained of and the reasons such a practice might be anticompetitive," as well as (ii) "the actual injury suffered"; and then (iii) the court compares them to ensure that the plaintiff's injury is "of the type that the antitrust laws were intended to prevent and . . . flows from that which makes or might make defendants' acts unlawful." *Id.* at 76; *see also Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 122 (2d Cir. 2007). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

### 1. The Complaint Alleges a *Per Se* Violation of the Sherman Act

Agreements among horizontal competitors to fix prices or a component of a price are so inherently anticompetitive that they constitute *per se* violations of the Sherman Act. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980). This well-established principle includes cases in which defendants collude to alter a benchmark incorporated into contracts prevalent in that market. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940); *see also* 12 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (Areeda & Hovenkamp) ¶ 2022a (3d ed. 2010) ("The *per se* rule generally governs not only explicit price fixing but also agreements to fix a 'price element.'"). Moreover, "a complaint that sufficiently pleads a *per se* violation need not separately plead harm to competition," because a *conclusive presumption* of that harm arises from the horizontal price-fixing allegation, itself. *In re Foreign Exchange Antitrust Litigation* ("*Forex*"), 74 F. Supp. 3d 581, 594 (S.D.N.Y. 2015) (emphasis added); *see also In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 67 (2d Cir. 2012) (same).

Plaintiff alleges that Defendants—as horizontal competitors in the market for financial instruments tied to Sterling LIBOR—engaged in a multiyear conspiracy to rig Sterling LIBOR, a price component in Plaintiff's financial instruments; and that Plaintiff was injured when it paid the cartel price. Plaintiff thus alleges the strongest form of antitrust injury with respect to each of the Second Circuit's three steps: (i) a *per se* anticompetitive practice—horizontal price fixing; (ii) the "quintessential

antitrust injury"—loss of money; and (iii) the strongest possible connection between the two—Plaintiff paid the cartel price and lost money as a result of Defendants' price fixing. *See DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d at 688.

In *Forex*, which involved similar allegations of foreign exchange benchmark manipulations by large banks (including many of these Defendants), the court easily disposed of the defendants' antitrust injury argument for reasons equally applicable here: "[T]he Complaint adequately … alleges that Defendants, who are horizontal competitors, engaged in price-fixing, which caused plaintiffs to pay supra-competitive prices … Such an injury plainly is 'of the type the antitrust laws were intended to prevent.'" 74 F. Supp. 3d at 594.

### 2.   Defendants' Argument Is Predicated on *LIBOR I*'s Legal Errors

Defendants ignore *Forex*, and instead attempt to rely on *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666 (S.D.N.Y. 2013) ("*LIBOR I*") to argue that the alleged collusion among Defendants was not anticompetitive. The question of whether Defendants' conduct was anticompetitive, however, is necessarily resolved against them by the conclusive presumption of the *per se* rule. The *LIBOR I* court's holding not only contradicts the *per se* rule, but, as the *first case ever* to allow horizontal price fixers to successfully argue that their collusion did not "harm competition," endorsed several other legal errors.

*First*, although the *LIBOR I* court accepted that plaintiffs alleged a violation of the Sherman Act,[9] it reasoned that the process of setting the LIBOR benchmark was "cooperative" and therefore could not have harmed competition. 935 F. Supp. 2d at 686 n.7, 687-88. However, because *LIBOR I* involved horizontal price fixing, the *per se* rule already conclusively presumes harm to competition. *See Socony*, 310

---

[9] This aspect of the court's analysis was consistent with the proper approach to the evaluation of antitrust injury. The court, in fact, specifically found that prices of LIBOR-based financial instruments "were affected by Defendants' unlawful behavior" such that "Plaintiffs paid more or received less than they would have in a market free from Defendants' collusion." *Id.* at 688.

U.S. at 224 & n.59; *see also Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) ("horizontal price fixing . . . is illegal *per se* without inquiry into the harm it has actually caused."). A plaintiff still must show how the conclusively presumed anticompetitive harm impacted *it*, but has no obligation to separately allege a harm to competition.

*Second*, there is no antitrust principle that requires the mechanism for fixing prices to itself be a competitive one. As the Supreme Court has noted: "the machinery employed by a combination for price-fixing is *immaterial*." *Socony*, 310 U.S. at 223 (emphasis added). Moreover, the Supreme Court has long recognized that cooperative aspects of association activities "can be rife with opportunities for anticompetitive activity." *Am. Soc. Of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982). Indeed, greater vigilance against collusion is required where competitors are already cooperating because those activities "provide[] the structure for cartel decision making, the cover for why competitors are gathering, and may also foster a climate conducive to collusion." Herbert Hovenkamp & Christopher R. Leslie, The Firm as Cartel Manager, 64 Vand. L. Rev. 813, 837-39 (2011). The Second Circuit's decision in *Allied Tube* (which *LIBOR I* ignored), squarely addressed and found antitrust liability for abuse of a cooperative standard setting process. *Indian Head, Inc. v. Allied Tube & Conduit Corp.*, 817 F.2d 938, 946-47 (2d Cir. 1987).[10] Thus, cooperative associational activities do not invalidate claims of anticompetitive harm—*they make them more likely*.

*Third*, *LIBOR I* improperly assumed, as a matter of law, that defendants' conduct did not reduce competition because only the "baseline" of LIBOR-based financial instruments was affected by the defendants' collusion, not the "final" price. But the Supreme Court has said that a horizontal conspiracy to fix *any* component of price is *per se* illegal. *See Catalano*, 446 U.S. at 648-49 (horizontal agreement to eliminate one form of competition among sellers—credit sales—is *per se* illegal even if it could ultimately

---

[10] Plaintiffs in *Allied Tube* claimed that defendants manipulated the standard-setting process to achieve *an anticompetitive effect* in the market. *See id.* The *LIBOR I* court, by contrast, incorrectly focused exclusively on whether plaintiffs were injured by anticompetitive aspects of the mechanism used to fix prices, rather than the anticompetitive effects of that behavior.

lead to corresponding decrease in invoice prices).[11]

### 3.   Defendants' Rigging of Sterling LIBOR Requires *Per Se* Condemnation

The Sterling LIBOR-rate setting process was intended to be "blind" to prevent collusive distortion of the Sterling LIBOR rate. Indeed, the only justification for the Sterling LIBOR-rate setting process is the creation of a moving daily rate reflecting competition in the interbank lending market, which allows that benchmark to be used as a competitive price term in various Sterling LIBOR-based derivatives. That justification for competitors working together was eliminated by Defendants' agreement to set prices collusively, which destroyed the legitimate justification for the "combination," making a *per se* condemnation necessary.

There is no antitrust principle that would *a priori* exempt the manipulation of a collaborative process among competitors from having anticompetitive effects and causing antitrust injury. "Any combination which tampers with price structures," regardless of the means or "machinery employed," is a *per se* violation of the Sherman Act, *Socony*, 310 U.S. at 221-23, and is conclusively presumed to harm competition. *In re Publ'n Paper*, 690 F.3d at 67.

Nevertheless, the Complaint alleges numerous ways in which Defendants manipulated prices and harmed competition. *See* ¶¶ 185-187. To constitute antitrust injury, the "injury should reflect the anticompetitive effect either of the violation *or of the anticompetitive acts made possible by the violation*." *Brunswick*, 429 U.S. at 489 (emphasis added); *see also Atl. Richfield Co. v. USA Petroleum Co.("ARCO")*, 495 U.S. 328, 344 (1990). Defendants engaged in additional anticompetitive conduct, including: (1) sharing proprietary market-sensitive information regarding their Sterling LIBOR-based derivative positions with

---

[11] Indeed, prior to the *LIBOR I* decision, courts had uniformly held that there is antitrust injury when defendants collude to rig a benchmark used as a component of prices. *See, e.g., Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987-89 (9th Cir. 2000) (defendants' conspiracy to manipulate a benchmark measuring bulk cheese auction prices, which was used as a component of the government-mandated minimum price for milk, caused antitrust injury to milk buyers); *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F .Supp. 2d 262 (D. Conn. 2003) (defendants' conspiracy to inflate the price of butter, which was used as a component of minimum milk prices, caused antitrust injury to milk buyers); *Aluminum,* 95 F. Supp. 3d at 442-44 (defendants' conspiracy to raise the Platts Midwest Premium benchmark, which is commonly used as a component of price in contracts for the purchase of aluminum, caused antitrust injury to aluminum purchasers).

other Defendants; (2) making false and "spoof" bids and offers in the Sterling money market for the purpose of manipulating Sterling LIBOR interest rates to artificial levels; (3) engaging in sham transactions and rigging bids with co-conspirators for financial instruments that were priced, benchmarked and/or settled based on Sterling LIBOR; and (4) timing illegitimate trades in Sterling money market instruments during periods of reduced liquidity to maximize the manipulative impact of such trades on Sterling LIBOR interest rates. [12] *See* ¶¶ 9, 144-155. These allegations further show that Defendants directly manipulated the prices of Sterling LIBOR-based derivatives, thereby causing antitrust injury to Plaintiff and the Class.[13]

### 4. Sterling LIBOR-Based Derivatives Were Directly Affected by Defendants' Collusion and Damages Are Sufficiently Quantifiable

Courts judge whether a plaintiff is an "efficient enforcer" by weighing four factors: (1) the directness of the claimed injury; (2) the existence of an identifiable class of persons whose self-interest motivates them to sue to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the asserted injury; and (4) the difficulty of apportioning damages among direct and indirect victims in an effort to avoid double recovery. *Id.* Defendants do not challenge prongs (2) or (4) of the test; and the question of whether Plaintiff's injuries are insufficiently "direct" or "speculative" is, like it was in *Daniel v. Am. Bd. Of Emergency Med.*—the principal case on which Defendants rely—inappropriately resolved on

---

[12] All Sterling LIBOR-based derivatives are priced, benchmarked and/or settled using a mathematical formula that incorporates Sterling LIBOR. The cost of buying or selling Pound Sterling in the future, and thus the prices of Sterling LIBOR-based derivatives, is determined using an industry standard formula that incorporates Sterling LIBOR. The calculation involves taking the "spot price" of Sterling for immediate delivery, and adjusting it to account for the "cost of carry," i.e., the amount of interest paid or received on Sterling deposits, for the duration of the agreement. ¶ 172-73. As a result, if Sterling LIBOR is artificial so is the cost of buying or selling Pound Sterling in the future and the prices of Sterling foreign exchange forwards and futures contracts.

