# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SONTERRA CAPITAL MASTER FUND, LTD., on
behalf of itself and all others similarly situated,

Plaintiffs,

- against -

BARCLAYS BANK PLC, BARCLAYS CAPITAL INC.,
COÖPERATIEVE CENTRALE RAIFFEISEN-
BOERENLEENBANK B.A., DEUTSCHE BANK AG,
LLOYDS BANKING GROUP PLC, THE ROYAL
BANK OF SCOTLAND PLC, UBS AG, AND JOHN
DOE NOS. 1-50,

Defendants.

Docket No. 15-cv-3538 (VSB)

FRONTPOINT EUROPEAN FUND, L.P., and
RICHARD DENNIS, on behalf of themselves and all
others similarly situated,

Plaintiffs,

- against -

BARCLAYS BANK PLC, BARCLAYS CAPITAL,
INC., COÖPERATIEVE CENTRALE
RAIFFEISEN-BOERENLEENBANK B.A.,
DEUTSCHE BANK AG, LLOYDS BANKING
GROUP PLC, THE ROYAL BANK OF SCOTLAND
PLC, UBS AG, AND JOHN DOE NOS. 1-50,

Defendants.

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT .................................................................................................... 1

SUMMARY OF PERSONAL JURISDICTION ALLEGATIONS AND FACTS ................................ 2

ARGUMENT .............................................................................................................................. 9

    I.   UBS consented to jurisdiction in a ISDA Master Agreements with FrontPoint .......... 9

    II.  Defendants are subject to specific jurisdiction because they purposefully availed themselves of the forum and caused harmful effects in the forum by their suit-related contacts ................................................................................................................ 9

        A.   Defendants' in-forum and out-of-forum acts to manipulate Sterling LIBOR and related derivatives constitute suit-related contacts ........................ 9

        B.   Defendants intentionally caused harmful effects in the United States and purposefully availed themselves of the forum ................................. 13

        C.   Personal jurisdiction over defendants comports with fair play and substantial justice ............................................................................... 16

        D.   Defendants' attempt to avoid jurisdiction ignores the application of nationwide contacts and Fifth Amendment jurisprudence ............................ 17

    III.  Defendants conspired to exploit the U.S.-market for Sterling LIBOR derivatives .... 20

    IV.  Defendants Rabobank, Deutsche Bank, RBS, and Barclays Bank consented to jurisdiction ................................................................................................................ 22

        A.   New York courts have long construed registration to do business in New York, including registration of a branch of a foreign bank, to constitute consent to jurisdiction for any matter ............................... 23

        B.   *International Shoe*, *Daimler*, and *Brown* do not undercut the *Pennsylvania Fire* line of cases .................................................................................. 27

    V.   Alternatively, this Court should allow jurisdictional discovery or a transfer of venue ................................................................................................................ 28

CONCLUSION ........................................................................................................................ 29

<u>**TABLE OF AUTHORITIES**</u>

*Cases*

*7 W. 57th Street Realty Co. v. CitiGroup, Inc.*, No. 13-cv-981, 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) ........................................................................................................................................13

*Allstate Life Ins. Co. v. Linter Group Ltd.*, 782 F. Supp 215 (S.D.N.Y. 1992) .............................21

*AM Trust v. UBS AG*, 78 F. Supp. 3d 977 (N.D. Cal. 2015) ....................................................14

*Amalgamet, Inc. v. Ledoux & Co.*, 645 F. Supp. 248 (S.D.N.Y. 1986).........................................23

*APWU v. Potter*, 343 F.3d 619 (2d Cir. 2003)........................................................................29

*Augsbury Corp. v. Petrokey Corp.*, 470 N.Y.S.2d 787 (App. Div. 1983)..................................24, 26

*Bagdon v. Philadelphia & Reading Coal & Iron Co.*, 217 N.Y. 432 (1916)...................................26

*Brown v. Lockheed Martin Corp.*, 814 F.3d 619 (2d Cir. 2016) .............................................23, 28

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) ..........................................................13, 27

*Calder v. Jones*, 465 U.S. 783 (1984).....................................................................................14

*Cleft of the Rock Found. v. Wilson*, 992 F. Supp. 574 (E.D.N.Y. 1998) .......................................21

*Daimler AG v. Bauman,* 134 S. Ct. 746 (2014) .......................................................................27

*De Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989) ...........................................28

*Del. Midland Corp. v. Westhampton Beach*, 359 N.Y.S.2d 944 (Sup. Ct. 1974) ...........................24

*Dorchester Fin. Sec, Inc. v. Banco BRJ, S.A.*, 722 F.3d 81 (2d Cir. 2013)..............................19, 20

*Eades v. Kennedy, PC Law Offices*, 799 F.3d 161 (2d Cir. 2015) ..................................................19

*First Capital Inv. Holdings LLC v. Wilson Capital Group, Inc.*, No. 10-cv-2948 (JSR), 2010 WL 4967833 (S.D.N.Y. Nov. 29, 2010) ....................................................................................21

*Gelboim v. Bank of America Corp.*, No. 12-3565-cv, 2016 WL 2956968 (2d Cir. May 23, 2016) ....................................................................................... 10, 11, 13, 21

*Gucci Am. Inc. v. Weixing Li*, 135 F. Supp. 3d 87 (S.D.N.Y. 2015) ...........................................10

*Gucci Am. v. Bank of China*, 768 F.3d 122 (2d Cir. 2014)..........................................................25

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 104 F. Supp. 2d 279 (S.D.N.Y. 2000)...............17

*Hargrave v. Oki Nursery, Inc.*, 646 F.2d 716 (2d Cir. 1980)..........................................................................17

*In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219 (S.D.N.Y. Mar. 4, 2015) .....................21

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016) ......................................................................................................................... 11, 14, 21, 22

*In re LIBOR-Based Fin. Instrs. Antitrust Litig.* ("LIBOR IV"), No. 11 MDL 2262 (NRB), 2015 WL 1634541 (S.D.N.Y. Aug. 4, 2015), *amended* 2015 WL 6243526 (Oct. 20, 2015)............................. 9, 28

*In re LIBOR-based Fin. Instruments Antitrust Litig.* ("*LIBOR V*"), No. 11 MDL 2262 (NRB), 2015 WL 6696407 (S.D.N.Y. Nov. 3, 2015). ..............................................................................................28

*In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204 (2d Cir. 2003) .................................... 10, 11

*In re S. Afr. Apartheid Litig.*, 643 F. Supp. 2d 423 (S.D.N.Y. 2009) ..........................................................18

*In re Satyam Comput. Servs. Sec. Litig.*, 915 F. Supp. 2d 450 (S.D.N.Y. 2013) ......................................21

*In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659 (2d Cir. 2013) ..................................12

*In re: Term Commodities Cotton Futures Litig.*, No. 12-cv-5126, 2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013) ...............................................................................................................................17

*Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 746 N.Y.S.2d 631 (2002) .......................................9

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982) ....................... 24, 27

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945)................................................18, 19, 27

*IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049 (2d Cir. 1993) ......................................17

*Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2015 WL 1499185 (S.D.N.Y. Mar. 31, 2015) ..............13

*Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2015 WL 1515358 (S.D.N.Y. Mar. 31, 2015) ........ 13, 21

*Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50 (2d Cir. 2012) ..........................................9, 19

*Lotes Co., Ltd. v. Hon Hai Precision Indus. Co., Ltd.*, 753 F.3d 395 (2d Cir. 2014).....................................18

*Mariash v. Morrill*, 496 F.2d 1138 (2d Cir. 1974)......................................................................18

*Mark E. Mitchell, Inc. v. Charleston Library Soc.*, 114 F. Supp. 2d 259 (S.D.N.Y. 2000) ...........................19

*Matter of B&M Kingstone, LLC v. Mega Intl. Commercial Bank Co., Ltd.*, 15 N.Y.S.3d 318 (App. Div. 2015) ..................................................................................................................................25

*Newbro v. Freed*, No. 03-cv-10308, 2004 WL 691392 (S.D.N.Y. Mar. 26, 2004) .....................................29

*Newtown Jackson Co. v. Barclays Bank*, 133 N.Y.S.2d 726 (Sup. Ct. 1954) ...................................25

*Olberding v. Illinois Central Railroad Co.*, 346 U.S. 338 (1953) ...............................................27

*Pabon v. Barclays Bank*, No. 14-cv-7897, 2016 WL 2770541 (S.D.N.Y. May 12, 2016) ........................20

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, No. 05-cv-9016, 2006 WL 708470 (S.D.N.Y. Mar. 20, 2006) ......................................................................29

*Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952) ...........................................27

*Porina v. Marward Shipping Co., Ltd.,* 521 F.3d 122 (2d Cir. 2008) ..........................................18

*Robert Mitchell Furniture Co. v. Selden Breck Construction Co.*, 257 U.S. 213 (1921) .....................24

*S. New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123 (2d Cir. 2010)......................................20

*S.E.C. v. Morton*, No. 10-cv-1720, 2011 WL 1344259 (S.D.N.Y. Mar. 31, 2011) ..................................17

*SEC v. Softpoint, Inc.*, No. 95-cv-2951, 2001 WL 43611 (S.D.N.Y. Jan. 18, 2001) ..............................19

*SEC v. Straub*, 921 F. Supp. 2d 244 (S.D.N.Y. 2013)........................................................17

*Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598 (S.D.N.Y. 2012) ..............................................29

*Simmtech Co. v. Barclays Bank plc*, 74 F. Supp. 3d 581 (S.D.N.Y. 2015).......................................14

*Singer v. Bell*, 585 F. Supp. 300 (S.D.N.Y. 1984).............................................................21

*Sonera Holding B.V. v. Cukurova Holding A.S.,* 750 F.3d 221 (2d Cir. 2014)...................................29

*Spiegel v. Schulmann*, 604 F.3d 72 (2d Cir. 2010)..........................................................26

*Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010) ...............................................20

*Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17 (2d Cir. 2004)...........................................12

*United States v. Busic*, 592 F.2d 13 (2d Cir. 1978) ..........................................................22

*United States v. Hayes*, 99 F. Supp. 3d 409 (S.D.N.Y. 2015) ...........................................12, 22

