

March 14, 2018

**VIA ECF**
The Honorable Vernon S. Broderick
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

   Re: **Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC et al,**
      **15-cv-03538 (VSB)**

Dear Judge Broderick:

   We write in response to Defendants' March 9, 2018 letter ("Defs. Ltr.") submitting *Charles Schwab Corp. v. Bank of America Corp.*, No. 16-1189-cv, 2018 WL 1022541 (2d Cir. Feb. 23, 2018) ("*Schwab*") in support of their pending motion to dismiss Plaintiffs' Consolidated Amended Class Action Complaint [ECF No. 95] ("Complaint" or "¶ __") for lack of personal jurisdiction.

   Correctly applied to the conspiracy and claims alleged in this case, *Schwab* fully supports jurisdiction over each of the Defendants. Faced with this reality, Defendants ask this Court to turn a blind eye to Plaintiffs' allegations that Defendants' price-fixed sales in the United States were the means through which Defendants achieved their "profit-driven" conspiracy and purposefully availed themselves of the forum. Defendants' denials must be rejected at the pleading stage.

**I. *Schwab* confirms that Defendants purposefully availed themselves of the forum by selling price-fixed Sterling LIBOR-based derivatives in the United States.**

   *Schwab* vacated Judge Buchwald's decision in the USD LIBOR multidistrict litigation to dismiss several California plaintiffs' state law claims for lack of personal jurisdiction.[1] Plaintiffs there alleged a "reputation-driven" conspiracy in which a group of multinational banks (including some Defendants here) conspired to suppress LIBOR by misrepresenting their cost of borrowing "to project an image of financial stability" during the financial crisis. *Id.* at *2; *see also In re LIBOR-Based Financial Instruments Antitrust Litig.*, 2015 WL 6243526, *45-48 (S.D.N.Y. Oct. 20, 2015) ("*LIBOR IV*"). This allegedly caused the *Schwab* plaintiffs to receive lower returns on LIBOR-based securities purchased in California, where they sued defendants for violations of the Securities Exchange Act and claims arising under California state law. *Id.* at *3-4.

   The Second Circuit proceeded to analyze personal jurisdiction claim-by-claim, focusing on: (a) the elements of each claim asserted by plaintiffs; (b) defendants' contacts with California, and (c) the relationship of those contacts to the claims asserted. *Id.* at *6 (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 341 (2d Cir. 2016)). For plaintiffs' claims that were based on transactions in California, e.g., unjust enrichment and breach of the implied covenant of good faith

---

[1] A separate appeal concerning the dismissal of federal antitrust claims for lack of personal jurisdiction is pending before the Court. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 17-1569-cv (2d Cir.).

and fair dealing,[2] the Court held that plaintiffs had established personal jurisdiction over each defendant that had sold plaintiffs LIBOR-based financial instruments in California. *Id.* at *6.[3]

Applying *Schwab's* holding to the claims here, Defendants' domestic Sterling LIBOR-based derivatives transactions establish personal jurisdiction for Plaintiffs' Sherman Act, Commodity Exchange Act, and common law claims against that "profit-motivated" conspiracy. *See* ¶ 10 (alleging conspiracy "to generate illicit profits for themselves and their co-conspirators on their Sterling LIBOR-based derivatives positions."). Unlike the "reputation-based" conspiracy alleged in *Schwab*, where the goal of projecting financial soundness was achieved by making false LIBOR submissions, the "profit-motivated" conspiracy alleged here was not complete until Defendants entered Sterling LIBOR-based derivatives transactions that financially benefited from that manipulation. *See Sonterra*, 277 F. Supp. 3d at 591-92 (explaining that transactions intended to benefit from the manipulation of a benchmark are suit-related contacts in a profit-driven conspiracy).

Defendants' U.S. sales and marketing activities are "suit related" because they represent the means through which Defendants achieved the objective of their conspiracy. *See Waldman*, 835 F.3d at 335 (explaining that "suit-related" conduct includes any "conduct that could have subjected [defendants] to liability" under the relevant statute.). Defendants' derivatives positions, including in the United States, were the animating purpose behind their Sterling LIBOR manipulation. *See, e.g.*, ¶¶ 13, 55, 135, 154 (Deutsche Bank); ¶¶ 17-18, 129-34, 155, 211, 214 (UBS); ¶¶ 20, 51, 136-42, 179, 207, 213 (Rabobank); ¶¶ 21, 46-47 (Barclays); ¶¶ 22-23, 64 (Lloyds). Plaintiffs' claims directly relate to this misconduct because it resulted in a domestic injury to investors in the United States that were overcharged or underpaid due to Defendants' conspiracy. *See Gelboim v. Bank of America Corp.*, 823 F.3d 759, 772 (2d Cir. 2016) (holding that consumers suffer an "antitrust injury" when "because of a conspiracy, [they] must pay prices that no longer reflect ordinary market conditions").

