

April 3, 2018

**VIA ECF**
The Honorable Vernon S. Broderick
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

   Re: **Sonterra Capital Master Fund, Ltd., et al. v. Barclays Bank PLC, et al.,
      15-cv-03538 (VSB)**

Dear Judge Broderick:

  We write to submit *Nypl v. JPMorgan Chase & Co.*, No. 15 Civ. 9300 (LGS), 2018 WL 1472506 (S.D.N.Y. Mar. 22, 2018) ("*Nypl*") (attached as Exhibit A) as supplemental authority in opposition to Defendants' pending motion to dismiss Plaintiffs' Consolidated Amended Class Action Complaint [ECF No. 95] ("CAC" or "¶ __"). *Nypl* is the first opinion to apply the Second Circuit's recent decision in *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. Feb. 23, 2018), to a profit-motivated price-fixing conspiracy like the one alleged here.[1] *Nypl* confirms that Defendants' price-fixed sales of Sterling LIBOR-based derivatives in the United States are "suit-related" contacts that establish personal jurisdiction over each member of the conspiracy that transacted in the United States.

**I. Defendants' Sterling LIBOR-based derivatives transactions in the forum are "suit-related conduct" that establish specific personal jurisdiction.**

  In *Nypl*, a group of multinational banks (including several of the Defendants) conspired to increase the profitability of their global foreign exchange ("FX") trading business by manipulating FX benchmark rates in London. *See Nypl* at 1-2; *see also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 587 (S.D.N.Y. 2015) (describing the FX rate conspiracy). This conspiracy allegedly caused plaintiffs to lose money in retail FX transactions in the United States because "the manipulated FX benchmark rates were the primary component of the prices Plaintiffs paid for foreign currency." *See Nypl* at 10-11.

  Applying *Schwab*, the court held that plaintiffs had made a prima facie showing of specific personal jurisdiction over defendants who marketed and sold FX products in the United States. *Id.* at 7. "Taken as a whole, the TAC plausibly alleges suit-related conduct that either took place in the United States, or had effects expressly aimed inside the United States due to the Foreign Defendants' substantial FX businesses here." *Id.* at 11. Judge Schofield rejected the argument that such U.S.-based FX trading operations were not "suit-related," finding minimum contacts sufficient to "tie the alleged unlawful conduct to the United States" under both a "purposeful availment" and

---

[1] *See* Plaintiffs' March 14, 2018 letter [ECF No. 176] (explaining that *Schwab* supports jurisdiction over each Defendant that sold price-fixed Sterling LIBOR-based derivatives in the United States or participated in Defendants' conspiracy).



Letter to the Honorable Vernon S. Broderick
April 3, 2018
Page 2

"effects test" theory of jurisdiction. *Id.* at 9, 11. The court reached this conclusion based on allegations that:

- "[A] substantial part of the events giving rise to plaintiffs' claims occurred in this District [and] a substantial portion of the affected interstate trade and commence described herein was carried out in this District";

- "The conspiracy to set, fix and establish foreign currency Benchmark exchange rates and impose Trade Restraints was implemented in California and New York";

- "The illegal conduct allegedly undertaken has resulted in injury and damage to plaintiffs and the class within the States of California and New York and throughout the United [S]tates";

- Defendants "purchased and sold substantial quantities of EUR/USD currency pair in a continuous and uninterrupted flow of interstate and U.S. import trade and commerce to customers and counterparties located in the U.S. states"; and

- "At relevant times herein, UBS was an FX dealer/market maker, with FX trading desks in the following main locations: Stamford, Connecticut; Singapore; and Zurich, Switzerland." *Id.* at 9-10.

Here, the CAC exceeds the generalized jurisdictional allegations sufficient in *Nypl*. Plaintiffs allege a profit-motivated conspiracy where Defendants conspired to manipulate Sterling LIBOR to increase the profitability of their derivatives trading businesses. ¶¶ 10, 120. Defendants implemented their conspiracy in the United States by entering into Sterling LIBOR-based derivatives transactions with investors in the United States and selling "substantial quantities of Sterling LIBOR-based derivatives in a continuous and uninterrupted flow in interstate commerce" to profit from their "repeated manipulation" of Sterling LIBOR. *Compare* ¶ 2, 28, 218 *with Nypl* at 9;[2] *see also Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG,* 277 F. Supp. 3d 521, 591-92 (S.D.N.Y. 2017) (explaining that transactions intended to benefit from the manipulation of a benchmark are suit-related contacts in a profit driven conspiracy). Defendants' "profit-motivated" conspiracy was not complete until Defendants entered Sterling LIBOR-based derivatives transactions that financially benefited from their manipulation. This included selling directly to Plaintiff FrontPoint, which transacted Sterling LIBOR-based swaps with Defendant UBS. ¶ 29.

