

Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022
T  +1 212 918 3000
F  +1 212 918 3100
www.hoganlovells.com

April 13, 2018

**VIA ECF**

The Honorable Vernon S. Broderick
United States District Judge, Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

      Re:    *Sonterra Capital Master Fund, Ltd., et al., v. Barclays Bank PLC, et al.,*
             No. 15-cv-3538-VSB

Dear Judge Broderick:

      As counsel for Lloyds[1] and Defendants' liaison counsel in this action, I write in response to Plaintiffs' April 3, 2018 letter (Dkt. 178) alerting the Court to Judge Schofield's recent decision in *Nypl v. JPMorgan Chase & Co.*, 2018 WL 1472506 (S.D.N.Y. Mar. 22, 2018) ("*Nypl*"), as supplemental authority in connection with Defendants' pending motion to dismiss the CAC (Dkt. 99). Contrary to Plaintiffs' contention, *Nypl* does not bolster their opposition, and in fact supports Defendants' motion.

      *Nypl*, one of several actions before Judge Schofield concerning alleged manipulation of the foreign exchange ("FX") markets, involved allegations that defendants conspired to execute FX transactions within the U.S. designed to manipulate the "fix"—the benchmark most widely used to price currency trading globally. The *Nypl* decision, like Judge Schofield's prior decision in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016) ("*FX II*")—which was discussed at length in Foreign Defendants' briefing on the motion to dismiss, *see* Defs.' PJ Br. at 20-21; Defs.' PJ Reply at 6–7—concluded that the operative complaint adequately alleged specific jurisdiction because, unlike here, it "contains allegations that tie the alleged unlawful conduct to the United States," in that "at least part of the alleged conspiratorial conduct of [certain foreign defendants] took place in, or was directed into, the United States." 2018 WL 1472506, at *5–6. Thus, rather than supporting Plaintiffs' arguments, *Nypl* (like *FX II* before it) confirms that Plaintiffs' claims must be dismissed.

      *First*, because the process for determining FX benchmarks differs in fundamentally important ways from foreign panel submission-based benchmarks such as Sterling LIBOR, judges in this district have recognized that for Rule 12(b)(2) purposes, *FX II*—and, by extension,

---

[1] Unless otherwise specified, defined terms have the same meaning as in Defendants' briefs addressing the merits and personal jurisdiction: (1) Dkt. 100 ("Defs.' Merits Br."); (2) Dkt. 103 ("Defs.' PJ Br."); (3) Dkt. 120 ("Defs.' PJ Reply"); and (4) Dkt. 121 ("Defs.' Merits Reply"). Internal citations and quotation marks are also omitted.

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia. "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in: Alicante   Amsterdam   Baltimore   Beijing   Birmingham   Boston   Brussels   Colorado Springs   Denver   Dubai   Dusseldorf   Frankfurt   Hamburg   Hanoi   Ho Chi Minh City   Hong Kong   Houston   Johannesburg   London   Los Angeles   Luxembourg   Madrid   Mexico City   Miami   Milan   Minneapolis   Monterrey   Moscow   Munich   New York   Northern Virginia   Paris   Perth   Philadelphia   Rio de Janeiro   Rome   San Francisco   São Paulo   Shanghai   Silicon Valley   Singapore   Sydney   Tokyo   Warsaw   Washington DC   Associated offices: Budapest   Jakarta   Shanghai FTZ   Zagreb.   Business Service Centers: Johannesburg   Louisville.   For more information see www.hoganlovells.com

*Nypl*—does not apply to cases involving alleged manipulation of the various LIBORs. *See, e.g.*, *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 596 (S.D.N.Y. 2015) (distinguishing USD LIBOR and FX manipulation); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 1558504, at *7 (S.D.N.Y. Apr. 15, 2016) ("*LIBOR*") (distinguishing the exercise of personal jurisdiction in *FX* from the lack of personal jurisdiction in USD LIBOR because USD LIBOR defendants "need not engage in any market transactions at all . . . to affect the LIBOR fix"). As explained, *see* Defs.' PJ Br. at 20–21; Defs.' PJ Reply at 6–7, the benchmarks at issue in *FX II* (and *Nypl*) were calculated based on actual market transactions, and the Court construed the operative complaints to allege that defendants accomplished their purported scheme by entering into FX transactions in the U.S. that impacted those rates. *See FX II*, 2016 WL 1268267, at *5 ("Defendants executed concerted trading strategies designed to manipulate, and which actually did manipulate, the Fixes . . . Each Defendant has continuously and systematically entered into FX transactions . . . in this District[.]"). By contrast, during the relevant time period, Sterling LIBOR was set through the submission of hypothetical borrowing rates outside the U.S. *See* Defs.' PJ Br. at 2–4. As Judge Buchwald put it in *LIBOR*:

> In [*FX II*], defendants allegedly manipulated the WM/Reuters Closing Spot Rates, an important benchmark in the FX market, by discussing and engaging in coordinated trading strategies. Therefore, substantial FX business, including billions of dollars of FX transactions, in the United States provides a basis to find that defendants engaged in suit-related conduct here, because defendants' accomplished their purported scheme *by entering into FX transactions*. Here, by contrast, defendants need not engage in any market transactions at all, much less in Eurodollar futures contracts, to affect the LIBOR fix, and we have already held that plaintiffs have failed to show that defendants engaged in their purported suppression of LIBOR in order to benefit their Eurodollar trading position.

