UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                                 :

SONTERRA CAPITAL MASTER FUND,     :
LTD., RICHARD DENNIS, FRONTPOINT  :
EUROPEAN FUND L.P., on behalf of     :
themselves and all others similarly situated,  :
                                                 :

                            Plaintiffs,     :

                                                 :

                  -against-          :

                                                 :

BARCLAYS BANK PLC, COOPERATIEVE :
CENTRALE RAIFFEISEN-            :
BOERENLEENBANK B.A., DEUTSCHE   :
BANK AG, LLOYDS BANKING GROUP   :
PLC, THE ROYAL BANK OF SCOTLAND  :
PLC, UBS AG, JOHN DOE NOS. 1-50,     :
BARCLAYS CAPITAL, INC.,           :

                                               :

                        Defendants.  :
--------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __12/21/2018__

15-CV-3538 (VSB)

**OPINION & ORDER**

Appearances:

Christian Levis
Geoffrey Milbank Horn
Raymond Peter Girnys
Vincent Briganti
Peter Dexter St. Phillip, Jr.
Sitso W. Bediako
Lee Jason Lefkowitz
Lowey Dannenberg, P.C.
White Plains, New York

Benjamin Martin Jaccarino
Christopher Lovell
Lovell Stewart Halebian Jacobson LLP
New York, NY
*Counsel for Plaintiffs and Proposed Interim Class Counsel*

James Anthony Diehl
Akin Gump Strauss Hauer & Feld LLP (NYC)
New York, New York
*Counsel for Plaintiff Richard Dennis*

Jonathan David Schiller
Amos Emory Friedland
Leigh Mager Nathanson
Boies, Schiller & Flexner LLP
New York, New York

Michael Brille
Melissa Brooke Felder Zappala
Boies, Schiller & Flexner LLP
Washington, District of Columbia

David Harold Braff
Yvonne Susan Quinn
Jeffrey T. Scott
Matthew Joseph Porpora
Sullivan & Cromwell LLP
New York, New York
*Counsel for Defendants Barclays Bank PLC and Barclays Capital, Inc.*

David Robert Gelfand
Jonathan Ohring
Mark David Villaverde
Sean Miles Murphy
Milbank, Tweed, Hadley & McCloy LLP
New York, New York

Melanie Westover Yanez
Milbank, Tweed, Hadley & McCloy LLP
Washington, District of Columbia
*Counsel for Defendant Cooperatieve Rabobank U.A.*

Aidan John Synnott
Elizabeth M. Sacksteder
Moses Silverman
Elizabeth Justine Grossman
Michael Joseph Biondi
Paul, Weiss, Rifkind, Wharton & Garrison LLP
New York, New York
*Counsel for Defendant Deutsche Bank AG*

Lisa Jean Fried
Benjamin Andrew Fleming
Kevin Timothy Baumann
Marc Joel Gottridge
Hogan Lovells US LLP

New York, New York
*Counsel for Defendant Lloyds Banking Group Plc*

David Sapir Lesser
Fraser Lee Hunter, Jr.
Jamie Stephen Dycus
Wilmer Cutler Pickering Hale and Dorr LLP
New York, New York
*Counsel for Defendant The Royal Bank of Scotland PLC*

Eric Jonathan Stock
Jefferson Eliot Bell
Lawrence Jay Zweifach
Mark Adam Kirsch
Gibson, Dunn & Crutcher, LLP
New York, New York
*Counsel for Defendant UBS AG*

VERNON S. BRODERICK, United States District Judge:

Plaintiffs Sonterra Capital Master Fund, Ltd. ("Sonterra"), FrontPoint European Fund

L.P. ("FrontPoint"), and Richard Dennis ("Dennis") bring this putative class action against

Defendants Barclays Bank PLC ("Barclays"), Cooperatieve Rabobank U.A. (f/k/a Cooperatieve

Centrale Raiffeisen-Boerenleenbank B.A.) ("Rabobank"), Deutsche Bank AG ("Deutsche

Bank"), Lloyds Banking Group Plc ("Lloyds"), The Royal Bank of Scotland PLC ("RBS"), and

UBS AG ("UBS") (collectively, the "Foreign Defendants"), and Barclays Capital, Inc. ("BCI,"

and, together with the Foreign Defendants, "Defendants").  The Consolidated Amended

Complaint ("CAC") brings claims (1) under the Sherman Antitrust Act ("Sherman Act"), 15

U.S.C. § 1, *et seq.*, (2) under the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1, *et seq.*, (3)

under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et*

*seq.*, and (4) asserts common-law claims of breach of the implied covenant of good faith and fair

dealing and unjust enrichment.

Defendants move to dismiss the CAC for lack of subject matter jurisdiction and for

failure to state a claim under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil

3

Procedure.  The Foreign Defendants also move to dismiss the claims against them for lack of personal jurisdiction under Rule 12(b)(2).  For the reasons that follow, the motion to dismiss is GRANTED in part and DENIED in part.  The motion is DENIED with regard to Plaintiff FrontPoint's Sherman Act claims and unjust enrichment claim against Defendant UBS; the motion is otherwise GRANTED.

## I.     <u>Factual Background</u>[1]

### A.     *Overview*

This case is one of several civil cases filed in this District alleging that certain banks manipulated and fixed prices of the London Interbank Offered Rate ("LIBOR"), submitted them to the British Bankers' Association ("BBA"), and thereby made artificial submissions over a period of years, which allegedly harmed Plaintiffs as purchasers or sellers of financial instruments they claim were in some way connected to LIBOR.  LIBOR is an interest rate benchmark used in financial markets around the world and intended to reflect the competitive conditions of the London interbank money market.  (CAC ¶¶ 6–7.)  LIBOR is calculated by averaging a number of submitting banks' estimates of their own respective costs of borrowing money in the London interbank market in several currencies and for a number of maturities (or "tenors") per currency.  (*Id.* ¶¶ 116–17.)  It is administered by the BBA, "the leading trade association for the United Kingdom banking and financial services sector."  (*Id.* ¶¶ 91, 92.)  It is published daily and used to price, benchmark, and/or settle interest rate derivatives traded over-the-counter and on public exchanges, including interest rate swaps, forward rate agreements, foreign exchange forwards, and futures contracts.  (*Id.* ¶¶ 8, 121.)

[1] The following factual summary is drawn from the allegations in the CAC, (Doc. 95), which I presume to be true for purposes of this motion, *see Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

During the relevant time period, the BBA published LIBOR rates for ten different currencies,[2] including the British Pound Sterling, based upon interest rate quotas that panel banks submit. (*Id.* ¶¶ 7, 103–07.) Defendants in this case were BBA panel banks that controlled the British Pound Sterling LIBOR ("Sterling LIBOR") during the class period. (*Id.* ¶¶ 101, 109, 116.) Other actions filed in this District involve the U.S. Dollar,[3] Japanese Yen,[4] and Swiss Franc[5] LIBOR. The financial instruments used by Plaintiffs in this action were foreign exchange ("FX") forward contracts, interest rate swaps, and FX futures contracts traded on the Chicago Mercantile Exchange ("CME"). (*See id.* ¶¶ 37–39.)

To set Sterling LIBOR, the BBA asks the panel banks to answer independently the following question on every banking day in London: "At what rate could you borrow [Sterling], were you to do so by asking for and then accepting inter-bank offers in a reasonable market size, just prior to 11:00 a.m.?" (*Id.* ¶ 101.) The panel members each submit answers reflecting the rate of interest offered on loans for 15 different maturities, or tenors. (*Id.* ¶ 116.) Pursuant to

---

[2] *See In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR I*"), 935 F. Supp. 2d 666, 678 (S.D.N.Y. 2013), *vacated and remanded sub nom. Gelboim v. Bank of Am. Corp.*, 823 F.3d 759 (2d Cir. 2016).

[3] Judge Buchwald has issued seven decisions in the U.S. Dollar LIBOR multi-district litigation: *LIBOR I*, 935 F. Supp. 2d 666; *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR II*"), 962 F. Supp. 2d 606 (S.D.N.Y. 2013); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR III*"), 27 F. Supp. 3d 447 (S.D.N.Y. 2014); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR IV*"), No. 11 MDL 2262 (NRB), 2015 WL 6243526 (S.D.N.Y. Aug. 4, 2015, as amended Oct. 20, 2015); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR V*"), No. 11 MDL 2262 (NRB), 2015 WL 6696407 (S.D.N.Y. Nov. 3, 2015); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR VI*"), No. 11 MDL 2262 (NRB), 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016, as amended Feb. 2, 2017); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR VII*"), 299 F. Supp. 3d 430 (S.D.N.Y. 2018). Judges Gardephe and Preska have also issued opinions pertaining to the U.S. Dollar LIBOR. *See 7 W. 57th St. Realty Co. v. Citigroup, Inc.*, 314 F. Supp. 3d 497 (S.D.N.Y. 2018); *7 W. 57th St. Realty Co. v. Citigroup, Inc.*, No. 13 Civ. 981 (PGG), 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015); *Mayfield v. British Bankers' Ass'n*, No. 14-CV-4735, 2014 WL 10449597 (S.D.N.Y. July 24, 2014).

[4] *Laydon v. Mizuho Bank, Ltd.* ("*Laydon I*"), No. 12-cv-3419 (GBD), 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014); *Laydon v. Mizuho Bank, Ltd.* ("*Laydon II*"), No. 12-cv-3419 (GBD), 2015 WL 1499185 (S.D.N.Y. Mar. 31, 2015); *Laydon v. Mizuho Bank, Ltd.* ("*Laydon III*"), No. 12-cv-3419 (GBD), 2015 WL 1515358 (S.D.N.Y. Mar. 31, 2015); *Laydon v. Mizuho Bank, Ltd.* ("*Laydon IV*"), No. 12-cv-3419 (GBD), 2015 WL 1515487 (S.D.N.Y. Mar. 31, 2015); *Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.* ("*Laydon V*"), No. 12 Civ. 3419 (GBD), 2017 WL 1093288 (S.D.N.Y. Mar. 10, 2017); *Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.* ("*Laydon VI*"), No. 12 Civ. 3419 (GBD), 2017 WL 1113080 (S.D.N.Y. Mar. 10, 2017).

[5] *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521 (S.D.N.Y. 2017).

BBA guidelines, each panel bank's answer at each tenor is supposed to reflect actual competitive market rates. (*Id.* ¶ 109.) Each panel bank submits its rates electronically to Thomson Reuters, "as administrator of the LIBOR fixing," including the Sterling LIBOR. (*Id.* ¶ 117.) After all the submissions are received, the quotes in each tenor are ranked. (*See id.*) The Sterling LIBOR is then calculated for each tenor by averaging the middle 50% of submissions. (*Id.*) Because there were sixteen members of the Sterling LIBOR contributing panel, this meant that Thomson Reuters used the middle eight submissions, after discarding the top and bottom quartiles. (*Id.* ¶ 101.) "This average rate becomes the daily official Sterling LIBOR for that particular tenor and is distributed electronically to the market, including within the United States, through Thomson Reuters and Bloomberg among other financial services platforms." (*Id.* ¶ 117.) Thomson Reuters also publishes each member bank's submissions, including those that were in the top and bottom quartiles. (*Id.* ¶ 101.)

Nearly $100 trillion in Sterling LIBOR-based derivatives were traded within the United States from January 1, 2005 through December 31, 2010 (the "Class Period"). (*Id.* ¶¶ 1, 95.) During this time, Defendants also maintained operations within the United States from which they "transacted in a full range of interest rate derivatives products, including those based upon Sterling LIBOR." (*Id.* ¶ 96.) They "competed against one another and others in the United States in the sales of financial services and products, including sales of interest rate swaps, forward rate agreements, foreign exchange forwards, and other financial products in which the price or payments were based upon the Sterling LIBOR." (*Id.* ¶ 98.) They also competed in the futures markets, including the Sterling futures contracts traded on the London International Financial Futures and Options Exchange ("LIFFE"), and British pound futures contracts traded on the CME. (*Id.* ¶¶ 39, 98.)

## B.    *Defendants' Alleged Conduct*

Barclays, Deutsche Bank, Lloyds, Rabobank, RBS, and UBS were among the members of the sixteen-bank Contributor Panel for Sterling LIBOR during the putative Class Period.[6] (*Id.* ¶¶ 11, 118.)  Plaintiffs allege that each member bank over that period "coordinated their Sterling LIBOR submissions and manipulative trading practices to fix the prices of Sterling LIBOR-based derivatives for their financial benefit." (*Id.* ¶ 125.)  According to the CAC, "Defendants' derivatives traders frequently used electronic communications, including instant messages and chat rooms, to share information regarding their Sterling LIBOR-based derivatives positions and to request Sterling LIBOR submissions that would manipulate and fix the prices of those derivatives at artificial levels for their financial benefit." (*Id.* ¶ 126.)  Those communications allegedly took place internally as well as "externally (among Sterling LIBOR-based derivatives traders and submitters located at different, supposedly competing, Sterling LIBOR contributor banks)." (*Id.* ¶ 127.)  "During the Class Period, Defendants entered into a series of agreements designed to create profit or limit liabilities amongst themselves by coordinating the manipulation of Sterling LIBOR and the prices of Sterling LIBOR-based derivatives, by conspiring to, *inter alia*, make false submissions to the BBA designed to artificially suppress, inflate, maintain, or otherwise alter Sterling LIBOR." (*Id.* ¶ 238.)  Defendants have entered into various settlements and non-prosecution agreements with government regulators, such as the Department of Justice ("DOJ"), Commodity Futures Trading Commission ("CFTC"), and United Kingdom Financial

---

[6] Lloyds, a holding company, was apparently not a member of the BBA's Sterling LIBOR Contributor Panel but its subsidiary, Lloyds Bank plc (formerly, Lloyds TSB Bank plc), was a member throughout the Class Period; in January 2009, Lloyds acquired HBOS plc, whose subsidiary was a member of the Panel through February 6, 2009. Similarly, BCI is a subsidiary of Barclays, (CAC ¶ 44), and was not a member of the Sterling LIBOR Contributor Panel. (*See* Defs.' SMJ Br. 7 n.6.)  "Defs.' SMJ Br." refers to Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Amended Complaint for Lack of Subject Matter Jurisdiction and Failure to State a Claim. (Doc. 100.)

Conduct Authority ("FCA"), in connection with LIBOR manipulation related to various currencies.  (*See id.* ¶¶ 13–25.)[7]

### C.    *Plaintiffs' Alleged Injuries*

Plaintiff Sonterra is an investment fund that traded in Sterling foreign exchange forwards ("Sterling FX Forwards") on unspecified dates.  (*Id.* ¶ 37.)  An FX forward is "[a] transaction that solely involves the exchange of two different currencies on a specific future date at a fixed rate agreed upon on the inception of the contract covering the exchange."  (*Id.* ¶ 121(e).)  Sonterra characterizes its forwards as "Sterling LIBOR-based derivatives," (*id.* ¶ 37), because the "cost of buying or selling Sterling under a foreign exchange forward is determined using a formula that incorporates Sterling LIBOR," (*id.* ¶ 206).  "The calculation involves taking the 'spot price' of Sterling for immediate delivery, and adjusting it to account for the 'cost of carry,' *i.e.*, the amount of interest paid or received on Sterling deposits, for the duration of the agreement.  Sterling LIBOR, the benchmark rate for Sterling deposits, is used in this formula to calculate the cost of carrying Sterling over the duration of the foreign exchange forward."  (*Id.*)

Plaintiff Dennis is an individual trader who participated in transactions in Sterling foreign exchange futures contracts ("Sterling FX Futures") on the CME on one occasion—May 11, 2010.  (*Id.* ¶¶ 39, 214.)  A "CME British pound futures contract is an agreement to buy or sell £62,500, in terms of U.S. Dollars, on some future date."  (*Id.* ¶ 212.)  Prices of CME Sterling FX Futures are determined using "the same calculation used to determine the price of" Sterling FX Forwards, but CME Sterling FX Futures are traded on the exchange according to standardized terms.  (*Id.* ¶ 212.)  On May 11, 2010, Dennis entered into a "long position" in CME Sterling FX

---

[7] An index of links to the Foreign Defendants' publicly available regulatory settlements, which are incorporated by reference into the CAC, is located at Appendix A to the Foreign Defendants' Reply Memorandum of Law in Further Support of Foreign Defendants' Motion to Dismiss for Lack of Personal Jurisdiction.  (Doc. 120-1.)

