UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                              :

SONTERRA CAPITAL MASTER FUND, LTD.,    :
RICHARD DENNIS, and FRONTPOINT
EUROPEAN FUND, L.P., on behalf of            :
themselves and all others similarly situated,
                                                           :

                          Plaintiffs,    :
                                                :                 15-CV-3538 (VSB)
              -against-                         :
                                                :             **OPINION & ORDER**

BARCLAYS BANK PLC, COOPERATIEVE      :
CENTRALE RAIFFEISEN-BOERENLEENBANK  :
B.A., DEUTSCHE BANK AG, LLOYDS BANKING :
GROUP PLC, THE ROYAL BANK OF SCOTLAND :
PLC, UBS AG, JOHN DOE NOS. 1-50, and    :
BARCLAYS CAPITAL, INC.,
                                                           :
                          Defendants.    :
-----------------------------------------------------------------X

Appearances:

Christian Levis
Geoffrey Milbank Horn
Raymond Peter Girnys
Vincent Briganti
Margaret Ciavarella MacLean
Peter Dexter St. Phillip, Jr.
Sitso W. Bediako
Lowey Dannenberg, P.C.
White Plains, New York

Benjamin Martin Jaccarino
Christopher Lovell
Lovell Stewart Halebian Jacobson LLP
New York, New York

James Anthony Diehl
The Law Office of Jamison A. Diehl LLC
New York, New York
*Counsel for Plaintiff FrontPoint European Fund, L.P.*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/16/2019

Peter Sullivan
Eric Jonathan Stock
Jefferson Eliot Bell
Lawrence Jay Zweifach
Mark Adam Kirsch
Gibson, Dunn & Crutcher, LLP
New York, New York
*Counsel for Defendant UBS AG*

VERNON S. BRODERICK, United States District Judge:

Plaintiff FrontPoint European Fund, L.P. ("FrontPoint") brings this putative antitrust class action lawsuit against Defendant UBS AG ("UBS") for allegedly conspiring with other financial institutions to manipulate the London Interbank Offered Rate ("LIBOR") for British Pound Sterling. Before me is FrontPoint's motion to substitute Fund Liquidation Holdings, LLC ("FLH"), individually, and as assignee of and attorney-in-fact for FrontPoint, pursuant to Federal Rule of Civil Procedure 17(a)(3). Because I conclude that FrontPoint did not assign the claims at issue in this litigation to FLH, FrontPoint's motion to substitute is DENIED. Furthermore, since FrontPoint filed its certificate of cancellation prior to the commencement of this lawsuit, FrontPoint lacks capacity to maintain this lawsuit and I therefore grant UBS's request that FrontPoint's claims be dismissed in their entirety.

I. **Background**[1]

This action arises out of alleged manipulation and price fixing of the Sterling LIBOR by numerous financial institutions,[2] which allegedly harmed purchasers and sellers of financial instruments that were in some way connected to LIBOR. (CAC ¶¶ 6–7.) In 2007, FrontPoint—a Delaware limited partnership—entered into swap transactions with UBS, the price of which was allegedly affected by UBS's manipulation of Sterling LIBOR. (*Id.* ¶¶ 38, 209, 211.)

On July 13, 2011, as FrontPoint was preparing to wind up and cease operations, FrontPoint and related entities[3] entered into an Asset Purchase Agreement ("APA") with FLH. (FrontPoint Br. 1.)[4] Pursuant to the APA, FrontPoint "absolutely, unconditionally and irrevocably s[old], assign[ed], convey[ed] and transfer[red]" to FLH all of FrontPoint's "right, title and interest" in certain of FrontPoint's assets. (APA § 1.1.) The APA also appointed FLH as FrontPoint's attorney-in-fact and granted FLH the authority to take certain actions on FrontPoint's behalf. (*Id.* § 5.3.) The APA further provided that the agreement would be "governed by and construed in accordance with the laws of the State of New York." (*Id.* § 6.6.)

---

[1] A detailed summary of the facts set forth in the Consolidated Amended Class Action Complaint ("CAC," Doc. 95), can be found in my Opinion & Order granting in part and denying in part Defendants' motion to dismiss this lawsuit pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6) ("12/21/18 O&O," Doc. 191). I assume familiarity with the facts set forth in my 12/21/18 O&O and recite herein only those facts necessary to decide this motion.

[2] In addition to UBS, these financial institutions included Barclays Bank PLC; Barclays Capital, Inc.; Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A.; Deutsche Bank AG; Lloyds Banking Group PLC; and the Royal Bank of Scotland PLC (collectively, "Defendants"). (*See* CAC.) All Defendants other than UBS were previously dismissed from this action. (*See* 12/21/18 O&O, at 3–4.)