[13] On appeal in *LIBOR I*, in attempting to distinguish plaintiffs' "benchmark" cases, defendants—including Defendants in this case—effectively conceded that antitrust injury is properly alleged where defendants also engage in collusive market transactions rather than merely fixing the index. *See Gelboim, et al. v. Bank of America Corp., et al.*, 13-cv-3565 (L) Joint Brief for Defendants-Appellees at 20-21 ECL No. 464 (2d Cir. July 17, 2015) (arguing certain precedent is distinguishable because the "cases involved manipulation of a benchmark price through transactions in the competitive market on which that benchmark was based," as opposed to false assessments of referenced market). That is exactly what Plaintiff alleges here: in addition to colluding to rig Sterling LIBOR, Defendants colluded to directly fix prices of competitive market transactions.

a motion to dismiss. 428 F. 3d 408, 437-38 (2d Cir. 2005) ("[m]aterial factual disputes exist between the parties as to the first [remoteness] and fourth [apportioning damages] factors. Thus, like the district court, we do not assume at this stage that these factors would necessarily be resolved against the plaintiffs.").[14] Plaintiff, nevertheless, satisfies the "efficient enforcer" requirements in this action.

i.   **Defendants' Collusive Rate Setting Directly Caused Plaintiff's Injuries**

An antitrust injury is direct "[w]here the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question that the loss was precisely the type of loss that the claimed violations . . . would be likely to cause." *Aluminum*, 95 F. Supp. 3d at 442 (citation omitted). The injuries suffered by Plaintiff and the Class—monetary loss as a result of being overcharged and/or underpaid in transactions for Sterling LIBOR-based derivatives—were not only "an integral act of the conspiracy" to fix the prices of these financial instruments, but their losses were "precisely the type of loss" that Defendants intended to cause by increasing the value of their own Sterling LIBOR-based derivatives positions.

Antitrust proximate causation does not require that Plaintiff was the means used by Defendants to allegedly injure participants in the Sterling LIBOR interbank cash market. *Def. Br.* at 16. Rather, Plaintiff is an efficient enforcer where its injury is "inextricably intertwined with the competitive landscape in which defendants' alleged scheme ultimately played out," *i.e.*, the market for Sterling LIBOR-based derivatives. *See Aluminum*, 95 F. Supp. 3d at 442. This requirement is met here, as the "allegations concern a dysfunction of the competitive process that . . . would not have occurred but for defendants' actions." *Id.* at 443.

All Defendants (except RBS) have *admitted* that they manipulated Sterling LIBOR to benefit their

---

[14] The Supreme Court recently observed, in discussing these factors in the context of the Lanham Act, that the latter two factors are "problematic" and "not … an *independent* basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1392 (2014); *see also DNAML Pty., Ltd. v. Apple Inc.*, No. 13 Civ. 6516 (DLC), 2014 WL 2545113, at *7 (S.D.N.Y. June 5, 2014) (applying *Lexmark* to the Clayton Act).

own Sterling LIBOR-based derivative positions. *See* ¶¶ 5, 12. They did so by extracting unlawful profits from the same market for Sterling LIBOR-based derivatives in which Plaintiff and the Class transacted. The injuries alleged, therefore, are not remote under the antitrust proximate causation test announced by the Supreme Court in *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*").

Focusing entirely on multiple links in an invented chain of causation, Defendants claim that these links depend upon a number of complicated market interactions and reconstruction of the acts of multiple decision-makers. *Def. Br.* at 17. Defendants' "remoteness" argument, however, diverges from the type of inquiry the Supreme Court in *AGC* and later cases applies to antitrust proximate causation. *AGC* "remoteness" questions whether a claimed injury relies on an initial injury to a third party, not the steps a plaintiff must take to prove a causal chain.[15]

Here, Plaintiff, as a Sterling foreign exchange forwards trader, along with other Class participants in the Sterling LIBOR-based derivatives market, were Defendants' targets. The very purpose of the collusive setting of Sterling LIBOR was to extract unlawful profits in the Sterling LIBOR-based derivatives market, not in some ancillary market that was affected secondarily. Hence, Plaintiff's claims are not remote under *AGC*.

     **ii.    Plaintiff's Injury Can Be Established With Scientific Rigor**

---

[15] In *AGC*, and subsequent cases evaluating remoteness arguments, the Supreme Court has focused primarily on whether plaintiff's injury relies on harm to a third party and a consequential loss to plaintiff. *Id.*; *see also Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 271 (1992) (plaintiff's injury was "purely contingent on the harm suffered by the broker-dealers"); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458-60 (2006) (competitor's alleged loss caused only a secondary alleged effect to plaintiff); *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9-10 (2010) (Hemi's failure to file cigarette sales reports with New York State (a third party) resulted in the State not passing such information on to New York City. Hemi's retailer customers (a fourth party) were the ones obligated to pay the tax, but chose not to do so, "causing" New York City millions of dollars in lost taxes). None of the plaintiffs in *AGC*, *Holmes*, *Anza*, or *Hemi* was the target of the defendants' conduct nor had a direct economic interest affected by the defendants' crimes. Each plaintiff's injury was dependent upon another more direct injury to a third party. As the Second Circuit has explained, the *AGC* remoteness test examines "the physical and economic nexus between the alleged violation and the harm to the plaintiff, and . . . the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendants' conduct unlawful and in providing a private remedy under § 4.'" *Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 294 (2d Cir. 1983).

The injuries to Plaintiff and the Class are not speculative because they transacted in derivatives bearing a mathematical pricing relationship to Sterling LIBOR. ¶¶ 105, 111-113. The "directness" of these pricing relationships and the predicable way a change in Sterling LIBOR impacts prices of such financial instruments was key in Defendants' anticompetitive strategy. *See, e.g.*, ¶ 113-114 (Defendants understood that "as Sterling LIBOR changes, so does the value of all Sterling LIBOR-based derivatives . . . [and] intentionally exploited such relationship for their financial benefit").

As in other antitrust and commodities manipulation cases, "[t]hrough discovery, economic experts can evaluate the impact of the defendants' illegal actions . . . and come to reasoned conclusions." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 493 (7th Cir. 2002). Nor can Defendants hide behind their own conspiracy by claiming it is "too difficult" to estimate its impact. *See Def. Br.* at 18. This same argument is routinely rejected, as "it does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981) (internal quotations and citations omitted).

Here, the Complaint alleges in detail the relationship between Sterling LIBOR and the prices of Sterling LIBOR-based derivatives. Plaintiff's damages and those of the Class are mathematically determinable.

**B.  The FTAIA Does Not Bar Plaintiff's Sherman Act Claims**

Defendants argue that the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), 15 U.S.C. § 6a, bars Plaintiff's Sherman Act claims, but wholly ignore the Complaint's allegations of domestic conduct, which are not limited by the FTAIA. *See Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 415 n.8 (2d Cir. 2014). Even as to Defendants' foreign conduct, the FTAIA does not bar Plaintiff's claims because such conduct caused "direct, substantial and reasonably foreseeable effect" on domestic commerce. *Id.* at 413-14.

19

### 1.   Defendants Engaged in Substantial Domestic Anticompetitive Conduct

During the Class Period, the Sterling foreign exchange and interest rate derivatives market was the fourth largest such market within the United States. ¶ 86.  As reflected in the Deutsche Bank CFTC Consent Order pursuant to which Deutsche Bank and Deutsche Bank, AG New York Branch paid a $600 million fine, Deutsche Bank "knowingly delivered or caused to be delivered its . . . Sterling . . . LIBOR . . . submissions . . . into the United States." Deutsche Bank CFTC Consent Order at 36. This same finding is echoed in the criminal and regulatory settlements entered by each of the other Defendants. *See* ¶ 28 ("Defendants themselves transmitted and caused Thomson Reuters . . . to electronically transmit a false Sterling LIBOR fix (as well as Defendants' own individual false Sterling LIBOR submissions) from within the United States to U.S. market participants who transacted in Sterling LIBOR-based derivatives."). Further, managers and traders from Defendants' U.S.-based offices were directly involved in the manipulation. *See* ¶¶ 14, 20, 36-37, 39-40, 44, 48, 50-51, 63-64. 71-74, 77, 239, 247.  For example, a UBS manager located in Connecticut directly manipulated UBS' LIBOR submissions (¶ 77); a Deutsche Bank manager held "Monday Risk Calls" with New York-based traders and other employees to plan how they were going to rig Sterling LIBOR (¶ 51).

Defendants, in fact, maintained extremely large and profitable operations in the United States during the Class Period, from which they transacted in a full range of Sterling LIBOR-based derivatives that benefited from and furthered their anticompetitive agreement. ¶¶ 83-84, 87. Defendants overcharged and/or underpaid not only Plaintiff, but also U.S. "asset management corporations, mortgage and loan corporations, insurance companies, banks, and other financial institutions" (¶ 57), as well as "universities, and non-profit organizations" (¶ 64). Defendants' extensive domestic misconduct automatically removes this case from the FTAIA's purview.

### 2. Defendants Rigged the U.S. Market for Sterling LIBOR-Based Derivatives, Causing a Substantial and Foreseeable Effect on Domestic Commerce

"The [FTAIA] excludes from the Sherman Act's reach much anticompetitive conduct that causes *only foreign injury*." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 158 (2004) (emphasis added) ("*Empagran I*"). Here, Defendants' price-fixing conspiracy was designed to generate illicit profits, including from U.S. counterparties, causing "a direct, substantial and foreseeable effect" on U.S. domestic commerce under § 6a(1)(A). *See* ¶¶ 104, 176-179.

In *Lotes*, the Second Circuit endorsed the Seventh Circuit's interpretation of § 6a in *Minn-Chem* and held that the "direct . . . effect" formulation "means only a 'reasonably proximate causal nexus.'" 753 F.3d at 410 (citing *Minn-Chem v. Agrium Inc.*, 683 F.3d 845 (7th Cir. 2012)). And *Minn-Chem* is directly on point. In *Minn-Chem*, the Seventh Circuit held that where an international cartel fixes a benchmark price that is used to price U.S. sales, there is a direct effect on U.S. commerce:

> Benchmark prices set in one market for general use are common: *think, for instance of the London Interbank Offered Rate (LIBOR), in the credit market.* . . . It is no stretch to say that the foreign supply restrictions, and the concomitant price increases forced upon the Chinese purchasers, were a direct—that is, proximate—cause of the subsequent price increases in the United States.

*Minn-Chem*, 683 F.3d at 859 (emphasis added). The same analysis applies here.