*United States v. Hayes*, No. 12-mj-3229 (PAC) (JCF), 2015 WL 4620254 (S.D.N.Y. Aug. 3, 2015) ......12

*Varga v. Credit-Suisse*, 155 N.Y.S.2d 655 (Sup. Ct. N.Y. Co.1956)...........................................25

*Varga v. Credit-Suisse*, 157 N.Y.S.2d 391 (App. Div. 1956) ................................................25

*Vera v. Republic of Cuba*, 91 F. Supp. 3d 561 (S.D.N.Y. 2015) ...............................................25

*Walden v. Fiore*, 134 S. Ct. 1115 (2014) ................................................................................14

**Statutes**

15 U.S.C. § 22 ........................................................................................................................18

18 U.S.C. § 1965 ....................................................................................................................18

7 U.S.C. § 25 ..........................................................................................................................18

N.Y. Banking Law § 200 (consol. 2015) ..........................................................................23, 24

**Rules**

C.P.L.R. § 302 .......................................................................................................................19

Fed. R. Civ. P. 4(k)(1)(C) ......................................................................................................17

Fed. R. Civ. P. 4(k)(2) ...........................................................................................................18

<u>**PRELIMINARY STATEMENT**</u>

This Court has personal jurisdiction over defendants[1] because: (1) UBS contractually consented to resolve this dispute in this Court; (2) all defendants have "minimum contacts" with the United States, both by directing their manipulation here and through their conduct in the forum; (3) all defendants were part of a conspiracy to manipulate the London Interbank Offered Rate for British Pound Sterling ("Sterling LIBOR") and Sterling LIBOR-based derivatives that operated in part through domestic actors; and (4) Rabobank, Deutsche Bank, RBS and Barclays Bank consented to personal jurisdiction in New York by registering to do business here.

UBS contracted with Plaintiff FrontPoint European Fund, L.P. to trade derivatives priced based on Sterling LIBOR while manipulating the prices of those derivatives. In its FrontPoint contracts, UBS agreed to resolve this dispute in this Court. UBS waived its right to even bring this motion in the contracts.

All defendants have sufficient minimum contacts because each knowingly directed its scheme to rip off their U.S. counterparty victims. Your Honor personally observed an admission of similar knowledge when Deutsche Bank's former U.S. Dollar ("USD") LIBOR submitter Michael Curtler pleaded guilty to LIBOR manipulation, testifying that he "knew that some of the affected parties were American financial institutions." *United States of America v. Michael Ross Curtler*, 15-cr-670 (VSB), Tr. of October 8, 2015 Hearing, (ECF No. 6) at 25:8-13, attached as *Lefkowitz Decl.* Ex. 29. Plea allocutions of former Rabobank employees in this Court contain the same admissions: they knew they were harming U.S.-based investors by infecting the U.S. LIBOR-based derivatives market with artificiality. Discovery will show additional evidence of knowledge from agents of the other

---

[1] "Defendants" refers to Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank"), Deutsche Bank AG ("Deutsche Bank"), Barclays Bank plc ("Barclays Bank"), Lloyds Banking Group plc ("Lloyds"), The Royal Bank of Scotland plc ("RBS"), and UBS AG ("UBS"). Barclays Capital Inc. has not moved to dismiss for lack of personal jurisdiction.

defendants, as well as defendants' use of bank accounts and money wires to and from the U.S. and this forum to further the manipulative scheme.

Defendants also used U.S.-based facilities, employees, and enterprises to rob their U.S. counterparties by manipulating Sterling LIBOR and Sterling LIBOR-based derivatives. Each defendant signed standardized contracts—International Swaps and Derivatives Association, Inc. ("ISDA") Master Agreements[2]—with U.S. counterparties under which they traded Sterling LIBOR-based derivatives. In a substantial portion of these agreements, defendants, like UBS in its FrontPoint ISDA, irrevocably consented to this Court's personal jurisdiction and waived any right to object to this Court's personal jurisdiction over them. And even if a defendant could colorably claim that it did not sufficiently avail itself of the benefits of doing business in the United States, the Court would still have personal jurisdiction over it because it joined a conspiracy whose members did.

Rabobank, Deutsche Bank, RBS, and Barclays Bank consented to jurisdiction in this forum by registering to do business as a foreign bank in New York. The New York statute governing foreign bank registration gives notice to registrants that they will be subject to suit in New York so long as they do business under their registration. These four defendants do substantial business, including Sterling LIBOR-based derivatives business, in New York and the United States. Settled law demands a finding that these banks consented to this Court's jurisdiction through registration.

The Complaint[3] adequately pleads specific personal jurisdiction as to each defendant. Defendants' motions to dismiss for lack of personal jurisdiction should, therefore, be denied.

## SUMMARY OF PERSONAL JURISDICTION ALLEGATIONS AND FACTS

Defendants' brief brushes aside the Complaint's allegations of how their manipulation of

---

[2] An ISDA Master Agreement is a standardized form agreement published by the International Swaps and Derivatives Association, Inc., that is used to provide certain legal and credit protections for parties who entered into over-the-counter or "OTC" derivatives, including swaps and forward rate agreements. ¶ 29 n.25.

[3] "Complaint" or "¶" refers to the Consolidated Amended Class Action Complaint. ECF No. 95.

Sterling LIBOR worked. Avoiding the many predicate steps required to make money from their manipulation, defendants ask the Court to focus only on one step in determining the motion. But each step of the manipulation is "suit-related," and each step had a connection to—and a direct impact on—the United States economy.

### A.  The manipulative steps

Stealing from their counterparties required each defendant to take the following steps:

*Step One — Contract with victims*

Targeting the immense U.S. market for Sterling LIBOR-based derivative instruments, defendants offered Sterling LIBOR-based derivatives products to U.S. investors. Before any of these investors traded their OTC Sterling LIBOR derivatives, they each entered into an ISDA Master Agreement with the defendants. *See, e.g.*, *Lefkowitz Decl.* Ex. 1. These contracts allow the parties to select either this District and the state courts of New York or the English courts as the forum to hear all disputes arising thereunder. *Lefkowitz Decl.* Ex. 1. Publicly available evidence indicates that the derivatives industry convention is to select this District and New York state courts when the counterparty is located within the United States. *Lefkowitz Decl.* ¶ 10, Exs. 5-19. *See also* Paul C. Harding, Mastering the ISDA Master Agreements (1992 and 2002), Pearson Education Ltd. (3d ed. 2010) at 405 ("U.S. parties will often insist that New York law be applied to govern the ISDA Master Agreement.")

*Step Two — Trade Sterling LIBOR-based derivatives with the U.S. victim*

Once the ISDA Master Agreement is signed, the next step is for the parties to enter into individual Sterling LIBOR-based derivative trades thereunder. *See, e.g.*, *Lefkowitz Decl.* Ex. 4. This second step involves setting terms with U.S. counterparties for each individual trade and using U.S. correspondent bank accounts to hold collateral/margin for funds exchanged. *See, e.g., Lefkowitz Decl.* Ex. 4. Each trade calls for resets (or periodic payments) based on future Sterling LIBOR rates or

"fixes" calculated by Thomson Reuters on behalf of the BBA.

   *Step Three — Examine positions and determine which way to move Sterling LIBOR to make illegal profits*

   After the trades are placed, and before the reset date or dates, defendants' traders, including

their U.S. traders, examine the bank's aggregate proprietary trading positions to determine if the

bank is "long" or "short" Sterling LIBOR. Once the bank knew which direction Sterling LIBOR

must move to benefit its position, only then could it manipulate Sterling LIBOR in a direction that

made it money or minimized potential losses.

   *Step Four — Skew Sterling LIBOR*

   Defendants focus on this one element of the scheme, rate fixing, and claim that overseas

submitters were the ones who provided the BBA, via Thomson Reuters, false Sterling LIBOR rates

used to calculate the Sterling LIBOR fix. First, the overseas submitters knew they were harming U.S.

counterparties with each false submission. Second, the Complaint pleads and the evidence shows

that certain defendants requested false rates from within the United States. In the case of Barclays

Bank, its New York-based traders asked foreign submitters to submit artificial LIBORs. ¶¶ 21, 46-

47. UBS also asked for false rates and submitted false Sterling LIBOR from its Connecticut desk. ¶¶

81-85. And regardless, all defendants are alleged to have engaged in non-rate setting manipulation

directly in the U.S. market for Sterling LIBOR-based derivatives by publishing false prices for

derivatives and lending at above- or below-market rates. ¶¶ 9, 158, 231. Defendants colluded with

each other and co-conspirators to maximize the effect of their manipulation.

   *Step Five — Profit from U.S. counterparties based on manipulated trades*

   After Thomson Reuters published the artificial Sterling LIBOR fixes, defendants returned to

their U.S. victims to collect. The illicit profits were from trades with payments based on the Sterling

LIBOR fix. For each and every Sterling LIBOR-based derivatives transaction that initiated, reset,

matured, or terminated while Sterling LIBOR was artificial, defendants received more from or paid

less to U.S. counterparties than they would have under honest market conditions. Throughout, they funneled their illicit proceeds through U.S. bank accounts and utilized U.S. employees and facilities to swindle U.S. investors. ¶¶ 20, 43, 53, 140, 172, 180, 272.

### B. Defendants' Contacts with the United States

#### UBS

UBS was a reporting bank for the Federal Reserve Bank of New York's ("FRBNY") surveys on the over-the-counter interest rate derivatives and foreign exchange market. The FRBNY surveys indicated that the Sterling foreign exchange and interest rate derivatives market was the fourth largest interest rate derivatives market in the United States. ¶¶ 94-95; *see Lefkowitz Decl.* Exs. 32 and 33. Plaintiff FrontPoint traded directly with UBS in the manipulated products pursuant to a ISDA Master Agreements. Under the agreements, UBS and FrontPoint consented to jurisdiction in New York. ¶¶ 29-31; *Lefkowitz Decl.* Exs. 2 and 3.