Defendants' argument that the Court should sever their domestic sales and marketing operations from their conspiracy to manipulate Sterling LIBOR ignores that "[t]he character and effect of a conspiracy are not judged by dismembering it and viewing its separate parts, but only by looking it at as a whole." *United States v. Apple*, 791 F.3d 290, 319 (2d Cir. 2015) (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). Rather, *Schwab* confirms the reasoning of Judge Stein (shared by three other judges in this District) in *Sonterra* that the "front-end" of defendants' conspiracy (*i.e.*, the manipulation of Sterling LIBOR) cannot be viewed separately from the "back-end of the misconduct (profiting from that manipulation through transactions in [Sterling LIBOR-based] derivatives)." 277 F. Supp. 3d at 591;[4] *see also In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 2016 WL 1268267, at *5 (S.D.N.Y. Mar. 31, 2016) ("*Forex*"); *In re North Sea Brent Crude Oil Futures Litig.*, 2017 WL 2525731, at *7 (S.D.N.Y. June 8, 2017) ("*Brent Crude*"); *LIBOR VI*, 2016 WL 7378980, at *4 (sales in the forum are jurisdictionally relevant for profit-driven conspiracy).

---

[2] In contrast, the Court upheld dismissal of fraud claims based solely on false LIBOR submissions to the BBA in London because the California-based trades "did not give rise to" those claims. *Id.* at *7.

[3] The Court applied the same reasoning whether a defendant dealt directly with a *Schwab* plaintiff or "indirectly," through a non-party broker-dealer affiliate or subsidiary. *See* 2018 WL 1022541, at *9 (holding that "an agency relationship . . . could establish personal jurisdiction over the parent in a state in which the parent 'indirectly' sells the securities").

[4] Defendants persist in arguing that "Foreign Defendants' supposed domestic trading in instruments allegedly affected by overseas conduct" cannot constitute "suit-related" activity. Defs. Ltr. at 2. However, *Schwab* confirms that confining the analysis to the place where manipulation occurred is an "(erroneous) rationale." 2018 WL 1022541, at *12.

This Court should reach the same conclusion: that personal jurisdiction is appropriate over each Defendant that exploited the Sterling LIBOR-based derivatives market in the United States as part of the same "profit-driven" conspiracy. *See Schwab*, 2018 WL 1022541, at *6 (citing *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010)).

### II. *Schwab* establishes conspiracy jurisdiction over all members of the conspiracy.

The *Schwab* Court endorsed a "conspiracy theory" of jurisdiction where a plaintiff alleges: "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Id.*[5]

The Complaint here easily satisfies each element of this standard. Plaintiffs allege that the purpose of Defendants' conspiracy was to extract unlawful trading profits from Sterling LIBOR-based derivatives positions in the United States. Accordingly, any act in furtherance of that goal is a jurisdictionally relevant contact. *See Sonterra*, 277 F. Supp. 3d at 591 ("The first step in evaluating personal jurisdiction in a conspiracy case is to define the scope of the conspiracy). This included transactions with U.S. investors, which were included in the Sterling LIBOR-based derivatives positions that were the object of Defendants' Sterling LIBOR manipulation. *See* ¶¶ 13-25, 28, 96, 120, 126-29, 139, 211. Defendants' "overt acts" of marketing and selling price-fixed derivatives in the forum to monetize their conspiracy subjects each co-conspirator that helped manipulate the prices of those derivatives to personal jurisdiction. ¶¶ 13-23, 40-85, 93-97.

### III. *Schwab* supports exercising jurisdiction over Defendants based on the "effects test."

*Schwab*'s application of the "effects test" likewise supports jurisdiction over all Defendants here. *See* 2018 WL 1022541, at *10 (citing *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013)). The Complaint alleges that Defendants "expressly aimed" their misconduct at the United States because they intended to maximize the profitability of Sterling LIBOR-based derivatives positions in the forum. ¶¶ 10, 20, 96, 120, 205-16. Courts in this district have repeatedly held that, where "profiting from transactions in the forum was part of the motivation for defendants' manipulation," these allegations satisfy the "effects test." *Sonterra*, 277 F. Supp. 3d at 594 n.35; *see also Brent Crude*, 2017 WL 2535731, at *11; *Forex*, 2016 WL 1268267, at *6.[6]

As in *Sonterra*, the location of the Sterling LIBOR benchmark that Defendants manipulated is immaterial because Defendants "expressly aimed" that manipulation at the United States to extract unlawful profits from those trading positions. ¶¶ 10, 13-25. Because Plaintiffs were harmed by the intended in-forum effects of Defendants' "profit-motivated" conspiracy, personal jurisdiction under the "effects test" is proper here.

---

[5] The *Schwab* plaintiffs' allegations of sales or marketing activity in California were insufficient for conspiracy jurisdiction because the goal of that conspiracy was to make defendants appear more financially sound, not profit from illicit trading. *See id.* at *2, *10 ("As alleged, the conspiracy to manipulate LIBOR had nothing to do with the California transactions").

[6] Defendants mischaracterize the domestic effects of their conspiracy as merely "foreseeable" in an attempt to analogize this case to the reputation-based conspiracy in *Schwab*. Defs. Ltr. at 3. This ignores that Plaintiffs' injuries are the intended consequence of Defendants' conspiracy to fix Sterling LIBOR-based derivatives prices. ¶¶ 10, 96, 120, 126-42.

Respectfully submitted,

| /s/ Vincent Briganti | /s/ Christopher Lovell |
|---|---|
| Vincent Briganti | Christopher Lovell |
| Lowey Dannenberg P.C. | Lovell Stewart Halebian Jacobson LLP |
| 44 South Broadway, Suite 1100 | 61 Broadway, Suite 501 |
| White Plains, NY 10601 | New York, NY 10006 |

*Counsel for Plaintiffs*