Moreover, "a substantial portion of the affected interstate trade and commerce described in this complaint was carried out in this district." *Compare* ¶ 27 *with Nypl* at 9. The CAC describes how Defendants implemented their conspiracy here by exploiting banking licenses granted by the New York Department of Financial Services and Connecticut Department of Banking to market price-fixed Sterling LIBOR-based derivatives to U.S. investors and establish themselves as "dealer[s]/market maker[s]" for Sterling LIBOR-based derivatives in the United States. ¶¶ 28, 95-96. *Compare, e.g.,* ¶¶ 41-47 (Barclays), ¶¶ 49-51 (Rabobank), ¶¶ 53-56 (Deutsche), ¶¶ 60-64 (Lloyds), ¶¶ 66-71

---

[2] None of the Defendants deny trading Sterling LIBOR-based derivatives from within the United States or with U.S.-based counterparties. *See* Defendants' declarations submitted in support of their motion to dismiss [ECF Nos. 104-110].



Letter to the Honorable Vernon S. Broderick
April 3, 2018
Page 3

(RBS), and 79-81(UBS) *with Nypl* at 9-10. Defendants manipulated Sterling LIBOR in order to generate unlawful profits based on the derivatives positions they held at their trading desks in this forum. ¶¶ 13, 17-18, 20-22. For example, Defendant Deutsche Bank's traders in New York discussed their trading positions and strategies with a supervisor who "issued specific directives promoting manipulation by LIBOR (including Sterling LIBOR) submitters." ¶ 58.

Defendants' conspiracy injured Plaintiffs and Class members, resulting in Sherman Act claims when they were overcharged or underpaid in Sterling LIBOR-based derivatives transactions within the United States. ¶¶ 205-216. Defendants expressly aimed their manipulation at this forum by transacting with U.S. counterparties at the same time they were manipulating Sterling LIBOR to generate illicit profits at the expense of their U.S. counterparties. ¶¶ 35-36. Thus, the "United States is the 'nucleus of the harm' alleged" because Plaintiffs seek to represent a Class of exclusively U.S. investors. *Sonterra*, 277 F. Sup. 3d at 594.

*Nypl* confirms that Defendants' arguments fail because they all rely on the same "(erroneous) rationale": that Plaintiffs can only establish personal jurisdiction by showing that Defendants' manipulation of Sterling LIBOR occurred in the forum. *Compare Schwab*, 883 F.3d at 89-90 *with* Defs. PJ Br., ECF No. 103, at 19-21 (arguing that allegations that Foreign Defendants transacted in Sterling LIBOR-based derivatives in New York and the U.S. cannot support personal jurisdiction.) Defendants cannot escape jurisdiction by separating the "front end" of their conspiracy, *i.e.*, the manipulation of Sterling LIBOR, from the "back end" transactions in the United States intended to benefit from that misconduct. *Sonterra*, 277 F. Supp. 3d 591-93.[3]

## II.     *Nypl* confirms that Plaintiffs sufficiently allege causation.

*Nypl* also rejected the defendants' causation argument that plaintiffs failed to connect the manipulation of FX benchmark rates to the prices they paid in the retail FX market. The court found plaintiffs established an antitrust injury by alleging "that the manipulated benchmark FX rates were the primary component of the prices Plaintiffs paid for foreign currency." *Nypl* at 11 (citing *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 765 (2d Cir. 2016)).

Likewise, Plaintiffs here allege that Sterling LIBOR is the primary price component in their Sterling LIBOR-based derivatives transactions. ¶¶ 121-22. As a result, Plaintiffs' losses result directly from Defendants' manipulation of Sterling LIBOR during the Class Period. ¶¶ 206-14. Two other courts in this district have already rejected identical causation arguments (made by many of the same Defendants) regarding FX forwards and swaps in other benchmark rate manipulation cases. *See Sonterra,* 277 F. Supp. 3d at 546-48; *Sullivan v. Barclays PLC,* No. 13-CV-2811 (PKC), 2017 WL 685570, at *9-10 (S.D.N.Y. Feb. 21, 2017). This Court should do the same.

Respectfully submitted,

/s/ Vincent Briganti
Vincent Briganti

---

[3] *See also In re N. Sea Brent Crude Oil Futures Litig.*, No. 13-md-2475, 2017 WL 2535731, at *11 (S.D.N.Y. June 8, 2017).