2016 WL 1558504, at *7 (emphasis in original). For this reason, *Nypl* is simply inapposite here.

Plaintiffs' contrary contention is mistaken on several fronts. Among other things, Plaintiffs assert that the manipulation alleged in *Nypl* occurred in London. *See* Pls.' Ltr. at 1. But the alleged manipulation of the FX benchmarks at issue in *Nypl*, and in *FX II*, was purportedly achieved through the trading of FX instruments, and some of those trading activities occurred in the United States; those FX benchmarks were not determined through the submission of hypothetical rates outside the U.S. as is alleged to have occurred here.

Plaintiffs' claim that *Nypl* upheld the exercise of personal jurisdiction based on "generalized jurisdictional allegations" (*see* Pls.' Ltr. at 2) is also incorrect. The operative complaint in *Nypl* drew on plea agreements between the Government and certain defendants that had engaged in FX transactions in the U.S.—and the Court concluded that those plea agreements "add specificity and plausibility" to the plaintiffs' more generalized allegations of suit-related conduct in the forum. *See Nypl*, 2018 WL 1472506, at *5 (quoting one of the plea agreements as stating that the "business activities of the defendant and its co-conspirators in connection with the purchase and sale of the EUR/USD currency pair were the subject of this conspiracy and were within the flow of, and substantially affected, interstate and U.S. import trade and commerce . . . [and the conspiracy] was carried out, in part, within the United States"). In stark

contrast here, Plaintiffs' allegations, including those based on the regulatory settlements, do not indicate that any of the alleged suit-related conduct took place in or was directed at the U.S. *See* Defs.' PJ Reply Br. at 7–8. Thus, *Nypl*'s reliance on FX plea agreements is of no consequence

*Second*, in *Nypl* Judge Schofield rejected the argument, which Plaintiffs also advance here, that a court can assert personal jurisdiction over a Foreign Defendant that is merely a foreign holding company or otherwise does not operate in the United States. 2018 WL 1472506, at *6. Judge Schofield dismissed all claims against two entities that were "foreign parent holding companies, not banks or dealers in any foreign currency exchange market," that had no "operations in the United States," *id.*, because the *Nypl* plaintiffs had failed to set forth any "allegations of suit-related conduct specific" to them. *Id.* Plaintiffs do not attempt to address this holding, which only confirms the lack of personal jurisdiction over Lloyds, a "foreign parent holding company" which is not adequately alleged to have engaged in any trading activity or suit-related conduct in or aimed at the United States. *See* Defs.' PJ Br. at 3 n.2, 11 n.7, 17 n.17; Defs.' Merits Br. at 15 n.15.[2]

*Finally*, even though *Nypl* addressed only personal jurisdiction, Plaintiffs argue that it supports their spurious claims that Sterling LIBOR is linked to the FX forwards and futures that Sonterra and Dennis allegedly traded. Pls.' Ltr. at 3. *Nypl* does no such thing. That the prices of *FX consumer retail transactions* were allegedly impacted by *FX spot market benchmark rates* says nothing about whether the prices of the *FX forwards and futures* that Sonterra and Dennis allege they purchased here were impacted by the alleged manipulation of an *interest rate benchmark*, Sterling LIBOR. Here, Sonterra and Dennis make no non-conclusory allegations to support their contention that Sterling LIBOR was used to price their FX forwards and futures— let alone that LIBOR was the "primary price component," *id.* at 3, a contention that appears nowhere in, and squarely contradicts, the CAC's allegations. *See* CAC ¶ 121 (alleging that a FX forward "*solely involves* the exchange of two different currencies on a specific future date *at a fixed rate* agreed upon on the inception of the contract covering the exchange") (emphasis added); *see also* Defs.' Merits Br. at 9–12, 17–18, 38–39, 47; Defs.' Merits Reply at 8–9, 20–21.

Respectfully submitted,

/s/ Marc J. Gottridge

Marc J. Gottridge

cc: All counsel (*via ECF*)

---

[2] *Nypl* does nothing to alter the conclusion mandated by the Second Circuit's recent decision in *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68 (2d Cir. 2018) that Plaintiffs' allegations that Foreign Defendants manipulated Sterling LIBOR outside the U.S. and traded Sterling LIBOR-based derivatives in the U.S. are insufficient to support a finding of specific jurisdiction. Under *Schwab*, these allegations fail to establish the requisite substantial connection between the alleged misconduct, Plaintiffs' claims, and the forum because their claims do not arise out of Foreign Defendants' supposed U.S.-based trading activities and because Plaintiffs did not trade directly with any Foreign Defendants other than UBS. *See* Defs.' Mar. 9, 2018 Ltr. at 1-3 (Dkt. 175); Defs.' PJ Br. at 19-22.