Futures and, two days later, "liquidated that position," at a loss of approximately $38,000. (*Id.* ¶ 214.)

Plaintiff FrontPoint is a Delaware limited partnership with its principal place of business in Greenwich, Connecticut. (*Id.* ¶ 38.) FrontPoint claims to have entered into "Sterling LIBOR-based swaps" with UBS on three occasions in 2007—October 17, 2007, November 22, 2007, and November 29, 2007—with payments ceasing on those swaps in 2008. (*Id.* ¶¶ 209, 211.) These swaps were entered into in accordance with an International Swaps and Derivatives Association, Inc. ("ISDA") Master Agreement dated May 1, 2007.[8] (*Id.* ¶ 29.) "A swap is an over-the-counter Sterling LIBOR-based derivative in which two parties exchange the obligation to make [a] series of payments based on some underlying principal amount for a set period of time." (*Id.* ¶ 208.) FrontPoint only transacted business with Defendant UBS. (*See id.* ¶ 211.)

## II.    __Procedural History__

Plaintiff Sonterra filed its complaint on May 6, 2015, (Doc. 1), and amended it on July 24, 2015, (Doc. 18). Defendants requested a pre-motion conference to discuss their proposed motion to dismiss. (Doc. 48.) The pre-motion conference was held on October 19, 2015, during which I granted the parties' request to submit separate briefing on the question of whether this Court lacks personal jurisdiction, as distinct from their briefing on whether to dismiss on other grounds, and set a motion schedule. (Doc. 61.)

On February 16, 2016, I granted Plaintiffs' motion to consolidate the Sonterra action, *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, Case No. 15-cv-3538, with a similar case brought by Plaintiffs FrontPoint and Dennis, *FrontPoint European Fund, L.P. v. Barclays*

---

[8] An ISDA Master Agreement is a standardized form agreement published by the ISDA, used to provide certain legal and credit protections for parties entering into over-the-counter derivatives transactions, including swaps and forward rate agreements. (CAC ¶ 29 n.25.)

*Bank plc*, No. 16-cv-464, and dismissed Defendants' motion to dismiss with leave to renew after the filing of a consolidated amended complaint. (Doc. 91.) Plaintiffs filed the CAC on February 25, 2016. (Doc. 95.) The CAC asserted federal claims under Section 1 of the Sherman Act (First and Second Claims for Relief), the CEA (Third, Fourth, and Fifth Claims for Relief), RICO (Sixth and Seventh Claims for Relief), as well as state law claims for unjust enrichment and violation of the implied covenant of good faith and fair dealing (Eighth and Ninth Claims for Relief).

On April 11, 2016, Defendants moved to dismiss the CAC, (Doc. 99), and filed two briefs in support—one brief addressing the question of personal jurisdiction and the other brief addressing Defendants' remaining arguments, (Docs. 100, 103).[9] Plaintiffs filed their oppositions, (Docs. 114, 116); and Defendants filed their reply briefs, (Docs. 120, 121). The parties also filed various declarations with exhibits in support of their positions. (Docs. 101, 102, 104–10, 115.) I have since received the parties' letters of supplemental authority addressing recent decisions of the Supreme Court and Second Circuit, as well as other cases in the Southern District of New York. (Docs. 119, 123–25, 131–33, 135–38, 142, 143, 154–56, 160, 163, 169, 170, 175–83, 188.) Oral argument on the motion was held on August 4, 2017.[10]

---

[9] Only the Foreign Defendants move to dismiss for lack of personal jurisdiction; Defendant BCI does not challenge the Court's personal jurisdiction over it. (*See* Defs.' PJX Br. 1 n.1.) "Defs.' PJX Br." refers to the Memorandum of Law in Support of Foreign Defendants' Motion to Dismiss for Lack of Personal Jurisdiction. (Doc. 103.)

[10] Following oral argument, Plaintiffs submitted a letter indicating their intent to move to substitute an entity named Fund Liquidation Holdings, LLC ("FLH") as assignee and attorney-in-fact for Plaintiffs Sonterra and FrontPoint. (Doc. 171, at 1.) Plaintiffs had learned that both Sonterra and FrontPoint ceased operations no later than 2012; however, before winding down, both assigned certain rights to FLH, including the right to recover any amounts payable on their assets, as well as the right to commence suit in Sonterra's and FrontPoint's names. (*Id.* at 1–2.) Plaintiffs contend that the substitution of FLH for Sonterra and FrontPoint would not affect any of the substantive factual or legal allegations in the CAC, (*Id.* at 2); Defendants disagree, (Doc. 172). Because I conclude that Sonterra's claims fail for reasons other than their lack of capacity to sue, Plaintiffs' request for leave to file a motion to substitute for Plaintiff Sonterra is denied as moot. Plaintiff shall submit any motion to substitute Plaintiff FrontPoint in accordance with my instructions below.

### III. __Legal Standards__

#### A. *Rule 12(b)(6)*

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *See Kassner*, 496 F.3d at 237. A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

## B.    *Rule 12(b)(2)*

When a defendant moves for dismissal for lack of personal jurisdiction pursuant to Rule

12(b)(2), the plaintiff bears the burden of demonstrating that the court has jurisdiction over the

defendant.  *Kernan v. Kurz– Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir. 1999).  On a motion

under Rule 12(b)(2), when the issue of personal jurisdiction "is decided initially on the pleadings

and without discovery, the plaintiff need show only a *prima facie* case."  *Volkswagenwerk*

*Aktiengesellschaft v. Beech Aircraft Corp*., 751 F.2d 117, 120 (2d Cir. 1984).  A plaintiff "can

make this showing through [her] own affidavits and supporting materials[] containing an

averment of facts that, if credited . . . would suffice to establish jurisdiction over the defendant."

*Whitaker v. Am. Telecasting Inc*., 261 F.3d 196, 208 (2d Cir. 2001) (internal citations and

quotation marks omitted).  Thus, a court may consider materials outside the pleadings when

deciding a motion dismiss for lack of personal jurisdiction.  *Hsin Ten Enter. USA, Inc. v. Clark*

*Enters*., 138 F. Supp. 2d 449, 452 (S.D.N.Y. 2000).

## IV.    <u>Article III Standing</u>

As an initial matter, Defendants argue that Plaintiffs Sonterra and Dennis lack standing

under Article III of the Constitution.[11]  (Defs.' SMJ Br. 11–13.)  Article III standing is "the

threshold question in every federal case, determining the power of the court to entertain the suit."

*Ross v. Bank of Am., N.A.(USA)*, 524 F.3d 217, 222 (2d Cir. 2008) (quoting *Denney v. Deutsche*

*Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006)).  To satisfy the requirements of Article III standing,

a plaintiff must establish three elements:

> (1) the plaintiff must have suffered an injury in fact, i.e., an invasion of a legally
> protected interest which is (a) concrete and particularized and (b) actual or
> imminent, not conjectural or hypothetical; (2) there must be a causal connection
> between the injury and the conduct complained of; and (3) it must be likely, as

---

[11] Defendants do not argue that Plaintiff FrontPoint lacks Article III standing.  (*See* Defs.' SMJ Br. 11–13.)

opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) (internal quotation marks omitted).

"In considering a Rule 12(b)(1) motion, all facts alleged in the complaint are taken as true and all reasonable inferences drawn in Plaintiffs' favor." *In re Currency Conversion Fee Antitrust Litig.*, Nos. M 21-95, 05 Civ. 7116 (WHP), 2009 WL 151168, at *2 (S.D.N.Y. Jan. 21, 2009). "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Id.* (quoting *Raila v. United States*, 355 F.3d 118, 119 (2d Cir. 2004)).

Defendants argue that neither Sonterra nor Dennis alleges facts showing that the Sterling LIBOR manipulation plausibly affected the financial products they traded in—Sterling FX Forwards and CME Sterling FX Futures—and have thus failed to allege injury in fact. (Defs.' SMJ Br. 11.) An FX forward is "an agreement to buy or sell a certain amount of one currency, *e.g.*, Sterling, in terms of another, *e.g.* U.S. Dollars, on some future date." (CAC ¶ 206.) Sterling FX Futures are the same as Sterling FX Forwards "except that [Sterling FX Forwards] are not traded on an exchange and thus [are] not subject to the standardized terms specified by the CME." (*Id.* ¶ 212.) Plaintiffs allege that "[t]he cost of buying or selling Sterling under a foreign exchange forward is determined using a formula that incorporates Sterling LIBOR." (*Id.* ¶ 206.) The CAC describes this "formula":

> The calculation involves taking the "spot price" [what it costs today] of Sterling for immediate delivery, and adjusting it to account for the "cost of carry," *i.e.*, the amount of interest paid or received on Sterling deposits, for the duration of the agreement. Sterling LIBOR, the benchmark rate for Sterling deposits, is used in this formula to calculate the cost of carrying Sterling over the duration of the foreign exchange forward. As a result a manipulation of Sterling LIBOR renders the cost of buying or selling Sterling under a foreign exchange forward artificial.

(*Id.*) I find that these non-conclusory allegations about the relationship between Sterling LIBOR and the Sterling FX Futures and FX Forwards are sufficient to establish—for the purpose of determining whether there is constitutional standing—that any LIBOR manipulation had an effect on the price of Plaintiffs' transactions. *See Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC), 2017 WL 685570, at *9–10 (S.D.N.Y. Feb. 21, 2017) (finding that plaintiffs who transacted in CME Euro currency futures and FX forwards had standing to challenge Euribor manipulation because industry-based formula incorporated Euribor into those transactions). "That sort of 'paid too much' or 'received too little' harm is classic economic injury-in-fact." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 53 (S.D.N.Y. 2016). Indeed, in *Gelboim v. Bank of America Corp.*, 823 F.3d 759 (2d Cir. 2016), although constitutional standing was not in question, the Circuit noted in dicta that it was "easily satisfied by appellants' pleading that they were harmed by receiving lower returns on LIBOR-denominated instruments as a result of defendants' manipulation of LIBOR." *Id.* at 770. Given the Circuit's observations in *Gelboim*, I find that the allegations in the CAC that Plaintiffs received lower returns because of Defendants' manipulation of Sterling LIBOR support a finding of Article III standing.

Defendants point to *Sonterra Capital Master Fund, Ltd. v. UBS AG*, No. 15-cv-5844-GBD-HBP, 2017 WL 1091983 (S.D.N.Y. Mar. 10, 2017), in which Judge Daniels concluded that FX forwards are not indexed or priced by reference to the Euroyen TIBOR or Yen LIBOR, and therefore the connection between the two is too attenuated and speculative to support standing. (*See* 3/17/17 Ltr.)[12] However, Judge Daniels noted that plaintiffs there were unable to establish "that the Yen LIBOR rate is definitively used to price foreign exchange forwards." *Sonterra*

---

[12] "3/17/17 Ltr." refers to Defendants' letter dated March 17, 2017. (Doc. 136.)

*Capital Master Fund, Ltd. v. UBS AG*, 2017 WL 1091983, at *2. While there appears to be a serious factual question as to the extent to which Plaintiffs' FX forwards took Sterling LIBOR into account and what impact it had on Plaintiffs' investments, I concur with Judge Castel that "[t]he Court cannot resolve these conflicting factual assertions at the pleading stage." *Sullivan*, 2017 WL 685570, at *9. Therefore, I find that Plaintiffs have Article III standing to pursue their claims.

## V.    Discussion

Defendants move to dismiss for failure to state a claim, and the Foreign Defendants also move to dismiss for lack of personal jurisdiction. Although personal jurisdiction is a threshold inquiry, and ordinarily addressed prior to the merits of substantive claims, "that practice is prudential and does not reflect a restriction on the power of the courts to address legal issues." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 n.6 (2d Cir. 2013). Because only the Foreign Defendants move for lack of personal jurisdiction, and since the jurisdictional question relies in part on the underlying claims and plausible scope of the conspiracy, *see LIBOR VI*, 2016 WL 7378980, at *3, I will address the personal jurisdiction questions last, *see Sullivan*, 2017 WL 685570, at *11 (addressing defendants' 12(b)(6) motion before personal jurisdiction because personal jurisdiction arguments turned in part on substance of 12(b)(6) motion).

### A.    *Statute of Limitations*[13]

Defendants argue that Plaintiffs' Sherman Act, CEA, and RICO claims are all untimely under their respective statutes of limitations. (Defs.' SMJ Br. 25–26 (Sherman Act); 27–31

---

[13] "In deciding a motion to dismiss on statute of limitations grounds, 'a district court may take judicial notice of media reports, state court complaints, and regulatory filings' as long as 'the court does not take judicial notice of the documents for the truth of the matters asserted in them, but rather to establish that the matters had been publicly asserted.'" *7 W. 57th St. Realty Co.*, 2015 WL 1514539, at *23 n.8 (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 424 (2d Cir. 2008)).

(CEA); 46–47 (RICO).)  As discussed in detail below, because I find that certain of Plaintiffs'

claims are tolled by the doctrine of fraudulent concealment, Plaintiffs' claims—with the

exception of their CEA claims against Defendants Barclays, UBS, and RBS—are not barred by

their respective statute of limitations.

### 1. Applicable Law

#### a. Antitrust Claims

The statute of limitations for antitrust claims is four years from the date of accrual.  15

U.S.C. § 15b.  The limitations period begins to run "as soon as there is injury to competition."

*Johnson v. Nyack Hosp.*, 86 F.3d 8, 11 (2d Cir. 1996).

> In an alleged price-fixing conspiracy, each overt act that is part of the violation and
> that injures the plaintiff starts the statutory period running again, regardless of the
> plaintiff's knowledge of the alleged illegality at much earlier times.  Plaintiffs may
> only recover damages based on acts falling within the statutory period, and not
> based on previous acts.

*Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 134–35 (S.D.N.Y, 2016)

(citations and internal quotation marks omitted); *see also Zenith Radio Corp. v. Hazeltine*

*Research, Inc.*, 401 U.S. 321, 338 (1971).

#### b. RICO Claims

RICO claims are subject to a four-year statute of limitations.  *Koch v. Christie's Int'l*

*PLC*, 699 F.3d 141, 148 (2d Cir. 2012).  "As a general matter, 'the limitations period does not

begin to run until a plaintiff has actual or inquiry notice of the injury.'"  *Id.* at 150–51 (quoting *In*

*re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998)).

> Inquiry notice—often called "storm warnings" in the securities context—gives rise
> to a duty of inquiry "when the circumstances would suggest to an investor of
> ordinary intelligence the probability that she has been defrauded."  In such
> circumstances, the imputation of knowledge will be timed in one of two ways:  (i)
> "if the investor makes no inquiry once the duty arises, knowledge will be imputed
> as of the date the duty arose"; and (ii) if some inquiry is made, "we will impute

knowledge of what an investor in the exercise of reasonable diligence should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud."