[3] These entities are FrontPoint European Fund, L.P. (Plaintiff in the instant action); FrontPoint Asian Event Driven Fund, L.P. ("FrontPoint Asia"); FrontPoint Australian Opportunities Trust; FrontPoint Consumer and Industrials Fund, L.P.; FrontPoint Financial Services Fund, L.P.; FrontPoint Healthcare Flagship Enhanced Fund, L.P.; FrontPoint Healthcare Flagship Fund, L.P.; FrontPoint Financial Horizons Fund, L.P.; FrontPoint Healthcare Horizons Fund, L.P.; FrontPoint Partners Trading Fund, L.P.; and FrontPoint Technology Fund, L.P. (collectively, the "FrontPoint Entities"). (APA Schedule I.) ("APA" refers to the July 13, 2011 Asset Purchase Agreement between the FrontPoint entities (as sellers) and FLH (as buyer), attached as Exhibit A to the Declaration of Geoffrey M. Horn in Support of Plaintiff's Motion for Substitution, filed February 5, 2019, (Doc. 203).)

[4] "FrontPoint Br." refers to Plaintiff FrontPoint European Fund, L.P.'s Memorandum of Law in Support of Its Motion for Substitution, filed February 5, 2019. (Doc. 202.)

On March 9, 2012, FrontPoint filed its Certificate of Cancellation of Certificate of Limited Partnership with the Delaware Secretary of State.  (*See* Bell Decl. Ex. 2.)[5]

Notwithstanding the fact that FrontPoint had ceased operations in 2012, FrontPoint—along with Richard Dennis—filed a complaint against Defendants on January 21, 2016, in which FrontPoint alleged that it "is a Delaware limited partnership with its principal place of business in Greenwich, Connecticut."  *See FrontPoint European Fund, L.P. v. Barclays Bank plc*, No. 16-cv-464, ECF No. 1, ¶ 36.  On February 16, 2016, FrontPoint and Dennis's action was consolidated with the instant case, which had been filed by Sonterra Capital Master Fund, Ltd. ("Sonterra") on May 6, 2015.  (*See* Doc. 91.)  Plaintiffs FrontPoint, Sonterra, and Dennis filed a Consolidated Amended Class Action Complaint on February 25, 2016.  (Doc. 95.)  The CAC—which also described FrontPoint as a live entity, (*see* CAC ¶ 38 ("Plaintiff FrontPoint is a Delaware limited partnership with its principal place of business in Greenwich, Connecticut."))—asserted federal claims under the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. § 1, *et seq.*; the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*; and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*; and also asserted common law claims for breach of the implied covenant of good faith and fair dealing and unjust enrichment, (CAC ¶¶ 234–319).

On April 11, 2016, Defendants moved to dismiss the CAC in its entirety for lack of subject matter jurisdiction and personal jurisdiction, and for failure to state a claim, pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and (12)(b)(6).  (*See* Doc. 99.)  On November 6, 2017—while Defendants' motion to dismiss was pending—Plaintiffs submitted a

---

[5] "Bell Decl." refers to the Declaration of Jefferson E. Bell in Support of UBS's Memorandum of Law in Opposition to Plaintiff's Motion for Substitution, filed March 5, 2019.  (Doc. 219.)

letter requesting a pre-motion conference in advance of seeking leave to substitute FLH as a plaintiff in place of both FrontPoint and Sonterra under Federal Rule of Civil Procedure 17(a)(3). (Doc. 171.) In that letter, FrontPoint and Sonterra explained that they were contacted by Defendants in October 2017 regarding certain inaccuracies in the CAC—namely the references to FrontPoint and Sonterra as "live" entities. (*Id.* at 1.) FrontPoint and Sonterra acknowledged that both entities had long since ceased operations but asserted that, prior to doing so, they had each assigned and transferred their respective rights to bring the instant lawsuit to FLH. (*Id.*)[6] Accordingly, FrontPoint and Sonterra argued that substitution of FLH into the action, both individually and as assignee and attorney-in-fact for FrontPoint and Sonterra, would address any potential concerns relating to the fact that FrontPoint and Sonterra were "no longer in business." (*Id.* at 1–2.) In a letter dated November 9, 2017, Defendants noted their opposition to FrontPoint and Sonterra's substitution request but asserted that I should address Defendants' motion to dismiss prior to entertaining Plaintiffs' request given that a ruling in Defendants' favor on that motion would "render the proposed substitution motion moot." (Doc. 172, at 1.)