Defendants ignore *Lotes*' discussion of *Minn-Chem* and instead rely on *McLafferty v. Deutsche Lufthansa AG*, No. 08-1706, 2009 WL 3365881 (E.D. Pa. Oct. 16, 2009). *Def. Br.* at 19-20. In *McLafferty*, the price-fixed service was passenger travel between Europe and Japan. U.S. customers did not pay to bring any goods or services into the United States, and thus no direct or substantial effect on domestic commerce was pleaded. *McLafferty*, 2009 WL 3365881, at *3-4. By contrast, "this case does not relate to foreign effects or foreign sales, but rather sales within the United States at inflated prices." *Precision Assocs., Inc. v. Panalpina World Transp., (Holding), Ltd.*, No. 08-cv-42, 2013 WL 6481195, at *28 (E.D.N.Y. Sep. 20, 2013), *report and recommendation adopted in full*, 2014 WL 298594 (E.D.N.Y. Jan. 28, 2014) (claims

of global conspiracy to fix prices for freight forwarding services caused U.S. consumers to pay supracompetitive prices and were not barred by FTAIA, citing *Minn-Chem*).

### 3.   Plaintiff's Claims Arise Out of the Domestic Effect of Defendants' Conduct

The effect of Sterling LIBOR on domestic commerce "gives rise" to Sherman Act claims pursuant to § 6a(1)(B). In *Empagran I,* the Supreme Court found that when the vitamin seller defendants agreed to fix prices globally, leading to higher prices in the United States and independently in other countries, a purchaser in the United States could bring a Sherman Act claim for a domestic injury. 542 U.S. at 159. But a foreign purchaser could not, as *Minn-Chem* explained:

> [T]he [*Empagran*] plaintiffs were foreign purchasers of allegedly price-fixed products that were sold in foreign markets. The Court held that their claims fell outside the scope of the Sherman Act. In our case, by contrast, the plaintiffs are all U.S. purchasers, and so the particular problem addressed in *Empagran* does not arise here.

683 F.3d at 854. In this case, where the Plaintiff and the proposed Class are U.S. persons and entities involved in "U.S.-based transactions" (¶ 180), the FTAIA does not exclude Plaintiff's Sherman Act claims from the reach of the Sherman Act.

### C.  The Complaint Plausibly Alleges Horizontal Price-Fixing

### 1.   This Complaint Meets the Standard for Pleading a Contract, Combination, or Conspiracy

Liability under Section 1 requires the plaintiff to allege (and eventually prove) a "contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. §1. The Supreme Court has described a contract, combination, or conspiracy under Section 1 as "'a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). To determine whether a conspiracy exists, a court must take into account the "totality of the evidence," as opposed to "'dismembering it and viewing its separate parts.'" *Ross v. Am. Exp. Co.*, Nos. 04 Civ. 5723, 05 Civ. 7116, 2014 WL 1396492, at *25 (S.D.N.Y. Apr. 10, 2014) (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). At the pleading stage,

"once the conspiracy is established, only 'slight evidence' is necessary to connect a defendant to [the] antitrust conspiracy." *Precision Assocs. v. Palapina World Transp. (Holding) Ltd.*, No. 08-CV-42 (JG) (VVP), 2012 WL 3307486, at *2 (E.D.N.Y. Aug. 13, 2012) (citing cases).

"Because unlawful conspiracies tend to form in secret . . . proof will rarely consist of explicit agreements." *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 681 n.3 (S.D.N.Y. 2012). For this reason, conspiracies "nearly always must be proven through 'inferences that may fairly be drawn from the behavior of the alleged conspirators.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012); *see also Am. Tobacco Co. v. U.S.*, 328 U.S. 781, 809-10 (1946) (holding that a conspiracy "may be found in a course of dealings or other circumstances as well as in any exchange of words").

To plead an antitrust conspiracy, "the plaintiff need not show its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment or a trial." *Anderson News*, 680 F.3d at 184 (internal citations omitted). A plaintiff need only allege facts "plausibly suggesting" that defendants acted pursuant to an agreement as opposed to independent decision-making. *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)*. The standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556. Thus, Plaintiff need only allege enough facts to "nudge [its] claim across the line from conceivable to plausible." *Id.* at 570.

### 2. The Complaint Plausibly Alleges the Existence of an Illegal Sterling LIBOR Rate-Setting Agreement

Plaintiff alleges that during the Class Period, Defendants collusively shared information to coordinate their Sterling LIBOR submissions and manipulative trading practices to fix the prices of Sterling LIBOR-based derivatives for their financial benefit. *See, e.g.*, ¶ 116. The Complaint alleges that collusive communications occurred both directly "among Sterling LIBOR-based derivative traders and submitters ***located at different, supposedly competing, Sterling LIBOR contributor banks***," and

23

*via* messages "**relayed between Defendants** by various unidentified [John Doe] inter-dealer brokers." ¶ 118 (emphases added).

As to Barclays, UBS, Lloyds, and Deutsche Bank, Plaintiff points to direct evidence of conspiracy based on findings and these Defendants' own admissions in various government criminal and regulatory settlements, and allege a raft of additional circumstantial evidence demonstrating the plausibility of the Complaint's conspiracy allegations as to these Admitted Conspirators. As to Rabobank and RBS, Plaintiff alleges overwhelming circumstantial evidence linking the conduct of these Defendants to that of the Admitted Conspirators.

### i. The Complaint Alleges Direct Evidence of a Rate Setting Conspiracy as to Deutsche Bank, Barclays, UBS, and Lloyds

"Direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999). "An admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs." *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 654 (7th Cir. 2002); *cf. In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775, 2009 WL 3443405, at *1 (E.D.N.Y. Aug. 21, 2009) (upholding sufficiency of allegations under *Twombly* in part because "three [Defendants] have entered the Department of Justice's leniency program (and thus have no doubt admitted their involvement in price-fixing)").

**UBS**. The DOJ, CFTC, the United Kingdom's Financial Services Authority ("FSA"), and the Swiss Market Supervisory Authority issued findings that detail UBS's misconduct in making false Sterling LIBOR submissions, including that UBS based its Sterling LIBOR submissions on requests from different panel banks and expressly manipulative instructions were conveyed through interdealer brokers. *See* ¶¶ 16-18, 111(e)*; see also* UBS CFTC Order at 2; UBS DOJ Statement of Facts at 21-22. The CFTC found that from at least January 2005 to at least June 2010, "UBS made knowingly false submissions to rate-fixing panels **to benefit** its derivative positions or **the derivatives trading**

24

***positions of other banks*** in attempts to manipulate Yen, Swiss Franc, ***Sterling*** and Euro LIBOR and Euribor, and periodically, Euroyen TIBOR." ¶ 111(e) (quoting UBS CFTC Order at 2) (emphasis added).[16] UBS specifically admitted that it used interdealer brokers (*i.e.*, third party intermediaries in the financial markets) to coordinate its manipulative conduct with other panel banks. ¶ 133; *see also* UBS DOJ Statement of Facts at 21-22.

Admitting to basing Sterling LIBOR submissions on requests from different banks and conveying expressly manipulative instructions to other panel banks, including through interdealer brokers, establishes a conspiratorial agreement. Neither UBS's nor the other Defendants' conduct becomes any less collusive if it was through brokers rather than directly. *See, e.g., In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 447 (9th Cir. 1990) ("[T]he form of an exchange . . . should not be determinative of its legality.") (quoting RICHARD POSNER, ANTITRUST LAW: AN ECONOMIC PERSPECTIVE 146 (1976)); 6 PHILIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1404 (3d ed. 2010) ("The statements that would form an agreement when uttered face to face have no less effect when communicated through an intermediary.").

***Barclays***. The DOJ, CFTC, and FSA issued findings in connection with settlements with Barclays detailing its misconduct in making false Sterling LIBOR submissions, including in combination with other panel banks.[17] *See* ¶¶ 20, 111(c)-(d). During the period from at least mid-2005 through the fall

---

[16] That the CFTC distinguishes UBS's periodic knowingly false submissions regarding Euroyen TIBOR from conduct respecting Sterling LIBOR and other currencies suggests that UBS's collusive manipulation of Sterling LIBOR may have been routine, if not pervasive.

[17] Defendants argue for dismissal of Barclays Capital Inc., contending the Complaint contains no allegations beyond its corporate affiliation with Barclays Banks PLC. *Def. Br.* at 50. Defendants are wrong. The Complaint alleges the findings contained in the Barclays CFTC Order, which itself makes findings and imposes remedial sanctions against Barclays PLC, Barclays Bank PLC *and Barclays Capital Inc. See* Barclays CFTC Order. On this basis, the Complaint alleges, for example, that "[t]he CFTC found that during this time period, *Barclays' interest rate swap traders located in New York* [*i.e.*, *at Barclays Capital Inc.*] and London *regularly requested that Barclays' LIBOR submitters make false LIBOR submissions to manipulate the daily LIBOR fixing in multiple currencies, including Sterling LIBOR, to financially benefit their IBOR-based derivatives positions.*" ¶ 20 (emphasis added). All of the Complaint's allegations relating to Barclays' conduct within New York concern to Barclays Capital Inc.

of 2007, and sporadically thereafter into 2009, Barclays based its LIBOR submissions on the requests of a number of "*former Barclays swaps traders*" at different banks. (¶ 111(c)) (emphasis added). As stated in Barclay's CFTC Order, "Barclays' swaps traders also facilitated former Barclays swaps traders' requests to alter LIBOR … The Barclays submitters routinely based their LIBOR … submissions on the traders' requests in furtherance of the attempts to manipulate LIBOR … *Barclays' violative conduct involved* [*inter alia*] … *Sterling LIBOR submissions*." Barclays CFTC Order at 3 (emphasis added). As with UBS, the CFTC distinguishes Barclay's "sporadic" manipulation in the latter period (after the fall of 2007 into 2009) from the earlier period (from no later than mid-2005 through the fall of 2007), suggesting that in the earlier period Barclays' collusive manipulation of Sterling LIBOR was routine, if not pervasive.