UBS operated an interest rate derivatives trading desk in Connecticut. ¶ 81. Traders at that desk acted as submitters or made requests to submit false Sterling LIBOR rates to harm Plaintiffs and the Class and benefit UBS's trading positions. ¶¶ 81-84. At least one UBS senior manager in Stamford, Connecticut, directly manipulated UBS's LIBOR submissions. ¶ 85.

#### Barclays Bank

Barclays Bank traded Sterling LIBOR-based derivatives with U.S. counterparties, many of which were likely governed by ISDA Master Agreements under which Barclays Bank selected New York to provide the governing law and jurisdiction. ¶ 33 and 34.[4]

Barclays Bank, in its non-prosecution agreement with the DOJ, admitted to manipulating Sterling LIBOR-based derivatives. ¶ 21. The CFTC found, and the Complaint alleges, that swap

---

[4] Barclays Bank's sister company, non-movant Barclays Capital, was a reporting bank for the FRBNY surveys on the over-the-counter interest rate derivatives and foreign exchange market.

traders at Barclays Bank in New York who dealt in these derivatives regularly asked Barclays Bank's Sterling LIBOR submitters to make false submissions to benefit their derivatives positions, to the detriment of Plaintiffs and the Class. ¶¶ 21, 46-47.

*Deutsche Bank*

Many of Deutsche Bank's U.S.-based trades were governed by ISDA Master Agreements between Deutsche Bank and its U.S. counterparties designating New York as a proper forum for disputes. ¶ 32. Deutsche Bank was also a reporting bank for the FRBNY survey. *Lefkowitz Decl.* Exs. 32-33. Deutsche Bank admitted in its U.S. Department of Justice ("DOJ") settlement that it manipulated Sterling LIBOR through its Global Finance and Foreign Exchange ("GFFX") unit (of which the Pool Trading and Money Market Derivatives desks were a part). ¶ 13. The U.K. Financial Conduct Authority ("FCA") concluded Deutsche Bank's manipulation "extended to GFFX desks abroad including . . . [in] New York." ¶ 14 (quoting FCA Final Notice to Deutsche Bank, Reference No. 150018, at 2) (emphasis added). A Deutsche Bank regional manager in New York oversaw the Pool Trading and Money Market Derivatives desks, which traded the derivatives Deutsche Bank manipulated. ¶¶ 56-57. Deutsche Bank engaged in "Monday Risk Calls," wherein traders in New York (and Deutsche Bank's other offices) discussed their positions with a supervisor, who then directed submitters how to manipulate Sterling LIBOR to benefit the Deutsche Bank's trades in the U.S. and abroad. ¶ 58. As Your Honor heard from the government during the allocution of former Deutsche Bank USD LIBOR submitter Michael Curtler, "[w]ith regard to the venue issue, the scheme involved multiple international wires into and out of the Southern District of New York . . . . Also, there were derivative traders that worked at Deutsche Bank who submitted requests that were working here in the Manhattan office." *Lefkowitz Decl.* Ex. 29 at 25:24-25, 26:1-6. On June 2, 2016, the DOJ announced the indictment of another Deutsche Bank director, Michael Connolly, who is New York-based and accused of directing his subordinates on the New York Pool Trading Desk to

"submit false or fraudulent LIBOR contributions consistent with the traders' or the bank's financial interests, rather than the honest and unbiased cost of borrowing." Press Release, U.S. Dep't of Justice, *Two Former Deutsche Bank Employees Indicted on Fraud Charges in Connection with Long-Running Manipulation of Libor* (June 2, 2016), attached as *Lefkowitz Decl.* Ex. 37. The indictment describes manipulation by Deutsche Bank New York's traders in USD LIBOR derivatives products "among other products." *Lefkowitz Decl.* Ex. 38 at 5-6.

*Rabobank*

The CFTC found, and the Complaint alleges, that Rabobank manipulated Sterling LIBOR-based derivatives from within this District. ¶ 51. Rabobank's unlawful LIBOR manipulation included acts by at least one Rabobank senior manager in New York. *Id.* Rabobank's former employees, who accomplished Rabobank's manipulation, admitted in plea allocutions that they knew U.S. investors were harmed. *See* Part II.B., *infra*. On November 5, 2015, Rabobank's former global head of cash, Anthony Allen, was convicted of conspiracy to commit wire fraud and fifteen counts of wire fraud in this District for LIBOR manipulation. *Lefkowitz Decl.* Ex. 24. He testified that he knew Rabobank's U.S. counterparties in derivatives trades based on Yen-LIBOR, U.S. Dollar LIBOR and LIBOR in "other currencies" were harmed as a result of Rabobank's manipulation:

> Q. And you understood that the interest rate swaps involved yen
> LIBOR, US dollar LIBOR?
> **A. Amongst other currencies, yes.**
> Q. And there are counterparties on the other side of these Rabobank
> interest rate swaps?
> A. Yes.
> Q. Located all over the world?
> A. Yes.
> Q. Located here in the US?
> A. Yes.
> Q. Located here in New York?
> A. Yes.
>                 * * *
> **Q. And you understood that if the individual on one side of an
> interest rate swap was manipulating LIBOR, the other side
> would lose money?**

### A. Yes.

*Lefkowitz Decl.* Ex. 24, at 1264-1265 (emphasis added).

<u>Lloyds</u>

According to the DOJ, and as alleged in the Complaint, Lloyds traded Sterling LIBOR-based derivatives with counterparties located in the United States, like Plaintiffs and the absent members of the proposed Class, while Lloyds was manipulating those derivatives to rig the trades in Lloyds' favor. ¶ 64.

The FCA found that Lloyds conspired with other banks to "force" Sterling LIBOR higher, in coordinated efforts. ¶¶ 160-66. Beginning on August 31, 2006, Lloyds overbid for Sterling deposits in the money market to force Sterling LIBOR, and specifically one-month Sterling LIBOR, higher.[5] *Id.* Through the concerted efforts of Lloyds, an unknown "Broker B," and other unidentified co-conspirators, one-month Sterling LIBOR moved higher by September 25, 2006. *Id.* Lloyds and its co-conspirators repeated this strategy at least two more times before the end of 2006, as well as at other times during the Class Period. *Id.*

<u>RBS</u>

During the Class Period, while RBS was manipulating LIBOR for multiple currencies, it traded Sterling LIBOR-based derivatives with U.S. counterparties. Many of these trades were governed by ISDA Master Agreements. ¶ 32. RBS contributed its U.S. derivatives trading data to the FRBNY survey and conducted derivatives trading from its Connecticut headquarters. ¶ 70.

In its DOJ settlement, RBS admitted it manipulated LIBOR for multiple currencies, but requested that it be kept under seal which currencies they were. ¶ 73. Sterling was likely among these currencies, as at least two RBS Sterling LIBOR traders have already been linked to manipulating

---

[5] As Sterling LIBOR is supposed to represent the inter-bank offered rate on Sterling deposits, any manipulation of the Sterling money market rates, including Sterling deposits, would cause other banks to wrongly interpret the market conditions and submit artificial Sterling LIBOR rates to the BBA. ¶ 159.

LIBOR for other currencies (¶¶ 75-77), Sterling is RBS' home currency, and RBS has Sterling

LIBOR-based derivatives traders located in United States. ¶ 69.

ARGUMENT

**I.    UBS consented to jurisdiction in ISDA Master Agreements with FrontPoint**

Defendant UBS executed ISDA Master Agreements with FrontPoint in which it consented to

jurisdiction in New York. *Lefkowitz Decl.* Exs. 2 and 3. UBS then traded with FrontPoint pursuant to

the ISDAs in the Sterling LIBOR derivatives market it and the conspiracy rigged. *Lefkowitz Decl.* Ex.

4. Under the ISDA Master Agreements governing the trades, UBS irrevocably consented to

jurisdiction in New York and waived any right to contest jurisdiction in this case. *Lefkowitz Decl.* Exs.

2 and 3.[6] To Plaintiffs' knowledge, no party has **ever** been allowed to avoid jurisdiction in this Court

for a dispute related to an ISDA Master Agreement in which it consented to jurisdiction in this

Court.

**II.    Defendants are subject to specific jurisdiction because they purposefully availed themselves of the forum and caused harmful effects in the forum by their suit-related contacts**

    **A.    Defendants' in-forum and out-of-forum acts to manipulate Sterling LIBOR and related derivatives constitute suit-related contacts**

Contacts with the forum satisfy specific personal jurisdiction when they are suit-related. There

must be "an articulable nexus or substantial relationship" between the contacts and the claim, but

---

[6] All defendants used ISDA Master Agreements (adhering to the practice of using New York jurisdiction selection clauses with their U.S. counterparties), routed funds through U.S.-based accounts, and used U.S.-based employees and facilities as they manipulated trades with in-forum counterparties to take more money than they deserved. The New York Court of Appeals has analyzed the ISDA Master Agreement and authoritatively determined that it can confer personal jurisdiction in two ways: *First*, the forum selection clause provides jurisdiction by consent; *second*, use of the forum selection clause and bank accounts in the course of the transaction demonstrates purposeful availment sufficient to establish minimum contacts. *Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 746 N.Y.S.2d 631, 636-37 (2002) (finding that "a course of dealing [using 1992 ISDA Master Agreements] has been established between the parties . . . [in] transactions through a New York bank. Such conduct constitutes purposeful exercise . . . . Not only is [defendant] subject to this state's jurisdiction because it has the requisite minimum contacts . . . it is also subject to jurisdiction based on the [consent] language in the confirmations"). *See also In re LIBOR-Based Fin. Instrs. Antitrust Litig. ("LIBOR IV")*, No. 11 MDL 2262 (NRB), 2015 WL 1634541, at *166 (S.D.N.Y. Aug. 4, 2015), amended 2015 WL 6243526 (Oct. 20, 2015) (holding that jurisdiction selection clauses in ISDA Master Agreements were a sound basis for jurisdiction in the manipulation of OTC swaps, noting that "[f]or jurisdictional purposes, the most significant type of contract are the ISDA Master Agreements used in the context of swap agreements"). *Licci* concluded that this type of conduct submits a defendant to the forum's jurisdiction. *Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 64 (2d Cir. 2012).

this "does not require a *causal relationship* . . . it is enough that the latter is not completely unmoored from the former." *Gucci Am. Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 93-94 (S.D.N.Y. 2015) (internal quotations omitted).