*Koch*, 699 F.3d at 151 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005)). "'Storm warnings' need not detail every aspect of the alleged fraudulent scheme: 'An investor does not have to have notice of the entire fraud being perpetrated to be on inquiry notice.'" *Staehr*, 547 F.3d at 427 (quoting *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 352 (2d Cir. 1993)). "Rather, a totality-of-the-circumstances analysis applies." *Id.* Whether a plaintiff was on inquiry notice is "analyzed under an objective standard," and may be "resolved as a matter of law." *Id.*

### c. CEA Claims

An action brought under the CEA "shall be brought not later than two years after the date the cause of action arises." 7 U.S.C. § 25(c). "Because the CEA does not define when a cause of action accrues, courts apply a discovery accrual rule wherein discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." *In re London Silver Fixing, Ltd., Antitrust Litig.* ("*In re Silver*"), 213 F. Supp. 3d 530, 573 (S.D.N.Y. 2016) (quoting *Koch*, 699 F.3d at 148–49). "Applying the corollary doctrine of 'inquiry notice,' a court must 'ask at what point the circumstances were such that they would suggest to a person of ordinary intelligence the probability that she has been defrauded." *LIBOR III*, 27 F. Supp. 3d at 471 (quoting *LIBOR I*, 935 F. Supp. 2d at 698); *see also Sullivan*, 2017 WL 685570, at *26 ("The limitations period begins to run when a plaintiff is placed on inquiry notice of the alleged wrongdoing through facts that 'suggest to a person of ordinary intelligence' that the CEA has been violated." (quoting *Benfield v. Mocatta Metals Corp.*, 26 F.3d 19, 22 (2d Cir. 1994))); *In re*

*Silver*, 213 F. Supp. 3d at 573 (comparing inquiry notice in the CEA context to storm warnings in the securities context).

<h4 style="text-align:center">d.   Doctrine of Fraudulent Concealment</h4>

"Under federal common law, a statute of limitations may be tolled due to the defendant's fraudulent concealment if the plaintiff establishes that: (1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Koch*, 699 F.3d at 157 (quoting *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 543 (2d Cir. 1999)). The rationale behind the doctrine "is to prevent a defendant from 'concealing a fraud, or committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it.'" *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988) (quoting *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 349 (1874)).

The first prong is met where "'the nature of the wrong itself' is self-concealing." *Sullivan*, 2017 WL 685570, at *27 (quoting *Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 267 n.20 (S.D.N.Y. 2006)); *see also Levy v. BASF Metals Ltd.*, No. 1:15-cv-7317-GHW, 2017 WL 2533501, at *8 (S.D.N.Y. June 9, 2017). Allegations of price-fixing conspiracies are often considered inherently self-concealing. *See Merced*, 165 F. Supp. 3d at 135 ("Allegations of price-fixing conspiracies in violation of antitrust law constitute the type of unlawful activity that is inherently self-concealing."); *In re Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000) ("[S]ince . . . price-fixing

conspiracies are deemed self-concealing, a plaintiff is not required to show defendants took independent affirmative steps to conceal their conduct.").

"A claim for fraudulent concealment must be pled with particularity, in accordance with the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure." *Merced*, 165 F. Supp. 3d at 135. However, "because resolution of a claim of fraudulent concealment is intimately bound up with the facts of the case, it often cannot be decided at the motion to dismiss stage." *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 675 (S.D.N.Y. 2016) (internal quotation marks omitted).

### 2. Application

Sonterra's initial complaint was filed on May 6, 2015. FrontPoint and Dennis's complaint was filed on January 21, 2016. The conduct at issue is alleged to have occurred during the Class Period—January 1, 2005 through December 31, 2010. (CAC ¶ 217.) Although Plaintiffs may have been aware of the identities of the panel members, they claim not to have known which of the panel members participated in the conspiracy, and thus lacked notice of their claims, until the Government settlements became public: Barclays on June 27, 2012, (*id.* ¶ 46), UBS on December 18, 2012, (*id.* ¶ 17 n.8), RBS on February 6, 2013, (*id.* ¶ 73), Rabobank on October 29, 2013, (*id.* ¶ 20 n.15), Lloyds on July 28, 2014, (*id.* ¶ 22 n.20), and Deutsche Bank on April 23, 2015, (*id.* ¶ 13 n.2). Therefore, Plaintiffs concede that their CEA claims against Barclays, UBS, and RBS are time-barred under the applicable two-year statute of limitations, (Pls.' SMJ Opp. 47 n.36)[14], but argue that their remaining CEA claims against Rabobank,

---

[14] "Pls.' SMJ Opp." refers to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim. (Doc. 116.)

Deutsch Bank, and Lloyds, as well as their antitrust and RICO claims against all Defendants, are tolled by the doctrine of fraudulent concealment.

Defendants argue that Plaintiffs were on notice of their claims as early as May 2008. (Defs.' SMJ Br. 25–30, 46–47.) As support for their argument, Defendants identify and include a number of surveys, articles, and reports (the "2008 press reports") that they assert placed Plaintiffs on inquiry notice in 2008. (*See* Gottridge Decl. Exs. A–H.)[15] These same materials have been discussed by a number of other courts in this District examining the issue of inquiry notice. As comprehensively summarized by Judge Furman, the 2008 press reports conveyed the following information:

> On April 10, 2008, strategists at Citigroup published a report comparing LIBOR to other interest rate measures and concluding that "LIBOR may understate actual interbank lending costs" by twenty to thirty basis points (or twenty to thirty hundreths of a percentage point). The strategists explained:
>
> "The most obvious explanation for LIBOR being set so low is the prevailing fear of being perceived as a weak hand in this fragile market environment. If a bank is not held to transact at its posted LIBOR level, there is little incentive for it to post a rate that is more reflective of real lending levels, let alone one that is higher than its competitors. Because all LIBOR postings are publicly disclosed, any bank posting a high LIBOR level runs the risk of being perceived as needing funding. With markets in such a fragile state, this kind of perception could have dangerous consequences."
>
> Six days later, the *Wall Street Journal* published an article citing the Citigroup report and warning that "one of the most important barometers of the world's financial health could be sending false signals." The article reported that the BBA, which oversees LIBOR, was conducting an investigation into potential problems

---

[15] "Gottridge Decl." refers to the Declaration of Marc J. Gottridge, dated April 11, 2016. (Doc. 101.) Those surveys, articles and reports include the following: a survey published by *Factiva*, dated June 19, 2008, titled *Market Participants Doubt Libor Rates Reflect Market Rates*, (Ex. A); an article published by the *Financial Times*, dated April 21, 2008, titled *Doubts over Libor Widen*, (Ex. B); an article published by *Bloomberg*, dated April 16, 2008, titled *Bankers Group Reviews Libor amid Manipulation Concern*, (Ex. C); an article published by the *Wall Street Journal*, dated April 16, 2008, titled *Libor Fog: Bankers Cast Doubt on Key Rate amid Crisis*, (Ex. D); an article published by the *Wall Street Journal*, dated April 18, 2008, titled *Libor Surges After Scrutiny Does, Too*, (Ex. E); an article published by the *Wall Street Journal*, dated April 17, 2008, titled *British Bankers Group Steps Up Review of Widely Used Libor*, (Ex. F); an article published by *Factiva*, dated April 16, 2008, titled *BBA Libor Review Will Look for Past Misquoting from Banks*, (Ex. G); and a research report, dated April 10, 2008, titled *Special Topic: Is LIBOR Broken?*, (Ex. H).

with the rate.

Two more articles in the *Wall Street Journal* followed in quick succession. The following day, April 17, 2008, the *Journal* reported that the BBA had "fast-tracked its inquiry into the accuracy of the rate." The *Journal* noted that the BBA's announcement "came as more traders and bankers expressed concerns about" the validity of LIBOR. And on April 18, 2008, the *Journal* reported a "sudden jump in the dollar-denominated London interbank offered rate, or LIBOR," in the wake of the announcement that the BBA was accelerating its inquiry into the rate's accuracy. The article reiterated "concerns among bankers that the LIBOR panel banks were not reporting the high rates they were paying for short-term loans for fear of appearing desperate for cash."

Nor was the *Wall Street Journal* the only news outlet reporting on concerns surrounding LIBOR. On April 21, 2008, the *Financial Times* reported that "the credibility of Libor as a measure is declining." In particular, the *Times* explained that, as the paper had "first revealed" in 2007, "bankers have been questioning the way Libor is compiled ever since the credit turmoil first erupted." On May 16, 2008, *Reuters* published an article discussing "problems with Libor," and noting that "recent concern had focused particularly on the dollar Libor index and worries that some banks were understating how much they had to pay to borrow money in order to avoid being labeled desperate for cash and, as a result, vulnerable to solvency rumors." And on May 29, 2008, *Bloomberg* published an article, the first line of which stated: "Banks routinely misstated borrowing costs to the British Bankers' Association to avoid the perception they faced difficulty raising funds as credit markets seized up, said Tim Bond, a strategist at Barclay Capital."

Amidst growing concern about LIBOR's reliability, the *Wall Street Journal* conducted its own study. Its results—published in a May 29, 2008 article— revealed that "in the first four months of 2008, the three-month and six-month dollar Libor rates were about a quarter percentage point lower than" the *Journal*'s analysis suggested they should have been. The data showed, further, that "after banks adjusted their Libor rates following news of the BBA review in mid-April, the difference between the reported rates and what rates should have been shrunk to about 0.15 percentage point." Three experts, the *Journal* reported, approved of its methodology. By May 29, 2008, then, there were at least seven articles in major publications reporting that there was substantial evidence to support the conclusion that LIBOR was artificially low and had been so for some time.

*BPP Ill., LLC v. Royal Bank of Scot. Grp., PLC*, No. 13 Civ. 0638(JMF), 2013 WL 6003701, at

*7–8 (S.D.N.Y. Nov. 13, 2013) (citations omitted), *aff'd in part, vacated in part*, 603 F. App'x

57 (2d Cir. 2015) (summary order); *see also LIBOR I*, 935 F. Supp. 2d at 700–03 (describing

same articles). Applying Pennsylvania's discovery rule, Judge Furman concluded that these

articles were sufficient storm warnings to raise the possibility that the US-dollar LIBOR was not

a legitimate and reliable market-based interest rate; therefore, the plaintiffs were not reasonably

unaware of their injury. *BPP Ill., LLC v*, 2013 WL 6003701, at *6-7. The Second Circuit

reversed in a summary order, stating that the district court erroneously held plaintiffs to too high

a standard of proof at the motion to dismiss stage by requiring plaintiffs to exhibit reasonable

diligence in not discovering their injury in response to the storm warnings. *See* 603 F. App'x at

59. Because plaintiffs were "not required to plead, in a complaint, facts sufficient to overcome

an affirmative defense," the Second Circuit concluded that the record was insufficient to show

that the plaintiffs had not exercised reasonable diligence. *See id.* at 59 (internal quotation marks

omitted).

On remand, Judge Furman concluded that the plaintiffs were judicially estopped from

bringing LIBOR-based fraud claims because they failed to list them in their schedule of assets in

a prior bankruptcy proceeding. *See BPP Ill., LLC v. Royal Bank of Scot. Grp., PLC*, No. 13-CV-

638 (JMF), 2015 WL 6143702, at *9 (S.D.N.Y. Oct. 19, 2015). The Second Circuit affirmed

and, relying on Fifth Circuit law, held that the 2008 press reports were sufficient to "suggest that

[the plaintiffs] may have [had] a possible cause of action." *BPP Ill., LLC v. Royal Bank of Scot.

Grp., PLC*, 859 F.3d 188, 193 & n.3 (2d Cir. 2017) (quoting *In re Coastal Plains, Inc.*, 179 F.3d

197, 210 (5th Cir. 1999)). In a footnote, the Court reconciled its decisions as follows:

> In the previous appeal in this case, we stated that the district court had acted too
> hastily in concluding, based in part on these newspaper reports, that BPP should
> have been aware of its potential LIBOR-fraud claims. In that appeal, however, we
> considered a different question under a different body of law. The issue was
> whether BPP had sufficient inquiry notice under the relevant Pennsylvania statute
> of limitations. That question turned on when the plaintiff reasonably should have
> known that he had been injured and that his injury had been caused by another
> party's conduct. In this appeal, controlled by Fifth Circuit bankruptcy precedents,
> the question is whether the debtor has enough information prior to confirmation to
> suggest that it may have a possible cause of action. The tests are different, and a

bankruptcy debtor in the Fifth Circuit could be required to list a cause of action in its schedule of assets even though the same debtor would not be deemed to have inquiry notice of his injury for purposes of the Pennsylvania statute of limitations.

*Id.* at 193 n.3 (citations and internal quotation marks omitted).

The Second Circuit's recent decision in *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68 (2d Cir. 2018), also addressed the significance of the 2008 press reports. In that case, the Circuit—albeit applying California law—reversed the district court's determination that the plaintiff was on inquiry notice based on reports published by May 29, 2008. *See id.* at 96–98. The Second Circuit's decision rested, in part, on California law, under which press reports are not sufficient to put a plaintiff on inquiry notice "where there is no evidence that the plaintiff was aware of the reporting in question." *Id.* at 97. The Circuit further stated that

> even if Schwab were aware of news articles that raised the possibility that LIBOR had been at artificial levels since August 2007, it is not certain that any of Schwab's claims would be time-barred. The BBA responded to the negative press reporting by assuring investors and journalists that its own investigation had confirmed the accuracy of LIBOR. It is plausible that Schwab reasonably relied on those assurances, thus delaying the start of the limitations period.

*Id.* at 98 (citing *BPP Ill., LLC*, 603 F. App'x at 59). "The Second Circuit's analysis strongly suggests that, even if the news articles published on or about May 29, 2008 are sufficient to place a plaintiff on inquiry notice, the statute of limitations would be tolled under the doctrine of fraudulent concealment where a plaintiff plausibly alleges that it relied on the BBA's assurances that LIBOR was accurate." *7 W. 57th St. Realty Co.*, 314 F. Supp. 3d at 518.

Here, Plaintiffs' allegations clear the first hurdle of the fraudulent concealment test because the nature of LIBOR submissions is inherently secretive, and therefore collusion related to such submissions is self-concealing. *See Sullivan*, 2017 WL 685570, at *27. As to the second factor, Plaintiffs adequately allege that they remained ignorant of the alleged scheme until a point within the relevant statutes of limitations—when the Government settlements became

public.  (*See* CAC ¶ 20 n.15 (Rabobank on October 29, 2013); *id.* ¶ 22 n.20 (Lloyds on July 28, 2014); *id.* ¶ 13 n.2 (Deutsche Bank on April 23, 2015).)

With regard to the third element—whether Plaintiffs exercised due diligence in pursuing the discovery of the claim during the period they seek to have tolled—Defendants argue that the 2008 press reports put Plaintiffs on inquiry notice of a cause of action prior to the Government settlements, thereby triggering the need for diligence.  As an initial matter, the 2008 press reports did not explicitly suggest that panel banks were manipulating Sterling LIBOR, which distinguishes this case from the U.S.-dollar LIBOR decisions that tolled the statute of limitations notwithstanding those same reports.  Further, it is unclear that the 2008 press reports should have alerted Plaintiffs to their various claims, as those reports may not have provided Plaintiffs with a basis to allege a cognizable theory of liability against each specific Defendant.  *See Sullivan*, 2017 WL 685570, at *28 (rejecting defendants' argument that "October 2011 press reports about possible Euribor manipulation should have alerted plaintiffs to their claims" because "those early reports did not provide plaintiffs with information sufficient to identify each defendant or a good-faith basis to allege a cognizable theory of liability").  Indeed, Plaintiffs claim not to have known which panel members participated in the conspiracy until the Government settlements became public.