On December 21, 2018, I issued an Opinion & Order dismissing all of Plaintiffs' claims, with the exception of FrontPoint's antitrust and unjust enrichment claims against UBS. (*See* 12/21/18 O&O, at 3–4.) The 12/21/18 O&O did not address the substance of FrontPoint's substitution request, but rather instructed FrontPoint to file its "motion to substitute pursuant to Rule 17(a)(3), limited in scope to the surviving claims." (*Id.* at 10 n.10, 68.) On February 5, 2019, FrontPoint filed the instant motion to substitute, (Doc. 201), along with a memorandum of law and supporting declarations with exhibits, (Docs. 202–05). UBS filed its opposition to

---

[6] According to Plaintiffs, Sonterra assigned certain rights to FLH in an August 2012 agreement. (*See* Doc. 171, at 1.) Because the 12/21/18 O&O dismissed all of Sonterra's claims, (*see* 12/21/18 O&O, at 3–4), the instant motion for substitution is limited to FrontPoint.

5

FrontPoint's motion on March 5, 2019, (Doc. 218), along with a declaration with exhibits in support, (Doc. 219); and FrontPoint filed its reply and supporting declarations with exhibits on March 18, 2019, (Docs. 222–24).[7]

## II.  Discussion

### A.  *Motion for Substitution*

Having reviewed the terms of the Asset Purchase Agreement, I conclude that FLH may not be substituted into this lawsuit because the APA did not assign to FLH the right to bring either the Sherman Act claims or the common law unjust enrichment claim at issue here.

#### 1.  Applicable Law

Federal Rule of Civil Procedure 17(a)(1) mandates that a lawsuit be "prosecuted in the name of the real party in interest." *See Cortlandt St. Recovery Corp. v. Hellas Telecomms. S.a.r.l*, 790 F.3d 411, 420 (2d Cir. 2015) ("The real party in interest principle embodied in Rule 17 ensures that only a person who possesses the right to enforce a claim and who has a significant interest in the litigation can bring the claim." (internal quotation marks omitted)).  In the event the real party in interest is not named as a plaintiff, a court may not dismiss the action for failure to prosecute in the name of the real party in interest "until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3).  "A Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir. 1997).  Courts ordinarily grant leave to substitute if "(1)

---

[7] Both FrontPoint and UBS have also moved for partial reconsideration of the 12/21/18 O&O.  (Docs. 196, 198.)  However, because I conclude herein that (1) FLH may not be substituted as a plaintiff in this action, and (2) all of FrontPoint's claims should be dismissed because FrontPoint lacks capacity to maintain this lawsuit, both FrontPoint's and UBS's motions for partial reconsideration of the 12/21/18 O&O are denied as moot.

6

'[t]he complaint's only pertinent flaw was the identity of the party pursuing those claims.  In other words, the proposed amended complaint sought only to substitute one name for another; the factual and legal allegations of the complaint would remain unaltered;' (2) 'there was [no] indication of bad faith . . . or an effort to deceive or prejudice the defendants' and (3) 'the proposed substitution . . . [does not] threaten to prejudice the defendants.'" *Kinra v. Chi. Bridge & Iron Co.*, No. 17 Civ. 4251 (LGS), 2018 WL 2371030, at *3 (S.D.N.Y. May 24, 2018) (alteration in original) (quoting *Cortlandt*, 790 F.3d at 422).  On the other hand, courts will deny leave to substitute where the previous misjoinder was "deliberate or tactical." *Advanced Magnetics*, 106 F.3d at 21.

"In general, claims or choses in action may be freely transferred or assigned to others"; however, in order to make that assignment valid, "the owner must manifest an intention to make the assignee the owner of the claim." *Id.* at 17 (internal quotation marks omitted).  Where a valid assignment has been executed, the assignee is "the real party in interest" and "the right to sue is exclusively" the assignee's. *Dennis v. JPMorgan Chase & Co.* ("*BBSW*"), 342 F. Supp. 3d 404, 409 n.6 (S.D.N.Y. 2018) (quoting *Rodriguez v. Compass Shipping Co.*, 617 F.2d 955, 958 (2d Cir. 1980)).  However, "if the accrued causes of action are not expressly included in the assignment, the assignee will not be able to prosecute them." *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 404 (2d Cir. 2018) (internal quotation marks omitted); *see also Cortlandt*, 790 F.3d at 419 ("An assignment . . . which does not transfer ownership of claims, is, on its own, insufficient to permit a purported assignee to sue on those claims in [the assignee's] name." (internal quotation marks omitted)).  This rule applies with particular force in the antitrust context, where, in order "[t]o effect a transfer of the right to bring an antitrust claim, the transferee must expressly assign the right to bring that cause of action, either by making specific

7

reference to the antitrust claim or by making an unambiguous assignment of causes of action in a manner that would clearly encompass the antitrust claim." *DNAML Pty, Ltd. v. Apple Inc.*, No. 13cv6516 (DLC), 2015 WL 9077075, at *3 (S.D.N.Y. Dec. 16, 2015) (collecting cases); *see also Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 440 (3d Cir. 1993) ("[G]eneral assignments, without specific reference to antitrust claims, cannot validly transfer the right to pursue those claims."). "In determining whether [an a]greement has effectively made an assignment of the right to bring an antitrust claim, ordinary principles of contract law will be applied." *DNAML*, 2015 WL 9077075, at *4.