**Lloyds**. The DOJ, CFTC, and FCA issued findings in connection with settlements with Lloyds detailing its misconduct in making false Sterling LIBOR submissions, including that Lloyds conspired with different interdealer brokers to coordinate its Sterling LIBOR submissions with other panel banks. *See* ¶¶ 21-22, 118 n.45, 131-132: *see also* Lloyds DOJ Statement of Facts at A9-A10. From at least as early as 2006 and at least as late as July 2009, Lloyds has admitted that its Sterling LIBOR submitters "contributed these improper rates in order to benefit their own trading position or *the trading position of others*," including unidentified co-conspirators. ¶ 21 (emphasis added); *see also* Lloyds DOJ Statement of Facts at A-6, ¶ 14. The FCA separately identified instances where Lloyds made Sterling LIBOR submissions based on third party traders' direct requests. ¶ 22; *see also* FCA Final Notice to Lloyds Bank plc and Bank of Scotland plc at 11, ¶ 4.30 (Jul. 28, 2014) (hereinafter "Lloyds FCA Notice")

**Deutsche Bank**. The DOJ, CFTC, FCA, and New York Department of Financial Services (DFS) issued findings in connection with settlements with Deutsche Bank detailing its misconduct in

making false LIBOR submissions.[18] Specifically, Deutsche Bank admitted that between 2005 and 2010 it manipulated Sterling LIBOR. ¶ 48. In the Consent Order entered with the DFS, pursuant to which it paid a $600 million fine, Deutsche Bank admitted that "Deutsche Bank traders and [panel] submitters *made and received requests from traders at other contributor panel banks for submissions that would be favorable to their trading positions*." *See In re Deutsche Bank AG, Deutsche Bank AG, New York Branch, Consent Order Under New York Banking Law §§ 44 and 44-a* (Apr. 23, 2015) (hereinafter "DFS Consent Order"), at ¶ 34 (emphasis added). Deutsche Bank *specifically admitted that it communicated with Defendants Barclays and UBS* in advance of making LIBOR submissions, and that instructions to manipulate benchmark submissions were given for all currencies, including Sterling LIBOR. *See, e.g.*, DFS Consent Order at ¶¶ 30, 57 (a group head within the Global Finance and Foreign Exchange Unit at Deutsche Bank directed the head London rate submitter to "Make sure our LIBORs are on the low side for all ccys [*i.e.*, currencies]." Deutsche Bank further admitted that it also "communicated with broker firms in an effort to influence IBOR submissions through the information disseminated by brokers . . . ." DFS Consent Order at ¶ 43.[19]

　　　　Against the backdrop of these factual findings and express admissions of collusive conduct, Defendants argue that the Complaint's allegations only show that the Defendants merely sought to benefit their own trading positions, and the alleged conduct "is as consistent with 'independent action' as with collusion," (*Def. Br.* at 22). This contention is contradicted by the Complaint's well-pled allegations as to these four Defendants. As to Barclays, UBS and Lloyds, the Complaint alleges detailed

---

[18] Deutsche Bank entered into a deferred prosecution agreement with the DOJ relating to violations of Title 18 United States Code, Section 1343 and Title 15 United States Code, Section 1 of the Sherman Act, and agreed to plead guilty to a violation of Title 18 United States Code, Section 1343, for wire fraud. *See* DOJ Deferred Prosecution Agreement with Deutsche Bank ("Deutsche Bank DPA"). Deutsche Bank has paid approximately $3.5 billion in penalties relating to its role in the LIBOR-setting conspiracy.

[19] The FCA separately found that Deutsche Bank's traders also made requests for false Sterling LIBOR submissions on days when Deutsche Bank did not, itself, have large position to "influence other Panel Banks [sic] future submissions," reflective of a *quid pro quo*. *See* FCA Final Notice to Deutsche Bank AG ¶ 4.29 (Apr. 23, 2015) (hereinafter "Deutsche Bank FCA Notice")

facts based on admissions and findings in government settlements, and as to Deutsche Bank, the admissions and findings contained in guilty pleas and settlements (specifically referenced in the Complaint) showing each of these Defendants sought to benefit the trading positions of other panel banks in making false Sterling LIBOR submissions.

Defendants fail to cite one case for the extraordinary proposition that a civil antitrust complaint directly related to guilty pleas, admissions, or concessions demonstrating an antitrust price fixing conspiracy should be dismissed as implausible. Government enforcement of the antitrust laws has long been recognized as a significantly important allegation at the pleadings stage. *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 661 (conspiracy plausible because defendant "conceded to have fixed prices on related products . . . during a period overlapping the period of the alleged conspiracy[.]"). Courts have consistently (and correctly) held that guilty pleas render antitrust conspiracy claims plausible. *See, e.g., In re Air Cargo*, 2009 WL 3443405 at *1 (concluding that "admissions of price-fixing by . . . the defendants certainly 'are suggestive enough to render a § 1 conspiracy plausible'"); *In re Optical Disc Drive Antitrust Litig.*, Case No. M 10-2143 RS, 2012 WL 1366718, at *2 (N.D. Cal. Apr. 19, 2012) (noting that guilty pleas are "an item of relevance as to the plausibility of plaintiffs' conspiracy claims"); *Costco Wholesale Corp v. AU Optronics Corp.*, Case No. C 11-0058 SI, 2011 WL 3809767, at *7 (N.D. Cal. Aug. 29, 2011) ("In light of the factual allegations in Costco's complaint, as well as the guilty pleas of many defendants for conspiring to fix prices of TFT-LCD panels, Costco's allegations that the conspiracy encompassed STN-LCD products are plausible on their face.").

In *Forex*, the Court rejected the argument advanced by defendants—indeed, by many of the same Defendants here—that the existence of government investigations cannot support the inference of an unlawful conspiracy. In rejecting this argument, the Court stated:

> [B]oth the scope and outcome of at least some investigations is known. The Court has taken judicial notice of penalties and fines levied by regulators in three countries against six Defendants as a result of some of the investigations detailed in the U.S. Complaint. The penalties provide non-speculative support for the inference of a conspiracy. In

> addition, while the fact of a single investigation may not be probative, the detailed allegations of investigations into the manipulation of FX benchmark rates by regulators in seemingly every significant financial market in the world lends some credence to the conspiracy allegations. *Cf. Starr*, 592 F.3d at 325 (considering DOJ's "two new investigations into whether defendants engaged in collusion and price fixing" in evaluating the plausibility of a complaint alleging a Section 1 violation).

*Forex*, 74 F. Supp. 3d at 592. *See also Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010) (reversing dismissal of antitrust claim based in part on allegations of parallel government investigations). Here, the results of these government investigations are now known. Clear and unequivocal acknowledgments by Deutsche Bank, Barclays, UBS, and Lloyds that they colluded with other panel banks to manipulate Sterling LIBOR through false rate submissions and other misconduct establishes the Complaint's plausibility of conspiracy allegations as to these Defendants.[20]

### ii.   The Complaint Alleges Overwhelming Circumstantial Evidence Linking Rabobank and RBS to the Rate-Setting Conspiracy

Apart from its direct agreement allegations and incorporated findings with respect to Deutsche Bank, UBS, Barclays, and Lloyds, the Complaint also alleges the type of conduct as to Rabobank and RBS that "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties" but that instead is precisely "conduct that indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement." *Twombly*, 550 U.S. at 557 n.4 (quotations and alteration omitted); *see also Starr,* 592 F.3d at 322 (same). "An allegation of parallel conduct … gets the complaint close to stating a claim" for purposes of surviving an initial motion to dismiss; however, "a statement of parallel conduct, … needs some setting suggesting the agreement necessary to make out a §

---

[20] To the extent Defendants attempt to rely on cases from this District that dismissed antitrust actions in the LIBOR context despite the pendency and resolution of government investigations, as the Court noted in *Forex*, such "reliance is misplaced because those cases were dismissed on antitrust injury grounds rather than plausibility grounds." *Forex*, 74 F. Supp. 3d at 592-93 n.9. *See, e.g., LIBOR I*, 935 F. Supp. 2d at 739 (finding dismissal warranted "although we are fully cognizant of the settlements that several of the defendants here have entered into with government regulators" because plaintiffs failed to meet the requirements of antitrust injury); *Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419, 2014 WL 1280464, at *10-12 (S.D.N.Y. Mar. 28, 2014) (finding dismissal warranted on antitrust injury grounds without any discussion of investigations or settlements).

1 claim." *Twombly*, 550 U.S. at 557. Thus, what is needed after *Twombly* is an allegation of parallel conduct with "some further factual enhancement," which "suggest[s] that an agreement was made." *Twombly*, 550 U.S. at 556, 557. Plaintiff alleges a litany of circumstantial evidence that provides the "setting" for an agreement among all Defendants.

Defendants argue "that at most Plaintiff's allegations suggest that individual traders at some Contributor Panel banks sought episodically to benefit their own trading positions by communicating with Sterling LIBOR submitters at their own bank, not that all seven (or any) Defendants conspired to manipulate Sterling LIBOR—much less that they all did so continuously for six years." *Def. Br.* at 23. As shown with respect to Deutsche Bank, Barclays, UBS and Lloyds, this argument flies in the face of government settlements finding that these banks colluded with other panel banks and third party brokers to manipulate Sterling LIBOR. With respect to RBS and Rabobank, Defendants fail to acknowledge the legal principles that apply when evaluating the existence of a conspiracy based on circumstantial evidence. Even absent "direct evidence" of Rabobank's and RBS' involvement in the conspiracy, Plaintiff's significant allegations based upon circumstantial evidence and parallel conduct are more than sufficient to link Rabobank and RBS to the conspiracy. *See Precision Assocs.*, 2012 WL 3307486, at *2; *Brown v. Pro Football,* 518 U.S. 231, 241 (1996).

It is reasonable to infer that the reason Rabobank and RBS—who also have admitted to submitting false LIBOR rates so as to benefit their derivatives positions in criminal and regulatory settlements—acted consistent with the Admitted Conspirators is that they were also party to the agreement. The details of guilty pleas and other settlements arising out of the same events—in the case of Rabobank, admitted manipulation of Sterling LIBOR, and, in the case of RBS, admitted collusive manipulation of LIBOR for other currencies involving an RBS Sterling LIBOR-based derivatives trader—as well as conduct mirroring that of the Admitted Conspirators, is more than sufficient to plead the plausibility of an agreement involving Rabobank and RBS.

a. **Criminal and Regulatory Settlements Provide More than Slight Evidence to Connect Rabobank and RBS to the Antitrust Conspiracy**

At the pleading stage, given that "once the conspiracy is established . . . only 'slight evidence' is necessary to connect a defendant to [an established] antitrust conspiracy[, . . .] it follows that the pleading burden may be more easily satisfied where, as here, there have been guilty pleas to criminal charges arising out of the same events." *Precision Assocs.*, 2012 WL 3307486, at *2.

Defendants incorrectly claim that the Court must restrict its analysis to the timing and nature of the LIBOR settlements identified in the various criminal and regulatory settlements. *See Def. Br.* at 20. However, as several courts have held, guilty pleas in related markets serve to bolster the Complaints' allegations. *See, e.g., In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (Wilken, C.J.) (stating that, although guilty pleas with respect to another type of memory "are not sufficient to support Plaintiffs' claims standing on their own, they do support an inference of a conspiracy in the SRAM industry"); *see also United States v. Andreas*, 216 F.3d 645, 664–66 (7th Cir. 2000) (recognizing that evidence concerning a prior conspiracy may be relevant and admissible to show the background and development of a current conspiracy). Indeed, the Second Circuit *rejected* a variant of this argument in *Starr* where defendants argued that the "'plaintiffs' allegations '[were] the very same that were thoroughly investigated and rejected by the Antitrust Division of the Department of Justice.'" *Starr*, 592 F.3d at 325.