*Gelboim v. Bank of America Corp.*, No. 12-3565-cv, 2016 WL 2956968 (2d Cir. May 23, 2016) provides guidance on what facts are suit-related here. The *Gelboim* plaintiffs brought antitrust and other claims against the certain panel banks that contributed rates to fix the U.S. dollar LIBOR ("USD LIBOR"). In its decision, the Second Circuit confirmed that allegations describing "**the influence that a conspiracy exerts on the starting point for prices**" are sufficient to make a prima facie *per se* price-fixing antitrust claim. *Id.*, at *11 (emphasis added). In so holding, the Second Circuit recognized that the manipulation and conspiracy to manipulate the USD LIBOR fix had such a tangible impact on the market prices of related derivatives to constitute actionable conduct.

It follows then that any act that facilitates the price fixing scheme is itself a suit-related contact. Defendants in this case injected price artificiality into the U.S. market by manipulating the Sterling LIBOR fix, and that act of rigging, on its own, irrespective of whether done in the United States or from overseas, caused an injury in the U.S. markets and violated antitrust laws. *Id.*

*Gelboim* further noted that "the market for money is worldwide, with competitors offering various increments above LIBOR, or rates pegged to other benchmarks, or rates set without reference to any benchmark at all." *Id.* at *15. The Second Circuit allowed the *Gelboim* plaintiffs' antitrust claims to go forward despite the fact that the manipulation was directed not just to the U.S., but globally. Harming a global market does not allow defendants to claim that their harm to U.S. markets in particular is not suit-related. *Id*; *see also In re: Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204 (2d Cir. 2003); *see also* Complaint, *Moon v. SKM, Ltd.*, No. BC150995 (Sup. Ct. Cal. July 19, 1996), attached as *Lefkowitz Decl.* Ex. 34 (noting that the *Magnetic Audiotape* antitrust violation that arose from injury in both the U.S. and elsewhere still satisfied the effects test in the United States).

The Second Circuit in *Magnetic Audiotape* concluded that a single price-fixing meeting held overseas could have effects on the U.S. market sufficient to subject the foreign colluders to personal jurisdiction in an antitrust suit brought by affected U.S. consumers. *Magnetic Audiotape*, 334 F.3d at 208. The overseas meeting, therefore, constituted a suit-related contact. This Court's inquiry is not limited to whether the employees were sitting in the United States when they clicked "send" on e-mails to Thomson Reuters with phony rates. Plaintiffs traded with defendants and others who were at the mercy of defendants' "influence . . . on the starting point for prices" in the United States and elsewhere. *Gelboim*, 2016 WL 2956968, at *11. The acts by which defendants influenced prices in the U.S. are therefore suit-related contacts that, as discussed below, give rise to jurisdiction. The Second Circuit has therefore established that creating U.S.-market artificiality is an act of purposeful availment or purposeful direction into the forum. *Id.* Under the effects test, that artificiality is sufficient to defeat a motion to dismiss for lack of personal jurisdiction. *Magnetic Audiotape*, 334 F.3d at 208 ("[Plaintiffs] point to minutes from a meeting showing that an executive of SKM was present at a meeting in Seoul in which price-fixing activities took place. For purposes of a motion to dismiss, this arguably would satisfy the "effects" test frequently used in the analysis of specific personal jurisdiction.").

If a contact creates "a 'plausible inference' based on factual allegations that a defendant acted illegally in the United States or 'intended his [actions] to cause injury in the United States,'" the contact is by definition suit-related. *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 1268267, at *6 (S.D.N.Y. Mar. 31, 2016) ("*FX II*"). Defendants here had both types of contact with the United States.

Plaintiffs plead in-forum contacts by defendants. Defendants "deliberately thrust[ ] [themselves] into the New York financial market by establishing" U.S.-based Sterling LIBOR trading enterprises to take advantage of the enormous profits they could reap here by transacting at products priced to

11

an artificial rate. *See Gucci*, 135 F. Supp. 3d at 95. Defendants' U.S.-based trades create a relationship between "transactions occurring within the [forum] and the cause of action sued upon." *Sunward Electronics, Inc. v. McDonald*, 362 F.3d 17, 23 (2d Cir. 2004) (internal quotations omitted). Here, as in *FX II,* none of the defendants seriously disputes that it regularly traded billions of dollars' worth of Sterling LIBOR-based derivatives in this forum with U.S. counterparties throughout the Class Period while they exploited that market. Instead, they attempt to distinguish *FX II* by arguing that in this case, Plaintiffs' claims "arise from the Foreign Defendants' alleged manipulation of Sterling LIBOR," not from "their alleged transactions in Sterling LIBOR-based derivatives in New York and the U.S." *Defs. Br.* at 21. *Gelboim* does not permit this distinction.

Defendants also had out-of-forum contacts that are nevertheless suit-related. Defendants intended their manipulation to impact Sterling LIBOR derivatives transacted in the United States. *See In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 678 (2d Cir. 2013) (out-of-forum conduct gives rise to specific jurisdiction where the defendant participates in a scheme "known to be targeting the United States"); *United States v. Hayes*, 99 F. Supp. 3d 409, 423 n.4 (S.D.N.Y. 2015), *endorsed*, 2015 WL 4620254 (S.D.N.Y. Aug. 3, 2015) (rejecting Yen-LIBOR criminal defendant's argument that his "knowledge that the LIBOR figures were published globally . . . cannot provide a sufficiently targeted basis for personal jurisdiction . . . . [I]f [this were] true, it would work to insulate from prosecution those accused of wide-ranging frauds merely because of their expansive scope . . . . [O]ne who enters in a conspiracy with a global scale risk[s] being held to account for his illegal actions where[ever] his [ ] manipulation efforts had effects.").[7,8]

---

[7] Moreover, the Complaint here pleads non-rate setting collusion and anti-competitive conduct that, as found in *FX II*, is also sufficient to create suit-related contacts. The Complaint pleads that defendants "forced LIBOR" or "pushed cash," intentionally borrowing or loaning pound sterling at above or below prevailing market prices to manipulate the cost of borrowing (¶ 158), and "spoofed," publishing false prices to influence Sterling LIBOR derivatives and submissions at other banks not involved in the conspiracy. *Id.*

[8] Defendants urge this Court to follow other "IBOR"-related decisions in this District. But those cases, for different reasons, do not and should not apply to the claims before the Court. Defendants' citation of *7 W. 57th Street* is

The allegations in the complaint, which are suit-related under *Gelboim*, bring about personal jurisdiction both by defendants' in-forum acts and by their acts abroad that caused a harmful effect in the forum.

### B. Defendants intentionally caused harmful effects in the United States and purposefully availed themselves of the forum

Where a defendant's contacts are suit-related and such "contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State," specific jurisdiction is proper. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Every time a co-conspirator defendant targeted a U.S. counterparty by entering into an ISDA and/or a trade with that counterparty; manipulated Sterling LIBOR-based derivatives knowing the U.S. market was infected by their acts; or collected illicit returns from their U.S.-based victims, they purposefully availed themselves of the forum and, in the process, committed a *per se* violation of the antitrust laws. *See Gelboim*, 2016 WL 2956968, at *11.

Defendants did not fortuitously contact the United States. Rather, they executed essential elements of their scheme here using, to their benefit, their status as panel banks and U.S. derivatives dealers. Deutsche Bank manipulated Sterling LIBOR-based derivatives via its New York GFFX desk, the New York regional manager, who oversaw the Pool Trading and Money Market Derivatives desks, and likely others. ¶¶ 14, 56-57. Barclays Bank's traders in New York regularly asked Barclays Bank's Sterling LIBOR submitters to make false submissions, to benefit their derivatives positions and to the detriment of Plaintiffs and the Class. ¶ 21, 46-47. A Rabobank senior

---

completely non-precedential. In that case, Judge Gardephe granted a motion to dismiss because "[o]nly two paragraphs in the 72-page Amended Complaint even hint at a connection between New York and the Defendants' suit-related conduct." *7 W. 57th Street Realty Co. v. CitiGroup, Inc.*, No. 13-cv-981, 2015 WL 1514539, at *10 (S.D.N.Y. Mar. 31, 2015). That is hardly the pleading here. The Court can also put the *Laydon* decision aside; it dismissed none of the defendants in this case. *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2015 WL 1515358 (S.D.N.Y. Mar. 31, 2015). Further, the allegations against defendants here are distinct from the allegations made against the Japanese bank defendants in the *Laydon* decision. There were no government settlements available at the time of the *Laydon* action confirming manipulation and conspiracy among the Japanese banks.

manager in New York was responsible for manipulating LIBOR. ¶ 51. UBS traders acted as submitters and made requests for false Sterling LIBOR submissions with at least one UBS senior manager in Stamford, directly manipulating UBS's LIBOR submissions. ¶¶ 81-85.

Defendants' expansive Sterling LIBOR-based derivatives trading operations in the United States mirror those contacts found by Judge Schofield to be sufficient, when combined with allegations of manipulation, to support personal jurisdiction.[9] *See FX II*, 2016 WL 1268267, at *6 (Defendants' argument that the complaint did not identify a single manipulated trade in the United States was "unavailing, and amounts to 'a demand for specifics that are not required, and that Plaintiffs could not be reasonably expected to know, at the pleading stage.'") (citing *Simmtech Co. v. Barclays Bank plc*, 74 F. Supp. 3d 581, 595 (S.D.N.Y. 2015)). Judge Schofield found that a plaintiff meets the plausible inference requirement by "provid[ing] undisputed averments concerning the . . . Defendants' extensive U.S.-based [derivative trading] operations." *Id.* The complaint cites myriad other examples of defendants' in-forum acts that purposefully availed the forum. *See* SUMMARY OF PERSONAL JURISDICTION ALLEGATIONS AND FACTS, *supra*.