Moreover, even if the 2008 press reports were sufficient to place Plaintiffs on inquiry notice, "the statute of limitations would be tolled under the doctrine of fraudulent concealment where [P]laintiff plausibly alleges that it relied on the BBA's assurances that LIBOR was accurate."  *7 W. 57th St. Realty Co.*, 314 F. Supp. 3d at 518; *see also Schwab*, 883 F.3d at 97–98. Although Plaintiffs' due diligence allegations are thin, the CAC alleges that Defendants' agreements to manipulate Sterling LIBOR were "intentionally self-concealing" and that through

the BBA, Defendants were representing that their Sterling LIBOR quotes were accurate. (*See, e.g.*, CAC ¶ 230.) I therefore find that Plaintiffs have adequately alleged fraudulent concealment, and at the pleading stage, I need not determine the precise contours of the applicable tolling period. *See In re Commodity Exch., Inc.*, 213 F. Supp. 3d at 676. Accordingly, Plaintiffs' antitrust and RICO claims against all Defendants and CEA claims against Rabobank, Deutsche Bank, and Lloyds are not barred by their applicable statutes of limitations.

## B. *Antitrust Claims*

The Consolidated Amended Complaint asserts two antitrust claims under Section 1 of the Sherman Act: First, that Defendants conspired with each other and with brokers to make false Sterling LIBOR submissions; and second, that Defendants conspired through trading strategies to affect other banks' Sterling LIBOR submissions. In addition to the statute of limitations arguments addressed above, *see supra* Part V.A, Defendants argue that these claims should be dismissed because (1) Plaintiffs lack antitrust standing; (2) the claims are barred by the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), 15 U.S.C. § 6a; and (3) the CAC fails to plausibly allege an antitrust conspiracy.

### 1. Antitrust Standing[16]

Defendants primarily argue that Plaintiffs lack antitrust standing because (1) Plaintiffs do not allege they were customers or competitors of Defendants (with one exception), and

---

[16] Plaintiffs argue that dismissal on this basis is premature, as the CAC alleges that Plaintiffs were damaged by the conduct alleged. (Pls.' SMJ Opp. 15–16.) However, standing is a threshold issue. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519 (1983); *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013) ("Antitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law." (quoting *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007)). Therefore, it is appropriate to consider the issue at this stage of the case.

(2) Plaintiffs' injury is too speculative to allow them to be "efficient enforcers" of the antitrust laws. (Defs.' SMJ Br. 16–19.) As discussed below, I find that Plaintiffs Sonterra and Dennis lack antitrust standing, but find that Plaintiff FrontPoint has antitrust standing to pursue its claims against Defendant UBS.

<h3 style="text-align:center">a.  <u>Applicable Law</u></h3>

Section 4 of the Clayton Act provides in relevant part that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). This language has been interpreted in this Circuit to mean that a plaintiff alleging antitrust claims must establish antitrust standing in addition to constitutional standing under Article III. *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016). "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Gelboim*, 823 F.3d at 770 (quoting *AGC*, 459 U.S. at 535 n.31).

To adequately plead antitrust standing, a plaintiff must plausibly allege that (1) it suffered an antitrust injury, meaning injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," and (2) it is an acceptable plaintiff to pursue the alleged antitrust violations, in satisfaction of the "efficient enforcer" factors. *Gordon v. Amadeus IT Grp., S.A.*, 194 F. Supp. 3d 236, 246 (S.D.N.Y. 2016) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977); *AGC*, 459 U.S. at 538–45); *see*

*also Gelboim*, 823 F.3d at 778; *Aluminum Warehousing*, 833 F.3d at 157.

b.  Application:  Antitrust Injury

As an initial matter, the CAC alleges that Defendants engaged in a horizontal price-fixing scheme, which is a *per se* antitrust violation.  *See Gelboim*, 823 F.3d at 771.  As in *Gelboim*, Plaintiffs allege that the banks colluded to manipulate the Sterling LIBOR, and thereby increased the cost to buyers of various LIBOR-based instruments.  (*See* CAC ¶¶ 13–25, 126–42). "Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"  *Gelboim*, 823 F.3d at 772 (quoting *Brunswick*, 429 U.S. at 489).  The CAC therefore adequately pleads antitrust injury based on the price-fixing's effect on the prices for LIBOR-based financial instruments.  "No further showing of actual adverse effect in the marketplace is necessary.  This attribute separates evaluation of *per se* violations—which are presumed illegal—from rule of reason violations, which demand appraisal of the marketplace consequences that flow from a particular violation." *Id.*

Prior to the Second Circuit's decision in *Gelboim*, Defendants argued that Plaintiffs failed to allege antitrust injury, relying on Judge Buchwald's conclusion in *LIBOR I* that, because LIBOR-setting is a cooperative rather than competitive process, the alleged conduct cannot be the source of an antitrust injury.  (Defs.' SMJ Br 14–15.)  *Gelboim* rejected Judge Buchwald's antitrust injury analysis and held that manipulating LIBOR is a per se violation of antitrust laws that causes antitrust injury to anyone who transacted in financial instruments with prices influenced by that rate.  *See* 823 F.3d at 771.  Here, the CAC alleges that the financial instruments purchased by Plaintiffs were priced, benchmarked, or settled based on Sterling

LIBOR. In light of *Gelboim*, Plaintiffs have clearly sufficiently alleged that they have suffered an antitrust injury in the form of higher prices flowing from the alleged corruption of the rate-setting process. Accordingly, Plaintiffs have adequately alleged antitrust injury.

### c. Application: Efficient Enforcer of the Antitrust Laws

"The four efficient enforcer factors are: (1) the 'directness or indirectness of the asserted injury,' which requires evaluation of the 'chain of causation' linking appellants' asserted injury and the Banks' alleged price-fixing; (2) the 'existence of more direct victims of the alleged conspiracy'; (3) the extent to which appellants' damages claim is 'highly speculative'; and (4) the importance of avoiding 'either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.'" *Id.* at 778 (quoting *AGC*, 459 U.S. at 540–45). "Courts sometimes weigh a fifth consideration: 'whether the putative plaintiff is a proper party to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement.'" *Sullivan*, 2017 WL 685570, at *15 (quoting *Gatt*, 711 F.3d at 80). "A determination of standing in an individual antitrust case is a fact-specific exercise involving a fact-intensive inquiry." *In re Platinum & Palladium Antitrust Litig.* ("*Platinum*"), No. 1:14-cv-9391-GHW, 2017 WL 1169626, at *20 (S.D.N.Y. Mar. 28, 2017) (citing *AGC*, 459 U.S. at 536–37).

### i. *Causation*

The first factor addresses the "directness or indirectness of the asserted injury," which "requires evaluation of the 'chain of causation' linking [plaintiff's] asserted injury and the [defendants'] alleged price-fixing." *Gelboim*, 823 F.3d at 778 (quoting *AGC*, 459 U.S. at 540). "The antitrust laws do not require a plaintiff to have purchased directly from a defendant in order to have antitrust standing." *Platinum*, 2017 WL 1169626, at *20 (quoting *In re Foreign Exch.*

*Benchmark Rates Antitrust Litig.* ("*FOREX*"), No. 13 Civ. 7789 (LGS), 2016 WL 5108131, at *9

(S.D.N.Y. Sept. 20, 2016)).  However, whether Plaintiffs dealt directly or indirectly with

Defendants, as well as the scope of the relevant market, are both relevant to the issue of

causation.  *See Gelboim*, 823 F.3d at 778.  The Second Circuit in *Gelboim* expressed concern

over "umbrella standing"—a plaintiff injured by dealing with a non-defendant by virtue of a

defendant's raising of prices in the market as a whole.  *Id.  Gelboim* acknowledged a circuit split

concerning whether umbrella purchasers have antitrust standing but declined to adopt a position.

*Id*. at 778–79; *see also Platinum*, 2017 WL 1169626, at *22.  The court in *Gelboim* noted that

while "there appears to be no difference in the injury alleged by those who dealt in LIBOR-

denominated instruments, whether . . . directly or indirectly with the Banks," the Banks appeared

to "control only a small percentage of the ultimate identified market." *Gelboim*, 823 F.3d at 779.

The Second Circuit cautioned that "[r]equiring the Banks to pay treble damages to every plaintiff

who ended up on the wrong side of an independent LIBOR-denominated derivative swap would,

. . . not only bankrupt 16 of the world's most important financial institutions, but also vastly

extend the potential scope of antitrust liability in myriad markets where derivative instruments

have proliferated." *Id*.

      The concern with so-called umbrella purchasers is that "significant intervening causative

factors, most notably, the independent pricing decisions of non-conspiring retailers, attenuate the

causal connection between the violation and the injury." *LIBOR VI*, 2016 WL 7378980, at *15

(internal quotation marks omitted).  For that reason, courts in this District have "[drawn] a line

between plaintiffs who transacted directly with defendants and those who did not" because "the

'independent decision' of contracting parties to incorporate LIBOR 'breaks the chain of

causation between defendants' actions and a plaintiff's injury.'" *Sullivan*, 2017 WL 685570, at

*17 (quoting *LIBOR VI*, 2016 WL 7378980, at *16); *see also FOREX*, 2016 WL 5108131, at *7; *Platinum*, 2017 WL 1169626, at *22.  Courts have been "able to draw that line in part by acknowledging that 'plaintiffs who did not purchase directly from defendants continue to face the same hurdle:  they made their own decisions to incorporate LIBOR into their transactions, over which defendants had no control, in which defendants had no input, and from which defendants did not profit.'"  *Platinum*, 2017 WL 1169626, at *22 (quoting *LIBOR VI*, 2016 WL 7378980, at *16).

Here, Plaintiffs Sonterra and Dennis assert exactly the sort of "umbrella claims" that the Circuit viewed with skepticism, since their claims are based solely on financial transactions with third-parties, and not with Defendants.  *See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 16 Civ. 5263 (AKH), 2018 WL 4830087, at *5–6 (S.D.N.Y. Oct. 4, 2018) (dismissing Sonterra's antitrust claims because "Sonterra's transactions with third-parties [were] insufficient to give it antitrust standing to sue [the defendants]").  Moreover, the relationship between Sterling LIBOR—on the one hand—and Sonterra's Sterling FX Forwards and Dennis's Sterling FX Futures—on the other—while enough to confer Article III standing, *supra* Part IV, is more attenuated than the relationship between LIBOR and the "LIBOR-denominated" transactions in *Gelboim*, *see* 823 F.3d at 779; indeed, the FX Forwards of Sonterra and the FX Futures of Dennis incorporated LIBOR only implicitly through a complex formula involving numerous other causal factors.  These sort of "vaguely defined links," *AGC*, 459 U.S. at 540, suggest that the causal relationship is too indirect to support the causation element of the efficient enforcer prong for antitrust standing, *see Laydon I*, 2014 WL 1280464, at *9; *7 W. 57th St. Realty Co.*, 314 F. Supp. 3d at 512–14.

Because Plaintiff FrontPoint is alleged to have dealt with Defendant UBS directly, its claims do not suffer from the same causation problems. (*See* CAC ¶ 38.)

### ii. *Existence of More Direct Victims*

Whether a plaintiff is a consumer or competitor is relevant to the second factor, but not dispositive. *See Gelboim*, 823 F.3d at 779. Like the plaintiffs in *Gelbiom*, "one peculiar feature of this case is that remote victims (who acquired LIBOR-based instruments from any of thousands of non-defendant banks) would be injured to the same extent and in the same way as direct customers of the Banks." *Id*. Accordingly, I give the existence of more direct victims "diminished weight" in determining whether Plaintiffs are efficient enforcers of the antitrust laws. *Id.*; *see also LIBOR VI*, 2016 WL 7378980, at *17; *Sullivan*, 2017 WL 685570, at *18.

### iii. *Speculative Damages*

"[H]ighly speculative damages is a sign that a given plaintiff is an inefficient engine of enforcement." *Gelboim*, 823 F.3d at 779. While "some degree of uncertainty stems from the nature of antitrust law" and is permitted, plaintiffs must be able allege that they could arrive at a just and reasonable estimate of damages. *Id.*; *see also Platinum*, 2017 WL 1169626, at *23 (stating that plaintiffs "carry the burden of coming forward with a just and reasonable estimate of damages" (internal quotation marks omitted)). "As with most antitrust cases, to establish damages, Plaintiffs will have to offer a reliable 'but-for' world. At a minimum, that 'but-for' world will require Plaintiffs to establish (1) what an alternative Fix Price would have been absent collusion, and (2) the behavior of [defendants] absent a Fix Price affected by collusion." *Id.* (citations omitted). "Whether damages calculations will be too speculative and, therefore, unreliable, depends on 'the nature and complexity of the alleged antitrust violation.'" *Id.* (quoting *Gelboim*, 823 F.3d at 779).

*Gelboim* noted the "unusual challenges" that are also present in this case: "The disputed transactions were done at rates that were negotiated, notwithstanding that the negotiated component was the increment above LIBOR. And the market for money is worldwide, with competitors offering various increments above LIBOR, or rates pegged to other benchmarks, or rates set without reference to any benchmark at all." 823 F.3d at 780. In evaluating whether damages are unduly speculative in price-fixing cases, considerations include (1) the extent to which the damages claim is conclusory in nature; (2) whether the injury is "so far down the chain of causation from defendants' actions that it would be impossible to untangle the impact of the fixed price from the impact of intervening market decisions," which relates to the causation factor; (3) whether external market factors affected the "relationship between the fixed price and the price that the plaintiffs ultimately paid;" and (4) whether "the non-fixed components of a transaction were heavily negotiated between the parties in relation to the fixed component." *LIBOR VI*, 2016 WL 7378980, at *17–18 (citations omitted).

In *LIBOR VI*, Judge Buchwald found "highly negotiated transactions," such as interest rate swaps,[17] to be the kind of transactions that "absorb[] the effects of LIBOR suppression." *Id.* at *20. Similarly, Plaintiff Sonterra's Sterling FX Forwards are also the sort of highly negotiated contracts that incorporate numerous considerations as to make the effect of Sterling LIBOR manipulation highly speculative. This factor weighs against finding antitrust standing for Sonterra.

With respect to futures contracts purchased on an exchange, such as those purchased by Plaintiff Dennis, Judge Buchwald found that

> [t]he mathematical relationship between LIBOR and the settlement price of

---

[17] An interest rate swap is an instrument in which "two parties agree to exchange interest rate cash flows, based on a specified notional amount from a fixed rate to a floating rate (or vice-versa) or from one floating rate to another." *LIBOR VI*, 2016 WL 7378980, at *19.

Eurodollar futures contracts does not address the relationship, if any, between LIBOR and the *trading* price of . . . futures contracts (that is, the price at which . . . futures contracts were bought and sold prior to settlement). The trading price reflects the market's prediction for what the price will be at settlement, which could be years away—not what LIBOR is at the present moment.