### 2. Application

The two surviving claims at issue in this litigation are the federal antitrust claim pursuant to the Sherman Act and the unjust enrichment claim under New York law. Although FrontPoint conclusorily asserts that "FLH is and always has been the real party in interest in this case," (FrontPoint Reply 1),[8] a review of the APA reveals that FrontPoint did not transfer to FLH the right to sue on either of these claims.

Pursuant to the terms of the APA, FrontPoint assigned to FLH FrontPoint's "right, title and interest in all of the Assets," (APA § 1.1), which are defined, in pertinent part, as "all of [FrontPoint's] right, title and interest in and to any and all Recovery Rights," (*id.* Art. II). "Recovery Rights," in turn, are defined as "all monetary, legal and other rights held by or accruing to [FrontPoint] in respect of [any] Claim." (*Id.*) "Claims" are subdivided into "Existing Claims" and "Future Claims." (*Id.*)[9] "Future Claims"—the relevant term for the

---

[8] "FrontPoint Reply" refers to Plaintiff FrontPoint European Fund, L.P.'s Reply Memorandum of Law in Further Support of Its Motion for Substitution, filed March 18, 2019. (Doc. 222.)

[9] The APA defines "Existing Claims" and "Future Claims" in similar terms; however, "Existing Claims" extend only to those claims that had been filed as of the date the APA was executed (July 13, 2011). (APA Art. II.) The claims at issue here were not filed until January 21, 2016, and therefore clearly do not satisfy the APA's definition of "Existing Claims." *See FrontPoint European Fund, L.P.*, No. 16-cv-464, ECF No. 1.

purpose of the instant motion—is defined as

> all claims of [FrontPoint] to Recovery Rights related to the ownership of, or any transaction in, any Included Securities . . . as to which no Case has been filed as of the date hereof arising out of: (i) any future *securities class action lawsuit* or any Judgment thereon to the extent related to [FrontPoint]'s ownership of, or any transaction in, any Included Securities . . . . Future Claims *do not include Recovery Rights in respect of causes of action and interests in any state or federal common law claim, any non-securities related claim*, or any claim related to the bankruptcy of Lehman Brothers.

(*Id.* (emphasis added).) In sum, FrontPoint assigned to FLH its claims relating to future "securities class action lawsuit[s]," and—for the avoidance of doubt—the APA expressly states that the assignment does not extend to other types of lawsuits, including those involving "any state or federal common law claim" or any "non-securities related claim." (*Id.*)

Considering FrontPoint's Sherman Act claim first, I note that the APA makes no reference to the Sherman Act specifically or to "antitrust claims" generally. The APA also fails to make "an unambiguous assignment of causes of action in a manner that would clearly encompass the antitrust claim." *DNAML*, 2015 WL 9077075, at *3. Rather, the APA specifically defines the claims assigned to FLH to exclude all claims other than those pertaining to "securities class action lawsuit[s]." (APA Art. II.)

FrontPoint asserts that the term "securities class action lawsuit" should be read to encompass "any kind of class action lawsuit . . . related to the financial products [in which] FrontPoint transacted," (FrontPoint Br. 5); however, I find that the text of the APA simply cannot be read as including "any kind of class action lawsuit" related to FrontPoint's transaction in financial products. "Securities class action lawsuit" is not a defined term in the APA and should therefore be accorded its everyday meaning. *See 1070 Park Ave. Corp. v. Fireman's Fund Ins. Co.*, 313 F. Supp. 3d 528, 535 (S.D.N.Y. 2018) ("New York courts construe terms in a contract in accordance with their 'plain and ordinary meaning.'" (quoting *Fed. Ins. Co. v. Am.*

*Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011))).  A "securities class action lawsuit" is commonly understood to refer to a lawsuit litigated as a class action based on alleged violations of the securities laws—namely (in the federal context), the Securities Act of 1933 and the Securities Exchange Act of 1934.  *See, e.g.*, *Querub v. Hong Kong*, 649 F. App'x 55, 56 (2d Cir. 2016) (summary order) (analyzing a "securities class action . . . alleging that [defendants] violated Section 11 of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934"); *In re Prestige Brands Holdings, Inc. Sec. Litig.*, No. 05 Civ. 6924(CLB), 2006 WL 6900987, at *1 (S.D.N.Y. Nov. 9, 2006) (describing a "securities class action suit on behalf of purchasers of stock . . . seeking remedies under the Securities Act of 1933 . . . and the Securities Exchange Act of 1934").  Furthermore, courts routinely distinguish between securities class actions and cases like the purported antitrust class action that FrontPoint has brought here.  *See, e.g.*, *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2d Cir. 2007) (distinguishing between "securities class actions" and "antitrust class actions" and noting that the "[Private Securities Litigation Reform Act] is not applicable to antitrust class actions"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526, at *150 (S.D.N.Y. Oct. 20, 2015) (distinguishing between plaintiffs' "securities claims" and "antitrust" claims).  I therefore find that the term "securities class action lawsuit" does not extend to the antitrust claims at issue here.

Judge Hellerstein recently reached precisely the same conclusion after analyzing the same passage in the same APA.  *See Fund Liquidation Holdings LLC v. Citibank, N.A.* ("*SIBOR II*"), No. 16 Civ. 5263 (AKH), 2019 WL 3388172 (S.D.N.Y. July 26, 2019).[10]  In *SIBOR*,

---

[10] Judge Hellerstein originally announced this decision orally, during a May 2, 2019 conference.  *See SIBOR*, No. 16-cv-5263, ECF No. 389 ("*SIBOR II* Tr.").

another FrontPoint entity, FrontPoint Asia, alleged that a number of financial institutions (including UBS AG) conspired to manipulate two other interest rate benchmarks—the Singapore Interbank Offered Rate ("SIBOR") and the Singapore Swap Offer Rate—in violation of the Sherman Act, among other statutes. *See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.* ("*SIBOR I*"), No. 16 Civ. 5263 (AKH), 2018 WL 4830087, at *1 (S.D.N.Y. Oct. 4, 2018).[11]

Judge Hellerstein concluded that the APA's assignment of claims from the FrontPoint entities to FLH did not extend to FrontPoint Asia's Sherman Act claims. In his oral decision, Judge Hellerstein explained that "[a] securities claim . . . is defined by the Securities Exchange Act and the Securities Act or any state provision that is comparable. That has to do with issues of fair representation, it does not have to do with antitrust. . . . And the claim [in *SIBOR*] is that the market for these products ha[s] been manipulated, and as manipulated claims, we have not a securities-related claim but an antitrust claim." (*SIBOR II* Tr. at 13:7-15.) Judge Hellerstein therefore "h[e]ld with the defendants and grant[ed] their motions that the [antitrust claims] [we]re not covered" by the APA's assignment clause. (*Id.* at 17:17-19.)

FrontPoint cites to the APA's definition of the term "Securities"—i.e., "any debt and/or equity securities of any kind, type or nature, including, without limitation, stocks, bonds, options, puts, calls, swaps and similar instruments or rights," (APA Art. II)—to argue for a broader reading of the term "securities class action lawsuit," (FrontPoint Br. 4–5). This argument is unavailing. Indeed, Judge Hellerstein rejected the same argument in *SIBOR II*, explaining that

---

[11] In an October 4, 2018 opinion granting in part and denying in part defendants' motion to dismiss plaintiffs' Second Amended Complaint, Judge Hellerstein granted FrontPoint Asia leave to amend the complaint to substitute FLH as the sole plaintiff in the action. *See SIBOR I*, 2018 WL 4830087, at *11. However, after FLH filed a Third Amended Complaint, defendants moved to dismiss FLH's claims, in part because—according to defendants—the APA did not assign FrontPoint Asia's Sherman Act claims to FLH. *See SIBOR*, No. 16-cv-5263, ECF No. 319, at 11–20. Judge Hellerstein has since agreed and recently dismissed the action in its entirety. *See SIBOR II*, 2019 WL 3388172, at *4–5.

11

"the wide scope of securities and securities-adjacent instruments nowhere suggests that 'securities class action lawsuit' should also encompass antitrust claims." *SIBOR II*, 2019 WL 3388172, at *5; *see also SIBOR II* Tr. at 17:14-16 (explaining that the fact that an "antitrust wrong [might] affect[] securities, namely derivative contracts, does not make the claim a securities claim or a securities-related claim").  Moreover, in the APA's definition of "Future Claims"—the key term at issue here—the word "securities" is not capitalized, either in reference to "securities class action lawsuit[s]" or "non-securities related claim[s]."  (APA Art. II.)  The APA's extensive use of defined terms demonstrates that its drafters were perfectly capable of using such terms when they wished to do so.  Their decision not to capitalize the "s" in "securities class action" or to specifically define "securities class action lawsuit" should not be ignored and the term should therefore be accorded its ordinary meaning, which does not encompass antitrust claims.  *See SIBOR II*, 2019 WL 3388172, at *5 ("While the broadly delimited term 'Securities' is explicitly defined by the APA, the lowercase-s 'securities class action' and 'non-securities related claim' used to define Future Claims are not, making 'security' suitable for interpretation in light of common understanding."); *cf. Sunbelt Rentals, Inc. v. Charter Oaks Fire Ins. Co.*, 839 F. Supp. 2d 680, 688–89 (S.D.N.Y. 2012) (faulting party's failure "to draw a distinction between the use of the term 'equipment' generically and its use as a (capitalized) defined term in the [contract's] terms and conditions").