If a government investigation that concluded without an antitrust finding does not foreclose plausibility, investigations resulting in Rabobank and RBS admitting involvement in closely related conspiracies (as described below) can only bolster the plausibility of antitrust conspiracy as to Sterling LIBOR and supports the reasonable inference that Rabobank and RBS joined the agreement.[21]

---

[21] Courts have consistently held that civil antitrust suits cannot "be circumscribed or defined by the boundaries of the criminal investigations or plea agreements." *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d. 987, 1011 (E.D. Mich. 2010); *see also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 664-65 (setting forth reasons why the DOJ may decide to limit criminal charges); *In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603, 619-20 (N.D. Ga. 1997) (holding that "no authority

**_Rabobank_**. Rabobank entered into numerous settlements in connection with its role in manipulating benchmark interest rates, including Sterling LIBOR. As part of its deferred prosecution agreement with the DOJ, a criminal information was filed charging Rabobank with wire fraud for its role in manipulating the benchmark interest rates, including Sterling LIBOR. *See* DOJ Deferred Prosecution Agreement and Attachment A Statement of Facts with Rabobank at 1-2, ¶¶ 1-2, *USA v. Cooperatieve Centrale Raffeisen-Boerenleenbank BA*, No. 3: 13cr200, Dkt. No. 14 (D. Conn. Oct. 29, 2013) ("Rabobank DPA").  In announcing the deferred prosecution agreement, Acting Assistant Attorney General Mythili Raman of the Justice Department's Criminal Division stated:

> For years, employees at Rabobank, **_often working with traders at other banks around the globe_**, illegally manipulated four different interest rates – Euribor and LIBOR for the U.S. dollar, the yen, and **_the pound sterling_** – in the hopes of fraudulently moving the market to generate profits for their traders at the expense of the bank's counterparties . . . .[22]

The CFTC also brought regulatory violations against Rabobank, charging that "**_Rabobank regularly attempted to manipulate the official LIBOR fixings for U.S. Dollar, Yen and Sterling in particular tenors_**, and knowingly delivered false, misleading or knowingly inaccurate reports concerning LIBOR for U.S. Dollar, Yen and Sterling, commodities in interstate commerce." *See* Rabobank CFTC Order at 38.[23] These charges and settlements involved conduct over the same time period for which the admitted conspirator banks have similarly confessed to engaging in collusive manipulation in the same LIBOR currencies. These allegations are more than sufficient to

---

. . . requires a civil antitrust plaintiff to plead only the facts of a prior criminal indictment. To the contrary, several cases flatly reject this theory."); *In re Vitamins Antitrust Litig.*, 2000 WL 1475705, at *11 (D. D.C. May 9, 2000) (rejecting "the notion that the guilty pleas, and cooperation agreements and the class settlements foreclose a broader conspiracy. Guilty pleas are negotiated instruments which take into account not only the culpability of the accused but the Justice Department's resources and other cases requiring the government's attention."). Further, the DOJ makes pleading decisions based on its burden of proof in criminal cases, which is higher than the standard for civil cases.

[22] Department of Justice, Press Release, dated October 29, 2013, *Rabobank Admits Wrongdoing In LIBOR Investigation, Agrees to Pay $325 Million Criminal Penalty*, (available at: http://www.justice.gov/opa/pr/rabobank-admits-wrongdoing-libor-investigation-agrees-pay-325-million-criminal-penalty) (emphasis added).

[23] In total, Rabobank paid over $1 billion in criminal and regulatory penalties and fines to regulators in at least three countries for its misconduct.

plausibly infer Rabobank's connection to the larger conspiracy.

**_RBS_**. RBS also entered into a deferred prosecution agreement with the DOJ, and agreed to the filing of a criminal information charging it with wire fraud for its role in manipulating LIBOR benchmark interest rates, and with participation in a price-fixing conspiracy in violation of the Sherman Act by rigging the Yen LIBOR benchmark interest rate with other banks. ¶¶ 23, 68-69. As part of the deferred prosecution agreement, RBS admitted this misconduct. ¶ 69.[24]

It is publicly known that RBS's Sterling LIBOR-based derivative traders colluded with UBS (one of the Admitted Conspirators) to manipulate LIBOR for at least one other currency (Yen) during the Class Period. The CFTC found that at least one of RBS's Sterling derivatives traders served as an intermediary between RBS and UBS to coordinate requests for manipulative Yen-LIBOR submissions. RBS CFTC Order at 21.  In addition, and separate from efforts to manipulate Yen-LIBOR, the CFTC also found that a RBS derivatives trader engaged in wash trades with UBS to generate brokerage commissions to compensate third party brokers for assisting UBS's attempted manipulations. RBS CFTC Order at 19, 22-23. The CFTC Order does not indicate the currencies in which such wash trades occurred. However, it is plausible that the same RBS Sterling derivatives trader who facilitated UBS' collusion with RBS also rewarded brokers that furthered the manipulative efforts. Further, while the CFTC describes Yen-LIBOR manipulation, there is ample evidence to suggest RBS also manipulated Sterling LIBOR.

In one instance, the CFTC Order indicates that the RBS Sterling cash trader had spent time socially with the UBS trader "last week," and that the two discussed false LIBOR submissions. CFTC Order at 21. Following this meeting, in a recorded chat between the two, the UBS trader requested a "low 6m in jpy [Yen-LIBOR]for the next few days." _Id._  That the UBS trader had to specify the

---

[24] RBS paid regulatory penalties, fines and disgorgement to the DOJ, CFTC and U.K. FSA totaling approximately $612 million.

operative currency to manipulate suggests that the currency manipulation varied. Further, the CFTC Order indicates that the RBS "Primary Submitter" for Yen-LIBOR was also the "Primary Submitter" for Swiss Franc LIBOR, establishing that a single person was at times responsible for making multiple or all LIBOR submissions, including Sterling LIBOR.

The CFTC Order further indicates that even after receiving inquiries from the CFTC, RBS continued to attempt to manipulate Yen and Swiss Franc LIBOR "*and other benchmark interest rates* well into 2011." RBS CFTC Order at 32 (emphasis added). In this regard, the deferred prosecution agreement between RBS and the DOJ included other undisclosed manipulative transactions that were filed under seal and not made public. *See* ¶¶ 24, 66. Because *RBS was found to have actively manipulated every other principal LIBOR benchmark* (¶ 69) and also "other [undisclosed] benchmark interest rates," and its Sterling LIBOR traders participated in RBS's admitted collusive manipulation of LIBOR, there are plainly grounds to infer that RBS collusively manipulated Sterling LIBOR.[25]

### b.   Allegations of Rabobank's and RBS' Parallel Conduct Suffice to Allege Plausible Affiliation with the Antitrust Conspiracy

Either actions or words can demonstrate entry into a conspiracy; for example, acting in parallel with other known conspirators. *See Brown,* 518 U.S. at 241 (unlawful conduct may be inferred from "uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision.") (internal citations omitted); *see also United States v. Consol. Packaging Corp.,* 575 F.2d 117, 126 (7th Cir. 1978) (recognizing cartels often "devise some subtle, unique form of conspiracy tailored to best serve their own purposes" that "cannot be easily accommodated in the

---

[25] The CFTC Order indicates, with respect to benchmark interest rate submitters for *all currencies* lacked supervision, were not informed of factors to be considered in the LIBOR submission process, were not required to document submissions, and received no training regarding communications between derivatives traders and LIBOR submitters.  RBS CFTC Order at 31-32.

familiar mold of a simple and limited conspiracy"). "It is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to this arrangement." *Ambook Enterprises v. Time, Inc.*, 612 F.2d 604, 614 (2d Cir. 1979) (quoting *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 142 (1948)).

As the Third Circuit has explained, "If six firms act in parallel fashion and there is evidence that five of the firms entered into an agreement, for example, it is reasonable to infer that the sixth firm acted consistent with the other five firms' actions because it was also a party to the agreement. This is especially so if the sister firm's behavior mirrored that of the five conceded conspirators." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 363 (3d Cir. 2004).

The behavior of the RBS and Rabobank mirrored that of Deutsche Bank, UBS, Barclays and Lloyds. The Complaint's allegations place Defendants' conduct in a "context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Starr*, 592 F.3d at 323 (citation and quotations omitted). Unlike *Twombly*, where the parallel conduct was behavior that happens in a normally functioning market every day, consistent with independent decision-making, *Twombly*, 550 U.S. at 569, Rabobank's admitted manipulation of Sterling LIBOR and RBS's admitted collusive manipulation of LIBOR for other currencies (involving an RBS Sterling trader), needless to say, was not routine everyday market behavior. *Compare In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. Ill. 2010) ("Parallel behavior of a sort anomalous in a competitive market is thus a symptom of price fixing"). The Complaint's allegations, taken as true, and supported by the independent confirmations of government settlements, demonstrate illegal behavior that is contrary to the normal functioning of the Sterling LIBOR-setting process.

The Complaint also alleges conduct by RBS and Rabobank that closely paralleled that of the Admitted Conspirators. For example, in 2006, Deutsche Bank merged its Pool Trading and Money markets Derivative ("MMD") desks to increase the bank's trading profits by aligning the desks' trading

positions across all LIBOR currencies. ¶ 157. As a result of the merger, Deutsche Bank's MMD derivatives traders sat next to Deutsche Bank's cash traders who were also LIBOR submitters, and were instructed to have open communications and encouraged to manipulate LIBOR for all currencies. ¶¶ 158-159. UBS made similar seating arrangements among traders and submitters. ¶ 163. In 2006, RBS's senior management also reorganized its trading desks so that derivatives traders and money market traders, some of whom were also LIBOR submitters, would share the same physical location within the firm, intended to encourage derivatives and submitters to share market information. ¶ 168. Rabobank introduced an almost identical structure. ¶ 66.

Defendants have admitted in government settlements that they were motivated to submit suppressed LIBOR bids to deflate their perceived borrowing costs and inflate their apparent credit worthiness, and were found to have acted on such motivation at the same time. *See, e.g.*, Deutsche Bank NYDFS Consent Order at ¶ 57.[26] Importantly, collusion was indispensable to this effort. Because of the BBA's transparency rule, a bank attempting to unilaterally skew its LIBOR submissions would stick out like a sore thumb and immediately put itself at risk of regulatory action. A conspiracy is most likely when parallel actions (like making suppressed LIBOR submissions) would be inconsistent with self-interest if undertaken unilaterally. *See, e.g., Starr*, 592 F.3d at 324.