Defendants are also subject to jurisdiction by causing harmful effects in the forum. Defendants' overseas manipulators, which they present to this Court in isolation, knew their acts caused harmful effects in the United States. Some even admitted they knew of these harmful effects in related sworn

---

[9] Defendants urge the Court to ignore their substantial suit-related trading activities in the forum because they directed much of their rigged trading at non-party residents of this forum. *Defs. Br.* at 19, n.22. In fact, contacts with non-parties (class members or not) in the forum *are* relevant for specific jurisdiction because such contacts are part of a defendant's "relationship" with the forum. *See Calder v. Jones*, 465 U.S. 783 (1984) (finding jurisdiction due to defendants' telephonic interviews with non-parties in the forum, circulating their magazine to non-parties in the forum, and causing injury to plaintiff that defendants knew would occur in the forum). *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) (The "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."). Defendants cite *AM Trust v. UBS AG* for the proposition that Sterling LIBOR-based transactions with absent class members are not contacts with the forum. *Defs. Br.* at 19 n.22. But the *AM Trust* court noted that the *only* connection between the defendant and the forum was that "some members of the [class of plaintiffs whose funds were allegedly embezzled by a Swiss bank in Switzerland to accounts also located in Switzerland] reside in California and in this District." 78 F. Supp. 3d 977, 983 (N.D. Cal. 2015). In *AM Trust*, the plaintiffs did not allege that the defendant reached into the forum to defraud investors (or do anything else), as Plaintiffs do here.

plea allocutions, one of which before Your Honor. Defendants knew when Sterling LIBOR transactions would begin, reset, and mature; they knew who the counterparties were, and they knew which tenor of Sterling LIBOR was involved. They intentionally manipulated the individual trades to profit off their U.S. counterparties.

Rabobank trader Lee Stewart also explained that he intentionally harmed U.S. counterparties by manipulating LIBOR, testifying that:

> "[i]n connection with trading financial instruments tied to LIBOR that I and others at Rabobank conducted, I knew that the profit or loss that flowed from this trading could be directly affected by the relevant LIBOR rate on [a] particular date. Further, I knew Rabobank regularly settled trades with certain counterparties located in the United States."

*Lefkowitz Decl.* Ex. 26, at 15:6-12. After the trial of two former Rabobank employees, Judge Rakoff denied the defendants' motion for a new trial. The defendants argued that they did not "intend" harm to U.S. counterparties. Judge Rakoff observed that:

> Mr. Allen while testifying answered "yes" to the question "And you understood that if the individual on one side of an interest rate swap was manipulating LIBOR, the other side would lose money?"

*Lefkowitz Decl.* Ex. 28, at 9. Another Rabobank submitter, Paul Robson, pled guilty in this District and admitted that the scheme harmed counterparties in this District and throughout the U.S.:

> THE COURT: In addition to knowing that it was wrong to do so, you realized, did you not, that your scheme would cause harm to those who were not aware of the way in which the rate was being manipulated, correct?
>
> THE DEFENDANT: Yes, your Honor."

*Lefkowitz Decl.* Ex. 27, at 13.

Your Honor personally heard the same admission with respect to Deutsche Bank and its submitter Michael Curtler, who testified:

> [w]hen I altered Libor to support Deutsche Bank's trading positions, I understood that the counterparties on the opposite side of these

trades could be negatively affected. **I knew that some of the affected parties were American financial institutions and that some of these trades would involve wire transfers beginning or ending in the United States.**

*Lefkowitz Decl.* Ex. 23 at 25:8-13 (emphasis added).

Defendants argue that some (not all) of their employees who were convicted of or implicated in LIBOR manipulation admitted to doing so in LIBOR-based derivatives of other currencies, not Sterling, in part or in whole. *Defs. Br.* at 17-19. This extension of the fraud to IBORs for currencies beyond Sterling only demonstrates that defendants' manipulation was widespread and routine, not that defendants limited their LIBOR manipulation to other currencies. In fact, Curtler received an email message in 2007 from David Nicholls, who managed Deutsche Bank's global finance and FX forward trading desk, in which Nicholls instructed Curtler "[m]ake sure our libors are on the low side **for all ccys [currencies]**." *See* Tom Schoenberg and Suzi Ring, *Deutsche Bank Libor Probe Said to Rise to Former Trading Manager*, Bloomberg, Oct. 15, 2015, attached as *Lefkowitz Decl.* Ex. 36. This email was cited by both New York and German regulators investigating the culture of manipulation at Deutsche Bank. *Id.* Discovery will likely reveal similar instructions from other defendants' employees.

Defendants' manipulation created a U.S. trading environment in which defendants won every time, akin to the conspiracy exposed in *Magnetic Audiotape* and virtually identical to that in *Gelboim*. The entire purpose of was to profit off of Plaintiffs and other U.S. investors by altering the prices of and payments due under Sterling LIBOR-based derivatives. These profits arose from self-directed contacts with and at the expense of counterparties in New York and elsewhere in the United States.

### C.  Personal jurisdiction over defendants comports with fair play and substantial justice

The "fair play" prong of personal jurisdiction due process has diminished as modern technology and transportation ease the burden of litigating in a distant forum. Defendants are major

international corporations with "significant international resources," and all have a U.S. presence. *In re: Term Commodities Cotton Futures Litig.*, No. 12-cv-5126, 2013 WL 9815198, at *30 (S.D.N.Y. Dec. 20, 2013) (holding "the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago."). *See Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 104 F. Supp. 2d 279, 284 (S.D.N.Y. 2000) (Courts analyzing personal jurisdiction in cases brought under statutes authorizing nationwide service of process "undertake[ ] little independent inquiry into the fairness of subjecting the defendant to the jurisdiction of the forum."). There are no concerns about fair play here, as "such unfairness will rarely be found . . . in a federal-question case coupled with nationwide service of process." *S.E.C. v. Morton*, No. 10-cv-1720 (LAK), 2011 WL 1344259, at *12 (S.D.N.Y. Mar. 31, 2011), *report and recommendation adopted,* 2011 WL 11768504 (S.D.N.Y. Nov. 3, 2011).

### D. Defendants' attempt to avoid jurisdiction ignores the application of nationwide contacts and Fifth Amendment jurisprudence

#### 1. *Specific jurisdiction must be analyzed using a nationwide contacts standard*

Defendants' argument that the only relevant contacts are those with New York fails both because defendants' contacts with New York are sufficient to give rise to jurisdiction (*see* SUMMARY OF PERSONAL JURISDICTION ALLEGATIONS AND FACTS, Part II.A., and II.B, *supra*) and because this Court must analyze jurisdiction based on nationwide contacts. "When the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nation-wide service of process . . . the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state." *SEC v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013); *see* FED. R. CIV. P. 4(k)(1)(C).[10]

---

[10] This Court should also assert supplemental jurisdiction over Plaintiffs' state law claims because there is no dispute that they have "a nucleus of pertinent facts in common with a substantial federal claim." *Hargrave v. Oki Nursery, Inc.*, 646 F.2d 716, 719 (2d Cir. 1980); *see also IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993).

Plaintiffs' Sherman Act, RICO, and CEA claims arise under statutes that permit a defendant to be sued in any district where the defendant is found or where the violation occurred, and for process to be served wherever a defendant is found. *See* 7 U.S.C. § 25; 15 U.S.C. § 22; 18 U.S.C. § 1965.[11, 12]

### 2. *The Complaint sufficiently pleads personal jurisdiction under the Fifth Amendment*

When a plaintiff invokes the Court's federal question jurisdiction by asserting claims under federal statutes authorizing nationwide service of process, as here, specific jurisdiction over a defendant is analyzed differently from the traditional "minimum contacts" test in *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). The *International Shoe* test incorporates concerns about interstate federalism and state sovereignty, which are absent in a Fifth Amendment analysis.

In cases invoking federal legislation and nationwide service of process, Courts determine personal jurisdiction by considering the weighty national interests against the defendants' liberty rights. The resulting inquiry gives more deference to the federal government's enforcement of congressionally enacted legislative policies than under the interstate federalism-focused *International Shoe* "minimum contacts" test. *See Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974) ("the 'minimal contacts' principle does not, in our view, seem particularly relevant in evaluating the constitutionality of in personam jurisdiction based on nationwide, but not extraterritorial, service of process."); *SEC v. Softpoint, Inc.*, No. 95-cv-2951, 2001 WL 43611, at *5 (S.D.N.Y. Jan. 18, 2001)

---

[11] Although defendants assert that a nationwide contacts analysis is unnecessary if the federal claims fail on the merits, this argument is contrary to precedent. *Lotes Co., Ltd. v. Hon Hai Precision Indus. Co., Ltd.*, 753 F.3d 395, 403 n.3 (2d Cir. 2014) ("Jurisdiction is an issue distinct from and logically prior to the merits of a claim, and the Supreme Court has held that the nonexistence of a cause of action [i]s no proper basis for a jurisdictional dismissal.") (internal citation omitted).

[12] Even if this Court did not employ specific jurisdiction based on nationwide service of process, the Court should assert jurisdiction over Rabobank, Deutsche Bank, and Lloyds under FED. R. CIV. P. 4(k)(2) because: (1) the causes of action arise under federal law; (2) Defendants argue that they are not subject to jurisdiction in any state, and cannot say otherwise for the application of 4(k)(2); and (3) sufficient contacts with the U.S. exist such that personal jurisdiction over defendants is consistent with due process. *See Porina v. Marward Shipping Co., Ltd.*, 521 F.3d 122, 127 (2d Cir. 2008); *In re S. Afr. Apartheid Litig.*, 643 F. Supp. 2d 423, 434 (S.D.N.Y. 2009). The burden shifts to defendants to establish they are subject to jurisdiction in another state and therefore not subject to Rule 4(k)(2) jurisdiction, an argument defendants already waived because they claim they are not subject to suit anywhere in the United States. If the Court so directs, Plaintiffs will submit an affirmation to further support jurisdiction under Rule 4(k)(2).

(Lynch, *J.*) (holding that the reasonableness of jurisdiction "is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process."); *Mark E. Mitchell, Inc. v. Charleston Library Soc.,* 114 F. Supp. 2d 259, 263-64 (S.D.N.Y. 2000) (Kaplan, *J.*) ("The exercise of personal jurisdiction in [a federal question case] is subject only to the limitations imposed by the Due Process Clause of the Fifth Amendment, **which are less restrictive** because they do not reflect concern with limiting incursions on state sovereignty by the exercise of jurisdiction by other states and because there is an independent federal interest in providing for resolution of federal claims.") (emphasis added).