*Id.* at *21. Judge Buchwald concluded that the effect of LIBOR on the trading price could only be established if the trading price and settlement price were closely related. *Id.* She found that the Exchange-based plaintiffs had not sufficiently pled a close relationship between the LIBOR and trading prices, and that damages based on an impact of LIBOR manipulation on the futures trading prices was speculative. *Id.* at 22–23. The only Exchange-based claims that survived were those of plaintiffs who, "before the suppression period started, shorted contracts that were held to settlement during the suppression period," as they could "rely on an unmanipulated selling price as well as a settlement price demonstrably impacted by LIBOR suppression." *Id.* at 23.

Defendants point out that Plaintiff Dennis does not allege that he held any of his futures contracts to settlement. (1/6/17 Ltr. at 4.)[18] Dennis also fails to allege sufficient detail about his transactions to explain how his damages could be calculated. (*Id.*) This factor weighs against finding antitrust standing for Dennis. In addition, there is no direct relationship between Sterling LIBOR and the price of the products purchased by Plaintiffs Sonterra and Dennis, and Plaintiffs fail to allege sufficient details concerning how Defendants' alleged manipulation of Sterling LIBOR caused damages. Specifically, Plaintiffs state, in a conclusory fashion, that "[g]iven the mathematical and formulaic nature of the Sterling LIBOR and the Sterling LIBOR-based derivatives, the amount of injury to Plaintiffs and Class on each Sterling LIBOR-based derivative instrument may be mathematically ascertained and computed." (*See* CAC ¶ 114.) The CAC,

---

[18] "1/6/17 Ltr." refers to Defendants' letter dated January 6, 2017. (Doc. 131.)

however, does not contain any allegations that demonstrate how the amount of injury can be "mathematically ascertained and computed," and the allegations in the CAC are too vague to plausibly allege damages. Moreover, as discussed above, the price of the products purchased by Sonterra and Dennis was not determined based upon Sterling LIBOR; rather, Sterling LIBOR was part of a formula to calculate the cost of carrying Sterling over the duration of the foreign exchange forward or futures contract. (*See id.* ¶¶ 206, 212.)

### iv. *Duplicative Recovery and Complex Damage Apportionment*

The final factor "reflects a 'strong interest in keeping the scope of complex antitrust trials within judicially manageable limits.'" *LIBOR VI*, 2016 WL 7378980, at *23 (quoting *AGC*, 459 U.S. at 543). It traditionally concerns "the prospect of different groups of plaintiffs attempting to recover for the same exact injury." *Id.* The Circuit in *Gelboim* expressed concern over the fact that the conduct at issue in that case was the subject of numerous government and regulatory investigations and cases, as well as ongoing proceedings in several other countries. 823 F.3d at 780. "Some of those government initiatives may seek damages on behalf of victims, and for apportionment among them. Others may seek fines, injunctions, disgorgement, and other remedies known to United States courts and foreign jurisdictions. It is wholly unclear on this record how issues of duplicate recovery and damage apportionment can be assessed." *Id.*

However, at this stage, "there has been no showing that certain plaintiffs have been made whole through the receipt of restitution payments made to governments." *LIBOR VI*, 2016 WL 7378980, at *23. The situation here is analogous to *LIBOR VI*. Should duplicate recoveries or apportionment issues become an issue in the future, any restitution payments would be considered to avoid duplicative recovery. *Id.*; *see also Sullivan*, 2017 WL 685570, at *20 ("This Court also concludes that government enforcement actions have not been shown to risk

duplicative recovery in this case.").

*    *    *

Based on the foregoing factors, I find that only Plaintiff FrontPoint has antitrust standing, and only with respect to its Sherman Act claims against Defendant UBS. Unlike Plaintiffs Dennis and Sonterra, FrontPoint transacted directly with UBS and can point to specific transactions on specific dates, which obviates concerns about damage calculations and speculative damages. The remaining claims involve transactions with non-defendant third-parties—whose "independent decision[s]" to incorporate Sterling LIBOR into their transactions "breaks the chain of causation between [D]efendants' actions and [Plaintiffs'] injury," *LIBOR VI*, 2016 WL 7378980, at *17 (internal quotation marks omitted)—and damages that are speculative.

## 2. The FTAIA

Defendants also argue that Plaintiffs' Sherman Act claims are barred by FTAIA, (Defs.' SMJ Br. 19–21), which provides that the Sherman Act:

> shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless--
>
> (1) such conduct has a direct, substantial, and reasonably foreseeable effect--
>
> (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
>
> (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
>
> (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6a. "This technical language initially lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach. It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1)

sufficiently affects American commerce, *i.e.,* it has a 'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.,* the 'effect' must 'give rise to a Sherman Act claim.'" *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004) (quoting §§ 6a(1), (2)); *accord Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 398 (2d Cir. 2014). "The FTAIA permits a plaintiff to bring Sherman Act claims 'involving trade or commerce with foreign nations,' provided that defendants' conduct has a 'reasonably proximate causal nexus' to an antitrust injury in the United States." *Sullivan*, 2017 WL 685570, at *21 (quoting *Lotes*, 753 F.3d at 405). "The requirements of the FTAIA go to the merits of an antitrust claim rather than to subject matter jurisdiction." *Id.*

Defendants argue that Plaintiffs fail to allege that the foreign conduct had a "reasonably proximate" effect within the United States. (Defs.' SMJ Br. 19–21.) I disagree. The foreign conduct alleged here easily falls within the FTAIA exception for having "adversely affect[ed] domestic commerce, imports to the United States, or exporting activities of one engaged in such activities within the United States." *Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.*, No. CV-08-42 (JG)(VVP), 2013 WL 6481195, at *23 (E.D.N.Y. Sept. 20, 2013) (quoting *F. Hoffmann-La Roche*, 542 U.S. at 161). The CAC alleges that Defendants manipulated Sterling LIBOR, which caused injury with regard to transactions carried out in financial instruments with prices influenced by that manipulated rate. Specifically, Plaintiffs allege that the financial instruments purchased by Plaintiffs—U.S. corporations and individuals—were priced, benchmarked, or settled based on Sterling LIBOR. This is the type of injury the Sherman Act is meant to address. *See F. Hoffmann-La Roche*, 542 U.S. at 165 ("[O]ur courts have long held that application of our antitrust laws to foreign anticompetitive conduct is

nonetheless reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress *domestic* antitrust injury that foreign anticompetitive conduct has caused."); *see also Sullivan*, 2017 WL 685570, at *22 (holding that similar claims were not barred by FTAIA).  Therefore, Plaintiffs have adequately alleged a domestic antitrust injury caused by Defendants' foreign anticompetitive conduct, and Defendants' motion to dismiss based on the FTAIA is therefore denied.

### 3.  Antitrust Conspiracy

Plaintiffs' First Claim for Relief alleges that Defendants conspired to restrain trade by making false submissions to the BBA designed to artificially suppress, inflate, maintain, or otherwise alter Sterling LIBOR.  (CAC ¶¶ 234–44.)  The Second Claim for Relief alleges that Defendants conspired to manipulate derivative prices.  (*Id.* ¶¶ 245–52.)  Defendants argue that, for both claims, Plaintiffs fail to either (1) assert direct evidence that Defendants entered into an agreement in violation of the antitrust laws, or (2) present circumstantial facts supporting the inference that a conspiracy existed.  (Defs.' SMJ Br. 21–25.)

### a.  Applicable Law

Section 1 of the Sherman Act makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1.  "Price-fixing 'conspiracies concentrate the power to set prices among the conspirators, including the power to control the market and to fix arbitrary and unreasonable prices.'"  *Sullivan*, 2017 WL 685570, at *23 (quoting *United States v. Apple, Inc*., 791 F.3d 290, 326 (2d Cir. 2015)).  "[A]ny conspiracy 'formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity is illegal per se,' and the precise 'machinery employed is immaterial.'"  *Apple*, 791 F.3d at 327 (quoting *United States v.*

*Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940)).

At the pleading stage, a plaintiff "need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment, or a trial." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) (citations omitted). "Rather, 'because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible. The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Gelboim*, 823 F.3d at 781 (quoting *Anderson News*, 680 F.3d at 184–85). "Skepticism of a conspiracy's existence is insufficient to warrant dismissal; 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

To establish a Section 1 conspiracy, "proof of joint or concerted action is required; proof of unilateral action does not suffice." *Gelboim*, 823 F.3d at 781 (quoting *Anderson News*, 680 F.3d at 183). "Circumstances must reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Id.* Mere "parallel conduct" does not suffice. *Id.* Because "conspiracies are rarely evidenced by explicit agreements," however, a conspiracy "nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." *Id.* "The line separating conspiracy from parallelism is indistinct, but may be crossed with allegations of interdependent conduct, accompanied by circumstantial evidence and plus factors." *Id.* (internal quotation marks omitted). Those illustrative, non-exhaustive "plus factors" are "(1) a common motive to

conspire; (2) evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators; and (3) evidence of a high level of interfirm communications." *Id.* (internal quotation marks omitted). "[A]t the motion-to-dismiss stage, appellants must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, *even if* the facts are susceptible to an equally likely interpretation." *Id.* at 782 (citation omitted).

### b. Application

With these principles in mind, I find that Plaintiffs adequately allege an antitrust conspiracy.[19] The CAC alleges that Defendants collusively shared information to coordinate their Sterling LIBOR submissions and engaged in manipulative trading practices to fix the prices of Sterling LIBOR-based derivatives for their collective financial benefit. (CAC ¶ 125.) It alleges that collusive communications occurred "among Sterling LIBOR-based derivative traders and submitters located at different, supposedly competing, Sterling LIBOR contributor banks," and in messages "relayed between Defendants by various . . . inter-dealer brokers." (*Id.* ¶ 127.) With respect to UBS, Plaintiffs rely on regulatory settlements between them and the DOJ, CFTC, and other regulators, which brought charges against UBS for LIBOR manipulation. (*Id.* ¶¶ 5, 11–12.) The settlements describe collusive conduct intended to manipulate the LIBOR. (*See id.* ¶¶ 17–19, 120(e).)

For instance, Plaintiffs cite to UBS's non-prosecution agreement with DOJ, in which UBS admitted to manipulating and colluding to manipulate with other Contributor Panel banks LIBOR submissions with respect to other currencies. (CAC ¶¶ 17–19; *see also* UBS DOJ SOF

---

[19] Because I find that Plaintiff FrontPoint is the only efficient enforcer of any antitrust claims against Defendants, *see supra* Part V.B.1, I need only address the extent to which FrontPoint has alleged an antitrust conspiracy against UBS.

at ¶¶ 21–22 (describing conduct as to Yen LIBOR and Euroyen TIBOR).)[20]  With respect to Sterling, UBS communicated internally with its Sterling derivatives traders to manipulate the Sterling LIBOR.  (CAC ¶¶ 17–19; UBS DOJ SOF at ¶¶ 77–82.)  Plaintiffs also point to the CFTC's findings that

> UBS made knowingly false submissions to rate-fixing panels to benefit its derivatives trading positions or the derivatives trading positions of other banks in attempts to manipulate Yen, Swiss Franc, Sterling and Euro LIBOR and Euribor, and, periodically, Euroyen TIBOR.

(CAC ¶ 120(e) (quoting UBS CFTC Agmt. at 2);[21] *see also* UBS CFTC Agmt. at 2 ("UBS, through certain derivatives traders, also colluded with traders at other banks and coordinated with interdealer brokers in its attempts to manipulate Yen LIBOR and Euroyen TIBOR.")

Defendants argue that Plaintiffs have not alleged any communication between or among the Defendants regarding Sterling LIBOR to support their conspiracy claim, and instead only point to intrafirm communications.  However, while direct communications among conspirators are relevant, they are not necessary.  Accordingly, Defendants' motion to dismiss for failure to allege an antitrust conspiracy is denied.

### C.    *Commodity Exchange Act (CEA)*

The CAC assert three causes of action of under the CEA.  (CAC ¶¶ 253–64.)  However, Plaintiffs Sonterra and FrontPoint abandoned their claims under the CEA, (Pls.' SMJ Opp. 32 n.24); therefore, I only address Plaintiff Dennis's claims under the CEA.  Defendants argue that Dennis (1) lacks standing to pursue his claims and (2) fails to adequately allege specific intent to

---

[20] "UBS DOJ SOF" refers to DOJ Non-Prosecution Agreement and Appendix A Statement of Facts with UBS AG (Dec. 18, 2012), *available at* https://www.justice.gov/iso/opa/resources/6942012121911725320624.pdf.

[21] "UBS CFTC Agmt." refers to CFTC Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act Making Findings and Imposing Remedial Sanctions against UBS AG and UBS Securities Japan Co., Ltd., CFTC Docket No. 13-09 (Dec. 19, 2012), *available at* http://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfubsorder121912.pdf.

manipulate the price of Sterling FX Futures.  (Defs.' SMJ Br. 31–45.)

## 1. Applicable Law

The CEA prohibits any person from "manipulat[ing] or attempt[ing] to manipulate the price of any commodity in interstate commerce."  7 U.S.C. § 13(a)(2); *see also In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013).  "While the CEA itself does not define the term, a court will find manipulation where '(1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price.'"  *Id.* at 173 (quoting *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 247 (5th Cir. 2010)).

To plead the element of specific intent, also known as scienter, a plaintiff must allege that defendants "acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand."  *Platinum*, 2017 WL 1169626, at *32 (quoting *U.S. Commodity Futures Trading Comm'n v. Wilson*, 27 F. Supp. 3d 517, 532 (S.D.N.Y. 2014)).  It is insufficient to show a mere "generalized intent to obtain trading profits 'which could be imputed to any corporation with a large market presence in any commodity market.'"  *Wilson*, 27 F. Supp. 3d at 532–33 (quoting *In re Crude Oil Commodity Litig.*, No. 06 CIV. 6677, 2007 WL 1946553, at *8 (S.D.N.Y. June 28, 2007)).  To establish "specific intent to cause a market distortion," a plaintiff can allege facts either "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *Platinum*, 2017 WL 1169626, at *32 (quoting *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 530 (S.D.N.Y. 2008)).  The factual allegations in the complaint must "give rise

to a *strong inference* of scienter." *LIBOR III*, 27 F. Supp. 3d at 468 (internal quotation marks omitted).

### 2. Application

#### a. CEA Standing

Section 22(a)(1) of the CEA creates an exclusive private right of action "available to any person who sustains loss as a result of any alleged violation" of the CEA. 7 U.S.C. § 25(a)(2). "To have standing under Section 22, a private plaintiff must fall into one of four categories" set forth in Section 22(a)(1). *Loginovskaya v. Bartatchenko*, 936 F. Supp. 2d 357, 365 (S.D.N.Y. 2013), *aff'd*, 764 F.3d 266 (2d Cir. 2014). Plaintiff Dennis invokes Section 22(a)(1)(D) of the CEA, which conveys standing to any person "who purchased or sold a [futures contract] or swap if the violation constitutes . . . (ii) a manipulation of the price of any such contract." 7 U.S.C. § 25(a)(1)(D); *see Platinum*, 2017 WL 1169626, at *28. He argues that Defendants manipulated the prices of his Sterling futures contracts. (Pls.' SMJ Opp. 32.)

Defendants argue that Plaintiff Dennis lacks standing because he fails to plausibly allege that Defendants manipulated the prices of his FX Futures contracts because their prices are not pegged to Sterling LIBOR. (Defs.' SMJ Br. 39.) This is essentially the same argument as discussed above in the context of antitrust standing—that there is no plausible relationship between Dennis's FX Futures and the alleged Sterling LIBOR manipulation to adequately allege an injury. Thus, for the reasons stated above, *supra* Part V.B.1.b, I find that Dennis has adequately pled that the Sterling LIBOR manipulation had an effect on futures contracts for the purposes of CEA standing. A CME futures contract is an agreement to buy or sell £62,500, in U.S. Dollars, on some future date. (CAC ¶ 212.) The cost of buying or selling Sterling on that future date is determined by a formula that incorporates Sterling LIBOR to adjust the spot price

of Sterling to account for the amount of interest paid or received over the duration of the agreement. (*Id.*) A change in the Sterling LIBOR thus affects the price of the contract, at least for the purpose of CEA standing.