I also find that the APA did not assign FrontPoint's unjust enrichment claim to FLH.  A claim for unjust enrichment is a "common-law claim[]," *see, e.g.*, *Greene v. Gerber Prods. Co.*, 262 F. Supp. 3d 38, 46 (E.D.N.Y. 2017), and FrontPoint's New York unjust enrichment claim, (*see* 12/21/2018 O&O, at 52), falls squarely within the realm of "state . . . common law claim[s]," which are expressly excluded from the APA's definition of "Future Claims," (APA

Art. II). Indeed, by failing to include a single reference to its unjust enrichment claim in either its opening brief or its reply, FrontPoint appears to concede that the APA did not assign FrontPoint's unjust enrichment claim to FLH.  (*See generally* FrontPoint Br.; FrontPoint Reply.)

Because I find the APA's language unambiguous, I decline to consider the supporting declarations that FrontPoint has submitted to establish the parties' intent in drafting the agreement.  *See Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993) ("If a contract is unambiguous, courts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning."); *see also SIBOR II*, 2019 WL 3388172, at *5 (concluding that it would be "unnecessary and inappropriate" to consider the declaration of FrontPoint Asia's former general counsel where "the terms of the APA [were] unambiguous on their face").

Finally, I find that FrontPoint cannot invoke the APA's Power of Attorney clause as the source of FLH's asserted right to bring the instant claims.  The APA designates and appoints FLH "as [FrontPoint's] attorney-in-fact, . . . with the right, power, and authority to take [a wide range of] actions on behalf of [FrontPoint], in [FrontPoint's] name, place and stead, with respect to any of the Claims . . . .  The foregoing power of attorney is coupled with an interest and may not be terminated or revoked by [FrontPoint] at any time."  (APA § 5.3.)  As an initial matter, it is well established that "[t]he grant of a power of attorney . . . is not the equivalent of an assignment of ownership; and, standing alone, a power of attorney does not enable the grantee to bring suit in his own name." *Advanced Magnetics*, 106 F.3d at 17–18.  Moreover, a power of attorney "generally terminates when the grantor ceases to exist." *BBSW*, 342 F. Supp. 3d at 413 (citing *Hunt v. Rousmanier's Adm'rs*, 21 U.S. (8 Wheat.) 174, 202 (1823) ("We think it well settled, that a power of attorney, though irrevocable during the life of the party, becomes extinct

13

by his death.")). The Supreme Court established long ago that a power of attorney survives the death of the grantor only where that power is "coupled with an 'interest,' [in which case] it survives the person giving it, and may be executed after his death." *Hunt*, 21 U.S. at 203. That interest "must be an interest in the thing itself," *id.* at 204, which in this case would be "the assignment of the claims asserted in the litigation," *BBSW*, 342 F. Supp. 3d at 414 (interpreting the same provision of the APA in decision denying request by other FrontPoint entities to substitute FLH as the real party in interest pursuant to Rule 17(a)(3)). Thus, because I have determined that FLH was not assigned the claims asserted in this litigation—and that FLH lacks an interest "in the thing itself"—I find that the power of attorney terminated when FrontPoint ceased operations in 2012 and it therefore cannot be the source of FLH's right to assert the claims at issue in this litigation.

Because I have concluded that FrontPoint did not assign the claims at issue in this litigation to FLH and that FLH therefore may not be substituted pursuant to Rule 17(a)(3), I need not and decline to consider UBS's remaining arguments as to why substitution would be improper.[12]