Managers at all four of the Admitted Conspirators directed their LIBOR submitters (using the identical phrase) to stay "in the middle of the pack," with their respective submissions during the same period of time. S*ee supra* at 5 n.4.  Rabobank and RBS were also found to have used the same expression, a remarkable parallelism that more than satisfies the "slight evidence" standard to link it to the admitted

---

[26] At the very least, such suppressed LIBOR bids support an inference of a tacit agreement, which is formed by the conspirators' actions and not any express communications. *White v. R.M. Packer Co.*, 635 F.3d 571, 576 (1st Cir. 2011); *see also American Tobacco Co. v. United States*, 328 U.S. at 809-10 ("No formal agreement is necessary to constitute an unlawful conspiracy … The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchanges of words."). A tacit agreement is distinguishable from conscious parallelism by "uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision." *White*, 635 F.3d at 576 (internal quotation marks and citations omitted).

conspiracy.

The Seventh Circuit's recent ruling in *Text Messaging* is instructive in evaluating whether, as described above, plausible allegations have been made against Rabobank and RBS. The *Text Messaging* plaintiffs alleged a mixture of parallel behavior, industry structure, and industry practices that facilitate collusive behavior, including increased prices in the face of falling costs, simultaneous changes to their pricing structures, membership in a trade association, and exchange of pricing information at association meetings. *In re Text Messaging*, 630 F.3d at 627-28. The court found the allegations were sufficient to plead a plausible conspiracy: "We need not decide whether the circumstantial evidence that we have summarized is sufficient to compel an inference of conspiracy; the case is just at the complaint stage and the test for whether to dismiss a case at that stage turns on the complaint's 'plausibility.'" *Id.* at 629.

Here, accepting all factual allegations in the Complaint as true and drawing all reasonable inferences in Plaintiff's favor, Plaintiff has pled "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" of Defendants' conspiracy. *Starr*, 592 F.3d at 322 (quoting *Twombly*, 550 U.S. at 556). At the pleading stage, this is more than sufficient to permit discovery.

### 3. Defendants Engaged in Further Concerted Manipulative Action

The Complaint further alleges that Defendants colluded to manipulate the prices of Sterling LIBOR-based derivatives by conspiring, among other things, to make false bids and offers for Sterling money market instruments, arrange for sham transactions, and employ other manipulative trading strategies, such as intentionally trading when the Sterling money market was illiquid. In fact, Defendants have admitted to "pushing cash" (Deutsche Bank and Barclays), "forcing cash" (Lloyds) and engaging in "wash trades" (RBS) in Sterling LIBOR-based derivatives transactions. ¶¶ 144-155. Such conduct, which establishes separate grounds for liability under the Sherman Act, reveals Defendants' concerted strategy to enhance the manipulative impact they had on Sterling LIBOR, and generate more profits for their respective banks.

37

In addition, Plaintiff has alleged that Defendants, the other panel banks, and the BBA entered into an agreement that an average borrowing rate would be calculated from the panel banks' submissions, from which Sterling LIBOR would be fixed each day (the "Sterling LIBOR Agreement").  ¶¶ 8, 91-93.  While the Sterling LIBOR Agreement offered the benefits of competition in setting Sterling LIBOR, Defendants abused the Sterling LIBOR Agreement by taking numerous anticompetitive actions, converting the Sterling LIBOR Agreement, itself, into a contract in unreasonable restraint of trade. ¶¶ 9, 101-04.  Courts have long condemned such contracts under Section 1.  *E.g.*, *Associated Press v. United States*, 326 U.S. 1, 12 (1945) (cooperative association's "By-Laws in and of themselves were contracts in restraint of commerce in that they contained provisions designed to stifle competition in the newspaper publishing field"), citing *Socony-Vacuum Oil Co.*, 310 U.S. at 225.  Where a plaintiff has alleged such a "contract or combination" in restraint of trade, it need not plead or prove that defendants shared a "unity of purpose" before entering into such an agreement or combination.  *Eskofot A/S v. E.I. Du Pont de Nemours & Co.*, 872 F.Supp. 81, 92-93 (S.D.N.Y. 1995) (citations omitted).[27]

## III. Plaintiff Plausibly Pleads Rico Claims

Plaintiff has asserted RICO and RICO conspiracy claims against Defendants based on predicate acts in violation of the wire fraud statute, 18 U.S.C, § 1343. The elements of the federal wire fraud violation are: (1) a scheme to defraud; (2) money or property as the object of the scheme; and (3) use of the wires to further scheme. *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004), *cert. denied*, 544 U.S. 1017, *rehearing denied*, 545 U.S. 1150 (2005). To prove a wire fraud violation, it need only be shown that a defendant was one of the participants in a fraudulent scheme that was furthered by the use of

---

[27] Other courts and the leading antitrust commentators have followed *Eskofot* or its reasoning.  *Procaps S.A. v. Patheon Inc.*, No. 12-24356-CV, 2014 WL 3764002, at *8, 10 (S.D. Fla. July 30, 2014) *10, citing, *inter alia*, *Eskofot*, 872 F.Supp. at 91-92; Areeda & Hovenkamp, *Antitrust Law* ¶¶ 1400b & 1400c at p. 5 ("[a]n undisputed contract remains an agreement for antitrust purposes").  *See also Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1153-54 (9th Cir. 2003); *Helicopter Support Systems, Inc. v. Hughes Helicopter, Inc.*, 818 F.2d 1530, 1534-36 (11th Cir. 1987); *United States v. Delta Dental of Rhode Island*, 943 F. Supp. 172, 175 (D.R.I. 1996).

interstate transmission facilities. *United States v. Corey*, 566 F.2d 429, 430 n. 2 (2d Cir. 1977). Defendants do not contest that Plaintiff has adequately alleged that the object of the scheme was to obtain money or property.  Indeed, all Defendants save Barclays have pled guilty to wire fraud or had criminal wire fraud informations filed.[28]

### A.  Defendants' Recycled Standing Arguments Again Fail

Defendants reiterate improper fact-based arguments, contradicting the Complaint as they expressly reiterate their "remote injury" antitrust arguments against the RICO claims. As set forth at Part I. *supra*, Defendants' arguments are meritless, *see, e.g.*, ¶ 256; and their authorities are inapposite.[29]

### B.  The RICO Claims Are Not Impermissibly Extraterritorial

Section 1962(c) of RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Defendants' argument that Plaintiff seeks an extraterritorial application of the statute is meritless. Defendants' conduct involved the use of wires to transmit false information to persons and entities within the United States with the intent to defraud U.S. citizens, which suffices under 18 U.S.C. § 1343.

---

[28] *See* http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/04/23/db_dpa.pdf (Deutsche Bank); http://www.justice.gov/opa/pr/rbs-securities-japan-limited-agrees-plead-guilty-connection-long-running-manipulation-libor (RBS); http://www.justice.gov/opa/pr/rabobank-admits-wrongdoing-libor-investigation-agrees-pay-325-million-criminal-penalty; http://www.justice.gov/opa/pr/lloyds-banking-group-admits-wrongdoing-libor-investigation-agrees-pay-86-million-criminal (Lloyds);
http://www.justice.gov/iso/opa/resources/1392012121911745845757.pdf (UBS);
http://www.justice.gov/opa/pr/barclays-bank-plc-admits-misconduct-related-submissions-london-interbank-offered-rate-and (Barclays).

[29] *Holmes*, 503 U.S. at 271 (federal injuries were "purely contingent on the harm suffered by the broker-dealers"); *Gordon v. Palumbo*, No. 07 Civ. 6624, 2009 WL 690647 (S.D.N.Y. Mar. 9, 2009) (allegations that defendants, who included owners and operators of plaintiffs' building, the superintendent, handyman, attorneys who represented the building's management company, and certain neighbors, acted in concert, as a racketeering enterprise, to interfere with plaintiffs' legal rights as tenants of rent-stabilized apartment, failed to state how RICO was violated, by whom, or how plaintiffs were damaged).

Defendants principally rely on the non-precedential decision in *Petroleos Mexicanos v. SK Eng'g & Constr. Co.*, 572 F. App'x 60 (2d Cir. 2014), but the case does not preclude violations of the wire fraud statute from serving as predicate RICO acts here. Indeed, *Petroleos Mexicanos* relied on *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 141 (2d Cir. 2014), which reasoned that in order to determine whether defendants' scheme was properly within RICO's territorial reach, the court must analyze whether plaintiffs alleged sufficient domestic conduct for defendants' predicate acts of wire fraud.[30]

Plaintiff here has alleged claims arising from Defendants' mostly admitted domestic conduct and effect (¶¶ 104, 176-79) of using wire electronic communications to deliver false Sterling LIBOR submissions across interstate and international borders and throughout the United States.[31] ¶¶ 28, 51, 64, 77, 83-84, 87, 180, 236. Two judges in this District have recently analyzed this exact issue—predicated on the same statute, 18 U.S.C. § 1343, and the same alleged use of domestic wires—and concluded that the defendant's acts of wire fraud to manipulate LIBOR for Yen occurred domestically. *See United States v. Hayes*, 99 F. Supp. 3d 409, 420-22 (S.D.N.Y. 2015) (Francis, M.J.); *United States v. Hayes*, 12 MJ 3229, 2015 WL 4620254, at *1, 7 (S.D.N.Y. Aug. 3, 2015) (Crotty, J.). Plaintiff here, like the government in *Hayes*, alleges domestic wire fraud, making the presumption against extraterritoriality irrelevant.[32] *See* ¶¶ 13-15, 46-51 (Deutsche Bank); ¶¶ 20, 34-40 (Barclays); ¶¶ 42-44 (Rabobank); ¶¶ 53-57 (Lloyds); ¶¶ 59-64 (RBS); ¶¶ 71-77 (UBS).

---

[30] *European Community* thus does not stand for the proposition that foreign actors cannot commit wire fraud from abroad, nor does it establish any sort of bright line rule between domestic and foreign conduct that can constitute an actionable wire fraud claim. *See id.* ("We need not now decide precisely how to draw the line between domestic and extraterritorial applications of the wire fraud statute . . . because wherever that line should be drawn, the conduct alleged here clearly states a domestic cause of action.").

[31] Defendants do not explain their citation to *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29 (2d Cir. 2010) because *European Community* made clear that district courts in this Circuit were misreading *Norex* to hold that "RICO has no application outside the territory of the United States and cannot apply to a foreign enterprise." *European Community*, 764 F.3d at 134; *see also LIBOR I*, 935 F.Supp.2d at 732 (citation omitted) ("Under *Morrison*, a RICO enterprise must be a 'domestic enterprise.'").