> 3.  *Notwithstanding the applicability of the Fifth Amendment, the Complaint satisfies the Fourteenth Amendment* International Shoe *minimum contacts standard*

Even if the Court decides to follow the *International Shoe* standard, rather than the Fifth Amendment standard, it has jurisdiction over defendants because the exercise of jurisdiction comports with Fourteenth Amendment Due Process. *Licci*, 673 F.3d at 59.[13]

The Fourteenth Amendment provides that a court may exercise specific jurisdiction over a defendant who maintains certain minimum contacts with the forum based on "single or occasional" acts. *International Shoe,* 326 U.S. at 316; *accord Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015) ("[P]roof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendants' activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."). The contacts described above meet this standard, particularly before discovery, when a plaintiff need only allege facts which support (not prove) a *prima facie* basis for jurisdiction. *Dorchester Fin. Sec, Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 87 (2d Cir. 2013); *see also In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d at 206.

---

[13] Defendants do not contest service or seek to dismiss based on the New York long arm statute (C.P.L.R. § 302). *See Defs. Br.* at 9. However, Plaintiffs have alleged facts that comply with the provisions of that statute, including § 302(a)(1); (a)(2) and (a)(3).

Plaintiffs' "own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *S. New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010). Defendants' contrary evidence *cannot be considered* before Plaintiffs test it through discovery and an evidentiary hearing. *See Dorchester*, 722 F.3d at 87.[14]

## III.    Defendants conspired to exploit the U.S.-market for Sterling LIBOR derivatives

The volume of facts available in the related government prosecutions against these defendants is more comprehensive for some banks than for others.[15] For example, RBS admitted it manipulated LIBOR for multiple currencies, but requested the pertinent facts be kept under seal (¶ 73). For other defendants, the facts of their manipulation of Sterling LIBOR have been more widely disclosed. But even if a defendant appears to have fewer contacts in isolation, the Court still has personal jurisdiction over it because the Complaint plausibly pleads that defendants joined a conspiracy with significant U.S. contacts.[16]

---

[14] For example, Lloyds, in its declaration, claims that it had no "U.S.-based *employee*[ ] make or have any input into the Sterling LIBOR submissions." Decl. of Kevin P. McKendry (ECF No. 108) ¶ 8 (emphasis added). But Lloyds does not disclaim involvement in a conspiracy involving U.S.-based co-conspirators. Nor does it deny that manipulation of U.S.-based transactions was a factor in Lloyds' false submissions. The same slanted, self-serving, imprecise statements compose all the declarations. Barclays Bank submitted a declaration in support of its motion asserting that "[n]o U.S. branch or office of BBPLC has ever been responsible for the determination or submission of rates to the British Banker's Association in the U.K. for use in the calculation of Sterling LIBOR" and that "BBPLC's Sterling LIBOR submissions are determined by employees in London and transmitted from London." Decl. of Patrick Gonsalves, ECF No. 106, ¶ 16, Executed November 12, 2015. Barclays Bank filed a declaration with *nearly identical* language in *In re LIBOR-based Financial Instruments Antitrust Litigation* ("USD LIBOR") with the only difference being the reference to U.S. Dollar LIBOR instead of Sterling LIBOR. *In re LIBOR-based Fin. Instruments Antitrust Litig.*, No. 11-md-2262 (NRB), Declaration of Patrick Gonsalves in support of Barclays Bank PLC's Motion to Dismiss Certain Direction Actions for Lack of Personal Jurisdiction, ECF No. 759 ("Gonsalves USD LIBOR Decl."), ¶ 16, Nov. 6, 2014. Contrary to Gonsalves' statements in his USD LIBOR declaration, the CFTC found that Barclays Bank employees located within New York *regularly determined* what U.S. Dollar LIBOR submissions would benefit their own trading positions, *requested those submissions*, and that their requests were *regularly accommodated*. ¶¶ 21, 46-47.

[15] The existence of government investigations of a conspiracy makes the conspiracy plausible. *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010) (the existence of a DOJ investigation into a conspiracy is "plausible grounds to infer an agreement") (citations omitted)). But even if this Court finds the government investigations have not yet yielded conclusive evidence of conspiracy (which it should not), the government investigations have not necessarily turned up all the available evidence and do not end the inquiry; they only highlight the need for jurisdictional discovery to find more. *Pabon v. Barclays Bank*, No. 14-cv-7897, 2016 WL 2770541, at *3 (S.D.N.Y. May 12, 2016) (noting that the "alleged misconduct [was not] confined entirely or even principally to" the government's investigation into LIBOR rate fixing).

[16] Plaintiffs' incorporate by reference their discussion of the pleaded facts of conspiracy in their accompanying Rule 12(b)(6) opposition, filed contemporaneously with this brief.

To plead conspiracy jurisdiction, "a plaintiff must (1) make a *prima facie* factual showing of a conspiracy, (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy, and (3) set forth evidentiary facts to connect the defendants with transactions occurring in the United States." *In re Satyam Comput. Servs. Sec. Litig.*, 915 F. Supp. 2d 450, 484 (S.D.N.Y. 2013); *accord Singer v. Bell*, 585 F. Supp. 300, 302-03 (S.D.N.Y. 1984).

*Gelboim* reaffirmed that "[s]kepticism of a conspiracy's existence is insufficient to warrant dismissal." *Gelboim*, 2016 WL 2956968, at *15. The allegations of conspiracy here mirror and surpass those in *Gelboim*, and, as the Second Circuit held, "[c]lose cases abound on this issue, but this is not one of them; appellants' complaints contain numerous allegations that clear the bar of plausibility." *Id.* at *16. If *Gelboim* was not a close call, then neither is this case.

Courts in this Circuit have held that where there are sufficient allegations of unlawful conspiratorial conduct, "personal jurisdiction . . . turns on whether [p]laintiffs sufficiently alleged conspiratorial communications or unlawful manipulation of [benchmark price] [f]ixes either taking place in, or directed into, the United States." *FX II*, 2016 WL 1268267, at *5. This Court has jurisdiction over defendants' conspiracy and ***all*** of its members, no matter where located, as long as one of those defendants manipulated within the U.S. or directed manipulation to the U.S. in furtherance of the conspiracy. *Id.* at *6 (finding jurisdiction where the defendants allegedly "participated in a conspiracy to manipulate FX spreads[17] or FX benchmark rates—in the forum, or did so elsewhere with the express intent to cause harm in the forum.")[18]

---

[17] The spread is the difference in rates at which a dealer in derivatives (such as defendants) will borrow and lend at different tenors. ¶¶ 121, 173-74.

[18] This Supreme Court precedent has endured unchanged throughout the last 89 years, despite recent statements in *In re Aluminum Warehousing Antitrust Litig.*, 13-md-2481 (KBF), 90 F. Supp. 3d 219 (S.D.N.Y. 2015) (Forrest, *J.*) and *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419 (GBD), 2015 WL 1515358, at *3 (S.D.N.Y. Mar. 31, 2015) (Daniels, *J.*) that the concept has fallen into disfavor. *See, e.g.*, *First Capital Inv. Holdings LLC v. Wilson Capital Group, Inc.*, No. 10-cv-2948 (JSR), 2010 WL 4967833, at *2 (S.D.N.Y. Nov. 29, 2010) (finding jurisdiction over non-domiciliary defendants where their co-conspirators committed tortious acts in New York); *Cleft of the Rock Found. v. Wilson*, 992 F. Supp. 574, 581-82 (E.D.N.Y. 1998); *Allstate Life Ins. Co. v. Linter Group Ltd.*, 782 F. Supp. 215, 220-222 & n.6 (S.D.N.Y. 1992). *Aluminum* held that a

Therefore, even defendants' acts abroad satisfy the third prong of the conspiracy jurisdiction test because these acts were directed at the U.S. *United States v. Busic*, 592 F.2d 13, 20 n.4 (2d Cir. 1978) ("It has long been established that a sovereign has jurisdiction to prosecute an offense where only a part of that offense has been committed within its boundaries."); *see also Hayes*, 99 F. Supp. 3d at 425 (jurisdiction existed to charge an overseas "IBOR" manipulator because "the acts of co-conspirators may be taken into account in deciding whether United States courts may prosecute an alleged conspirator"). Judge Schofield ruled that a plaintiff could "plead collusive conduct within the United States, [by] giv[ing] examples of each . . . Defendants' participation in the alleged conspiracy (albeit in chatrooms whose participants' locations are presently unknown) . . . ." *FX II*, 2016 WL 1268267, at *6. Plaintiffs allege the same conduct here; some defendants' employees even admit these facts to be true: Rabobank trader Takayuki Yagami admitted that he knew the manipulation scheme would benefit the conspiracy at the expense of U.S. victims:

> THE COURT: So, when you were manipulating the LIBOR rate, it was to your advantage and the advantage of your co-conspirators but you knew it would be to the disadvantage of others including institutions in the United States, yes?
>
> THE DEFENDANT: Yes.

*Lefkowitz Decl.* Ex. 25, at 22; *see also* ¶¶ 9, 10, 115, 147, 150.

The Complaint's allegations, and defendants' own admissions, paint the picture of a conspiracy that had its feet planted in the U.S. and its eyes pointed at U.S. investors.

## IV.   Defendants Rabobank, Deutsche Bank, RBS, and Barclays Bank consented to jurisdiction

Rabobank, Deutsche Bank, RBS, and Barclays Bank registered under N.Y. Banking Law § 200 and appointed the Superintendent of the New York State Department of Financial Services

---

conspiracy with U.S. contacts presents evidence of purposeful availment, without the need for a separate "conspiracy jurisdiction" doctrine. *Aluminum*. 90 F. Supp. 3d at 231-32. Even under Judge Forrest's formulation, all facts discussed *infra* supporting conspiracy jurisdiction likewise support purposeful availment and the effects test.

("NYSDFS") as their agent for service of process. ¶¶ 28, 41, 49, 53, 60, 66. These banks consented to state oversight in exchange for permission to enjoy the benefits of conducting business in New York. Under New York law, they are subject to this Court's jurisdiction.