Defendants also argue that Dennis lacks standing under the CEA because he has not pled actual damages, a requirement for CEA standing. (Defs.' SMJ Br. 40–42.) "As several courts in this district have held, however, where plaintiffs allege that they transacted 'at artificial prices, injury may be presumed.'" *Platinum*, 2017 WL 1169626, at *28 (quoting *In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366, 380 (S.D.N.Y. 2010)); *see also In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 59–61 (S.D.N.Y. 2012). Therefore, I find that Dennis has adequately pled actual damages for standing under the CEA.

In addition, Defendants argue that Dennis lacks standing because he pleads only one specific futures transaction on two dates during the Class Period, but does not allege that Sterling LIBOR was artificial on those dates. (Defs.' SMJ Reply 18.)[22] They rely on *LIBOR II*, in which Judge Buchwald held that certain plaintiffs had failed to allege the requisite actual damages by failing to plead that they transacted in Eurodollar futures contracts on days in which the prices of such contracts were artificial as a result of trader-based manipulation of the LIBOR. *See LIBOR II*, 962 F. Supp. 2d at 620–21. However, Judge Buchwald expressly distinguished between plaintiffs' "trader-based manipulation theory" and their "persistent suppression theory," the latter of which did not require plaintiffs to plead a connection between specific trading days and days of LIBOR manipulation. *Id.* at 621–22; *see also Platinum*, 2017 WL 1169626, at *29 (discussing *LIBOR II*'s distinction between trader-based manipulation and persistent

---

[22] "Defs.' SMJ Reply" refers to Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Consolidated Amended Complaint for Lack of Subject Matter Jurisdiction and Failure to State a Claim. (Doc. 121.)

suppression).  Dennis alleges just such a "persistent suppression theory."  The CAC alleges that

Dennis engaged in U.S.-based transactions for CME British pound futures contracts during the

period in which Defendants were engaged in their ongoing scheme.  (CAC ¶ 214.)  The

allegations that Defendants' persistent conduct rendered the Sterling LIBOR artificial throughout

the Class Period is sufficient to plausibly allege that Dennis's damages were caused by the

alleged Sterling LIBOR manipulation.  *See Platinum*, 2017 WL 1169626, at *29*; LIBOR II*, 962

F. Supp. 2d at 621–22*.

Accordingly, Dennis has standing to pursue his CEA claims.  However, Dennis must still

overcome an additional hurdle to pursue his claims:  the element of specific intent.

### b.  Specific Intent

With regard to specific intent, Dennis pleads no facts indicating, much less giving rise to

a "strong inference," *LIBOR III*, 27 F. Supp. 3d at 468, that Defendants' conduct with respect to

Sterling LIBOR was intended to manipulate the prices of any particular financial instrument at

issue in this case.  Plaintiffs' generalized contention that "Defendants, as some of the largest

dealers in the Sterling LIBOR-based derivatives market, all shared a common motive to increase

profits through manipulation," (Pls.' SMJ Opp. 35), offers no basis to draw a "strong inference"

of intent to manipulate Sterling FX Futures contracts—instruments that are not even tied to the

benchmark Defendants allegedly manipulated.  *See Hershey*, 610 F.3d at 249 (no specific intent

where effect on certain futures contracts was "merely an unintended consequence of the

Defendants' manipulative trading").   Indeed, "[s]uch a generalized motive, one which could be

imputed to any corporation with a large market presence in any commodity market, is

insufficient to show intent."  *In re Crude Oil Commodity Litig.*, 2007 WL 1946553, at *8.

Nor do Plaintiffs adequately allege conscious misbehavior or recklessness with respect to the price of Dennis's FX Futures. Plaintiffs point to the various Government settlements as evidence of purported conscious misbehavior or reckless. Nothing in Defendants' settlements with regulators, however, reflects any intent by any Defendant to cause artificial pricing of the financial instruments purchased by Dennis in particular (as opposed to Sterling LIBOR in general). In *In re Commodity Exchange, Inc., Silver Futures & Options Trading Litigation*, the court emphasized that the complaint lacked "reference to specific communications between the defendants about any specific plan to cause artificial prices or an artificial price trend in the silver futures market." No. 11 Md. 2213(RPP), 2012 WL 6700236, at *11 (S.D.N.Y. Dec. 21, 2012). The same is true here as to the Sterling FX forwards, futures, and interest swaps markets. Accordingly, the CAC fails to adequately allege specific intent on the part of Defendants, and Plaintiff Dennis's CEA claim is dismissed.

Plaintiff Dennis's principal–agent liability and aiding and abetting claims under the CEA must also fail. Both types of claims are viable only where an underlying primary violation of the CEA can survive a motion to dismiss. *See In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*, 560 F. App'x 84, 87 (2d Cir. 2014) (summary order) ("As plaintiffs failed to allege a CEA violation, their aiding and abetting claim was properly dismissed as well."); *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 183 ("[A]iding and abetting requires knowledge of the primary violation and an intent to assist it . . . ."). Plaintiff Dennis fails to allege a primary CEA violation for the reasons discussed above, so his principal–agent liability and aiding and abetting claims must be dismissed as well.

## D. *RICO*

The CAC also asserts claims under RICO.  Defendants argue that (1) Plaintiffs lack RICO standing, (2) the claims are impermissibly extraterritorial, and (3) Plaintiffs fail to plead the elements of a RICO violation or conspiracy.  (Defs.' SMJ Br. 46–52.)  I agree with Defendants that Plaintiffs fail to overcome the presumption against extraterritoriality; therefore, I do not reach Defendants' remaining arguments.

### 1. Applicable Law

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  Section 1964(c) confers a private right of action to "[a]ny person injured in his business or property by reason of" such a violation.  *Id.* § 1964(c).  "To establish a violation of § 1962(c), . . . a plaintiff must show that a person engaged in '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (quoting *DeFalco v. Bernas*, 22 F.3d 286, 305 (2d Cir. 2001)).  "Racketeering activity" "encompass[es] dozens of state and federal offenses, known in RICO parlance as predicates.  These predicates include any act indictable under specified federal statutes, as well as certain crimes chargeable under state law.'"  *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2096 (2016) (internal citations and quotation marks omitted).

The Supreme Court in *RJR Nabisco, Inc. v. European Community* ("*RJR*"), established that private claims under RICO must overcome a presumption against extraterritoriality.  *Id.* at 2100–02.  A private plaintiff seeking extraterritorial application of RICO is subject to

considerations that do not apply to criminal prosecutions under the statute, and must specifically allege a domestic injury. *Id.* at 2106. In examining the extraterritorial reach of § 1962(c), the Supreme Court recently held that, in order for a private plaintiff to plausibly allege a claim for extraterritorial application of RICO, Congress must have intended that the underlying predicate statute have extraterritorial reach and that the plaintiff have suffered a domestic injury. *Id.* at 2101–02, 2106; *see also Bascuñan v. Elsaca*, No. 15-cv-2009 (GBD), 2016 WL 5475998, at *3– 4 (S.D.N.Y. Sept. 28, 2016), *rev'd in part, vacated in part on other grounds*, 874 F.3d 806 (2d Cir. 2017).

In this Circuit, "the wire fraud statute does not have extraterritorial application and may not serve as a predicate act for a RICO claim premised on foreign-based activities." *Sullivan*, 2017 WL 685570, at *32–33; *see also European Cmty. v. RJR Nabisco, Inc.* ("*European Community*"), 764 F.3d 129, 140–41 (2d Cir. 2014) ("We conclude that the references to foreign commerce in [the wire fraud statute], do not indicate a congressional intent that the statute[] apply extraterritorially."), *rev'd and remanded on other grounds*, 136 S. Ct. 2090; *Petróleos Mexicanos v. SK Eng'g & Constr. Co.*, 572 F. App'x 60, 61 (2d Cir. 2014) (summary order) ("[W]ire fraud cannot serve as such an extraterritorial predicate."). According to the Supreme Court, "[i]f the statute is not extraterritorial, then . . . we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's 'focus.' If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *RJR*, 136 S. Ct. at 2101.

There is some ambiguity in this Circuit as to the "focus" of the wire fraud statute. *See Elsevier, Inc. v. Grossman*, 199 F. Supp. 3d 768, 784 (S.D.N.Y. 2016) ("It is not entirely clear what sort of domestic conduct is 'relevant' to this statutory focus."); *United States v. Gasperini*, No. 16-CR-441 (NGG), 2017 WL 2399693, at *7–8 (E.D.N.Y. June 1, 2017) (explaining that some courts focus on the "wires" while others focus on the "fraud," and ultimately concluding that the wire fraud statute's focus is "the fraudulent scheme"). Nor is it entirely clear what level of domestic conduct is required. *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 266 (2010) (presumption against extraterritoriality applies even where "*some* domestic activity is involved in [a] case"); *European Community*, 764 F.3d at 142 n.14 ("We need not decide whether domestic conduct satisfying fewer than all of the statute's essential elements could constitute a violation of such a statute."); *Worldwide Directories, S.A. de C.V. v. Yahoo! Inc.*, No. 14-cv-7349 (AJN), 2016 WL 1298987, at *9–10 (S.D.N.Y. Mar. 31, 2016) ("The Second Circuit has not determined precisely how much domestic conduct need be alleged to sustain the application of the [wire fraud] statute[] . . . ."). In a recent summary order (after its decision in *European Community*, but prior to the Supreme Court's decision), the Second Circuit considered whether a wire fraud scheme had sufficient connections with the United States to warrant domestic, rather than extraterritorial, application of RICO. *Petróleos Mexicanos*, 572 F. App'x at 61. In *Petróleos Mexicanos*, the foreign defendants had obtained financing in the United States and transmitted seven false invoices for over $159 million to a trust in New York, and payment was made through that New York trust; but "[t]he activities involved in the alleged scheme—falsifying the invoices, the bribes, the approval of the false invoices—took place outside of the United States." *See id.*; *Petróleos Mexicanos v. SK Eng'g & Constr. Co.,* No. 12 Civ. 9070, 2013 WL 3936191, at *3 (S.D.N.Y. July 30, 2013), *aff'd*, 572 F. App'x 60. The

Second Circuit concluded that the domestic contacts were insufficient to support a RICO claim. 572 F. App'x at 61.  In contrast, in *European Community*, plaintiffs "clearly" alleged sufficient domestic conduct to sustain the application of RICO where defendants allegedly "hatched schemes to defraud in the United States," "used the U.S. mails and wires in furtherance of those schemes and with the intent to do so," and "traveled from and to the United States in furtherance of their schemes."  764 F.3d at 141–42.

Thus, "[s]imply alleging that some domestic conduct occurred cannot support a claim of domestic application."  *Petróleos Mexicanos*, 572 F. App'x at 61 (quoting *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32–33 (2d Cir. 2010)).  An intent to use the U.S. wires to further a wire fraud is insufficient; "if the domestic conduct alleged is peripheral to the overall scheme, and the scheme is not directed to or from the United States, it does not matter that the defendant intentionally used U.S. wires in furtherance of a fraudulent scheme."  *Worldwide Directories*, 2016 WL 1298987, at *10 (citing *Petróleos Mexicanos*, 572 F. App'x at 61) (concluding that the alleged domestic conduct, revising and drafting draft opinions, was "fundamentally minor and peripheral in comparison to the core allegations of the complaint: that the [defendants] bribed, pressured, and intimidated members of the Mexican judiciary in pursuit of a favorable verdict").

## 2.  Application

Plaintiffs assert RICO and RICO conspiracy claims against Defendants based on predicate acts allegedly in violation of the wire fraud statute, 18 U.S.C. § 1343.  Plaintiffs do not argue that the wire fraud statute has extraterritorial application; rather, Plaintiffs argue that their RICO claims arise from domestic violations of the wire fraud statute.  (Pls.' SMJ Opp. 40–42.) In support, Plaintiffs cite to the following allegations in the CAC:  (1) Defendants used U.S.

wires to deliver false Sterling LIBOR submissions into the United States by Thomson Reuters, (CAC ¶ 33); (2) Deutsche Bank engaged in "'Monday Risk Calls,' in which traders in New York, London, Tokyo, and Frankfurt discussed with a supervisor their trading positions and strategies in relation to LIBOR rates," and received directives "promoting manipulation . . . , collusion, and other improper conduct" from this supervisor, (CAC ¶ 58); (3) Defendant RBS transacted in Sterling LIBOR-based derivatives with counterparties in the United States, (*id.* ¶ 71); (4) "at least one senior UBS manager in its Stamford, Connecticut headquarters directly manipulated UBS's LIBOR submissions," and "directed UBS LIBOR submitters to similarly manipulate LIBOR submissions," (*id.* ¶ 85); (5) Defendants Barclays, UBS, RBS, and Deutsche Bank engaged in LIBOR-based transactions from within the United States during the Class Period, (*id.* ¶¶ 93–94, 96); (6) Defendant Deutsche Bank's conduct "originated from within its Global Finance and Foreign Exchange ('GFFX') business unit," which "extended to GFFX desks abroad including in New York," (*id.* ¶ 14); (7) in a settlement with the New York State Department of Financial Services, Deutsche Bank admitted that its New York Branch manipulated the Sterling LIBOR, (*id.* ¶¶ 53, 55); and (8) Defendant RBS employs traders responsible for trading LIBOR-based instruments in New York, (*id.* ¶ 69).

These allegations fall short of demonstrating that the acts of wire fraud in this case were domestic in nature. Instead, it is clear that the scheme was principally foreign in nature and only incidentally touched the United States. *See Sullivan*, 2017 WL 685570, at *33–34 (concluding that allegations of similar conduct were "organized outside of the United States through a European trade association," and that "[t]he use of United States wires was, at most, incidental"); *Laydon IV*, 2015 WL 1515487, at *8–9 (concluding that plaintiffs could not pursue RICO claims "based on the alleged actions of foreign and international institutions that submitted false

information to the BBA and [Japanese Bankers Association], located in London and Tokyo, respectively"). As the Second Circuit observed in *Petróleos*, "[s]imply alleging that some domestic conduct occurred cannot support a claim of domestic application" of RICO. *Petróleos Mexicanos*, 572 F. App'x at 61.

Accordingly, the CAC fails to allege that the acts of wire fraud in this case were domestic in nature. Because I find that the wire fraud statute does not have extraterritorial application and that Plaintiffs have failed to allege acts of domestic wire fraud, I do not reach Defendants' remaining arguments. Plaintiffs' RICO claims are therefore dismissed.[23]

### E. *Implied Covenant of Good Faith and Fair Dealing*

Plaintiff FrontPoint asserts a claim against one Defendant, UBS, for breach of the implied covenant of good faith and fair dealing. (CAC ¶¶ 314–19.) FrontPoint's claim arises from three swap transactions that it allegedly entered into with UBS in October and November 2007. (*Id.* ¶ 29.) Defendants argue that FrontPoint's claim is barred by the applicable six-year statute of limitations. (Defs.' SMJ Br. 54–55.) I agree.