---

[12] I note that in another benchmark rate manipulation case (addressing the Bank Bill Swap Reference Rate), Judge Kaplan recently addressed the same question presented here—i.e., whether FLH could be substituted in place of a group of FrontPoint entities on the basis of the APA's assignment of claims to FLH—and denied the substitution request on the ground that substitution would require plaintiffs to add allegations to the complaint relating to the assignment, which would exceed the scope of changes permitted under Rule 17. *BBSW*, 342 F. Supp. 3d at 416–17 (S.D.N.Y. 2018). (In *BBSW*, Judge Kaplan expressly declined to reach the question of whether the FrontPoint entities' assignment of claims to FLH was adequate, and instead concluded "for other reasons that Rule 17 substitution [wa]s not available to plaintiffs." *Id.* at 415.) Judge Kaplan explained that substitution pursuant to Rule 17(a) is appropriate only where "the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants." *Id.* at 416 (quoting *Advanced Magnetics*, 106 F.3d at 20). He then concluded that "were FLH to join the lawsuit, the amended complaint would 'necessarily reflect' the contents of the relevant assignments in order to establish FLH's standing," and that such an amendment exceeded the standard established by the Second Circuit. *Id.* at 417 (quoting *Cortlandt*, 790 F.3d at 424); *see also Cortlandt*, 790 F.3d at 424 (concluding that "pleading the existence of a new . . . assignment would require more than a merely formal alteration of the complaint" and affirming the district court's denial of plaintiff's request to substitute pursuant to Rule 17 (internal quotation marks omitted)).

### B.     *Dismissal for Lack of Capacity to Sue*

Having determined that FLH may not be substituted as a plaintiff in this action, I turn to the issue of whether FrontPoint may continue to litigate this action in its own name. I find that FrontPoint lacks capacity to maintain this lawsuit and therefore grant UBS's request to dismiss the action in its entirety.

### 1. Applicable Law

"Capacity refers to a party's personal right to litigate in federal court." *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386(KMW)(HBP), 2009 WL 464946, at *8 n.30 (S.D.N.Y. Feb. 25, 2009) (internal quotation marks omitted). "Capacity to sue is a threshold matter allied with, but conceptually distinct from, the question of standing." *LBBW Luxemburg S.A. v. Wells Fargo Sec., LLC*, 744 F. App'x 710, 714 n.3 (2d Cir. 2018) (summary order) (quoting 59 Am. Jur. 2d Parties § 26). Capacity, unlike standing, is "ordinarily not a jurisdictional issue." *Id.* (internal quotation marks omitted). However, "[a] party must maintain its capacity to sue throughout litigation," and lack of capacity is grounds for dismissal. *New Asia Enters. Ltd. v. Fabrique, Ltd.*, No. 13 Civ. 5271 (JFK), 2017 WL 384687, at *1 (S.D.N.Y. Jan. 26, 2017); *cf. Manhattan Review LLC v. Yun*, 765 F. App'x 574, 577 (2d Cir. 2019) (summary order) (affirming district court's determination that lawsuit "should not have been brought in the first place because the plaintiffs lacked the capacity to sue").

Federal Rule of Civil Procedure 17(b) provides that a corporation's capacity to sue is determined "by the law under which it was organized," while "for all other parties," capacity is determined "by the law of the state where the court is located." Fed. R. Civ. P. 17(b)(2)–(3); *see also BBSW*, 342 F. Supp. 3d at 409. Under New York law, a "partnership formed under the laws of any jurisdiction . . . other than the laws of this state and having as partners one or more

15

general partners and one or more limited partners" is deemed a "foreign limited partnership." N.Y. P'ship Law § 121-101(e) (McKinney 2018); *see also Prickett v. N.Y. Life Ins. Co.*, 896 F. Supp. 2d 236, 248 (S.D.N.Y. 2012) (treating Delaware limited partnership as "foreign limited partnership" under New York's Partnership Law).  "[A] foreign limited partnership's capacity to sue is determined by reference to the laws of the jurisdiction under which [that] limited partnership is organized."  *BBSW*, 342 F. Supp. 3d at 410 & n.15 (citing N.Y. P'ship Law § 121-901 (McKinney 2018)).  A limited partnership organized under Delaware law loses its right to sue when the partnership files a certificate of cancellation.  *See* Del. Code Ann. tit. 6, § 17-803(b) (2017) ("Upon dissolution of a limited partnership and until the filing of a certificate of cancellation as provided in § 17-203 of this title, the persons winding up the limited partnership's affairs may, in the name of, and for and on behalf of, the limited partnership, prosecute and defend suits, whether civil, criminal or administrative . . . ."); *see also United States v. Ovid*, No. 09-cr-216 (JG) (ALC), 2012 WL 2087084, at *4 n.2 (E.D.N.Y. June 8, 2012) (stating that for Delaware limited partnerships, "the right to bring suits on behalf of the partnership ends after the filing of a certificate of cancellation" (internal quotation marks omitted)).

### 2. Application

As an initial matter, I note that FrontPoint appears to acknowledge that it has no interest in this litigation and therefore lacks standing to sue.  (*See* FrontPoint Reply 1 ("FLH is and always has been the real party in interest in this case."); *see also BBSW*, 342 F. Supp. 3d at 409 ("Assuming *arguendo* that . . . the FrontPoint Plaintiffs completely assigned the claims brought in this case to FLH, they do not have standing to sue because they no longer have an interest in the litigation." (citing *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984) ("An unequivocal and complete assignment extinguishes the assignor's

rights against the obligor and leaves the assignor without standing to sue the obligor.")))).)
However, FrontPoint's concession that it lacks standing is rooted in its assertion that it fully assigned its interest in the claims at issue to FLH before the lawsuit was filed and—as detailed above—I have found that assignment to be inadequate. *See supra* Part II.A.