[32] In *Hayes*, Roger Darin, a former UBS Yen-LIBOR trader and submitter based in Singapore, Tokyo, and Zurich, moved to dismiss criminal charges for conspiracy to commit wire fraud, arguing that the charges against him violate the presumption against extraterritorial application of U.S. law. *Hayes*, 2015 WL 1740830, at *2. The court rejected Darin's argument, finding

The Second Circuit recognizes that Congress intended the reach of § 1343 to encompass foreign actors and activity that used the U.S. wires to perpetrate a fraud. *See United States v. Kim*, 246 F.3d 186, 189 (2d Cir. 2001) (defendant's "fraudulent scheme was implemented while he was located in Croatia - but furthered by wire transmissions to and from New York").

### C.  Plaintiffs Allege a RICO Claim Under Section 1962(c)

To state a claim under section 1962(c) predicated on wire fraud, the complaint must adequately allege that each defendant either committed or aided and abetted at least two acts of wire fraud. "Under the mail and wire fraud statutes, it is not necessary to allege, however, that the defendants have personally used the mails or wires; it is sufficient that a defendant 'causes' the use of the mails or wires." *Jerome M. Sobel & Co. v. Fleck*, No. 03 Civ. 1041, 2003 WL 22839799, at *6 (S.D.N.Y. Dec. 1, 2003), citing 18 U.S.C. § 1341 & 1343.

In civil RICO cases involving multiple defendants, Rule 9(b) does not require that "the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity." *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998) (citation omitted). Thus, Rule 9(b) requires only "that the plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." *Id.* (citation omitted). *See also Elsevier Inc. v. W.H.P.R., Inc.*, 692 F.Supp.2d 297, 304-05 (S.D.N.Y. 2010) ("The law requires only that each defendant be apprised of the circumstances surrounding the fraudulent conduct with which he or she stands charged."). Plaintiffs easily satisfy this standard.[33]

---

that the government's allegations that Darin and his co-conspirators utilized interstate wires to cause the manipulated LIBOR fix to be published through servers in the United States and used U.S. wires to memorialize trades based on the manipulated rate were sufficiently domestic. *Id.* at *28-29, 2015 WL 1740830, at *10. The court concluded that "[t]he culpable conduct underlying the substantive count therefore occurred in the United States. The presumption against extraterritoriality is thus irrelevant to both the wire fraud and the conspiracy." *Id.*, 2015 WL 1740830, at *10.

[33] Defendants rely on *Boritzer v. Calloway*, No. 10 Civ. 6264, 2013 WL 311013, at *4 (S.D.N.Y. Jan. 24, 2013) for the proposition that all RICO elements must be "adequately pleaded as against each individual defendant." But *Boritzer* cited *DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001), a post-trial decision which actually stated (at the page cited by *Boritzer*) that "[t]he requirements of section 1962(c) must be **established** as to each individual defendant"). *Id.* at 306 (emphasis added),

### 1.   Plaintiff Adequately Alleges an Enterprise

An enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Fresh Meadow Food Servs., LLC v. RB 175 Corp.*, 282 F. App'x 94, 97 (2d Cir. 2008). The definition "is obviously broad . . . . The term 'any' ensures that the definition has wide reach, and the very concept of an association in fact is expansive." *Boyle v. United States,* 556 U.S. 938, 944 (2009). *See also Calabrese v. CSC Holdings, Inc.*, 283 F.Supp.2d 797, 811 (E.D.N.Y. 2003) ("The Second Circuit has construed the enterprise element of RICO claims liberally, holding that "[t]he language and the history of RICO suggest that Congress sought to define the term [enterprise] as broadly as possible . . . . [a]llegations of the existence of a RICO enterprise must meet only the 'notice pleading' requirements of Fed.R.Civ.Pro. 8") (citation omitted).[34]

Plaintiff satisfies this low threshold by alleging that Defendants created an association-in-fact enterprise through their routine communication with each other, as well as through participation as members of the Sterling LIBOR panel. ¶¶ 12-24, 118 n.45, 131-32, 231, 233-35.[35] Contrary to Defendants' assertion, the Second Circuit has no requirement that an enterprise have a particular "hierarchy" or even an existence beyond the accomplishment of the asserted acts. *Pavlov v. Bank of New*

---

citing *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987), *cert. denied*, 486 U.S. 1022 (1988), also a post-trial, not a pleading decision.

[34] *See, e.g., United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir. 1989) ("the language and the history suggest that Congress sought to define [enterprise] as broadly as possible, 'includ[ing]' within it every kind of legal entity and any 'group of individuals associated in fact although not a legal entity' "), quoting 18 U.S.C. § 1961(4).

[35] Defendants argue that the Complaint does "not adequately allege a plan among any, much less all, of the named Defendants to make false Sterling LIBOR submissions to the BBA." *Def. Br.* at 47. But "there is no requirement that each member of a conspiracy conspire directly with every other member of the conspiracy." *United States v. Friedman*, 854 F.2d 535, 562 (2d Cir. 1988). All that is required under *Boyle* is to show three components: (1) a purpose; (2) relationships among those associated with the enterprise, and (3) sufficient longevity to permit the associates to pursue the enterprise's purpose. 556 U.S. at 946. The Complaint details a six-year long enterprise among Defendants' traders, submitters, and management to make Sterling LIBOR submissions in favor of their Sterling LIBOR-based derivatives positions, and those of other banks.

*York Co., Inc.*, 25 Fed.App'x 70, 71 (2d Cir. 2002); *see also Purchase Real Estate Group Inc. v. Jones*, 05 Civ. 10859, 2010 WL 3377504, at *7 (S.D.N.Y. Aug. 24, 2010) (same), quoting *Pavlov*, 25 F. App'x at 71.[36]

## 2. Plaintiff Adequately Alleges Defendants Engaged In A Scheme To Defraud

The Complaint also adequately pleads a scheme to defraud, which "has been construed liberally to include any plan consummated by the use of the mails or interstate or foreign wire communications, in which artifice or deceit is employed to obtain something of value with the intention of depriving the owner of his property." *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 249 (S.D.N.Y. 2012) (citation and internal quotation marks omitted). *See, e.g.*, ¶¶ 116-155.

Defendants invent their own requirement that Plaintiff must show "'conscious knowing intent to defraud' *a targeted victim*." *Def. Br.* at 48 (emphasis added). The Second Circuit does not require pleading either allegation.[37] Here, the Complaint alleges direct and circumstantial evidence that Defendants intended to injure their counterparties, depriving them of money on each Sterling LIBOR-based derivatives position that they traded. *See, e.g.*, ¶¶ 30-31.

## 3. Plaintiff Adequately Alleges A Pattern Of Racketeering Activity

A "pattern of racketeering activity" requires only two acts of racketeering within ten years. 18 U.S.C. § 1961(5). The Complaint demonstrates that Defendants conducted the affairs of the enterprise through a pattern of racketeering activity by alleging numerous examples of Defendants' long-term and persistent manipulation of Sterling LIBOR and the prices of Sterling LIBOR-based derivatives, including multiple acts of wire fraud from coordinated false reporting. ¶¶ 247-255.

---

[36] Defendants' reliance on *First Nationwide Bank v. Gelt Funding Corp.*, 820 F.Supp.89, 98 (S.D.N.Y. 1993), aff'd, 27 F.3d 763 (2d Cir. 1994), is misplaced. The alleged enterprise in *First Nationwide* was simply the association of a mortgage broker and different borrowers who had engaged in a series of unrelated loan transactions, and plaintiff failed to specify the personnel of the enterprise or how the various defendants came together as a group.

[37] *United States v. Guadagna*, 183 F.3d 122, 129-30 (2d Cir. 1999) (where evidence showed that defendant made misrepresentations to victims with knowledge of their falsity and in contemplation of harm to the victims, and "the 'necessary result' of the ... scheme is to injure others, fraudulent intent may be inferred from the scheme itself"). *United States v. Trapilo*, 130 F.3d 547, 552 (2d Cir. 1997) (statute proscribes "use of the telecommunication systems of the United States in furtherance of a scheme whereby one intends to defraud another of property. Nothing more is required. The identity and location of the victim . . . are irrelevant.").

### D.  Plaintiff Has Stated A RICO Conspiracy Claim

Plaintiff has adequately alleged that Defendants "conspire[d] to violate . . . the provisions of subsection . . . (c) of this section," 18 U.S.C. § 1962(d), because the Complaint alleges that each "defendant knew about and agreed to facilitate the scheme." *See* ¶¶ 9, 117-34, 144-155. This is a standard "less demanding" than that for a Section 1962(c) violation. *City of New York v. Bello*, 579 F. App'x 15, 17 (2d Cir. 2014) (summary order) (citation omitted) (allegations of intent to "adopt the goal of furthering or facilitating the criminal endeavor" are sufficient). Contrary to Defendants, *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 26 n. 4 (2d Cir. 1990) required only that plaintiffs allege "some factual basis for a finding of a conscious agreement among the defendants," which Plaintiff has done.

## IV.  Plaintiff's Sherman Act and RICO Claims Are Timely

Defendants contend Plaintiff's Sherman Act and RICO claims are time barred because the Complaint purportedly shows on its face that Plaintiff was on inquiry notice that it had actionable claims in 2008. *Def. Br.* at 2426. The statute of limitations is an affirmative defense. *See BPP II*, 603 F. App'x at 59. A plaintiff need not plead facts establishing that their action is timely, *id.*, and Defendants bear a heavy burden to prevail on this theory. *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 58 (S.D.N.Y. 2012). Dismissal is appropriate only if it is clear on the face of the complaint that the claim is out of time. *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999). Private actions under the Sherman Act and RICO claims are timely if brought within four years after the cause of action arises.

The doctrine of fraudulent concealment tolls the statute of limitations for antitrust and RICO claims until the time a plaintiff discovers the claim. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194-95 (1997) (discussing antitrust law and fraudulent concealment); *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988); *In re Nine West Shoes Antitrust Litigation*, 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000). In this Circuit, a plaintiff who seeks the benefit of fraudulent concealment is required to establish three elements: (1) that the defendant concealed the existence of the cause of action from the plaintiff;

(2) that the plaintiff brought suit within the applicable limitations period upon learning of the cause of action; and (3) that the plaintiff's ignorance of the claim did not result from a lack of diligence. *Hendrickson Bros., Inc.*, 840 F.2d at 1083 (citing authorities); *Baskin v. Hawley*, 807 F.2d 1120, 1131 (2d Cir. 1986).