### A. New York courts have long construed registration to do business in New York, including registration of a branch of a foreign bank, to constitute consent to jurisdiction for any matter

While defendants fixate on N.Y. Banking Law § 200(3), this Court should instead focus on the relevant section to this inquiry, N.Y. Banking Law § 200-b. New York Banking Law § 200-b(2) provides that foreign banking corporations registered to do business in New York consent to jurisdiction in any action by non-New York residents, like the Plaintiffs (¶¶ 37-39), where "the defendant is a foreign banking corporation doing business in this state." Rabobank, Deutsche Bank, RBS, and Barclays Bank never contest that they do business in New York or registered pursuant to the New York Banking Law; they therefore consented to personal jurisdiction in New York in any action against them.

N.Y. Banking Law § 200-b was enacted in 1964 to serve as the Banking Law analogue to N.Y. Bus. Corp. Law § 1314. *See* Bill Jacket for BJ 1964, CH 849, N.Y. Banking Law § 200-b (McKinney) at 42, attached as *Lefkowitz Decl.* Ex. 35. The legislative history bears out that registration by foreign corporations under § 200-b brings about consent to personal jurisdiction in New York. *Id.*

As previously held by New York courts and recently reaffirmed by the Second Circuit, N.Y. Bus. Corp. Law § 1314 provides that a foreign corporation's voluntary registration to do business in New York subjects the foreign corporation to the general jurisdiction of New York courts for any action. *See Brown v. Lockheed Martin Corp.*, 814 F.3d 619 (2d Cir. 2016); *Amalgamet, Inc. v. Ledoux & Co.*, 645 F. Supp. 248, 249 (S.D.N.Y. 1986); *Augsbury Corp. v. Petrokey Corp.*, 470 N.Y.S.2d 787 (App.

Div. 1983).[19] N.Y. Banking Law § 200-b must be interpreted similarly. *See Del. Midland Corp. v. Westhampton Beach*, 359 N.Y.S.2d 944, 950 (Sup. Ct. 1974) ("Statutes which relate to the same thing or class of things are *in pari materia* and may be construed together. A . . . new enactment of fragmentary nature is taken as intended to fit into existing laws on the same subject unless a different purpose is clearly shown.") (internal citations omitted), *aff'd* 48 A.D.2d 681, 369 N.Y.S.2d 378 (App. Div. 1975), *aff'd* 387 N.Y.S.2d 248 (1976). Defendants never reconcile N.Y. Banking Law § 200-b(2)'s express language providing non-residents the ability to obtain jurisdiction over registrant banks in New York courts, with their purported construction of N.Y. Banking Law § 200(3).[20] Nor do they provide any reason why N.Y. Banking Law § 200-b differs substantively from N.Y. Bus. Corp. Law § 1314.

The amendment to § 200(3) that defendants claim limited a foreign bank's consent to jurisdiction had no such purpose, but focused instead on the issue of service of process. N.Y. Banking Law § 200(3) (2006) (requiring a registering foreign bank to appoint the banking superintendent as "its true and lawful attorney" such that process "may be served with same force and effect as if [the foreign bank] were a domestic corporation and had been lawfully served with process in the state"). The 1951 amendment provided the option for resident and non-resident plaintiffs to use the banking superintendent to serve a foreign bank.

---

[19] Supreme Court precedent holds that: (1) a state may interpret its 'registration to do business' statute as conferring jurisdiction by consent; and (2) a foreign defendant may consent to jurisdiction, even for conduct that occurred overseas. *See Penn. Fire Ins. Co. v. Gold Issue Mining & Milling Co.*, 243 U.S. 93, 94-95 (1917) (finding jurisdiction where defendant appointed an agent pursuant to a state law with language requiring consent to personal jurisdiction); *Robert Mitchell Furniture Co. v. Selden Breck Constr. Co.*, 257 U.S. 213, 214-16 (1921) (finding that a state court may construe a statute requiring businesses to appoint in-state agents to "extend [jurisdiction] to suits in respect of business transacted by [a] foreign corporation elsewhere."); *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982) (holding that personal jurisdiction is an individual right, and a defendant may waive it and consent to jurisdiction).

[20] The New York Legislature added N.Y. Banking Law § 200-b thirteen years *after* defendants claim the New York Legislature amended N.Y. Banking Law § 200(3) to limit the reach of a foreign bank's consent to personal jurisdiction. Had the Legislature amended N.Y. Banking Law § 200(3) to limit personal jurisdiction, one would expect the inclusion of similar language upon enacting § 200-b to avoid conflicting interpretations. No such conforming language exists, and defendants do not attempt to explain the absence.

The language of the statute speaks for itself; yet defendants argue this Court should not follow its plain meaning. The Appellate Division has already rejected defendants' construction of the statute. *See Varga v. Credit Suisse*, 155 N.Y.S.2d 655 (Sup. Ct. N.Y. Co. 1956), *aff'd*, 157 N.Y.S.2d 391, 393 (App. Div. 1956). Just five years after the statute's 1951 amendment that defendants claim limits actions by plaintiffs against registering banks,[21] *Varga* said that "[t]he principal issue on this appeal is *the contention of defendant that under the provisions of section 200, subd. 3 of the Banking Law the Legislature intended to subject foreign banks to suit only for causes of action arising out of transactions of their agencies here*." *Varga*, 157 N.Y.S.2d at 393 (emphasis added). In rejecting the defendant's argument, the court held that "[t]he purpose of [§ 200(3)] is not to circumscribe and limit, but to expand and amplify the opportunities of plaintiffs, to effect service and to facilitate acquisition of jurisdiction in personam over defendant foreign banks in cases where adequate methods of obtaining redress for a wrong might not be otherwise afforded and where it is most needed." *Id.* at 393-94.[22] *Accord Matter of B&M Kingstone, LLC v. Mega Int'l Commercial Bank Co., Ltd.*, 15 N.Y.S.3d 318 (App. Div. 2015); *Vera v. Republic of Cuba*, 91 F. Supp. 3d 561, 570 (S.D.N.Y. 2015).[23]

New York state and federal courts have long acknowledged that a foreign corporation's

---

[21] Defendants acknowledge that prior to 1951, § 200(3) "provided unlimited consent for service of process in 'any action or proceeding' brought by a resident of New York," but assert that the 1951 amendment limited such consent to actions arising out of a transaction with the foreign bank's New York agency or branch. *Def. Br.* at 11 n. 8. As described *infra*, defendants misconstrue the amendment as a limit on the foreign bank's consent to personal jurisdiction arising out of its registration. In fact, the purpose was to limit the circumstances under which the banking superintendent must accept service for a registered foreign bank.

[22] Contrary to defendants' contention, *Varga* does not support their argument. *See Def. Br.* at 12. Further, the lower court that initially decided *Varga* expressly rejected another case on which defendants rely, *Newtown Jackson Co. v. Barclays Bank*, 133 N.Y.S.2d 726 (Sup. Ct. 1954). *See Varga*, 155 N.Y.S.2d 655, 658 (finding that defendant erroneously relied on dictum from *Newtown* suggesting foreign banks may only be served for actions arising out of their New York transactions, and further disagreeing with the *Newtown* court's analysis).

[23] The Second Circuit in *Gucci* cast doubt on Defendants' assertion that the consent-by-registration jurisdictional analysis materially differs depending on the party or non-party status of the entity: Although the consent issue was not before the Court, *Gucci* found: "On the one hand, a 'person who is subjected to liability . . . far from home may have better cause to complain of an outrage to fair play' than a nonparty. *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 20 (2d Cir. 1998). But on the other hand, a nonparty with few if any connections to the activities giving rise to the suit, or any stake in it, may have a strong interest in its freedom to take actions that are 'genuinely independent' of any intent to frustrate a court's injunction." *Gucci Am. v. Bank of China*, 768 F.3d 122, 137 n.16 (2d Cir. 2014).

"privilege of doing business in New York is accompanied by an automatic basis for personal jurisdiction" due in part to the fact that it has "has reaped the benefits of doing business in New York." *Amalgamet*, 645 F. Supp. at 249 (quoting *Augsbury*, 97 A.D.2d at 176); *see Bagdon v. Philadelphia & Reading Coal & Iron Co.*, 217 N.Y. 432, 436-37 (1916)  (registering and designating an agent for service of process is "real consent"); *Augsbury*, 97 A.D.2d at 175 (The "voluntary use of certain State procedures" such as "authorization to do business in the State and concomitant designation of the Secretary of State as its agent for service of process . . . is in fact a form of constructive consent to personal jurisdiction."). Corporations that consent to jurisdiction in this way do so for any case, as defendants or nonparties. *See Bagdon*, 217 N.Y. at 436-37 ("The actions in which [the designated representative] is to represent the corporation are not limited. The meaning must, therefore, be that the appointment is for any action which under the laws of this state may be brought against a foreign corporation."); *accord Spiegel v. Schulmann*, 604 F.3d 72, 77 n.1 (2d Cir. 2010) (per curiam).