"Under New York law, 'a covenant of good faith and fair dealing in the course of contract performance' is 'implicit in all contracts.'" *LIBOR II*, 962 F. Supp. 2d at 631–32 (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)). Claims for breach of the implied covenant of good faith and fair dealing must be brought within six years. N.Y. C.P.L.R. § 213(2); *see Klein v. City of New York*, No. 10. Civ. 9568 PAE JLC, 2011 WL 5248169, at *9 (S.D.N.Y. Oct. 28, 2011), *report and recommendation adopted by* 2012 WL 546786 (S.D.N.Y. Feb. 21, 2012). FrontPoint filed its complaint on January 21, 2016, more than eight years after

---

[23] Plaintiffs' RICO conspiracy claim "must necessarily fail" where, as here, Plaintiffs fail to plausibly allege a substantive RICO violation. *See Jerome M. Sobel & Co. v. Fleck*, No. 03 Civ. 1041 RMB GWG, 2003 WL 22839799, at *13 (S.D.N.Y. Dec. 1, 2003), *report and recommendation adopted by* 2004 WL 48877 (S.D.N.Y. Jan. 8, 2004).

its swap transactions of October and November 2007.  (CAC ¶ 211; *Dennis v. Barclays Bank plc*, No. 16-cv-464, Doc. 1.)  FrontPoint argues that the claim is timely because it relates back to the filing of the earlier complaint by Sonterra on May 6, 2015.  (Pls.' SMJ Opp. 54 n.43.)  However, the earlier complaint did not assert breach of implied covenant claims and, even if it did, they would have still been untimely.  *See In re Bear Stearns Cos. Sec., Derivative, and ERISA Litig.*, 995 F. Supp. 2d 291, 303 (S.D.N.Y. 2014).  Moreover, to the extent FrontPoint relies on its counsel's June 3, 2016 declaration that "FrontPoint executed Sterling LIBOR-based derivatives trades . . . until at least December 17, 2010 with UBS," (Lefkowitz Decl. ¶ 9; Pls.' SMJ Opp. 54),[24] it is extrinsic to the CAC—no such allegations are asserted in the CAC—and therefore outside the scope of the pleadings, *see Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir. 2000).

## F.  *Unjust Enrichment*

Plaintiffs' only remaining state law claim against Defendants is for unjust enrichment.  "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience require' restitution."  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quoting *Dolmetta v. Uintah Nat'l Corp.*, 712 F.2d 15, 20 (2d Cir. 1983)).  A "specific and direct benefit" is necessary to support an unjust enrichment claim.  *Id.* (citing *Wolf v. Nat'l Council of Young Isr.*, 694 N.Y.S.2d 424, 426 (2d Dep't 1999)).  "[W]hile 'a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment,' there must exist a relationship or connection between the parties that is not 'too attenuated.'"  *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d

---

[24] "Lefkowitz Decl." refers to the Declaration of Lee J. Lefkowitz in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, dated June 3, 2016.  (Doc. 115.)

511, 516 (2012) (quoting *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215–16 (2007)).  "Although the nature of the relationship required to establish an unjust enrichment claim has not been clearly defined, the relationship is 'too attenuated' if the parties were not connected in a manner that 'could have caused reliance or inducement,' or if they 'simply had no dealings with each other.'"  *Marks v. Energy Materials Corp.*, No. 1:14-cv-8965-GHW, 2015 WL 3616973, at *6 (S.D.N.Y. June 9, 2015) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011); *Georgia Malone*, 19 N.Y.3d at 517–18).

Defendants argue that the CAC asserts claims of unjust enrichment by Plaintiffs against all Defendants; however, it does not allege that any of Defendants had any direct contractual relationship with Plaintiffs Sonterra and Dennis.  (Defs.' SMJ Br. 53.)  Therefore, Plaintiffs Sonterra's and Dennis's unjust enrichment claims must be dismissed.  *See Laydon I*, 2014 WL 1280464, at *13–14 (finding insufficient conclusory assertions that banks financially benefited from LIBOR manipulation which injured plaintiff, and dismissing unjust enrichment claim); *LIBOR I*, 935 F. Supp. 2d at 737 ("[T]he relationship between plaintiffs and defendants, to the extent that there was any relationship, is surely too attenuated to support an unjust enrichment claim."); *cf. Sperry*, 8 N.Y.3d at 215–16.

Plaintiffs do allege, however, that Defendant UBS had a direct contractual relationship with Plaintiff FrontPoint.  The CAC alleges that FrontPoint "engaged in U.S.-based swap transactions" with UBS on October 17, November 22, and November 29, 2007.  (CAC ¶ 211.) "FrontPoint entered into swap transactions with UBS AG, agreeing to make monthly interest rate payments on one-month Sterling LIBOR until December 2008, in exchange for receiving payments based on the return of certain shares traded on the London Stock Exchange."  (*Id.*) "As a result of Defendants' manipulative conduct, FrontPoint was damaged and suffered legal

injury when it paid more and/or received in payments less than it otherwise should have under these swap contracts." (*Id.*) Contrary to Defendants' assertions, (Defs.' SMJ Br. 53), I find that these allegations are sufficiently specific to plausibly allege that UBS benefited at FrontPoint's expense.

To the extent that Defendants argue Plaintiffs' claims are untimely, my previous analysis of Defendants' fraudulent concealment of their activities governs. Accordingly, Defendants' motion to dismiss Plaintiffs Sonterra's and Dennis's unjust enrichment claims, as well as Plaintiff FrontPoint's unjust enrichment claim against all Defendants other than UBS, is granted. Defendants' motion to dismiss Plaintiff FrontPoint's unjust enrichment claim against UBS is denied.[25]

### G.    *Allegations of BCI's Involvement*

Defendants also argue that Plaintiffs have failed to allege that Defendant BCI had any actual involvement in the conduct in question. (Defs.' SMJ Br. 55.) I agree.

"Group pleading, by which allegations are made against families of affiliated entities[,] is simply insufficient to withstand review on a motion to dismiss." *Concord Assocs., L.P. v. Entm't Props. Tr.*, No. 12 Civ. 1667(ER), 2014 WL 1396524, at *24 (S.D.N.Y. Apr. 9, 2014); *see also In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 417 (S.D.N.Y. 2011) (allegations of "direct involvement of the Parent Companies by way of generic references to 'defendants'" were insufficient).

With regard to BCI, Plaintiffs' claims consist solely of the generic group allegations that courts routinely dismiss. The CAC defines "Barclays" to refer only to London-based Barclays

---

[25] To the extent Defendants argue that FrontPoint's unjust enrichment claim against UBS is duplicative of FrontPoint's breach of implied covenant claim, (Defs.' SMJ Reply 24), their argument is moot because I find that FrontPoint's implied covenant claim is untimely. *See supra* Part V.E.

Bank PLC, (CAC ¶ 11), so Plaintiffs cannot argue that allegations of conduct by "Barclays" implicate the separate BCI entity. By contrast, the only allegation involving BCI is that "BCI actively engaged in trading, including derivative trading, in LIBOR and Euribor-based currencies, from New York." (*Id.* ¶ 44.) The mere fact that BCI was a party to Barclays' regulatory settlements, which were the result of negotiations and not adjudication, is not a basis for imputing specific conduct to BCI. *See LIBOR II*, 962 F. Supp. 2d at 614; *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 588, 594 (S.D.N.Y. 2011).

Accordingly, Plaintiffs' claims against BCI are dismissed.

### H.    *Personal Jurisdiction*

The Foreign Defendants—Barclays, Rabobank, Lloyds, RBS, Deutsche Bank, and UBS—also move to dismiss the CAC for lack of personal jurisdiction pursuant to Rule 12(b)(2). Among the claims against the Foreign Defendants, I concluded above that the CAC adequately alleges that they conspired to fix the Sterling LIBOR in violation of Section 1 of the Sherman Act, and that Plaintiff FrontPoint can be an efficient enforcer of those claims against Defendant UBS. *See supra* Part V.B. Plaintiff FrontPoint has also adequately alleged an unjust enrichment claim against Defendant UBS. *See supra* Part V.F. In light of the above holdings, I turn to the question of whether Plaintiffs have established personal jurisdiction over Defendant UBS such that Plaintiff FrontPoint can pursue these remaining claims.[26]

Each Foreign Defendant is incorporated and headquartered in a foreign country. Plaintiffs concede that the Foreign Defendants are not "at home" in New York such that they would be subject to general jurisdiction. (Pls.' PJX Opp. 26 n.24.)[27] Instead, they argue first

---

[26] Although, as discussed above, Plaintiffs' claims against the Foreign Defendants—with the exception of Defendant UBS—fail on the merits, I nonetheless address Plaintiffs' argument as to whether Defendants Rabobank, Deutsche Bank, RBS, and Barclays consented to jurisdiction.

[27] "Pls.' PJX Opp." refers to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss for

that certain of the Foreign Defendants consented to jurisdiction either by virtue of registering

their offices under New York banking laws or through agreements with FrontPoint, and second,

that this Court has specific jurisdiction over the Foreign Defendants based on their contacts with

the United States.  I address each argument in turn.

### 1.  Consent to Jurisdiction

#### a.  Defendants Rabobank, Deutsche Bank, RBS, and Barclays did not consent to jurisdiction

Plaintiffs argue that Rabobank, Deutsche Bank, RBS, and Barclays are subject to general

jurisdiction by virtue of registering their offices under New York Banking Law § 200.  (Pls.' PJX

Opp. 22–23.)  "Parties can consent to personal jurisdiction through forum-selection clauses in

contractual agreements." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006).

Here, Plaintiffs assert that Defendants Rabobank, Deutsche Bank, RBS, and Barclays consented

to general jurisdiction by registering under New York Banking Law § 200, which required them

each to appoint the Superintendent of the New York State Department of Financial Services

("NYDFS") as their agent for service of process for "a cause of action arising out of a transaction

with [their] New York agency or agencies or branch or branches."  N.Y. Banking Law § 200(3).

However, "[t]he plain language of [§ 200(3)] limits any consent to personal jurisdiction by

registered banks to *specific* personal jurisdiction."  *7 W. 57th St. Realty Co.*, 2015 WL 1514539,

at *11; *see also In re Foreign Exch. Benchmark Rates Antitrust Litig.* ("*In re FOREX*"), No. 13

Civ. 7789 (LGS), 2016 WL 1268267, at *2 (S.D.N.Y. Mar. 31, 2016) ("By the terms of [§

200(3)], any consent to jurisdiction by virtue of . . . registration with the NYDFS is not general

jurisdiction over all claims, but instead is limited to claims arising out of transactions with the

Lack of Personal Jurisdiction.  (Doc. 114.)

. . . Defendants' New York agencies or branches.").

In an attempt to avoid the plain language of § 200(3), Plaintiffs rely in their opposition on § 200-b(2), (Pls.' PJX Opp. 23), which provides that an action "against a foreign banking corporation may be maintained by . . . a non-resident in the following cases only:  (a) where the action is brought to recover damages for the breach of a contract made or to be performed within this state, or relating to property situated within this state at the time of the making of the contract; (b) where the subject matter of the litigation is situated within this state; (c) where the cause of action arose within this state, except where the object of the action or special proceeding is to affect the title of real property situated outside this state; (d) where the action or special proceeding is based on a liability for acts done within this state by a foreign banking corporation; (e) where the defendant is a foreign banking corporation doing business in this state."  N.Y. Banking Law § 200-b(2).

Contrary to Plaintiffs' assertion, § 200-b(2) does not confer personal jurisdiction.  The New York Court of Appeals has interpreted § 200-b to "confer subject matter jurisdiction and not personal jurisdiction."  *In re FOREX*, 2016 WL 1268267, at *2 (citing *Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 744 N.E.2d 696, 702 (N.Y. 2002)).

Plaintiffs also argue that § 200-b is the "Banking Law analogue to N.Y. Bus. Corp. Law § 1314," that cases discussing whether jurisdiction is conferred by virtue of registration under § 1314 are therefore instructive, and that New York Banking Law § 200-b must be interpreted similarly.  (Pls.' PJX Opp. 23–24.)  Putting to the side whether these decisions continue to be viable post-*Daimler AG v. Bauman*, 571 U.S. 117 (2014), *see Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 640–41 (2d Cir. 2016); *Famular v. Whirlpool Corp.*, No. 16 CV 944 (VB), 2017 WL 2470844, at *4 (S.D.N.Y. June 7, 2017), the New York Business Corporation Law does not

share the same limiting language as the New York Banking Law, *see* N.Y. Bus. Corp. Law § 1304(a)(6) (requiring a foreign corporation to designate the Secretary of State "as its agent upon whom process against it may be served," in order to do business in the state). Therefore, I find those cases to be inapposite.

Even assuming either provision conferred general jurisdiction, such an interpretation would appear to "implicate Due Process and other constitutional concerns." *Brown*, 814 F.3d at 626. "If mere registration and the accompanying appointment of an in-state agent—without an express consent to general jurisdiction—nonetheless sufficed to confer general jurisdiction by implicit consent, every corporation would be subject to general jurisdiction in every state in which it registered, and *Daimler*'s ruling would be robbed of meaning by a back-door thief." *Id.* at 640; *see also Motorola Credit Corp. v. Uzan*, 132 F. Supp. 3d 518, 521 (S.D.N.Y. 2015) (holding that registration with NYDFS under New York Banking Law § 200 "is not constitutionally sufficient to establish general jurisdiction"). Such a result is not supported by the case law or common sense.

Accordingly, Defendants Rabobank, Deutsche Bank, RBS, and Barclays did not consent to general jurisdiction by virtue of registering under the New York Banking Law.

> b. Defendant UBS did not consent to jurisdiction in the ISDA Master Agreements with FrontPoint

Defendant UBS entered into "ISDA Master Agreements" with FrontPoint. (Lefkowitz Decl. Exs. 2, 3.) Plaintiffs argue that, in doing so, UBS consented to jurisdiction in New York. (Pls.' PJX Opp. 9.) However, the relevant provision in the ISDA Master Agreements merely consents to jurisdiction "[w]ith respect to any suit, action or proceedings relating to this Agreement." (*See* Lefkowitz Decl. Ex. 3, ¶ 13(b).) These terms expressly limit the parties' consent to claims "relating to this Agreement." The language does not extend to consent to

jurisdiction as to any dispute between the parties. *See Sullivan*, 2017 WL 685570, at \*38–39 (concluding that such ISDA Master Agreements did not establish consent to jurisdiction for claims unrelated to the agreements).

Accordingly, Defendant UBS did not consent to general jurisdiction by virtue of the ISDA Master Agreements.

## 2. Specific Jurisdiction

### a. Applicable Law

"In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation marks omitted); *accord Walden v. Fiore*, 571 U.S. 277, 283–84 (2014) ("[S]pecific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." (internal quotation marks omitted)). Specific jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum." *Goodyear*, 564 U.S. at 919 (internal quotation marks omitted). A plaintiff asserting specific personal jurisdiction "must establish the court's jurisdiction with respect to *each* claim asserted." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004).

The exercise of specific jurisdiction requires a two-step analysis. *See, e.g.*, *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013). First, courts "evaluate the quality and nature of the defendant's contacts with the forum . . . under a totality of the circumstances test." *Id.* (internal quotation marks omitted). Second, if the defendant purposefully established minimum contacts with the forum, the court must be satisfied that

exercising jurisdiction comports with due process pursuant to "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *see also Walden*, 571 U.S. at 284 ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State.").