UBS insists that "FrontPoint lacks standing regardless of whether its purported assignment to FLH was effective," on the ground that "[i]t is FrontPoint's burden to establish standing" and FrontPoint has made no attempt to do so. (UBS Opp'n 7.)[13] UBS relies on language from the Second Circuit's summary order in *Valdin Investments Corp. v. Oxbridge Capital Management, LLC*, in which the court determined it "need not question" plaintiff's assertions relating to the effectiveness of an assignment "insofar as [the assertions] demonstrate[d] the *absence* of standing" because the plaintiff, "as the party invoking federal jurisdiction, bears the burden of establishing standing." 651 F. App'x 5, 7 n.3 (2d Cir. 2016). However, like Judge Kaplan in *BBSW*, I decline to reach UBS's argument that "the mere assertion by [FrontPoint] that [it] assigned [its] claims to FLH deprives [FrontPoint] of standing." 342 F. Supp. 3d at 409. I need not reach this question because, even assuming FrontPoint had standing to sue, "[it] would still lack capacity to sue by virtue of having dissolved." *Id.*[14]

---

[13] "UBS Opp'n" refers to UBS AG's Memorandum of Law in Opposition to Plaintiff's Motion for Substitution, filed March 5, 2019. (Doc. 218.)

[14] Capacity to sue is a "defense [that] may be waived if it is not raised in a party's initial responsive pleading to a claim." *BBSW*, 342 F. Supp. 3d at 411. Although FrontPoint has not expressly argued that UBS's lack of capacity defense is waived, FrontPoint contends that "[t]he liquidation of the FrontPoint funds was publicly reported in the news" and was "no secret." (FrontPoint Reply 7.) Any argument implying that UBS has waived its right to challenge FrontPoint's capacity to sue is wholly without merit. UBS has not yet filed an answer to the CAC and, in any event, I find that UBS raised the capacity to sue defense "at the first pragmatically possible time." *Animazing Entm't, Inc. v. Louis Lofredo Assocs., Inc.*, 88 F. Supp. 2d 265, 268 (S.D.N.Y. 2000) (finding waiver improper where affirmative defense was raised as soon as pragmatically possible). UBS has argued that FrontPoint lacks capacity to sue since FrontPoint's dissolution first came to UBS's attention in late 2017. (*See* Doc. 172, at 1, 3 (November 9, 2017 letter explaining that Defendants had learned via a recent court filing in another action that "FrontPoint ceased to be a Delaware limited partnership effective March 7, 2012" and that therefore "[t]he claims

There is no dispute that FrontPoint was dissolved long before this lawsuit was filed. FrontPoint filed its Certificate of Cancellation of Certificate of Limited Partnership with the Delaware Secretary of State on March 9, 2012.  (*See* Bell Decl. Ex. 2.)  Thus, under Delaware law, FrontPoint's right to bring lawsuits terminated on that date.  *See* Del. Code Ann. tit. 6, § 17-803(b); *Ovid*, 2012 WL 2087084, at *4 n.2.  Because it is undisputed that FrontPoint lacked capacity to sue when the instant action was filed on January 21, 2016—and continues to lack capacity today—I grant UBS's request that FrontPoint's claims be dismissed.  *See New Asia*, 2017 WL 384687, at *1 (granting defendant's summary judgment motion where there was "no dispute" that plaintiff "lack[ed] capacity to maintain this suit").

### III.    Conclusion

For the foregoing reasons, FrontPoint's motion for substitution is DENIED and, because FrontPoint lacks capacity to maintain this lawsuit, its claims are DISMISSED.

The Clerk of Court is respectfully directed to terminate the motions pending at Docket Entries 196, 198, and 201, and to close the case.

SO ORDERED.

Dated: August 16, 2019
       New York, New York

Vernon S. Broderick
United States District Judge

---

asserted on behalf of . . . FrontPoint must be dismissed . . . because [FrontPoint] lack[s] any legal existence under applicable law, and therefore ha[s] no capacity to sue under Rule 17").)  Judge Kaplan reached the same conclusion in *BBSW* and declined to find waiver despite the fact that the FrontPoint entities' "dissolutions had been public for years," in part because the original complaint—like the CAC here—falsely "described each plaintiff as currently in business at the time of filing."  342 F. Supp. 3d at 411–12.