At the Rule 12(b)(6) stage, a plaintiff need only plead fraudulent concealment, as opposed to affirmatively proving it. *See Hinds County, Miss. v. Wachovia Bank, N.A.*, 700 F. Supp. 2d. 378, 400 (S.D.N.Y. 2010) (citing *Nine West*, 80 F. Supp. 2d at 192-93). The distinction is an important one, because Defendants' "attack[s] [on] the adequacy of the proof offered" with regard to tolling is "a matter the court does not consider on a motion to dismiss." *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06 MD 1775 (JG) (VVP), slip. op. at 31, 2010 U.S. Dist. LEXIS 146377, at *154 (E.D.N.Y. Sept. 22, 2010). Further, at the motion to dismiss stage, it is premature to require a plaintiff to make a showing of reasonable diligence. *BPP Ill.*, 603 F. App'x. at 59.[38]

With regard to the first prong, concealment is proven by showing either that "the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." *Hendrickson Bros.*, 840 F.2d at 1083; *see also Nine West*, 80 F. Supp. 2d at 192. The fact that the Complaint alleges that the conspiracy was "agreed to and implemented . . . under the guise of the defendants' trade association membership—specifically as members of the BBA—which "provided the defendants a 'cover,'" shows the alleged conspiracy to be inherently self-concealing. *Precision Associates, Inc. v. Panalpina World Transport (Holding) Ltd.*, 2011 WL 7053807, at *51 (E.D.N.Y. Jan. 4, 2011). *See also In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 514 (S.D.N.Y. 2003) ("[a]mong the principal allegations against Defendants are assertions that they reported false trade data to entities that collect that information for public dissemination. . . . Such

---

[38] The second and third prongs of fraudulent concealment present questions of fact that cannot be resolved at the motion to dismiss stage. *In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.*, 00 CIV 7804 (LMM), 2004 WL 487222, at *4 (S.D.N.Y. Mar. 12, 2004).

activities are inherently self-concealing"). Because the Complaint pleads a self-concealing conspiracy, "[p]laintiffs are not required to show that Defendants took independent affirmative steps to conceal their conduct in order to satisfy the first prong of the fraudulent concealment analysis." *In re IPO Antitrust Litig.*, 2004 WL 487222, at *4; *see also State of N.Y. v. Cedar Park Concrete Corp.*, 684 F. Supp. 1229, 1232 (S.D.N.Y. 1988).[39]

The Complaint also alleges that Defendants took multiple affirmative steps to conceal their misconduct. Defendants' management concealed the conspiracy, rearranging desks to facilitate verbal rather than written communication. ¶¶ 156-170. Deutsche Bank allowed possible relevant evidence to be destroyed, including 482 audio tapes. Deutsche Bank FCA Notice ¶ 4.121. And Defendants' conduct continued even after the CFTC, DOJ and other regulatory agencies started investigations. *See, e.g.*, UBS CFTC Order at 4-5; Deutsche Bank DPA, Attachment A, Statement of Facts at 67. With respect to Defendants' collusive market-transactions, as vividly conceded by a co-conspirator to Lloyds, "***You don't want the market knowing what you're fucking doing***." ¶ 149. Indeed, Defendants' affirmative acts of concealment were also inherently self-concealing. ¶ 191. *See In re IPO Antitrust Litig.*, 2004 WL 487222, at *4 (recognizing that bid-rigging and price-fixing conspiracies are inherently self-concealing) (citing *State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1084 (2d Cir. 1988). Without the secrecy of Defendants' conspiracy, they would not have been able to carry it out over a period of years without suffering civil and criminal liability.

Defendants state that news articles from the summer of 2008 put Plaintiff on notice as to each cause of action against each Defendant. *Def. Br.* at 24, 25-27. However, the Second Circuit in *BPP Ill.*,

---

[39] As a subjective measure not verifiable by transactions in the market, Sterling LIBOR submissions relied on the truthfulness of the submitter. ¶¶ 94-98. Indeed, the submitting banks' actual or reasonably expected costs of borrowing were not otherwise publicly disclosed, rendering it impossible for outsiders to discern any discrepancies. Further, communication within and among the Defendants likewise were not publicly available, which further precluded Plaintiff from discovering Defendants' misconduct. And the interbank lending market was generally opaque to the broader investment community, and susceptible to manipulation. ¶¶ 153-155. Thus, the subjective and discretionary nature of Defendants' LIBOR submissions as members of a private association with no government oversight, combined with internal communication, on the one hand, and the opacity of the interbank lending market, on the other, explains why Defendants' conspiracy was self-concealing.

603 F. App'x 57, has recently held in an action for fraud concerning defendant RBS's alleged manipulation of LIBOR, that these very same news articles did not support dismissal on statute of limitations grounds at the 12(b)(6) stage. The news articles lack the requisite information to put a reasonable investor on inquiry notice as to nature and extent of their injury in the Sterling LIBOR-based derivatives market. For example, none of the articles identified by Defendants suggested there was any actual evidence of collusion among panel banks to manipulate LIBOR generally, much less Sterling LIBOR specifically. At best, there is non-specific passing reference to a report which theorized that unnamed banks "might have an incentive" to manipulate LIBOR. *See* Declaration of Marc J. Gottridge, Ex. B at 2, Ex. D. at 4-5 (ECF No. 67). A later article referring to the report contradicted that assertion, noting that other research insisted banks had little incentive to "underreport Libor." *Id.*, Ex. G at 4-5. Instead, the articles suggested any variance in LIBOR rates may have been due to unspecified panel banks' concerns about signaling weakness in their financial health and were limited to the economic crisis that began in 2007. *Id.*, Ex. A at 1, Ex. B at 1-2, Ex. C at 1, Ex. D. 1-2, Ex. E at 1, Ex. F at 2, Ex. G at 2.  The news articles do not provide any basis (and Defendants cannot point to any articles that can) that there was information in the public domain suggesting panel banks were manipulating LIBOR, including Sterling LIBOR, to profit on their LIBOR-based derivatives, the identities of those manipulating panel banks and their co-conspirators, or even the period of time during which the manipulation occurred.

Plaintiff could not have known about the existence or composition of Defendants' conspiracy until the various government settlements were publicly disclosed, including Barclays' non-prosecution agreement on June 26, 2012, UBS' DOJ non-prosecution agreement on December 18, 2012, and RBS's CFTC and FCA settlements on February 6, 2013. Thus, the Complaint facially complies with the respective statute of limitation under the Sherman Act and RICO.

## V.  Plaintiff Has Sufficiently Alleged Unjust Enrichment

Defendants argue Plaintiff's claim for unjust enrichment fails as a matter of law because the Complaint fails to plead any relationship between Plaintiff and members of the putative class and any Defendant, and fails to plausibly allege how each Defendant was enriched at Plaintiff's expense. *Def. Br.* at 49-50. Defendants are mistaken.

First, under New York unjust enrichment law, "[t]here is no requirement that the aggrieved party be in privity with the party enriched at his or her expense." *See, e.g., Mandarin Trading Ltd. v. Wildenstein*, 884 N.Y.S.2d 47, 52 (1st Dep't 2009), aff'd, 919 N.Y.S.2d 465 (N.Y. 2011) (citing *Sperry v. Crompton Corp.*, 831 N.Y.S.2d 760, 863 (N.Y. 2007).

Second, Defendants' admissions in settlement agreements with the DOJ and CFTC evidence that Defendants' actions were specifically undertaken to benefit their Sterling LIBOR-based derivatives positions to the detriment of their counterparties and other market participants. *See, e.g.*, ¶¶ 139-140 (Lloyds' Sterling LIBOR Submitter brags to third party broker about how his consistently higher Sterling LIBOR submissions were responsible for bank's financial success). Because Plaintiff adequately pleads that Defendants were enriched to its and the Class' detriment, Plaintiff's unjust enrichment claims should be sustained.

## VI.  Leave To Amend

To enlarge Plaintiff's argument supporting its standing to bring CEA claims on behalf of the Class that traded Sterling LIBOR-based futures contracts during the Class Period, Plaintiff seeks leave to amend the Complaint to add one (or more) additional named plaintiff who traded Sterling LIBOR-based futures contracts during the Class Period. "Where, as here, a proposed amendment adds new parties, the propriety of amendment is governed by Rule 21 of the Federal Rules of Civil Procedure." *Momentum Luggage & Leisure Bags v. Jansport, Inc.*, No. 00 Civ. 7909, 2001 U.S. Dist. LEXIS 415, 2001 WL 58000, at *1 (S.D.N.Y. Jan. 23, 2001). A party may be added to an action "at any time, on just terms." Fed. R. Civ.

P. 21.  Under Rule 15(a)(2), leave to amend is freely granted in the interest of justice.[40] Here, Plaintiff

should be granted leave to amend in the event that Defendants' Motion to Dismiss is granted in any

respect. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss should be DENIED.

Dated:  White Plains, New York
        January 13, 2016

LOWEY DANNENBERG COHEN                LOVELL STEWART HALEBIAN
& HART, P.C.                          JACOBSON LLP


By: */s/ Geoffrey M. Horn*            By: */s/ Christopher Lovell*
    Geoffrey M. Horn                      Christopher Lovell
    Vincent Briganti                      Gary S. Jacobson
    Peter D. St. Phillip                  61 Broadway, Suite 501
    Sitso Bediako                         New York, NY 10006
    Lee J. Lefkowitz                      Tel.: 212-608-1900
    One North Broadway                    Fax: 212-719-4677
    White Plains, New York 10601          clovell@lshllp.com
    Tel.: 914-997-0500                    gsjacobson@lshllp.com
    Fax: 914-997-0035
    ghorn@lowey.com
    vbriganti@lowey.com
    pstphillip@lowey.com
    sbediako@lowey.com
    llefkowitz@lowey.com

*Counsel for Plaintiff and Proposed Interim Class Counsel*

---

[40] Plaintiff concedes that CEA claims as to Barclays, UBS and RBS are barred by the CEA's two-year statute of limitations. However, CEA claims as to Rabobank, Lloyds and Deutsche Bank are timely. As discussed, Plaintiff could not have known of these Defendants' involvement in the manipulative Sterling LIBOR scheme until their respective settlements were announced. Amended CEA claims relate back under Fed R. Civ. P. 15(c)(1)(B) to the filing of the Complaint on May 6, 2015. Under Rule 15, "[a]n amendment to a pleading relates back to the date of the original pleading when the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." FED. R. CIV. P. 15(c)(1)(B).  The Complaint specifies the facts underlying Defendants Rabobank, Lloyds and Deutsche Bank's misconduct, citing various criminal and regulatory findings of fact, which put these Defendants on notice of the facts alleged. *See Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014) (a complaint need only inform the defendant of factual basis of plaintiffs' claims, not the legal theory).