Given this overwhelming combination of analogous statutes, legislative history, and precedential, appellate case law supporting Plaintiffs' position, the Court should conclude that defendants' construction of N.Y. Banking Law § 200(3) is erroneous.[24]

Defendants chose to open branches in New York, the world's financial capital. Their act of

---

[24] Even if this Court agrees with defendants' interpretation of N.Y. Banking Law § 200(3) that jurisdiction over registrant banks is limited solely to causes of action arising out of transactions conducted by their New York branches, Plaintiffs plead facts that meet that standard. Defendants do not dispute that they have transacted Sterling LIBOR derivatives with Plaintiffs and U.S. counterparties through their New York branches. Not including its direct and indirect subsidiaries, Rabobank claims to maintain only one branch in the United States in New York, which accounts for 3% of its ordinary income and approximately 15% of its worldwide profit. *Defs. Br.* App'x A at 5-6; Sherman Declaration dated April 8, 2016 (ECF No. 110). Deutsche Bank similarly has a single U.S. branch in New York. *Defs. Br.* App'x A at 1-2; Cambria Declaration dated April 11, 2016 (ECF No. 104). RBS' single branch office is located in Stamford, and the U.S. accounted for 6% of RBS and its subsidiaries global revenues. *Defs. Br.* App'x A at 6-7; Lobato-Church Declaration dated April 11, 2016 (ECF No. 107). The declaration fails to mention that until at least December 2015, RBS had a registered representative office in New York. *See Lefkowitz Decl.* Ex. 30. Lloyds' two subsidiaries have bank branches that are located solely in New York. *Defs. Br.* App'x A at 2-5; McKendry Declaration dated April 5, 2016 (ECF No. 108). Barclays Bank maintains three U.S. branches, two of which are in New York, generating approximately $1.87 billion in revenue. Of Barclays Bank's 430 U.S. employees, 420 are located in New York. *Defs. Br.* App'x A at 2; Gonsalves Declaration dated November 12, 2015 (ECF No. 106). While defendants may not be "at home" in New York, their U.S. business was centered in New York (or in RBS' case, in New York and Connecticut).

registering and appointing an agent in the heart of the global economy dooms any argument

Deutsche Bank, Rabobank, Lloyds, RBS, and Barclays Bank make to avoid their consent to

jurisdiction as reflected in N.Y. Banking Law § 200(3) and § 200-b.

### B. *International Shoe, Daimler*, and *Brown* do not undercut the *Pennsylvania Fire* line of cases

*International Shoe*, *Daimler*, and *Brown* dealt with due process under the Fourteenth Amendment,

and not the Fifth Amendment and do not support defendants' personal jurisdiction arguments in

this federal question context. *See* Part II.D.2., *supra*. In any event, none of the cases expressly

overruled *Pennsylvania Fire* or *Robert Mitchell*, which provide that consent to jurisdiction by registration

does not violate due process.

*International Shoe* reaffirmed that consent was an alternative basis for jurisdiction. *See* 326 U.S. at

316-18. Even after *International Shoe*, the Court has cited pre-*International Shoe* cases for the

proposition that states may construe "the voluntary use of certain state procedures" to confer

consent jurisdiction. *Bauxites*, 456 U.S. at 704.[25]

*Daimler* held that a long arm statute imposing general jurisdiction on corporations doing

systematic and continuous business in a state does not allow the corporations "to structure their

primary conduct with some minimum assurance as to where that conduct will and will not render

them liable to suit." *Daimler AG v. Bauman,* 134 S. Ct. 746, 761-62 (2014) (internal quotation marks

and citation omitted). Here the defendants knew—or certainly should have known—that New York

construes registration under § 200 jurisdiction by consent.

> 1. *Brown has no precedential impact on the constitutionality or construction of New York's business registration statutes to confer jurisdiction by consent*

---

[25] The Court has also cited *Pennsylvania Fire* in a post-*International Shoe* case, *see Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 446 n.6 (1952), and reaffirmed the distinction between actual and fictional consent on which *Pennsylvania Fire Insurance* relied. *See Olberding v. Illinois Centr. R.R.*, 346 U.S. 338, 340-42 (1953); *see also Burger King*, 471 U.S. at 472 (*International Shoe*'s rule requiring a defendant to have fair warning that its activities will confer jurisdiction only applies to an "out-of-state defendant *who has not consented to suit there.*") (emphasis added).

*Brown* does not change the jurisdictional analysis. After jurisdictional discovery, the plaintiff in *Brown* relied on certain Connecticut business registration statutes that the Second Circuit determined "do not speak clearly on th[e] point" of consent to jurisdiction. *Brown*, 814 F.3d at 623.[26] At the same time, *Brown* referred to New York as an example of a state that has authoritatively interpreted its business registration statutes to confer jurisdiction. *Id.* at 640 ("The registration statute in the state of New York has been definitively construed to accomplish [consent to personal jurisdiction by registration] and legislation has been introduced to ratify that construction of the statute.").

*Brown* expressly declined to reach the question of whether statutes like New York's comply with due process, though its *dicta* implies it would find New York's statute constitutional. 814 F.3d at 640. The New York business registration statute at issue here is the precise type the Second Circuit in *Brown* observed would present it with "a more difficult constitutional question" concerning its validity because it "plainly advise[s] the registrant that enrolling in the state as a foreign corporation *and transacting business*" would subject it to general jurisdiction. *Id.* at 640. *Brown* is, therefore, non-precedential on the issue of the constitutionality of business registration statutes as consent provisions;[27] *Pennsylvania Fire* still controls.

## V.    Alternatively, this Court should allow jurisdictional discovery

Defendants themselves demonstrate that the vast majority of discoverable information remains exclusively in their hands by providing declarations and documents that only tell half the story, omitting any reference to the impact U.S.-based traders and employees had on their submissions and

---

[26] Not wishing to "implicate Due Process and other constitutional concerns," and "in the absence of a controlling interpretation by the Connecticut Supreme Court, or a clearer legislative mandate," the Second Circuit "decline[d] to construe the state's registration and agent-appointment statutes as embodying actual consent." *Id.* at *13-14. It did not reach the constitutional issue for good reason, because the Second Circuit has no authority to deem Supreme Court cases implicitly overruled. The Second Circuit cannot overrule *Pennsylvania Fire* because only the Supreme Court has "the prerogative of overruling its own decisions." *De Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).

[27] In *LIBOR IV* and *In re LIBOR-based Fin. Instruments Antitrust Litig.* ("*LIBOR V*"), No. 11 MDL 2262 (NRB), 2015 WL 6696407 (S.D.N.Y. Nov. 3, 2015), Judge Buchwald did not address consent and only ruled that receiving a license under New York Banking Law § 200 did not support finding a defendant "at home" for general jurisdiction under *Daimler*. *LIBOR IV*, 2015 WL 6243526, at *26. Judge Buchwald did not address *Varga*.

the impact of their manipulation on their U.S. trades. At an absolute minimum, the facts alleged give rise to "non-frivolous contentions" that jurisdiction in this Court is proper. *Newbro v. Freed*, No. 03-cv-10308, 2004 WL 691392, at *6 (S.D.N.Y. Mar. 26, 2004). Should the Court find that the Complaint's allegations need further enlargement to establish a *prima facie* case for jurisdiction, the Court should defer ruling and grant leave to take jurisdictional discovery. *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (a plaintiff should be provided with "ample opportunity to secure and present evidence relevant to the existence of jurisdiction" through jurisdictional discovery).

Jurisdictional discovery will show: (a) the nature and scope of the specific U.S. Sterling LIBOR-based derivatives transactions in which defendants participated; (b) the locus of the manipulative and conspiratorial conduct; (c) the extent to which defendants engaged in transactions directly with Plaintiffs, the Class, or other U.S.-based investors and consented to jurisdiction in New York in those transactions by forum selection clauses in ISDA Master Agreements; (d) the nature of the interactions between defendants' and their U.S. branches, subsidiaries, and affiliates regarding Sterling LIBOR-based derivatives transactions and Sterling LIBOR submissions;[28] (e) cooperation between defendants' submitters and U.S. traders to effectuate the manipulation.[29]

## CONCLUSION

Defendants' cartel transacted in billions of dollars in Sterling LIBOR-based derivatives in the

---

[28] Defendants may be subject to personal jurisdiction in New York based on the contacts of their in-forum subsidiaries. New York courts can properly assert jurisdiction over a foreign company when its in-state domestic affiliate "is so dominated by the defendant as to be its alter ego." *Sonera Holding B.V. v. Cukurova Holding A.S.,* 750 F.3d 221, 225 (2d Cir. 2014). Courts therefore routinely grant jurisdictional discovery "when faced with an unclear relationship between two corporations." *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, No. 05-cv-9016, 2006 WL 708470, at *6 (S.D.N.Y. Mar. 20, 2006); *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 625 (S.D.N.Y. 2012).

[29] Defendants' suggestion that jurisdictional discovery should be barred based on the fact that Plaintiff Sonterra did not seek a separate jurisdictional discovery motion within seven days of the first pre-consolidation motion should be ignored. There was no similar directive regarding jurisdictional discovery in this round of briefing. Moreover, Plaintiffs did not separately seek jurisdictional discovery for the simple reason that Plaintiffs do not believe jurisdictional discovery is necessary. The Complaint satisfies the requirement for pleading *prima facie* personal jurisdiction (as did the pre-consolidation pleadings). Plaintiffs only request jurisdictional discovery here, in the alternative, if Your Honor determines the Complaint requires further substantiation.

United States. The Complaint alleges that each defendant utilized its New York and U.S. operations, employees, facilities, and ISDA Master Agreements (in which they consented to New York jurisdiction) on their own and as a conspiracy to manipulate Sterling LIBOR to the detriment of Plaintiffs and the Class, all of whom are U.S. residents. And defendants knew, *as demonstrated by their own employees' testimony*, they were harming U.S. residents with each act of manipulation.

Defendants must answer to their U.S. victims in the U.S. courts. This Court should deny Defendants' Rule 12(b)(2) motion.

Dated:  White Plains, New York
        June 3, 2016

LOWEY DANNENBERG COHEN
& HART, P.C.

By: /s/ Arthur R. Miller                    By: /s/ Geoffrey M. Horn
Arthur R. Miller, *of counsel*              Geoffrey M. Horn
arthur.r.miller@nyu.edu                     Vincent Briganti
                                            Peter D. St. Phillip
                                            Sitso Bediako
                                            Lee J. Lefkowitz
                                            One North Broadway
                                            White Plains, New York 10601
                                            Tel.: 914-997-0500
                                            Fax: 914-997-0035
                                            ghorn@lowey.com
                                            vbriganti@lowey.com
                                            pstphillip@lowey.com
                                            sbediako@lowey.com
                                            llefkowitz@lowey.com

                                            LOVELL STEWART HALEBIAN
                                            JACOBSON LLP

                                            By: /s/ Christopher Lovell
                                            Christopher Lovell
                                            Gary S. Jacobson
                                            61 Broadway, Suite 501
                                            New York, NY 10006
                                            Tel.: 212-608-1900
                                            Fax: 212-719-4677

                                            *Counsel for Plaintiffs and Proposed Interim Class Counsel*