To determine whether there are sufficient minimum contacts, "[t]he crucial question is whether the defendant has 'purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws, such that the defendant should reasonably anticipate being haled into court there.'" *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242–43 (2d Cir. 2007) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985)). It is "insufficient to rely on a defendant's 'random, fortuitous, or attenuated contacts' or on the 'unilateral activity' of a plaintiff" with the forum to establish specific jurisdiction. *Walden*, 571 U.S. at 286 (quoting *Burger King*, 471 U.S. at 475).

A foreign defendant may be subject to specific jurisdiction where the relevant conduct took place entirely outside the forum but that contact had "in-forum effects harmful to the plaintiff." *Licci*, 732 F.3d at 173. "[W]ith regard to the effects test, the defendant must 'expressly aim' his conduct at the United States." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 337 (2d Cir. 2016) (quoting *Licci*, 732 F.3d at 173), *cert. denied sub nom. Sokolow v. Palestine Liberation Org.*, 138 S. Ct. 1438 (2018); *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 674 (2d Cir. 2013). It is not enough that certain effects be foreseeable. *See Waldman*, 835 F.3d at 337 (finding no jurisdiction over terrorists who harmed Americans in Israel because they did not intend to target United States citizens).

In addition, even if a defendant has minimum contacts with the forum, the exercise of jurisdiction must still be consistent with due process, such that it does "not offend traditional

notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316 (internal quotation marks

omitted). Relevant considerations include "(1) the burden that the exercise of jurisdiction will

impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the

plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's

interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest

of the states in furthering substantive social policies." *Metro. Life Ins. Co. v. Robertson-Ceco

Corp.*, 84 F.3d 560, 568 (2d Cir. 1996).

<h4 style="text-align:center">b. <u>Application</u></h4>

Here, Plaintiffs' surviving claims arise under the Sherman Act and New York law. With

respect to the federal claims under the Sherman Act, nationwide service of process is

permissible. *See* 15 U.S.C. § 22. When a civil case arises under federal law and a federal statute

authorizes nationwide service of process, courts often consider "contacts with the United States

as a whole" as the "relevant contacts for determining personal jurisdiction." *Platinum*, 2017 WL

1169626, at *40 (internal quotation marks omitted).[28] "The rationale underlying this national

contacts approach is that when the national sovereign is applying national law, the relevant

contacts are the contacts between the defendant and the sovereign's nation." *LIBOR IV*, 2015

WL 6243526, at *23 (internal quotation marks omitted).

While the Second Circuit has "not yet decided" whether to adopt the nationwide contacts

---

[28] Defendants' assert that "Plaintiffs have not sufficiently alleged . . . that the Clayton Act's venue provisions are satisfied such that its jurisdictional provisions may apply at all." (Defs.' PJX Br. 27 n.32.) Plaintiffs did not address this assertion in their opposition brief, (*see generally*, Pls.' PJX Opp.), perhaps because Defendants made the assertion in a footnote and "[a]rguments which appear in footnotes are generally deemed to have been waived[,]" *see In re Crude Oil Commodity Litigation*, No. 06 Civ. 6677(NRB), 2007 WL 2589482, at *3 (S.D.N.Y. Sept. 7, 2007). Defendants do not elaborate on this conclusory statement or provide any argument in support of it. (Defs. PJC Br. 27 n.32.) At any rate, Plaintiffs have at least arguably alleged that venue is proper because they allege that UBS is found or "transacts business" in New York. 15 U.S.C. § 22 (a suit may be brought under the Clayton Act "in any district wherein [a defendant] may be found or transacts business"); (CAC ¶ 79 ("UBS maintains branches and representative offices in several U.S. states, including . . . New York. UBS's U.S. headquarters are located in New York and Stamford, Connecticut.").)

test, it has observed that several other circuits have held that "when a civil case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014). Further, "several courts in this [D]istrict addressing federal claims with national service of process—including claims based on alleged LIBOR manipulation—have applied the 'national contacts' test." *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d at 589 (collecting cases); *see also LIBOR IV*, 2015 WL 6243526, at *23 & n.39 (noting that "[c]ourts in this Circuit commonly hold" that the minimum contacts test should consider nationwide contacts and that nothing in recent Supreme Court opinions such as *Daimler*, 571 U.S. 117, and *Walden*, 571 U.S. 277, "so much as hints that the national contacts rule might be unconstitutional where it is supported by a federal statute"). Therefore, with respect to the remaining federal claims—*i.e.*, Plaintiff FrontPoint's Sherman Act claims against Defendant UBS—I assume for the purposes of this motion that the relevant contacts are UBS's contacts with the United States as a whole.

With respect to the remaining state law claims—*i.e.*, Plaintiff FrontPoint's unjust enrichment claim against UBS—the personal jurisdiction analysis involves the application of New York's long-arm statute, N.Y. C.P.L.R. § 302, and the constitutional due process inquiry, which examines whether the defendants had sufficient minimum contacts with New York, as opposed to the United States as a whole. *Whitaker*, 261 F.3d at 208. Under New York's long-arm statute, "the party's conduct in New York cannot be unrelated to the lawsuit; rather, 'there must be a substantial nexus between the business and the cause of action.'" *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12-CV-5262 (JPO), 2014 WL 4473352, at *4 (S.D.N.Y. Sept. 11, 2014) (quoting *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158,

166 (2d Cir. 2005)).

i. *Specific Jurisdiction:  Sherman Act Claims*

Applying the nationwide contacts test to Plaintiff FrontPoint's claims under the Sherman Act, I find that Plaintiffs have alleged facts sufficient to establish personal jurisdiction over Defendant UBS.

UBS is a Swiss banking and financial services company headquartered in Zurich and Basel, Switzerland, and was a member of the BBA LIBOR Panel Bank for Sterling LIBOR throughout the Class Period.  (CAC ¶ 7.)  The CAC alleges various facts related to UBS's presence in the United States.  (*See* Pls.' PJX Opp. 5 (collecting allegations in the CAC).)  UBS was a reporting bank for the Federal Reserve Bank of New York's ("FRBNY") surveys on the over-the-counter interest rate derivatives and foreign exchange market.  The FRBNY surveys indicated that the Sterling foreign exchange and interest rate derivatives market was the fourth largest interest rate derivatives market in the United States.  (CAC ¶¶ 94–95; *see also* Lefkowitz Decl. Exs. 32–33.)  FrontPoint traded directly with UBS in the alleged manipulated products pursuant to the ISDA Master Agreements.  UBS operated an interest rate derivatives trading desk in Connecticut.  (CAC ¶ 81.)  Traders at that desk acted as submitters or made requests to submit false Sterling LIBOR rates to harm Plaintiffs and the Class and benefit UBS's trading positions.  (*Id.* ¶¶ 81–84.)  This United States presence, however, "is relevant only insofar as it has a nexus to the misconduct underlying plaintiffs' claims."  *Sullivan*, 2017 WL 685570, at *44.

Foreign Defendants argue that Plaintiffs' allegations suffer from the same defects as the allegations in *Sullivan*.  (3/14/17 Ltr.)[29]  In *Sullivan*, under similar—but not identical—circumstances, the court found that Plaintiffs failed to allege minimum contacts between UBS

---

[29] "3/14/17 Ltr." refers to Defendants' letter filed on March 14, 2017.  (Doc. 135.)

and the United States sufficient to confer specific jurisdiction. *Sullivan*, 2017 WL 685570, at

*44. However, the *Sullivan* court described, in a hypothetical, allegations that would be

necessary to satisfy the minimum-contacts prong of the specific jurisdiction test. Specifically,

Judge Castel stated that if the complaint had alleged "that a United State[s] branch employed

traders who requested artificial Euribor rates" or "pointed to directives from United States

management that facilitated or encouraged the scheme, such allegations would likely reflect suit-

related conduct with a substantial connection to the forum." *Id.* at *45; *see also* LIBOR IV, 2015

WL 4634541, at *26 ("[I]n principle, we would uphold jurisdiction in the forum containing the

office from which a defendant determined, or transmitted, a false LIBOR submission.") These

allegations are similar to some of the allegations in the CAC related to UBS and Frontpoint.

Foreign Defendants argue that "Plaintiffs have failed to plausibly allege that Foreign

Defendants engaged in manipulative conduct relating to Sterling LIBOR in the forum." (3/14/17

Ltr. 2.) With regard to Defendant UBS, this argument ignores Paragraph 85 of the CAC, which

alleges that "[a]t least one senior UBS manager in its Stamford, Connecticut headquarters

directly manipulated UBS's LIBOR submissions," and that the manager "directed UBS LIBOR

submitters to manipulate LIBOR submissions across all currencies, including Sterling LIBOR."

(CAC ¶ 85 (citing UBS CFTC Agmt. 48[30]).) This is the type of allegation that Judge Castel

found lacking in the *Sullivan* complaint. Plaintiffs allege, by reference to documentary evidence,

the involvement of a United States-based UBS employee in LIBOR manipulation. This conduct,

---

[30] The page of the UBS/CFTC agreement cited by Plaintiffs in support of Paragraph 85 discusses the manipulation
of both U.S. Dollar LIBOR submissions and of LIBOR submissions generally. In other words, the UBS/CFTC
agreement does not specifically state that Stamford-based UBS manager manipulated Sterling LIBOR. Therefore,
based on this ambiguity, it is not entirely clear that the Stamford-based UBS manager manipulated *Sterling* LIBOR,
as opposed to Dollar LIBOR or LIBOR in some other currency. Because I am considering a motion to dismiss, I
must accept the allegations in the CAC as true and draw all inferences in Plaintiffs' favor. Therefore, I resolve this
ambiguity in Plaintiffs' favor, and draw the reasonable inference that when the agreement references "LIBOR
submissions" without specifying a currency, Sterling LIBOR submissions are included in those references.

which allegedly occurred in the forum, is alleged to have caused, in part, the harm suffered by Plaintiff FrontPoint as a result of Defendant UBS's Sherman Act violations, which is "suit-related conduct" that creates a "substantial connection" with the forum. *See Walden*, 571 U.S. at 284. I find that Plaintiffs have adequately—albeit just barely—alleged a nexus between Defendant UBS's presence in the United States and Defendant UBS's alleged violations of the Sherman Act, which supports the exercise of specific personal jurisdiction with regard to Plaintiff FrontPoint's Sherman Act claims against Defendant UBS.

Having found that Defendant UBS "purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there," I must consider whether the assertion of personal jurisdiction would comport with fair play and substantial justice. *Licci*, 732 F.3d at 170 (internal quotation marks omitted). Applying the five factors the Supreme Court has identified, I find that it is appropriate to exercise jurisdiction over Defendant UBS. The CAC adequately alleges that Defendant UBS has a "substantial presence" in the United States, with one of its United States headquarters located in New York. (CAC ¶¶ 78–79.) Requiring Defendant UBS to answer to allegations in the United States, and specifically in New York, will not impose an unreasonable burden. This is consistent with the rulings of other courts in this district. *See, e.g., Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d at 598 (having found that Defendant UBS purposefully established minimum contacts with the forum, the inquiry into "whether the assertion of personal jurisdiction would comport with fair play and substantial justice . . . need not detain us for long," because UBS was "alleged to be among the world's largest financial institutions and to maintain a substantial and ongoing presence in the forum" (internal quotation marks omitted)).[31]

---

[31] Once minimum contacts with the forum have been established, "the burden shifts to the defendant to show that the exercise of jurisdiction would nonetheless be so unreasonable as to offend traditional notions of fair play and

Accordingly, this Court has jurisdiction over Plaintiff FrontPoint's Sherman Act claims against Defendant UBS.

### ii. *Specific Jurisdiction: Unjust Enrichment Claim*

Plaintiff FrontPoint's unjust enrichment claim against Defendant UBS involves conduct alleged to have taken place in Connecticut, not New York. Therefore the unjust enrichment claim does not meet the standard of New York's long-arm statute, *see* N.Y. C.P.L.R. § 302 (listing tortious acts *within New York* as a basis for jurisdiction), and cannot serve as a basis for jurisdiction. However, where, as here, a federal statute authorizes nationwide service of process, and the federal and state claims "derive from a common nucleus of operative fact," *see United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725 (1966), a district court "may assert personal jurisdiction over the parties to the related state law claims even if personal jurisdiction is not otherwise available," *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993); *see also In re Packaged Seafood Prods. Antitrust Litig.*, Case No. 15-MD-2670 JLS (MDD), 2018 WL 4222506, at *32 (S.D. Cal. Sept. 5, 2018) (finding that the court had jurisdiction over a state law claim because it arose out of a common nucleus of operative facts with a Sherman Act claim). It is undisputed that Plaintiff FrontPoint's unjust enrichment claim and its Sherman Act claims against Defendant UBS rely on the same set of operative facts.

Having found that Plaintiffs have made a prima facie showing that this Court has personal jurisdiction over Plaintiff FrontPoint's Sherman Act claims against Defendant UBS, and

---

substantial justice." *LIBOR IV*, 2015 WL 6243526, at *28 (citing *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 113 (1987)). The defendant must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477. Defendants' only argument that the exercise of personal jurisdiction would be unreasonable is that they "had no suit-related connections with the forum." (*See* Defs.' PJX Br. 28–29.) This is merely a statement that the first requirement for specific personal jurisdiction has not been met. Defendants fail to meet their burden because they do not point to any evidence that the exercise of personal jurisdiction would be unreasonable as to UBS or any other Defendant.

that the Sherman Act claims have a "nucleus of pertinent facts in common" with the unjust enrichment claim, it is appropriate to exercise pendent personal jurisdiction. *See Hargrave v. Oki Nursery, Inc.*, 646 F.2d 716, 719 (2d Cir. 1980).

Accordingly, this Court has jurisdiction over Plaintiff FrontPoint's unjust enrichment claim against Defendant UBS.

## I.     *Jurisdictional Discovery*

In the alternative, Plaintiffs seek jurisdictional discovery.  (Pls.' PJX Opp. 28–29.)  My dismissal on the merits of all of Plaintiffs' claims, except for Plaintiff FrontPoint's Sherman Act claims and unjust enrichment claim against Defendant UBS, and my decision to exercise personal jurisdiction over Defendant UBS for those specific claims render Plaintiffs' request for jurisdictional discovery moot.

Accordingly, Plaintiffs' request for jurisdictional discovery is denied.

## VI.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss for lack of subject matter jurisdiction is DENIED.  Defendants' motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim is GRANTED as to all claims against Defendant BCI.  Defendants' motion to dismiss pursuant to Rule 12(b)(6) is also GRANTED as to Plaintiffs' CEA claims, RICO claims, and state-law claim of breach of the implied covenant of good faith and fair dealing, as well as to Plaintiffs Sonterra's and Dennis's Sherman Act claims and unjust enrichment claim against all Defendants, and Plaintiff FrontPoint's Sherman Act claims and unjust enrichment claim against all Defendants except UBS.

Because Plaintiffs have made out a prima facie case of personal jurisdiction over Defendant UBS with regard to Plaintiff FrontPoint's Sherman Act claims and unjust enrichment

claim against Defendant UBS, the Foreign Defendants' motion to dismiss for lack of jurisdiction is DENIED as to those claims. Plaintiffs' request for jurisdictional discovery is DENIED. In light of this Opinion & Order, Plaintiffs shall file any motion to substitute pursuant to Rule 17(a)(3), limited in scope to the surviving claims, no later than January 21, 2019; Defendants' response shall be due no later than February 20, 2019; Plaintiffs' reply shall be due no later than February 27, 2019.

The Clerk of Court is respectfully directed to terminate the pending motion.

SO ORDERED.

Dated: December 21, 2018
       New York, New York

Vernon S. Broderick
United States District Judge